# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KELLY MILLIGAN, on behalf of himself and
all others similarly situated,

        Plaintiff,

        v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

        Defendants.

Case No. 3:24-cv-00440-KDB-DCK

Judge Kenneth D. Bell

Magistrate Judge David Keesler

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

MORGAN, LEWIS & BOCKIUS LLP

Samuel S. Shaulson (*pro hac vice forthcoming*)
600 Brickell Avenue
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001
samuel.shaulson@morganlewis.com

Sari M. Alamuddin (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
Eric M. Makinen (*pro hac vice*)
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
T: (312) 324-1000
F: (312) 324-1001
sari.alamuddin@morganlewis.com
matthew.russell@morganlewis.com
eric.makinen@morganlewis.com

MCGUIRE WOODS LLP

Robert A. Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
T: (704) 343-2000
F: (704) 343-2300
zmccamey@mcguirewoods.com
rmuckenfuss@mcguirewoods.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

UNDISPUTED MATERIAL FACTS ................................................................................. 3

    I.   Merrill's Wealth Management and Financial Advisor Business ....................................... 3

    II.  The Merrill Lynch FA Incentive Compensation Plans and Other Programs ..................... 4

    III. The WealthChoice Long-Term Contingent Award Plan .................................................... 6

    IV. Plaintiff Kelly Milligan ............................................................................................... 10

    V.  Summary of Plaintiff's Claims ....................................................................................... 10

APPLICABLE LEGAL STANDARD ............................................................................... 11

ARGUMENT ...................................................................................................................... 12

    I.   The WealthChoice Plan is a "Bonus Program" Exempt from ERISA's Coverage. ........ 13

         A.     WealthChoice Awards Easily Fall Within the DOL's Bonus-Plan Regulation. .............................................................................................................. 13

         B.     The Plan Does Not "Systematically Defer" Payment to Termination or Beyond. ........................................................................................................ 17

    II.  The Plan Does Not Constitute an "Employee Benefit Pension Plan" Under ERISA. ................................................................................................................................. 20

         A.     The Plan Does Not "Result in a Deferral of Income" Earned by FAs. ............... 20

         B.     The Plan Does Not Defer Income to Termination of Employment or Beyond. ........................................................................................................ 22

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................11

*Boos v. AT&T, Inc.*,
643 F.3d 127 (5th Cir. 2011) ....................................................................................20

*Callan v. Merrill Lynch & Co., Inc.*,
2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ...................................2, 15, 17, 19

*Cashman v. GreyOrange, Inc.*,
2023 WL 2652789 (N.D. Ga. Mar. 27, 2023)..........................................................14

*Conkright v. Frommert*,
559 U.S. 506 (2010)...................................................................................................12

*Depew v. MNC Fin., Inc.*,
819 F. Supp. 492 (D. Md. 1993)...............................................................................22

*Emmenegger v. Bull Moose Tube Co.*,
197 F.3d 929 (8th Cir. 1999) .............................................................................13, 18

*Hagel v. United Land Co.*,
759 F. Supp. 1199 (E.D. Va. 1991) ..........................................................................22

*Hahn v. Nat'l Bank, N.A.*,
99 F. Supp. 2d 275 (2000) ...........................................................................14, 18, 19

*Int'l Paper Co. v. Suwyn*,
978 F. Supp. 506 (S.D.N.Y. 1997) .....................................................................22, 23

*Jones v. Lowe's Cos., Inc.*,
402 F. Supp. 3d 266 (W.D.N.C. 2019) (Bell, J.) .....................................................11

*Juric v. USALCO, LLC*,
659 F. Supp. 3d 619 (D. Md. 2023).....................................................................22, 24

*Libertarian Party of Va. v. Judd*,
718 F.3d 308 (4th Cir. 2013) .....................................................................................11

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)...................................................................................................12

*McKinsey v. Sentry Ins.*,
986 F.2d 401 (10th Cir. 1993) ...........................................................13, 17, 18, 19

*Morgan Stanley v. Shafer*,
Civ. App. No. 24-1485, Order (2d Cir. Aug. 27, 2024)............................................24

ii

*Murphy v. Inexco Oil Co.*,
611 F.2d 570 (1980)............................................................................12, 13, 20

*Nachman Corp. v. PBGC*,
446 U.S. 359 (1980)........................................................................................12

*Oatway v. Am. Int'l Grp., Inc.*,
325 F.3d 184 (3d Cir. 2003)......................................................................13, 18

*Rathbun v. Qwest Commc'ns Int'l, Inc.*,
458 F. Supp. 2d 1238 (D. Colo. 2006)............................................................20

*Rich v. Shrader*,
823 F.3d 1205 (9th Cir. 2016) ..................................................................13, 18

*Shafer v. Morgan Stanley*,
2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023)................................................24

*Tolbert v. RBC Capital Mkts. Corp.*,
758 F.3d 619 (5th Cir. 2014) ................................................................ *passim*

*Vannoy v. Fed. Reserve Bank of Richmond*,
827 F.3d 296 (4th Cir. 2016) .........................................................................11

*Wilson v. Safelite Grp., Inc.*,
930 F.3d 429 (6th Cir. 2019) ................................................................ *passim*

**Statutes**

29 U.S.C.
§ 1002(2)(A) ............................................................................... *passim*
§ 1002(3) ............................................................................................12
§ 1132(a)(1)(B) ..................................................................................11
§ 1132(a)(3) ........................................................................................11

**Other Authorities**

29 C.F.R. § 2510.3-2(a) ....................................................1, 12, 15, 17

29 C.F.R. § 2510.3-2(c) ..............................................................*passim*

DOL Op. No. 98-02A, 1998 WL 103654 (1998) ..................................14, 17

DOL Op. No. 2002-13A, 2002 WL 31846478 (2002) ................................14

Fed. R. Civ. P. 56 ..........................................................................11

# INTRODUCTION

This case presents a threshold issue resolvable on undisputed facts: is the Bank of America WealthChoice Contingent Award Plan ("Plan") a "pension plan" under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A)? The clear answer is no. The Plan has nothing to do with retirement savings or deferring earned income, but rather is designed to reward ***active*** employees for ***continuing*** to work and improve performance. This lawsuit is no more than an opportunistic attempt to capitalize on an implausible interpretation of ERISA that would stretch the statute far beyond what Congress intended when seeking to protect vested retirement benefits.

Plaintiff was a financial advisor ("FA") at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill") from 2000 until he left voluntarily in 2021. Dkt. 1 ("Compl.") ¶ 11. He was a successful FA and was well-compensated for it, receiving nearly ███████ in regular cash compensation since 2015 alone. When he left, however, Plaintiff had not yet earned certain contingent incentive awards granted annually under the Plan. By the express terms of Plaintiff's award agreements, he did not earn these awards unless and until he satisfied the conditions for doing so—most notably, to stay at Merrill for eight years, when the awards vest. Indeed, over his tenure, Plaintiff satisfied these conditions for prior WealthChoice awards, for which he was paid once earned. But when he left in 2021, he had not yet earned other, more recent awards and therefore did not receive them.

Those unpaid WealthChoice awards are the subject of this lawsuit. Plaintiff does not claim he is entitled to anything under the actual terms of the Plan or his Award Agreements governing each award, nor could he. Instead, he maintains that those terms are unlawful because the Plan is purportedly a "pension plan" under ERISA and, if so, would violate certain statutory requirements. To proceed, therefore, Plaintiff must first establish the Plan is subject to ERISA. He cannot do so.

***First***, the Plan is a "bonus program" that does "not constitute [an] employee pension benefit plan[]" under Department of Labor regulations. 29 C.F.R. § 2510.3-2(a) & (c). The Plan's express

1

purpose is to "encourage the [FA] to remain employed" and "align the interests of the [FA] with the Company's business objectives" by paying a contingent, performance-based award. Ex. 1, Decl. of S. Testani ¶ 8, Ex. A (Plan, Art. I). Courts and the DOL have repeatedly found that similar payments to encourage performance, incentivize retention, and align the interests of the employee and employer—including two functionally identical predecessor plans that **Merrill offered to FAs**—are "bonuses for work performed" that fall comfortably within the bonus-plan regulation. *See Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371, at *8-9 (S.D. Cal. Aug. 30, 2010).

Nor is there any argument that the Plan "systematically deferred" payment for Wealth-Choice awards "to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c); *see* 29 U.S.C. § 1002(2)(A)(ii). Far from it, an FA typically must be **employed** to earn an award, and most departures **foreclose** payment, because the award's very purpose is to incentivize FA retention. Then, once earned, FAs are paid promptly; they cannot choose to "defer" payment to a later date, much less until they leave. Not only is this clear from the Plan and Award Agreements, but the Plan operated as intended: of all FAs paid for WealthChoice awards in each year over the putative class period (2018 to June 30, 2024), **92.6%** were **active** employees paid under the normal eight-year vesting schedule. There is no genuine dispute that the Plan is a "bonus program" that falls outside ERISA's scope, and the Court should grant summary judgment on this basis alone.

**Second**, even ignoring the bonus-plan regulation, the Plan does not meet ERISA's "pension plan" definition, which requires that it either (i) "provides retirement income," or (ii) "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). Not even Plaintiff claims the Plan "provides retirement income," and the definition's second prong does not apply. To start, the Plan does not "result in a deferral of income" at all. FAs do not forgo any **present** right to earned income, in exchange for receiving it later. *See, e.g.*, *Tolbert v. RBC Capital Mkts. Corp.*, 758 F.3d 619, 624 (5th Cir. 2014).

To the contrary, WealthChoice awards are an added incentive FAs can **only** earn "later," by staying at Merrill. That condition is essential to the Plan's fundamental purpose, as the award is designed to be an extra reward in exchange for FAs' loyalty and continued service in a competitive market.

Regardless, even if Plaintiff could show the Plan "deferred income" (it did not), it was not "for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). A fixed vesting period does not "defer" payment **to** termination of employment, whenever that may happen to occur. Rather, WealthChoice awards vest in eight years, period. FAs are paid promptly after the award is earned and cannot "defer" payment for any "period[]" at all.

Plaintiff does not dispute this. Instead, his entire case rests on the mere fact that it may be possible for an FA's award to become earned and payable upon or after leaving Merrill. But this only occurs in limited circumstances that are not known in advance, do not undermine the Plan's retention purposes, and where it would be harsh to withhold payment: death, disability, certain involuntary terminations, or retiring from the FA industry in the ordinary course. Courts are clear that payments like these are "merely incidental" to a plan designed to compensate **active** employees and do not transform every compensation program into an ERISA plan. *Infra* at § II.B. Ultimately, what Plaintiff is really arguing is that allowing **any** payment to **any** departing employee, no matter the reason (even in death), automatically pulls a plan under ERISA's umbrella. There is no support for this sweeping interpretation, which would expand ERISA far beyond Congress's intent.

There is no dispute over the Plan's terms or operation. The only question is whether ERISA applies to it. As explained below, it does not. The Court should grant judgment for Defendants.

## UNDISPUTED MATERIAL FACTS

## I.   Merrill's Wealth Management and Financial Advisor Business

Merrill is a registered broker-dealer and registered investment advisor that offers an array of investment, wealth management, and philanthropic services. Dkt. 25 (Answer) ¶ 13. Merrill is

a wholly owned subsidiary of Bank of America, which established the WealthChoice Plan. *Id.* ¶19.

Merrill operates in a highly competitive market for well-performing FAs. Ex. 2, Decl. of E. Wastell ¶ 3. Merrill's ability to recruit and retain FAs is an integral part of the success of its business. *Id.* ¶ 4. Given this environment, FAs are commonly recruited by other firms, and many choose to change employers over their careers—often taking clients with them. *Id.* Merrill and its competitors therefore offer various incentives to recruit FAs, including sign-on bonuses and other payments. *Id.* These incentives are often designed specifically to compensate FAs for unvested incentive compensation they will leave behind upon departing their prior employer. *Id.* ¶ 5.

## II. The Merrill Lynch FA Incentive Compensation Plans and Other Programs

Merrill strives to offer a competitive total compensation package to FAs. Ex. 2, Wastell Decl. ¶ 3. The Merrill Lynch FA Incentive Compensation Plan ("FA Comp. Plan"), published annually, summarizes the central features of the FA compensation program for the upcoming year. *E.g.*, Ex. 3, Decl. of T. Shook ¶ 8, Ex. E, 2018 FA Comp. Plan.[1] During the relevant period, the FA Comp. Plans outlined various ways an FA can earn compensation and incentive awards, but the categories most relevant here are: (1) a guaranteed base salary; (2) monthly cash incentive compensation; and (3) the opportunity to earn long-term contingent incentive awards. *See id.* at 2.

First, FAs received a guaranteed monthly salary, which is set before the start of each calendar year. *See, e.g.*, Ex. E, 2018 FA Comp. Plan at 1, 26.

Second, FAs are eligible to receive monthly cash compensation on top of their monthly salary. Compl. ¶ 2; Ex. E, 2018 FA Comp. Plan at 25 ¶ 1. An FA's monthly cash compensation was calculated as a percentage of his or her "production credits"—which generally represent revenue from the FA's clients—using "cash grid rates" stated in each annual FA Comp. Plan. *Id.*

---

[1] While this brief cites examples, all FA Comp. Plans from 2015-2020 are attached as Exs. B-G to the Shook Declaration. Plaintiff's Award Agreements (2010-2019) are attached as Exs. H-S to the Testani Declaration, which also attaches the WealthChoice Fact Sheets (2015-2020) as Exs. T-Y.

at 2-3. For example, an FA with less than ██████ in production in 2018 could earn ███ of that amount as ongoing compensation. *Id.* But an FA could earn as much as ███ in monthly cash compensation by attaining ██████ or more in production. *Id.* █████████████████████



*Id.* at 3, 25.

Third, FAs could be granted additional long-term contingent incentive awards. Ex. E, 2018 FA Comp. Plan at 2-3. These awards were granted only ***after*** the prior year, "based on [production credit] levels for the full performance year." *Id.* at 3. FAs could be granted two types of contingent incentive awards: a Long-Term Productivity award and a Service award. *Id.* at 2, 7. The amount of a Long-Term Productivity award was based on a distinct "long term productivity grid," separate from the "cash grid" above. *Id.* Unlike the cash grid, moreover, an FA had to satisfy a minimum production threshold to qualify for a Long-Term Productivity award. *Id.* at 2.[2] FAs also could be granted a separate Service award, based on a combination of the FA's length of service and full-year production, with the amount of such contingent award based on another distinct rate. *Id.* at 7.

For most of the relevant period, FAs' contingent awards (both Long-Term Productivity and Service awards) were issued through two vehicles: (1) WealthChoice awards, and (2) restricted stock units ("RSUs") under the applicable Bank of America stock plan. Ex. E, 2018 FA Comp. Plan at 7. Until 2016, FAs were granted such contingent awards as █████████████████ ████████, unless they elected otherwise. *E.g.*, Ex. B, 2015 FA Comp. Plan at 15. The default allocation changed over time, but FAs could decide how to allocate awards, within certain limits. *See, e.g.*, Ex. C, 2016 FA Comp. Plan at 15 (default became ███████████████;

---

[2] For example, in 2018 an FA had to have at least ██████ in production to be eligible. Ex. E, 2018 FA Comp. Plan at 2-3. If an FA met this threshold, the award was ███. *Id.* The long-term grid rate grew as FAs achieved higher production, thus incentivizing performance. *See, e.g., id.* (FA with ██████████ production may be eligible for a contingent award of ███).

Ex. F, 2019 FA Comp. Plan (allowing any election from ████████████████ ).

Beyond the FA Comp. Plan, Bank of America sponsored several actual retirement plans over the relevant period—including the Bank of America 401(k) Plan—as well as a voluntary deferred compensation plan for eligible employees. Ex. 2, Wastell Decl. ¶ 6. These plans, which Defendants intended to be governed by ERISA, were differentiated from the long-term incentive award plans, including the WealthChoice Plan. *See, e.g.*, Ex. 3, Shook Decl. ¶ 9, Ex. AA, 2019 Q&As at 3 (explaining why certain changes for "our long-term incentive award plans" did not "also apply to my company retirement plans" or "voluntary deferred compensation plans").

## III. The WealthChoice Long-Term Contingent Award Plan

As explained, Bank of America established the Plan to serve as one vehicle for "providing long-term contingent incentive compensation, subject to certain conditions, to a select group of [FAs]." Ex. A, Plan Art. 1. The Plan's stated purpose was to "encourage [FAs] to remain employed by the Company and its Subsidiaries and to further align the interests of [FAs] with the Company's business objectives." *Id.* The Plan advances these goals "[b]y awarding incentive compensation in the form of a cash award which becomes earned and payable over time." *Id.*

Unlike an FA's monthly cash compensation, WealthChoice awards were issued annually, after the prior year. *See, e.g.*, Ex. S, 2019 Award Agmt. (granted on Feb. 15, 2019); Ex. X, 2019 Fact Sheet at 2 (stating grant date will be Feb. 15, 2019). To be eligible for a WealthChoice award, an FA generally must be employed on the grant date and satisfy all "performance criteria" for the prior year, as "established periodically by the Administrator and [which] may vary from Performance Period to Performance Period and according to the type of performance[.]" Ex. A, Plan Art. II at 2. The Plan also grants the administrator "sole and exclusive discretion" to determine if an FA is eligible. *Id.* (defining "Covered Associate"); *id.* § 4.1 ("The amount of each Covered Associate's Award in any given year shall be determined by the Administrator and be subject to

the review and approval of the Company."); *see also, e.g.*, Ex. E, 2018 FA Comp. Plan at 3, 8.

Each award granted under the Plan was "evidenced by an Award Agreement" between the FA and Bank of America, which "specif[ies]the terms and provisions applicable to such Award as determined by the Administrator." Ex. A, Plan § 4.1; Ex. S, 2019 Award Agmt. at 2.

The Award Agreements made clear that FAs do not earn the contingent award unless and until they satisfy the contractual conditions for doing so. *See, e.g.*, Ex. S, 2019 Award Agmt. at 2, 7. Most notably, FAs must "remain employed with Bank of America and its Subsidiaries through" the date the award "will become earned and payable." *Id.* at 7 ¶ (a); *id.* at 2 ¶ 4 (the award "shall become earned by, and payable to, you in the amounts and on the dates shown"); *id.* at 3 ¶ 8 (the award "represents an unsecured, unfunded, contingent promise" to pay its value "after the Vesting Date"). The annual FA Comp. Plan similarly informed FAs that "Long Term Contingent awards are subject to the terms and conditions of the applicable plans, programs and award agreements, including but not limited to their vesting requirements." Ex. E, 2018 FA Comp. Plan at 8.

Each WealthChoice award was subject to an eight-year cliff vesting period. This means it generally does not become "earned and payable" unless the FA remains employed at Merrill eight years after the award was granted. For example, the Award granted to Plaintiff on February 15, 2019 stated that, subject to other terms in the Award Agreement, his "Award will become ***earned and payable*** on February 15, 2027 ***if you remain employed*** with Bank of America and its Subsidiaries through that date." Ex. S, 2019 Award Agmt. at 7 ¶ (a) (emphases added). The FA Comp. Plans similarly made clear that "WealthChoice awards have an 8 year cliff vest," and "***no awards are earned or paid until fully vested*** in accordance with the terms and conditions of each award." Ex. E, 2018 FA Comp. Plan at 7-8; *see also* Ex X, 2019 Fact Sheet at 2.

The Plan and Award Agreements also provided that a notional account will be established with the stated value of each WealthChoice award. Ex. S, 2019 Award Agmt. at 2 ¶ 1. This notional

account "represents [the FA's] contingent right to receive the value of the Account Balance on the Vesting Date for [his or her] Award." *Id.* The "value" of the account is indexed to the performance of "mutual funds or other benchmark investments [the FA] select[s] from choices established by the Administrator." *Id.* Both the Plan and Award Agreements are clear, however, that an FA's "Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date," and the FA "will not own the mutual funds or other options chosen as benchmarks[.]" *Id.* at 3 ¶ 8; *see also* Ex. A, Plan § 6.1.

If an FA satisfies the conditions for earning a WealthChoice award, payment occurs promptly thereafter. Compl. ¶ 23; Ex. S, 2019 Award Agmt. at 7 ¶ (a) ("Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made as soon as administratively practicable[.]"); *see also* Ex. A, Plan § 7.1. Therefore, once an award is earned, the Plan does not allow an FA to "defer" payment for such award to a later date.

The Award Agreements also govern the effect of an FA's termination of employment. *See* Ex. A, Plan Art. VIII. Specifically, the Award Agreements state that "in the case of your Termination of Employment prior to the [stated] payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows." Ex. S, 2019 Award Agmt. at 7 ¶ (b).

As a general rule, if an FA's employment ends before the award's stated payment date for any reason other than limited circumstances specified in the Award Agreement, "the Account Balance shall be canceled as of your Termination of Employment." *Id.* at 7 ¶ (b)(iii), 8 ¶ (v). This includes FAs who depart voluntarily, as Plaintiff did here. *Id.*; *see* Ex. X, 2019 Fact Sheet at 3.

The Award Agreements also address certain involuntary terminations due to circumstances largely beyond an FA's control. If an FA dies, the "Account Balance shall become immediately earned and payable," with payment "made as soon as administratively practicable." Ex. S, 2019

Award Agmt. at 7 ¶ (b)(i). If a termination is due to a "Workforce Reduction, Divestiture or Disability" (as defined in the Agreement), the FA's awards "shall continue to become earned and payable" on the stated vesting schedule—but only if the FA also complies with additional covenants, including not to solicit employees and clients, and not to engage in "Detrimental Conduct" before the awards are earned. *Id.* at 7 ¶ (b)(ii). If the FA's employment terminates within two years of a "Change in Control"—either without "Cause," or "for Good Reason"—the awards "shall become immediately earned as of the date of such" termination. *Id.* at 8 ¶ (iv).

The Plan does not allow FAs to "defer" payment for WealthChoice awards once they are earned—not until retirement, termination, or any other period. That is, an FA does not have an option to defer payment by keeping their award in the Plan. However, the Plan does anticipate that individual FAs may choose to retire from the industry in the ordinary course before an eight-year vesting period might end. If an FA is eligible for "Retirement" at termination (other than due to death or for Cause), awards "will become earned and payable in two installments." Ex. S, 2019 Award Agmt. at 8 ¶ (c). The first half becomes "earned and payable" shortly after the end of the year the FA leaves Merrill, and the second half becomes "earned and payable" shortly after the end of the next year. *Id.* To earn such awards, however, an FA also must comply with additional terms—including an agreement (i) not to engage in "Competition"; (ii) not to solicit employees and clients; (iii) not to engage in Detrimental Conduct; and (iv) to submit an annual certification that the FA has not engaged in Competition. *Id.* If the FA does not satisfy these added conditions, any unearned awards "shall be immediately canceled as of the date of such determination." *Id.*

Data reflecting the distribution of WealthChoice awards confirms that, as designed, nearly all payments were made to ***actively*** employed FAs. Specifically, from 2018 through June 30, 2024, between 91.3% and 94.2% of all FAs who received payment for earned WealthChoice awards in each year were paid while employed, under the normal eight-year period. Ex. 1, Testani Decl. ¶ 3.

9

## IV. Plaintiff Kelly Milligan

Plaintiff is a former FA who started working at Merrill in 2000. Compl. ¶ 11; Ex. 2, Wastell Decl. ¶ 7, Ex. Z, Milligan Resignation Ltr. He voluntarily resigned from Merrill on April 30, 2021, to co-found a competitor financial and wealth advisory firm, Quorum Private Wealth. *Id.*; *see also* Ex. 4, BrokerCheck Rpt.; Quorum Private Wealth, https://quorumpw.com/team/kelly-milligan/.

From 2015 through 2020, Plaintiff's annual compensation based on the "cash grid" (*i.e.*, not his distinct contingent awards) ranged from around ██████████████████████████ per year. Ex. 3, Shook Decl. ¶ 3. From 2015 until April 2021, Plaintiff earned—and Merrill therefore paid him—roughly ████████ in monthly compensation based on the cash grid. *Id.* ¶ 4.

By contrast, Plaintiff was issued long-term contingent awards (including both Long-Term Productivity and Service awards) that together ranged from around ████████████ annually, or ███████ on average. *Id.* ¶ 5. But not all of Plaintiff's contingent awards were WealthChoice awards. From 2015 through 2018, he was granted 50% of his awards in WealthChoice, with the other 50% as RSUs. *Id.* ¶ 6. For 2019 and 2020, however, Plaintiff chose 100% RSUs. *Id.* ¶ 7.

While at Merrill, Plaintiff also earned (and was therefore paid) several WealthChoice awards as they vested. Ex. 1, Testani Decl. ¶ 4. For example, in February 2021—just two months before he left—Plaintiff received a cash payment of ██████ (before taxes), for a WealthChoice award granted on February 15, 2013. *Id.* ¶ 5. The previous year, in February 2020, he was paid ███████ (before taxes), the value of the award he was granted on February 15, 2012. *Id.* ¶ 6.

## V. Summary of Plaintiff's Claims

When Plaintiff left Merrill, he did not receive payment for the WealthChoice awards he had not yet earned. Plaintiff now claims these awards were "wrongfully forfeited." Compl. ¶¶ 6, 11. He does not claim Defendants breached any term of the Plan or his Award Agreements (from which he had been benefiting for many years before choosing to leave Merrill). Instead, he now

10

claims the Plan itself was unlawful because it is an "employee pension benefit plan" subject to ERISA and, if so, would violate ERISA's vesting and anti-forfeiture provisions. *Id.* ¶¶ 42-45.

The Complaint asserts three counts under ERISA. Count I seeks declaratory and equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including, *inter alia*, a declaration that the Plan violated ERISA's vesting and anti-forfeiture rules, and an injunction requiring Defendants to pay all canceled awards that would have vested if ERISA applied. Compl. ¶¶ 61-64. Count II invokes both ERISA §§ 502(a)(3) and (a)(1)(B), 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3), first asking the Court to order Defendants to reform the Plan to comply with ERISA, then seeking to recover benefits allegedly due to him under the Plan, as reformed. Compl. ¶¶ 65-70. Finally, Count III alleges a breach of fiduciary duty, claiming the Plan's administrator was a fiduciary under ERISA and, in turn, breached its fiduciary duties by applying unlawful Plan terms. *Id.* ¶¶ 71-80. Plaintiff purports to represent a putative class that would encompass all former FAs who forfeited unearned WealthChoice awards from April 30, 2018, through the date of judgment. *Id.* ¶ 53.

## APPLICABLE LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). A factual dispute is only "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If, however, the opposing party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Jones v. Lowe's Cos., Inc.*, 402 F. Supp. 3d 266, 277 (W.D.N.C. 2019) (Bell, J.).

## ARGUMENT

Congress passed ERISA in 1974, in an era when more and more long-term employees were not getting the pension benefits their employers promised would be there when they retired. *See, e.g.*, *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (ERISA "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits."); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (1980). Congress sought to ensure that if employees were promised a benefit at retirement—and "fulfilled whatever conditions are required to obtain a vested benefit"—they "actually will receive it." *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980).

The Supreme Court and others have cautioned, however, that ERISA does not dictate what benefits employers must offer, *Spink*, 517 U.S. at 887, nor was it intended to hamstring or dissuade an employer in designing other compensation programs tailored to their particular workforce or industry, *see, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). To the contrary, in enacting ERISA, Congress "sought only to deal with those types of plans that had created the problems it sought to remedy." *Murphy*, 611 F.2d at 574. It therefore limited ERISA's application to two types of plans: "an employee welfare benefit plan or an employee pension benefit plan." 29 U.S.C. § 1002(3). Plaintiff alleges only that the Plan is an "employee pension benefit plan." Compl. ¶ 30.

To constitute an "employee pension benefit plan" under ERISA, a plan must either "(i) provide[] retirement income to employees, or (ii) result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). As noted, a DOL regulation further "clarifies the limits of the defined term[] 'employee pension benefit plan' . . . by identifying certain specific plans, funds and programs" that do not satisfy this definition. 29 C.F.R. § 2510.3–2(a). Among such programs, a pension plan "shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered

employment or beyond, or so as to provide retirement income to employees." *Id.* § 2510.3–2(c).

Consistent with ERISA's purposes, the pension-plan definition is not "algorithmic" and should not be "read as an elastic girdle that can be stretched to cover any content that conceivably fits within its reach." *Murphy*, 611 F.2d at 575. Moreover, the "paramount consideration" of this analysis "is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits." *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016); *see also Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 188-89 (3d Cir. 2003) (plan was not an ERISA plan "because its purpose was to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits"); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931-34 (8th Cir. 1999) (emphasizing the "purpose" of a non-ERISA incentive award plan).

Applying these standards to the undisputed facts here, the WealthChoice Plan is not a "pension plan" within the meaning of ERISA for several independent reasons.

## I.     The WealthChoice Plan is a "Bonus Program" Exempt from ERISA's Coverage.

First, the Plan falls squarely within the DOL's "bonus program" regulation, as its undisputed purpose and operation mirror the types of incentive payment plans that courts and the DOL itself have long considered beyond ERISA's reach under 29 C.F.R. § 2510.3–2(c).

### A.     WealthChoice Awards Easily Fall Within the DOL's Bonus-Plan Regulation.

Courts routinely hold that a "bonus for work performed" includes payments "designed to provide a financial incentive for employees to remain with [their employer] and improve their performance there." *Oatway*, 325 F.3d at 189; *see Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 435-36 (6th Cir. 2019) (a "bonus plan" is generally designed "to pay a financial 'bonus' or 'additional incentive' to employees to encourage performance or retention"); *Emmenegger*, 197 F.3d at 933 (describing a "reward . . . for superior performance" as a "classic bonus situation").[3] The DOL has

---

[3] *See also, e.g.*, *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) (finding bonus

similarly advised that a plan designed "to motivate [employees] to increase revenues and to continue in employment" is a non-ERISA "bonus program." DOL Op. No. 98-02A, 1998 WL 103654, at *1-2 (1998); *see also* DOL Op. No. 2002-13A, 2002 WL 31846478, at *1-3 (applying bonus regulation to incentive payments for "motivating and retaining skilled employees").

Here, there is no dispute that the Plan's "express purpose" was to award "an additional incentive . . . to encourage performance [and] retention." *Wilson*, 930 F.3d at 435-36. Indeed, the Plan says so directly: by granting a contingent award that "becomes earned and payable over time, the Company intends to encourage the [FA] to remain employed by the Company . . . and to further align the interest of the [FA] with the Company's business objectives." Ex. A, Plan Art. I.

The Plan's structure and operation directly advance these purposes. Long-term contingent awards are distinct from an FA's regular, ongoing cash compensation and salary, which are paid monthly and are the FAs' primary remuneration. *Supra* at Undisputed Material Facts ("SUMF"), § II. In contrast, long-term contingent awards were issued annually, ***after*** year-end, and represent an extra incentive to improve performance, over-and-above the "cash grid." *Id.* More importantly, long-term contingent awards are precisely that—contingent. *Id.* An FA has no immediate entitlement to ***any*** amounts under a WealthChoice award; rather, it is only earned if and when the FA satisfies the contractual preconditions, including by remaining at Merrill until the award vests. *Id.* As such, WealthChoice awards were not just a bonus to reward prior-year performance (though they were certainly that too), but also a bonus in exchange for staying at Merrill until earning it.

For many of these same reasons, another court has already held that two Merrill contingent

---

regulation applied to plan with seven-year vesting schedule designed to "promot[e] . . . loyalty to the organization and increased effectiveness of [employees'] work"); *Cashman v. GreyOrange, Inc.,* 2023 WL 2652789, at *5 (N.D. Ga. Mar. 27, 2023) (applying regulation where plan's purpose was "to incentivize or reward employees for good performance and to attract and retain talent"); *Hahn v. Nat'l Bank, N.A.*, 99 F. Supp. 2d 275, 279 (2000) (same, for plan providing "financial incentives for improving . . . long-term performance").

award plans for FAs—including the predecessor to the WealthChoice Plan—were "bonus plans" under the DOL regulation, not "pension plans" under ERISA. *Callan*, 2010 WL 3452371, at *8-9. Those Merrill plans operated like the Plan here. Both involved awards "stated as an amount equal to a percentage of achievement against established goals" (*i.e.*, production). *Id.* Both included a cliff vesting schedule—one of ten years, the other four years—and FAs had to be employed until the vesting date for awards to become earned and payable. *Id.* Both plans had provisions like the Plan's allowing an FA to earn an award sooner in the case of death, disability, a qualifying retirement, and other specified circumstances. *Id.* And both plans had the same purpose as the Plan here, which the *Callan* court described as being "intended merely as a bonus program to award top performing employees and provide financial incentive for employees to remain with Merrill Lynch and improve their performance there." *Id.* at *9. There is simply no valid basis for finding that these predecessor Merrill plans were "bonus plans," and yet the WealthChoice Plan is not.

Nevertheless, the Complaint raises two related—but equally flawed—assertions. First, citing Black's Law Dictionary, Plaintiff avers that a true "bonus" is a "premium paid in addition to what is expected," typically "over and above normal compensation." Compl. ¶ 48. But that accurately describes WealthChoice awards. Perhaps recognizing this, Plaintiff then revises the dictionary definition's focus on ***compensation*** above what is expected, to argue instead that FAs do not have to "***do anything*** 'in addition to what is expected'" to be granted a contingent award. *Id.* ¶ 49 (emphasis added). He then posits that because "FAs are expected to generate revenue," then ***any*** "compensation for performing this core function . . . is not, and cannot be, a 'bonus.'" *Id.*

Plaintiff's premise makes no sense. Even on his own terms, the definition he cites refers to whether a ***payment*** is expected, not whether it rewards ***work*** "in addition to what was expected." Indeed, the DOL regulation itself refers to "bonuses for work performed," not reasons untethered to an employee's normal job duties. 29 C.F.R. § 2510.3-2(a). There can be no genuine dispute that

WealthChoice awards are granted over-and-above an FA's expected salary and monthly cash compensation. SUMF § III; *see, e.g.*, Ex. Y, 2020 Fact Sheet at 5 (WealthChoice awards are "occasional and not part of normal or expected compensation"). This is a classic "bonus."[4]

More fundamentally, however, Plaintiff is wrong in declaring that FAs "do not have to do anything 'in addition to what is expected' of them in order to earn" a WealthChoice award. Compl. ¶ 49. To the contrary, the Plan's very purpose was to pay FAs an extra award for something "in addition to what was expected"—staying employed at Merrill for eight years. That is, FAs received their ongoing salary and cash compensation in exchange for their "core function" of "generat[ing] revenue." Compl. ¶ 49. And they could earn an additional WealthChoice award in exchange for their loyalty and continued service, rather than leaving as they are free to do as at-will employees.

Second, from his false premise, Plaintiff offers an illusory distinction. He contends that WealthChoice awards are really "commissions," not a "bonus," merely because their amount was calculated "as a fixed percentage of the revenue [FAs] generate from the sale of Merrill Lynch investment services." *Id.* ¶¶ 50-51. This is indisputably both incorrect and immaterial. Bonuses are often based on some measure of productivity. Here, the "percentage of revenue" merely determines the ***amount*** of an award; it says nothing about the nature of the award, whether it was issued on top of an FA's expected salary and cash compensation, the conditions the FA must satisfy to earn it, or any other factor informing whether it is a "bonus for work performed." The DOL regulation

---

[4] To hold otherwise would lead to absurd results. For example, if Merrill simply offered an extra $50,000 cash award to any FA who exceeded $1,000,000 in production, it would clearly be a "bonus." But Plaintiff's logic would say otherwise, because an FA already is expected to "generate revenue" and received regular, ongoing compensation under the "cash grid" for doing so. WealthChoice awards are no different, except that their ***amount*** was calculated using a percentage (5.0%, in this example) rather than a fixed dollar amount. Or, to use a different example, a law firm associate may be expected to bill 2,000 hours in exchange for her salary. But if the firm also offers a year-end award to anyone who hits 2,000 hours, it does not transform this obvious "bonus" into her "normal" compensation—even if the associate is only doing "what is expected of [her]."

certainly does not distinguish between "commissions" and "bonuses," such that they are somehow mutually exclusive. 29 U.S.C. § 2510.3-2(a); *see Callan*, 2010 WL 3452371, at *8-9 (finding Merrill incentive awards based on FAs' production were "bonus" payments); *see also McKinsey*, 986 F.2d at 405-06 (finding a "bonus plan" for sales representatives who received awards "based on their sales of insurance" and "the amount of Sales Credits they produce"); DOL Op. Ltr. 98-02A, 1998 WL 103654, at *1-2 (finding a bonus plan where awards were calculated based on "the percentage of revenue that [the employee's] efforts have gained during a fiscal year").[5]

Based on the undisputed (and indisputable) facts, there can be no genuine debate that WealthChoice awards constitute a "bonus" within the meaning of 29 C.F.R. § 2510.3–2(c).

### B. The Plan Does Not "Systematically Defer" Payment to Termination or Beyond.

ERISA could only apply, therefore, if payment for WealthChoice awards is "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). It is not.

First, as discussed further in section II.A below, the Plan does not allow *any* "deferral" of the payment for a WealthChoice award, once earned. That is, an FA has no choice about when to receive payment for a particular award or to leave an earned award in the Plan. To the contrary, awards *must* be paid promptly after being earned, whether that occurs on the stated vesting date or another time set forth in the Award Agreement. SUMF § II. Regardless, however, payment for WealthChoice awards is not "deferred" to termination or beyond—"systematically" or otherwise.

---

[5] WealthChoice awards also lack other characteristics of "commissions." Their purpose was not to compensate FAs for making a sale, nor did any FA obtain any immediate right to payment by doing so. Nor did FAs "automatically" receive long-term contingent awards "with the very first dollar" of production, as Plaintiff alleges (at ¶ 49). FAs were not eligible for *any* contingent awards if they did not exceed ███████ in production. *See* Ex. E, 2018 FA Comp. Plan at 2. Bank of America also retained discretion every year over which FAs would be eligible, what performance metrics to use, and the amount of awards. SUMF § III; Ex. G, 2020 FA Comp. Plan at 32. And, WealthChoice awards were not a substantial portion of FAs' total compensation. For some FAs, awards were 0% of their compensation. ████████████████████████████ ████████████████████████████████████████████████████ *Supra* at SUMF § III.

The critical inquiry is whether the Plan, by its terms or practical operation, systematically defers earned compensation *until* termination—whenever that may occur—as opposed to a fixed, neutral vesting schedule that may (or may not) "happen[] to provide payments after the end of an individual's employment" based on their personal circumstances. *Hahn*, 99 F. Supp. 2d at 279. That is, deferral of a payment *to* termination or retirement must be the plan's frequent and intended result, not merely "incidental." *Wilson*, 930 F.3d at 436 (citing *Oatway*, 325 F.3d at 189); *see Emmenegger*, 197 F.3d at 933 (where plan's purpose was "not to defer payment to the participant until termination or retirement," finding "nothing in the terms of the program that would result in such deferral with the purposeful consistency required to make deferral systematic").

Therefore, the mere fact that some FAs might be paid when or after they leave does not create a "pension plan." *See, e.g.*, *Shrader*, 823 F.3d at 1211 ("[T]he mere possibility that income *can* be deferred does not mandate ERISA coverage."); *Hahn*, 99 F. Supp. at 280. To the contrary, a "bonus plan may also provide for certain in-service distributions according to a fixed vesting schedule where a deferral of bonus payments to termination 'would occur only by happenstance.'" *Wilson*, 930 F.3d at 189 (quoting *Emmenegger*, 197 F.3d at 931-34); *McKinsey*, 986 F.2d at 406.

Applying these principles, many courts have held that a plan does not "systematically defer[]" payments to termination even where it *allows* deferring amounts that have already vested *until* retirement—which the Plan here indisputably does not do. For example, in *Emmenegger*, a participant could take a distribution at any time after an award vested. 197 F.3d at 931-33. Although this "could result in the deferral of a portion of any earned incentive until a participant's termination or retirement," it "would only occur by happenstance" and was "strictly at the option of the participant." *Id.* Likewise, the plan in *McKinsey* had a seven-year vesting period, although— like the Plan here—awards became earned and payable at death or retirement if it occurred sooner. 986 F.2d at 406. Unlike the Plan, however, once awards vested, participants were allowed to keep

them in the plan *until* termination or retirement, when "[a]ny vested allocations remaining in the account shall be paid." *Id.* Nonetheless, that employees "*can* defer payment" until termination did not subject this plan to ERISA. *Id.* And in *Hahn*, participants "were free to cash in" awards once they vested, or defer them for as long as they wanted. 99 F. Supp. 2d at 281. That some may choose to receive payments "after retirement" was "incidental to the administration of the Plan." *Id.*

Against this backdrop, there can be no dispute that the Plan does not "systematically defer" payment of awards to termination (even assuming it "defers" *earned* income at all, as it does not, *infra* at § II.B). Awards vest on a fixed eight-year schedule. Once an FA earns an award, payment occurs promptly, without even giving an option to "defer" +it. FAs typically must be employed on the stated vesting date to earn and receive payment, whereas an FA's termination before that date typically results in cancelation. This is effectively the opposite of a "systematic deferral" to termination, given that most departures *preclude* an FA from earning the right to payment.

That the Plan may allow a WealthChoice award to become "earned and payable" before eight years, in limited circumstances, does not alter this analysis. If an FA receives payment upon termination, it results from that FA's individual circumstances—the same sort of "incidental" or "happenstance" payments that courts deem beyond ERISA's reach. *Supra* at 18. Indeed, the *Callan* court already reached this conclusion, finding two similar plans for Merrill FAs did "not have a retirement purpose or provide a systematic deferral of compensation." 2010 WL 3452371, at *8.

Finally, if the Plan's terms and operation were not enough, the proof is in the pudding: of all FAs who received payment for an earned WealthChoice award in each year from 2018 to June 30, 2024, **92.6%** were *active* employees, paid under the standard eight-year period. SUMF § III. This aligns with the Plan's purpose of paying awards to *current* FAs to incentivize them to *stay* at Merrill, while also confirming there was no "systematic deferral" of payment to their termination.

Because the Plan is a "bonus plan" excluded from ERISA's "pension plan" definition, *see*

29 C.F.R. § 2510.3-2(c), the Court should grant summary judgment in Defendants' favor.

## II. The Plan Does Not Constitute an "Employee Benefit Pension Plan" Under ERISA.

### A. The Plan Does Not "Result in a Deferral of Income" Earned by FAs.

Even setting the regulation aside, the Plan is not a "pension plan" under ERISA. To start, the Plan does not "result in a deferral of income" within the meaning of ERISA § 3(A)(ii), 29 U.S.C. § 1002(2)(A)(ii). In alleging otherwise, the Complaint both misunderstands ERISA and mischaracterizes Merrill's FA compensation program and the Plan's role within it.

For these purposes, a "deferral of income" means an employee foregoes a ***present*** "right to income" earned, "in exchange for receiving income at a later date." *Tolbert*, 758 F.3d at 625 (citing *Murphy*, 611 F.2d at 575, and *Boos v. AT&T, Inc.*, 643 F.3d 127, 134-35 (5th Cir. 2011)); *Rathbun v. Qwest Commc'ns Int'l, Inc.*, 458 F. Supp. 2d 1238, 1248 (D. Colo. 2006) (plan did not "defer income because employees and retirees have no entitlement to any funds" allegedly "deferred").

Here, FAs do not have any right to a WealthChoice award unless they satisfy the conditions for earning it—including by staying at Merrill until it vests. SUMF § III. FAs therefore have no present right to any "income" reflected by a contingent award at the time it is granted. Nor do FAs "forgo[] income" in the past, "in exchange for receiving income at a later date." *Tolbert*, 758 F.3d at 625-26. Rather, they can ***only*** earn a payment for a WealthChoice award "later." After all, the Plan's central objective is to provide "a cash award which becomes earned and payable over time," thus encouraging FAs to remain at Merrill. Ex. A, Plan Art. 1. The Plan could not achieve its fundamental purpose if FAs automatically gain an enforceable right as soon as an award is granted.

Then, once an FA satisfies the conditions to earn an award, payment is made promptly. SUMF § III. The Plan does not give FAs an option to defer ***earned*** "income." *Id*. This differentiates the few cases finding that ERISA governs other types of "deferred compensation" plans, including the only two Plaintiff cites. Compl. ¶¶ 37-38 (citing *Tolbert*, 758 F.3d at 625; *Wilson*, 930 F.3d at

434). Both cases involved plans that indisputably deferred income employees actually earned. In *Tolbert*, a self-described "deferred compensation plan" allowed participants to defer "a portion of [FAs'] compensation ***to be earned*** with respect to the upcoming Plan Year"; the defendants did not even dispute this. 758 F.3d at 625-26 (emphasis added). Likewise, the plan in *Wilson* expressly allowed employees to defer earned compensation until termination or after retirement—including their "yearly compensation," "base salaries," and bonuses already earned. 930 F.3d at 437-38.

Here, the Complaint tries to reframe the WealthChoice Plan to look more like the plans in *Tolbert* and *Wilson*. Compl. ¶¶ 36-38. But, contrary to the Complaint, no portion "of an FA's commissions are withheld from their paychecks." *Id.* ¶ 36. Nor does Merrill "force[] FAs to defer the first portion of their compensation, instead of receiving it right away in cash," while they "receive the remaining commissions at the end of the next month as cash compensation." *Id.* ¶ 36.

Nearly everything about these allegations is wrong. FAs have no right to long-term contingent awards until they vest, so those amounts are not yet earned—let alone ***within*** "their paychecks"—and therefore nothing was "withheld" either. SUMF § II. Nor do FAs have any basis for receiving long-term ***contingent*** awards "right away in cash"; the whole reason they exist is to become "earned and payable" over time, if an FA remains employed. *Id.* Likewise, there is no "first portion" of an FA's "commissions," such that some other portion "remain[s]." Putting aside that WealthChoice awards are not "commissions" at all, *supra* § I.A, Plaintiff's theory assumes an FA's monthly compensation and contingent awards are one and the same, all subsumed in a single "commission" rate to which the FA is always entitled. They are not. These are independent pieces of Merrill's compensation strategy, each serving distinct purposes and functioning differently. *Id.*

The undisputed facts confirm the Plan does not "result in a deferral of income." ERISA therefore does not apply, and the Court can grant summary judgment on this basis alone.

21

**B.  The Plan Does Not Defer Income to Termination of Employment or Beyond.**

Moreover, the Plan does not defer income "for periods extending to termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). Courts, including within the Fourth Circuit, consistently hold that it is not enough that "a portion of withheld income happens to become due after termination"; rather, the "more natural reading" of this requirement "is that a plan generally defer the receipt of income ***to*** the termination of employment." *Hagel v. United Land Co.*, 759 F. Supp. 1199, 1202 (E.D. Va. 1991) (emphasis added); *see Juric v. USALCO, LLC*, 659 F. Supp. 3d 619, 633 (D. Md. 2023) (plan must "defer income until termination or beyond, and [] the fact that some income can be or may be deferred under the plan is insufficient to sustain an ERISA claim").[6]

If anything, the Plan is the opposite of an ERISA "pension plan." WealthChoice awards vest in eight years. The only "deferral" (if any exists at all) is for eight years. Once earned, payment occurs promptly, and FAs do not have an option to "defer" payment for any "period" whatsoever. *Id.* In fact, an FA's "termination of covered employment," 29 U.S.C., § 1002(2)(A)(ii), generally ***forecloses*** payment, because the FA typically must be ***employed*** to earn it. SUMF § III. After all, the Plan's purpose was to reward active FAs and incentivize continued service—not promise or set aside earned income that FAs could reasonably expect to be there whenever they opt to retire.

Plaintiff cannot dispute this. Instead, his entire lawsuit rests on the mere fact that it may be possible for an FA's award to become earned and payable upon or after leaving Merrill, in limited circumstances not known in advance and that do not undermine the Plan's purposes. His position is that simply because the Plan "contemplate[s]" these scenarios, this alone is enough to transform the entire Plan into an ERISA "pension plan." Compl. ¶ 41. This is wrong for several reasons.

---

[6] *See also, e.g.*; *Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 495-96 (D. Md. 1993) (plan did not "require[] deferral of income until the termination of [] employment," and the fact that payment might be made after termination did not equate to a deferral ***to*** termination); *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 511 (S.D.N.Y. 1997) (that plaintiff could be paid after death, disability, change in control, or age 65 was "merely incidental" and did not bring plan under ERISA).

***First,*** the limited exceptions on which Plaintiff relies involve circumstances in which a departure from Merrill does not negate the Plan's retention and incentive purposes, but rather where canceling an award may be inequitable: death, disability, certain involuntary terminations, or eligibility to retire from the industry in the ordinary course. SUMF § III. But even then, in all scenarios but death, an FA ***also*** must comply with specified covenants to earn an award and receive payment. *Id.* That is, the FA earns the right to receive an award in exchange for something beyond continued service alone, underscoring why this not a "deferral" of income an FA already earned.

***Second,*** the Plan does not allow FAs to "defer" income ***to*** or ***until*** these events. Rather, if one of these events simply happens to occur before eight years pass, an FA still may be able to earn the award. In most cases, these events only accelerate—not defer—the date an award becomes "earned and payable." SUMF § III. Courts routinely find these sorts of payments are "merely incidental" to a plan's primary purpose and function. *Suwyn*, 978 F. Supp. at 511; *supra* at 18, 22.

***Third,*** the payment of WealthChoice awards confirms the Plan operates as intended: to reward ***active*** employees. Of all FAs paid for awards each year since 2018, 92.6% were employed, belying any claim that the Plan was designed to defer earned "income" until FAs leave Merrill.

***Fourth,*** there is no precedent for Plaintiff's extreme interpretation of ERISA. The Complaint cites only two cases, neither of which holds that the mere fact that some FAs might be paid "at or after the end of their employment with Merrill" is enough to transform the entire Plan into a "pension plan." Comp. ¶ 41 (citing *Tolbert*, 758 F.3d at 625; *Wilson*, 930 F.3d at 434). In fact, both *Tolbert* and *Wilson* prove Defendants' point, illustrating why the Plan here is critically different. In both cases, there was no dispute the plan afforded the option to defer payment ***until*** termination or retirement (whenever it occurs). In *Wilson*, deferral until termination was the default payment, while participants also could choose to be paid while employed. 930 F.3d at 432. The plan in *Tolbert* provided the reverse, with default payment "promptly upon the vesting date," but

23

letting participants choose to defer distribution until "separation from employment," including for up to ten years after retirement. 758 F.3d at 622. So the question both courts faced was whether a plan that indisputably allows a "deferral of income" *until* termination is nonetheless removed from ERISA's coverage because it also allows payment sooner. *Id.* at 626; *Wilson*, 930 F.3d at 434-35.

Here, by contrast, the Plan does not even give FAs this choice. No FA could defer payment of a WealthChoice award, once earned. *Supra* at § II.A. In effect, Plaintiff is arguing the inverse of *Wilson* and *Tolbert*. Those courts rejected an argument that a plan "must require" payment at or after termination in all events to fall *within* ERISA's scope (*i.e.*, finding ERISA "does not exclude plans that give participants the option to receive in-service distributions," *Wilson*, 930 F.3d at 434-35). But Plaintiff here argues that a plan "must require" payment *before* termination in all events to *avoid* ERISA coverage (*i.e.*, that *any* post-termination payment, even upon death, creates a "pension plan"). This conclusion does not follow from *Wilson* or *Tolbert*, which did not address the issue here. And it has been rejected by many courts holding that isolated payments like these are "incidental" or "happenstance." *Supra* at § I.B; *Juric*, 659 F. Supp. 3d at 633-34 (distinguishing *Tolbert* because, in that case, "an employee could elect to have a distribution upon separation").[7]

*Finally*, to accept Plaintiff's interpretation of ERISA would mean a "deferral of income" for *any* "period" would qualify as "extending to termination of covered employment or beyond."

---

[7] Defendants are aware of only one decision suggesting that isolated post-termination payments are enough to rope an entire plan within ERISA's coverage. *Shafer v. Morgan Stanley*, 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023). *Shafer*, however, is not precedent in this Court; addressed the ERISA issue in clear *dicta*; is wrongly decided and an obvious outlier amidst the wealth of authority cited herein; involved materially different facts; and is pending a fully briefed motion to reconsider. *See* No. 1:20-cv-11407-PGG, Dkt. 88 (Dec. 5, 2023). Among other problems, the *Shafer* court addressed the ERISA-plan issue in deciding a motion to compel arbitration, without a record (or even full briefing), and in doing so decided the merits of the parties' central dispute—despite **compelling arbitration** of that very question. *Id.* at *16-20. And, although the Second Circuit recently denied Morgan Stanley's petition for a writ of mandamus, it did so "without prejudice to renewal if the district court fails to act on the reconsideration motion within a reasonable time." *Morgan Stanley v. Shafer*, Civ. App. No. 24-1485, Order (2d Cir. Aug. 27, 2024).

29 U.S.C. § 1002(2)(A)(ii). That the vesting period here is eight years makes no difference under his logic. It could be two years, one year, or 30 days—there always will be at least some employees who end their employment, particularly for a large employer like Bank of America. This reading of ERISA would render the statute's requirement that a deferral of income must be "for periods extending to the termination of covered employment or beyond" unnecessary and superfluous. If this was what Congress intended, it could have simply written: "results in a deferral of income."

More fundamentally, however, what Plaintiff is really arguing is that employers can never design a compensation program that allows ***any*** payment upon an employee's departure without creating an ERISA "pension plan." This would be true no matter how strongly the employer intends for the program to reward ***active*** employees or how effectively it achieves that purpose. If even a single employee is paid after departing, a plaintiff could always relabel this as a deferral for a "period[] extending to termination." Not only would this stray far beyond ERISA's purposes, but the practical effect of Plaintiff's argument would harm, not benefit, participants in programs like the Plan. Employers could simply remove the equitable exceptions and require that all awards are canceled upon any termination of any kind. Plaintiff would not even have an argument that such a plan is subject to ERISA. And yet this would eliminate terms designed solely to avoid harsh results when employees leave for reasons beyond their control or that do not thwart the plan's purposes—which have nothing to do with a promise of retirement savings, as ERISA was enacted to protect.

## CONCLUSION

Taking a step back, this suit is an obvious attempt to use a hyper-technical misinterpretation of ERISA to invalidate clear and unambiguous contractual terms that Plaintiff admittedly did not satisfy, to pay him canceled WealthChoice awards he indisputably did not earn. For the reasons above, the Plan is not a "pension plan" in any respect, and ERISA does not apply. The Court should grant summary judgment for Defendants because Plaintiff's claims fail as a matter of law.

Dated: September 30, 2024

Respectfully submitted,

By: /s/ Robert A. Muckenfuss

Samuel S. Shaulson (*pro hac vice forthcoming*)
600 Brickell Avenue
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001

Sari M. Alamuddin (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
Eric M. Makinen (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 324-1000
sari.alamuddin@morganlewis.com
matthew.russell@morganlewis.com
eric.makinen@morganlewis.com

Robert A. Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
MCGUIRE WOODS LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
(704) 343-2000
zmccamey@mcguirewoods.com
rmuckenfuss@mcguirewoods.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Robert A. Muckenfuss, an attorney, hereby certify that on September 30, 2024, I caused a copy of the foregoing document to be filed through the Court's CM/ECF Electronic Filing System, which will transmit notice of such filing to all counsel of record.

*/s/ Robert A. Muckenfuss*