# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

KELLY MILLIGAN,
ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED,

        Plaintiff,

    vs.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

        Defendants.

Civil Action No. 3:24-cv-00440-KDB-DCK

Judge Kenneth D. Bell
Magistrate Judge David Keesler

CLASS ACTION

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 1

    A.     Merrill pays FAs cash and deferred commissions. .................................. 1

    B.     Merrill pays FAs their deferred compensation after their employment ends but cancels the deferred compensation when an FA joins a competitor. ...................... 3

    C.     Merrill pays FAs awards that are different from the commission-based deferred compensation. ....................................................................................... 4

III.    LEGAL STANDARD........................................................................................... 5

IV.    ARGUMENT ....................................................................................................... 5

    A.     ERISA protects any "plan, fund, or program" that results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. ................................................................................................... 5

    B.     The Plan results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. .................................................. 6

          1.     The Plan involves "a deferral of income by employees." ........................... 6

          2.     The deferral extends "to the termination of covered employment or beyond." .................................................................................................. 11

    C.     The Plan is not a "bonus program" exempt from ERISA. .................................... 15

          1.     The Plan is not a "bonus program." ......................................................... 15

          2.     Even if the Plan is a bonus program, the systematic-deferral test cannot apply because it conflicts with the underlying statute. ............................. 21

V.    CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981) .................................................. 8, 15, 16

*Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700 (7th Cir. 2001) ............................................. 20

*Boos v. AT&T, Inc.*, 643 F.3d 127 (5th Cir. 2011) ......................................................................... 11

*Browe v. CTC Corp.*, 15 F.4th 175 (2d Cir. 2021) ..................................................................... 12, 21

*Burrage v. United States*, 571 U.S. 204 (2014) ............................................................................. 13

*Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) .............. 21-22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................. 25

*Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929 (8th Cir. 1999) ...................................... 22,23

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ................................................................. 12

*Hagel v. United Land Co.*, 759 F. Supp. 1199 (E.D. Va. 1991) ............................................. 15, 18

*Helvering v. Sabine Transp. Co.*, 318 U.S. 306 (1943) ................................................................. 24

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .................................................................. 5

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562 (4th Cir. 2015) .......................................... 5

*Juric v. USALCO, LLC*, 659 F. Supp. 3d 619 (D. Md. Mar. 2, 2023) .................................... 15,16

*Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504 (5th Cir. 2005) ........................ 19

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .................................................. 26

*Lorenzo v. Prime Commc'ns, L.P.*, 2018 WL 2296341 (E.D.N.C. March 29, 2018) .................. 19

*Macsherry v. Sparrows Point, LLC*, 2017 WL 3315262 (D. Md. Aug. 3, 2017) ........................ 19

*McKinsey v. Sentry Ins.*, 986 F.2d 401 (10th Cir. 1993) ............................................................. 24

*Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980) ............................................................. 11

*Pasternack v. Schrader*, 863 F.3d 162 (2d Cir. 2017) ..................................................... 6, 13, 14

*Paul v. RBC Capital Markets*, 2018 WL 784577 (W.D. Wash. Feb. 8, 2018) .............................. 9

*Rathbun v. Qwest Comm. Intn'l, Inc.*, 458 F. Supp. 2d 1238 (D. Colo. 2006) ............................ 11

*Rich v. Schrader*, 823 F.3d 1205 (9th Cir. 2016) .................................................... 14, 15

*Shafer v. Morgan Stanley*, 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023) ................... 7, 10, 19, 20

*Shafer v. Morgan Stanley*, 2024 WL 4697235 (S.D.N.Y. Nov. 5, 2024) .............................. 10, 17

*Skidmore v. Swift & Co*., 323 U.S. 134 (1944) ............................................................. 26

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................................ 13, 15

*Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619 (5th Cir. 2014) ............................ 6, 7, 9, 11

*United States v. Ward*, 972 F.3d 364 (4th Cir. 2020) .................................................. 12

*United States v. Wysinger*, 64 F.4th 207 (4th Cir. 2023) ............................................. 13

*Wilson v. Safelite Grp., Inc.*, 930 F.3d 429 (6th Cir. 2019) .................................... 15, 16

**Statutes**

26 U.S.C. § 409A, ..................................................................................... 8

29 U.S.C. § 1002(2)(A) ......................................................................... passim

29 U.S.C. § 1053(a)(2) ................................................................................. 5

29 U.S.C. § 1135 ....................................................................................... 26

**Regulations**

29 C.F.R. § 2510.3-2 ....................................................... 17, 18, 24, 25, 27

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 5

Plaintiff Kelly Milligan files this response to Defendants' motion for summary judgment.

## I.    INTRODUCTION

Plaintiff Kelly Milligan worked as a financial advisor ("FA") at defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") for over 20 years. When he left, Merrill "canceled" ███████████████████ of his deferred compensation. On behalf of himself and other former Merrill FAs, Milligan contends that Merrill's deferred compensation program for FAs (the "Plan") is subject to ERISA and that Merrill's cancellation of their deferred compensation violates the statute's vesting and anti-forfeiture requirements.

In its motion, Merrill argues that ERISA does not apply because the Plan does not defer income for FAs beyond when their employment ends, and that the Plan provides bonuses that are exempt from the statute's requirements. Merrill's arguments fail because the plan (1) provides for deferred commissions, not bonuses, and (2) results in the deferral of those commissions past when their employment ends. Therefore, the motion should be denied.

## II.    BACKGROUND[1]

### A.    Merrill pays FAs cash and deferred commissions.

Merrill pays FAs a small monthly salary to comply with state and federal minimum wage requirements. 2020 Comp. Plan, ECF 42-10, at 32. Otherwise, most of an FA's compensation is based on the FA's "production credits"—i.e., commissions from the revenue generated from their clients' investment activities. 2020 Comp Plan,[2] ECF 42-10 at 2, 31. FAs earn "cash" and "long-term" commissions from the revenue they generate, which Merrill calculates using a "Cash and

---

[1] The facts in this section are undisputed unless otherwise noted.

[2] 20XX Plan refers to the 20XX Merrill Lynch Financial Advisor Incentive Compensation Plan (the "Comp Plan"). As relevant here, the Comp Plans issued each year were substantively identical. Page numbers referenced are the page numbers designated by the ECF system.

Long Term Productivity Grid" ("Grid"). 2020 Comp Plan, ECF 42-10 at 2. As an example, the

Grid for 2020 calendar year is shown below:



2020 Comp Plan, ECF 42-10 at 3.



2020 Comp Plan,

ECF 42-10 at 3, 32; MSJ, ECF 42-2 at 9. In the year-end calculation, Merrill uses the fees and

revenues "that are received and retained by [Merrill]," adjusting for transactions that did not close

or were reversed, and "revenue that was not received and/or retained." *Id*. at 32. Merrill uses this

year-end calculation to determine "long-term" commissions, which it issues as WealthChoice or

Restricted Stock Unit[3] awards. 2020 Comp Plan, ECF 42-10 at 10, 32.[4] Merrill issues

---

[3] Restricted Stock Unit awards "represent the right to receive one share of Bank of America common stock or an equivalent cash payment for each unit that vests upon the applicable vesting date." 2020 Comp Plan, ECF 42-10 at 10. RSU awards "have a 3-year (1/3 per year) vesting schedule." *Id*.

[4] Only WealthChoice awards are currently at issue. *See* Compl., ECF 1 at ¶¶ 2, 6.

WealthChoice awards in dollars that FAs may invest in notional accounts until the awards "vest," which normally is after 8 years. 2019 WC Award Agreement, ECF 42-11 at 2; 2020 Comp Plan, ECF 42-10 at 10.

### B. Merrill pays FAs their deferred compensation after their employment ends but cancels the deferred compensation when an FA joins a competitor.

If an FA leaves Merrill before an award vests, Merrill cancels the award. *Id*. The vesting period is unrelated to the length of the FA's tenure with Merrill. But irrespective of "normal" vesting schedules, Merrill pays deferred compensation to FAs after the end of their employment in at least seven scenarios, which Merrill calls "exceptions." Merrill pays WealthChoice awards immediately (1) if the FA dies while employed by Merrill, or (2) if the FA's employment terminates for specified reasons after a change in control. 2010 WC Agreement, ECF 41-4 at 6-7. Merrill also pays WealthChoice awards to FAs that have left Merrill according to the 8-year vesting schedule (3) if the sum of the FA's age and years of service is over 65, or if the termination is due to a (4) disability, (5) layoff, or (6) divestiture. 2010 WC Agreement, ECF 41-4 at 6. Finally, Merrill pays WealthChoice awards to (7) retiring advisors.

The payments to retiring FAs have a unique schedule. Merrill pays one-half of the unvested awards shortly after the end of the "calendar year in which … Retirement occurs," and the other one-half a year later. 2010 WC Agreement, ECF 41-4 at 6. Thus, Merrill pays retiring FAs some WealthChoice awards earlier than under the normal eight-year vesting schedule and others later.[5] To receive these payments, retiring or terminated FAs must provide "written certification that

---

[5] For example, an FA who retired in 2018, ███████████████, received a WealthChoice award in 2010. Johnson Decl. at ¶ 11. The 8-year vesting date of that award was in 2018 but Merrill paid it in 2019 and 2020, 9-10 years after issue. *Id*. Merrill also issued awards to the FA in 2017. The 8-year vesting date of those awards which would occur in 2025, but Merrill paid them in 2019 and 2020. *Id*. Thus, it is untrue that "WealthChoice awards vest in eight years, period." *See* MSJ, ECF 42-2 at 7.

[they] have not engaged in Competition" with Merrill. 2010 WC Agreement, ECF 41-4 at 8. Merrill even awards new WealthChoice awards to FAs *after* they've retired, based on the production credits they earned in their last year of employment. 2020 Comp. Plan, ECF 42-10 at 11 ("Retirement" section, stating that retired FAs "will still be eligible to receive an award for the performance year based on the Advisor's actual year-to-date [production credits]").

Merrill made substantial payments to FAs after they left Merrill. Between January 1, 2018, and June 24, 2024, 18% of the FAs who received WealthChoice payments received some payments *after* their employment ended. Decl. of M. Zane Johnson ("Johnson Decl.") at ¶ 8. These post-termination payments totaled over ███████ 15.3% of the amount that Merrill paid in WealthChoice awards during that time. *Id*. at ¶ 9.[6]

In contrast, when an FA leaves Merrill to join a different firm, to change careers, or if Merrill terminates them for poor performance, Merrill "cancels" the FA's WealthChoice awards. 2010 Award Agreement, ECF 41-4 at 7 ("All Other Terminations").[7] Merrill cancels the deferred compensation awards even for long-tenured FAs, like Milligan, who worked at Merrill for more than 20 years. *Id*. at 7-8 (the "Non-Competition" clause), 9 (defining "Competition").

### C. Merrill pays FAs awards that are different from the commission-based deferred compensation.

In addition to their commissions, FAs earn money "by achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients." Compl., ECF 1 at ¶ 52. For example, FAs earn additional

---

[6] Merrill asserts that 92.6% of FAs who received WealthChoice payments "each year over the putative class period" were "paid under the normal vesting schedule," MSJ, ECF 42-2 at 6, but Merrill also paid many of those FAs outside the normal vesting schedule.

[7] Merrill cancels awards of FAs terminated for "Cause." 2010 WC Agreement, ECF 41-4 at 7.

compensation by acquiring new high-net worth clients, increasing the assets they manage from the previous year, or cross-selling products, such as mortgages or home-equity lines of credit (HELOC), to their clients. 2020 Comp. Plan, ECF 42-10 at 12-13, 17. These awards are not part of Milligan's claim.

## III.    LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court must view the evidence in the light most favorable to the nonmoving party. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015).

## IV.    ARGUMENT

ERISA's "vesting provision sets the minimum level of benefits an employee must receive after accruing specified years of service." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 441 (1999) (internal quotation marks omitted); *see* 29 U.S.C. § 1053(a)(2). These requirements apply to Merrill's Plan because it meets the definition of an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A)(ii).

### A.    ERISA protects any "plan, fund, or program" that results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

ERISA defines "employee benefit pension plan" as:

> Any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> > (i)    provides retirement income to employees ["Subsection (i)"], *or*

> (ii) ***results in a deferral of income by employees for periods extending to the termination of covered employment or beyond***, ["Subsection (ii)"]
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A) (emphasis added).

Subsections (i) and (ii) "set out independent tests to determine whether a plan is protected by ERISA." *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017). Subsection (i) "considers the plan's primary purpose rather than its result." *Id*. at 169 (noting that Subsection (i) applies "only to plans designed for the purpose of paying retirement income" (citations omitted)). In contrast, Subsection (ii)'s test is "an effects-based inquiry rather than one based on purpose." *Id*. at 170 n.5. A plan does not have to be "designed for the purpose of paying retirement or post-termination income" to be covered by Subsection (ii). *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014).

**B. The Plan results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.**

**1. The Plan involves "a deferral of income by employees."**

The Plan "results in a deferral of income by employees" under Subsection (ii). Courts interpret the phrase "deferral of income" to mean "deferred compensation." *Tolbert*, 758 F.3d at 625; *accord Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023) ("*Shafer I*"). "Deferred compensation" is (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when earned . . . ." Black's Law Dictionary (10th ed. 2014). In *Tolbert*, the Fifth Circuit found that the plan's provisions for deferred compensation "plainly refer to income that is deferred" to be within Subsection (ii). *Tolbert*, 758 F.3d at 625.

Here, the Plan provides deferred compensation. FAs perform the work associated with this money by generating revenue in one year but wait for eight years to get paid. 2020 Comp. Plan, ECF 42-10, at 32 ("Incentive compensation is calculated and awarded on an annual basis) and 36 (The "performance period" is a calendar year and "[t]he cornerstone of [Merrill's] compensation philosophy…is to pay for performance.").

The "surrounding circumstances" also show that the Plan results in a "deferral of income" under Subsection (ii). Between January 1, 2018, and June 30, 2024, under the Plan, Merrill made payments of over ████████ in deferred commissions to 10,183 different FAs, including payments of over ████████ to ███ different FAs (18.6%) categorized as "Retirement" or "Deceased," or after the individual's listed termination date. Johnson Decl. at ¶¶ 7-9. In addition, WealthChoice award agreements refer to 26 U.S.C. § 409A, which governs the taxation of "deferred compensation." *See* ECF 41-4 at 5. In its accounting statements, Merrill stated that it "participates in Bank of America sponsored deferred compensation plans in which employees … may participate on either a voluntary or mandatory basis." Johnson Decl. at Ex. B at 19, Ex. C at 21, Ex. D at 19, Ex. E at 15. Similarly, Merrill's "US GAAP Month Ledger" for December 2022 and 2023 have entries labeled "Deferred Compensation WealthChoice Plan," among other "Deferred Compensation" and "Deferred Comp" categories. Johnson Decl. at Ex. F at 3-4.

Merrill wrongly insists this is not a "deferral of income" because FAs do not "earn" the money until it vests, which is often eight years after the FAs performed the work. MSJ, 42-2 at 20. But this reasoning is circular because Merrill has defined "earned" and "vest" to mean the same thing. "Vesting" of an award requires continued employment with Merrill, while "earning" an award requires "staying employed at Merrill for eight years." *Id*. Under the Plan, "Vesting Date" means "the date … an award becomes ***earned*** and payable…." ECF 41-3 at 5 (emphasis added).

Allowing plans to redefine vesting to include a separate but concurrent requirement that participants "earn" their benefits through continued employment would render ERISA's vesting requirements illusory and meaningless. But statutory terms "cannot be meaningless, else they would not have been used." *Tolbert*, 758 F.3d at 624 (quoting *United States v. Butler,* 297 U.S. 1, 65 (1936)). Using the word "earn" rather than "vest" cannot circumvent ERISA. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 508 n.5, 512-513 (1981) (to protect employee benefits, "Congress in ERISA set the outer bounds" of when participants' benefits become vested).

Merrill is not alone in offering commission-based deferred compensation to financial advisors. Royal Bank of Canada's plan was at issue in *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014), and *Paul v. RBC Capital Markets*, No. 16-cv-5616, 2018 WL 784577, at *4 (W.D. Wash. Feb. 8, 2018). RBC's plan involved voluntary and mandatory awards of deferred compensation. *See Tolbert*, 758 F.3d at 622; *Paul*, 2018 WL 784577, at *1. Voluntary awards were fully vested, while mandatory awards vested and were paid to current employees at later dates. *See id.* Mandatory awards also vested and were paid to former employees who retired, died, or became disabled while employed by RBC. *See id.* In other situations, like where an FA joined a competitor, RBC forfeited any unvested awards. *See id.*

Two courts have concluded that RBC's plan was an ERISA plan under Subsection (ii). The Fifth Circuit in *Tolbert* did so based solely on the express terms of the plan. *Id.* at 626 n.5. Because the plan terms allowed awards to vest and be paid after an FA's employment with RBC ended, the court concluded that income was deferred. *Id.* at 626. The district court in *Paul v. RBC Capital Markets*, No. 16-cv-5616, 2018 WL 784577 (W.D. Wash. Feb. 8, 2018), looked at the "express terms" of the plan, and agreed with the Fifth Circuit. The *Paul* court also looked at the

"surrounding circumstances," and concluded that, because some participants actually received retirement distribution of benefits, the plan resulted in a deferral of income. *Id*. at *6.

Morgan Stanley also offers deferred compensation to its financial advisors. Morgan Stanley's plan is similar to Merrill's plan. Like Merrill, Morgan Stanley awards its FAs deferred compensation based on a percentage of the revenue they generated in the prior year. *Shafer I*, 2023 WL 8100717, at *2. Awards vest and are paid to current employees after four or six years. *Id.* Awards also vest and are paid to former employees who become disabled, retire, are laid off, or depart for government service while employed by Morgan Stanley. *Id.* at *3. But in other situations, such as where an FA joins a competitor, Morgan Stanley purports to cancel any unpaid awards. *Id.*

The district court in *Shafer* concluded that Morgan Stanley's plan was an ERISA plan under Section (ii). *Shafer I*, 2023 WL 8100717, at *20. The plan resulted in a deferral of income because awards were based on revenue generated in one year but paid out four or six years later. *Id.* Morgan Stanley argued that FAs "earned" their deferred compensation only by remaining employed with the company until their awards vested under the plan's vesting schedule. *Id.* The court rejected this argument because it "exalts form over substance." *Id*. "Whenever an action (here, leaving Morgan Stanley's employ) results in the forfeiture of a contractual right, those facts can always be re-characterized by stating that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent of the contract." *Id.*

The cases cited in *Tolbert* do not support Merrill's position either. In *Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980), defendants provided participants with royalty interests in undeveloped oil fields, with defendants paying any royalty "annually as it is received" from the development. The Fifth Circuit found this did not constitute a "deferral of income" because *the*

*company* had not previously realized any income from the oil fields. *Murphy*, 611 F.2d at 575. Here, in contrast, Merrill has already received the revenue associated with the deferred compensation awards and has delayed paying the commissions for several years. 2020 Comp. Plan, ECF 42-10, at 31 (Merrill calculates deferred compensation at the end of the year based on the "revenues and fees attributable to the Advisor that are received and retained by [Merrill]").

Nor do *Boos v. AT&T, Inc.*, 643 F.3d 127 (5th Cir. 2011), and *Rathbun v. Qwest Comm. Intn'l, Inc.*, 458 F. Supp. 2d 1238 (D. Colo. 2006), help Merrill. MSJ, ECF 42-2, at 20. *Boos* and *Rathbun* found that providing reimbursements for telephone services was not a "deferral of income" under Subsection (ii) because the retirees had expended no money to trigger a reimbursement. *Boos*, 643 F.3d at 135; *Rathbun*, 458 F.Supp.2d at 1248. This makes sense: someone cannot be reimbursed for something they have not yet purchased. But these cases are inapplicable here, where FAs have already earned the revenue on which their awards are based and Merrill has "received and retained" that money for later distribution.

Finally, Merrill suggests that the phrase "deferral of income" requires a "present" right to the money. MSJ at 20. But ERISA applies to money "even if [participants'] receipt must await the occurrence of future events such as retirement or death." *Browe v. CTC Corp.*, 15 F.4th 175, 203 (2d Cir. 2021); *Esden v. Bank of Boston*, 229 F.3d 154, 173 (2d Cir. 2000) (a plan's terms must comply with ERISA's vesting and forfeiture rules; "[a] participant cannot elect a forfeiture"). In *Shafer*, Morgan Stanley argued that the employees in *Tolbert* were "forgoing income to which they have a present right." *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2024 WL 4697235, at *17 (S.D.N.Y. Nov. 5, 2024) ("*Shafer II*").[8] The court found this argument "misleading, because

---

[8] On November 29, 2024, following the district court's ruling in *Shafer II*, Morgan Stanley filed a notice of appeal, *id*. at ECF 100, purporting to appeal a ruling in which ***it prevailed*** in forcing arbitration.

defendants tell only half the story." *Id.* While the plan in *Tolbert* included "Voluntary Deferred Compensation" that was always fully vested, it also included "Mandatory Deferred Compensation," which vested later. *Id.*

### 2. The deferral extends "to the termination of covered employment or beyond."

The Plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond" under Subsection (ii). The critical phrase in Subsection (ii) is "results in."[9] While ERISA does not define this phrase, courts should "'assume that the ordinary meaning of [the statutory] language controls." *United States v. Ward*, 972 F.3d 364, 369 (4th Cir. 2020) (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)).

The word "results" means an "effect, issue or outcome *from* some action process or design." *Burrage v. United States*, 571 U.S. 204, 210-11 (2014) (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)); *Tolbert*, 758 F.3d at 624 (interpreting Subsection (ii), concluding that "[a] thing 'results' when it arises as an effect, issue, or outcome from some action, process or design."); *see also United States v. Wysinger*, 64 F.4th 207, 216 (4th Cir. 2023) (interpreting the statutory phrase "results from" to mean "caused by"). Thus, the phrase "results in" creates a "results test" under Subsection (ii) in which intent is irrelevant. *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986); *Pasternack*, 863 F.3d at 170 n.5.

Here, FAs who end their employment with Merrill because of disability, retirement, or involuntary termination receive their deferred commissions—some immediately, some according to the normal 8-year vesting schedule, and some 1-2 years after retirement, irrespective of the normal 8-year schedule. *Supra*, § II.B. This triggers ERISA coverage under Subsection (ii).

---

[9] The phrase "covered employment" refers to when an employee leaves a company. *Tolbert*, 758 F.3d at 625.

Nothing else is required. Merrill's focus on the Plan's purpose ignores ERISA's plain language and Fourth Circuit precedent. *Ward*, 972 F.3d at 369; *Wysinger*, 64 F.4th at 216.

Merrill's Plan is essentially the same as RBC's and Morgan Stanley's ERISA plans in that they had materially identical deferral periods. As to RBC's plan, the Fifth Circuit in *Tolbert* concluded that income was deferred until former employees retired, died, or became disabled and therefore resulted in deferral of income for periods extending to the termination of covered employment or beyond. 58 F.3d at 626. *See also Paul*, 2018 WL 784577, at *6 ("from 2007-2011, anywhere from one-third to approximately one-half of WAP participants elected to take retirement distribution").[10] Morgan Stanley's plan also paid to former employees who become disabled, retire, are laid off, or depart for government service while employed by Morgan Stanley. *Shafer* held that because the plan terms provided for payment following disability, retirement, layoffs, or departure for government service, these future payments sometimes occurred at the end of employment or beyond. *Shafer I*, 2023 WL 8100717, at *19-20.

Merrill argues that the Plan does not defer income to the termination of employment under Subsection (ii), but the cases it cites focus on the plan's *purpose*, which is not relevant under Subsection (ii)'s results-based test. *Pasternack*, 863 F.3d at 170 n.5. This Court should not apply the purpose-based test used in cases like *Rich v. Schrader*, 823 F.3d 1205 (9th Cir. 2016), because doing so would ignore ERISA's plain language in Subsection (ii). The phrase "results in" plainly calls for a "results test," *Thornburg*, 478 U.S. at 36, not a test based on "purpose."

---

[10] Merrill attempts to distinguish *Tolbert* based on the "option to defer payment" in RBC's plan. But this option, which allowed participants to extend the distribution date of awards to retirement, was not crucial to *Tolbert*'s holding. Even without this option, payment of awards could still occur after the termination of employment. For example, under a separation due to death, disability, or retirement, awards would be paid after employment ended. 758 F.3d at 622.

This is especially true where a plan's purported purpose is "employee retention"—a broad term that could cover nearly every aspect of an employment relationship. The purpose of the so-called "exceptions" is immaterial. These events have the effect of deferring income until the termination of employment or beyond. Merrill's argument that "the Plan does not allow FAs to 'defer' income to or until these events" is also unavailing. MSJ, ECF 42-2, at 23. Because these events have the effect of deferring income until the termination of employment or beyond, the Plan is an "employee benefit pension plan" under Subsection (ii). *See Tolbert*, 758 F.3d at 623; *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 435 (6th Cir. 2019).

The cases applying the "purpose" test use a flawed analysis. For example, *Rich* relies on *Murphy* for the proposition that a plan's purpose is the "paramount consideration," *Rich*, 823 F.3d at 1210 (citing *Murphy*, 611 F.2d at 575). But *Rich* ignores the Fifth Circuit's more-recent holding in *Tolbert* that found the tests under Subsections (i) and (ii) are "separate and distinct." *Tolbert*, 758 F.3d at 624. In *Hagel v. United Land Co.*, 759 F. Supp. 1199 (E.D. Va. 1991), the court found that ERISA did not apply because the plan's purpose "was not to provide retirement income," but did not determine whether the plan "result[ed] in a deferral of income" under Subsection (ii). *Hagel*, 759 F. Supp. at 1202. The court in *Juric v. USALCO, LLC*, 659 F. Supp. 3d 619 (D. Md. Mar. 2, 2023), applied a test that *required* income to be deferred until the termination of employment for ERISA to apply. 659 F. Supp. 3d at 633. But Subsection (ii)'s "results in" test does not mean that a plan must *require* income to be deferred to the end of employment. "Results in" and "requires" are not synonymous. *Wilson*, 930 F.3d at 434.[11] Nor does Subsection (ii) require

---

[11] Two other cases Merrill relies upon apply similarly flawed analyses. In *Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 495-96 (D. Md. 1993), and *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 511 (S.D. N.Y. 1997), the courts employed a purpose-based test for its Subsection (ii) analysis, contravening the statute's language. *Suwyn* is no longer valid law because it is inconsistent with

that income always be deferred until the end of an employee's employment. *See Tolbert*, 758 F.3d at 623 ("[o]ur court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income."); *Wilson*, 930 F.3d at 435 (Subsection (ii) "covers plans containing terms that have as an effect, issue, or outcome—even if not as a requirement—deferral of income by employees to periods extending to the termination of covered employment or beyond." (cleaned up)).

Merrill argues that because over 90% of FAs each year receive payment as active employees, its Plan was not designed to defer income until FAs leave Merrill. But this is an argument about the Plan's purpose, which is not relevant under Subsection (ii). More than 18% of FAs received their WealthChoice awards after their end employment with Merrill ended. *See supra,* § II.B. Thus, the Plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond" under Section (ii).

Finally, Merrill misconstrues Plaintiff's position on the Plan and ERISA coverage generally. Merrill claims "Plaintiff's interpretation of ERISA would mean a 'deferral of income' for any 'period' would qualify as 'extending to termination of covered employment or beyond.'" MSJ, 42-2 at 24. (citations omitted). On the contrary, Plaintiff contends the Plan does not just defer compensation—it defers compensation until after a FA's employment ends. *See* § II.B *supra*.

---

the Second Circuit's decision in *Pasternack*. Regardless, the plans in those cases are materially different than Merrill's Plan and awarded bonuses, not commissions like Merrill's Plan. In *Depew*, the plan was designed to be in effect until the company "significantly reduced" "the level of non-performing assets." The distributions did not occur until either the plan had been discontinued or certain individual plan participants had been released prior to it being discontinued. *See* 819 F. Supp. at 496. In *Suwyn*, the plan operated via a fund that was only established if certain "qualitative nonfinancial performance factors" were met by employees each year, such as achievements in quality, safety, and employee development. 978 F. Supp. at 509.

**C.      The Plan is not a "bonus program" exempt from ERISA.**

Merrill argues the Plan is a "bonus program" that is exempt from ERISA because it does not "systematically defer" payments to the termination of covered employment or beyond. MSJ, ECF 42-2, at 17. This argument fails because (1) the Plan is not a "bonus program" under the Department of Labor ("DOL") regulation that Merrill cites, and (2) the DOL's systematic-deferral test in that regulation cannot be construed to override the results-based test in Subsection (ii).

**1.      The Plan is not a "bonus program."**

In 29 C.F.R. § 2510.3-2, the Department of Labor sought to "clarif[y] the limits of the defined terms 'employee pension benefit plan' and 'pension plan' . . . by identifying certain specific plans, funds and programs which do not constitute employee pension benefit plans for those purposes." 29 C.F.R. § 2510.3-2(a). Among other examples, the DOL included a "[b]onus program," writing:

> For purposes of title I of the Act and this chapter, the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

29 C.F.R. § 2510.3-2(c).

To determine whether this regulation applies is a two-step inquiry: (1) Is the plan a bonus program? (2) If so, does it "systematically defer to the termination of covered employment or beyond, or so as to provide retirement income to employees"? *Tolbert*, 758 F.3d at 626-27. But this "systematically deferred" standard is not a method for identifying a bonus program; rather, it

is the standard that the regulation applies to a bonus program.[12] *See id*. Here, the Court need not apply the "systematically deferred" standard because the Plan is not a bonus program.

"A bonus is a premium paid in addition to what is due or expected, especially a payment by way of division of a business's profits, given over and above normal compensation." *Shafer I*, 2023 WL 8100717, at *19 (cleaned up). Although a plan's stated purpose is one factor to consider in determining whether the plan is a bonus program, a court must consider the totality of the plan. *See id*. Other factors to consider include the type of compensation provided and the extent to which that compensation is paid to former employees. *Id*.

Commissions are not bonuses. *Shafer I*, 2023 WL 8100717, at *19. "A 'commission' is 'a fee paid to an agent or employee for transacting a piece of business or performing a service,' usually 'a percentage of the money received in a sale or other transaction paid to the agent responsible for the business.'" *Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504, 509 (5th Cir. 2005); *see also Macsherry v. Sparrows Point, LLC*, No. ELH-15-22, 2017 WL 3315262, at *23 (D. Md. Aug. 3, 2017) (defining a commission as a "fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction…") (quoting Black's Law Dictionary (10th ed. 2014)); *Lorenzo v. Prime Commc'ns, L.P.*, No. 5:12-cv-69-H-KS, 2018 WL 2296341, at *2 (E.D.N.C. March 29, 2018) (in case involving unpaid commissions, noting that under compensation plan at issue, commissions were paid to salespeople

---

[12] Defendants confuse matters by relying on cases that misuse the "systematically deferred" standard as a method for identifying a bonus program. *See, e.g.*, *Hagel*, 759 F. Supp. at 1202 (deeming fact that payments were not "systematically deferred to the termination of covered employment or beyond" as evidence that plan's purpose was to provide bonus payments, "not retirement income"); *see also Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 496 (D. Md. 1993) ("when combined with the fact that payments under the plans are not 'systematically deferred to the termination of covered employment or beyond,' the appropriateness of defining them as a bonus program becomes even more apparent" (quoting 29 C.F.R. § 2510.3-2(c)).

based on their individual monthly sales while bonuses were paid only to store managers and based on gross profits of their respective stores). Awards of deferred compensation under Merrill's Plan are commissions, not bonuses. As with the awards in *Tolbert* and *Shafer*, deferred compensation defers a "percentage of an employee's compensation that the [employer] designates as a required deferral." *Tolbert*, 758 F.3d at 622; *see also Shafer II*, 2024 WL 4697235, at *2.

In *Shafer*, the court determined that a similar plan offered by Morgan Stanley was not a bonus program because (1) FAs' deferred compensation is "premised on the revenue they generate, in the form of a percentage commission rather than a payment over and above normal compensation"; and (2) FAs are paid separate year-end bonuses that are distinct from their deferred compensation. *Shafer I*, 2023 WL 8100717, at *19. The same is true here. Merrill's Plan defers compensation in amounts based on the revenue advisors generate and pays separate year-end bonuses. *See supra*, §§ I. A. and C.

Merrill advances several arguments for why the Plan is a "bonus program." They are not persuasive. *First*, Merrill argues that the Plan is a bonus program because it provides "incentive compensation." MSJ, ECF 42-2 at 14. But the term "incentive compensation" means "payments that serve to move the payee to increase his or her efforts or output," and is an "umbrella term that includes commissions and bonuses." *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 706 (7th Cir. 2001). "Sales commissions are the paradigmatic form of incentive compensation...." *Id*. Merrill's use of the phrase "incentive compensation" does not automatically transform the money into a bonus. In fact, the term "bonus" does ***not*** appear in either the Plan or any award agreement.

Merrill's description of the deferred compensation as an "additional incentive" is wrong and misleading. Merrill bases FAs' compensation on the "fees and revenues" that FAs generate. 2020 Comp. Plan, ECF 42-10, at 32. The deferred compensation is not an "addition"—it is part of

the original incentive that provides production-based commissions. *See* WC Plan, ECF 41-3, at 3 (describing deferred compensation as "a portion of [an FA's] incentive compensation"). The fact that Merrill divided commissions into two pieces does not make one a "bonus." If Merrill were correct that "incentive" equals "bonus," then all of FA's production-based commissions—most of Plaintiff's annual income—would constitute a "bonus."[13] That defies logic.

*Second*, Merrill insists that deferred compensation awards are "contingent" and thus unearned "until the award vests." MSJ, ECF 42-2, at 14. As discussed above, this reasoning is circular. *See* § IV.B.1 *supra*. Moreover, this assumes Merrill is correct that ERISA does not apply. If ERISA applies, then the awards must vest according to ERISA's schedule—not Merrill's. If contributions were only considered "earned" when vested, then employers could evade ERISA's vesting requirements by labeling awards as unearned until vested. They may not do so. 29 U.S.C. § 1002(2)(B)(ii) ("In the case of any arrangement or payment a principal effect of which is the evasion of the standards or purposes of this chapter applicable to pension plans, such arrangement or payment shall be treated as a pension plan."). For ERISA's vesting protections to have any real meaning, the law must presume that benefits are being earned on an ongoing basis as the employee works, even if the employee's right to receive those benefits is still subject to ERISA's vesting rules. *See generally Browe*, 15 F.4th at 203; *Esden*, 229 F.3d at 173.

*Third*, Merrill relies on *Callan v. Merrill Lynch & Co., Inc.*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010). MSJ, ECF 42-2 at 19. But *Callan* effectively reads Subsection (ii) out of 29 U.S.C. § 1002(2)(A). *Compare Callan*, 2010 WL 3452371, at *8 (stating

---

[13] Merrill's description of "WealthChoice awards" as "occasional and not part of normal or expected compensation," MSJ, ECF 42-2 at 20, is part of a boilerplate disclaimer that applies to "[a]ny benefit you may receive under a Bank of America plan, program or policy," and allows Bank of America "to amend or terminate any plan, program or policy for any time and for any reason." 2020 Fact Sheet, ECF 41-21 at 6.

that ERISA plans "must possess a retirement purpose"), *with Tolbert*, 758 F.3d at 624 (explaining that requiring ERISA plans to "be designed for the purpose of paying retirement or post-termination income" "would render the entirety of subsection (ii) superfluous"). Further, *Callan* involved three plans for FAs. *See* 2010 WL 3452371, at *1. Two were found to be bonus plans, albeit after the plaintiffs withdrew their ERISA claims as to those plans. The amounts of awards in those two plans in *Callan* were discretionary, providing nothing "that would allow a reasonable person to calculate or determine the benefits of the plan or the procedure for receiving benefits." *Id*. at *8-9. In contrast, Merrill's compensation plan provides a detailed "Grid" formula for calculating commissions. Finally, the third plan in *Callan*—not mentioned in Merrill's motion— was the WealthBuilder plan, which awarded deferred compensation to FAs and appears to have provided for both in-service and retirement distribution of awards. *Id*. at *10 (awards vested when an FA reached age 55 with at least 10 years of service, reached age 65, or completed at least 20 years of service). It was found to be an ERISA "top hat" pension plan, although the court did not discuss why the WealthBuilder plan qualified as an ERISA pension plan. *Id*. at *9. Thus, *Callan* does not support defendants' argument.

*Fourth*, Merrill cites *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999), to "describ[e] a 'reward . . . for superior performance' as a 'classic bonus situation.'" MSJ, ECF 42-2 at 17. But Merrill FAs do not have to achieve "superior performance" to receive deferred compensation. FA's expected revenue is based on the FA's previous year's production. 2020 Comp. Plan. 2020 Comp. Plan, ECF 42-10, at 3. Under the Plan, an FA that generated ████ in revenue in 2019 but only ████ in 2020 would receive deferred compensation in both years,

even though their 2020 revenue was just ▮ of their 2019 revenue. *Id.* at 2. In other words, an FA receives deferred compensation even if their production *decreases*. That is not a "bonus."[14]

DOL Opinion Nos. 98-02A (1998 WL 103654) and 2002-13A (2002 WL 3184678) do not support Merrill's position. MSJ, ECF 42-2, at 14. In the 1998 Opinion, employees received a year-end payment based on how much they *exceeded* their individual revenue goal for that year. 1998 WL 103654. This is a "reward . . . for superior performance' as a 'classic bonus situation.'" *Emmenegger*, 197 F.3d at 933. Merrill separately offers the same thing—a Growth award—for FAs that increase the amount of assets they manage by more than ▮ from the previous year. 2020 Comp. Plan, ECF 42-10, at 12-13. But while Merrill's "Growth" awards may be a bonus because they reward "superior performance," Plaintiff does not contend that ERISA applies to them.

Nor does DOL Opinion No. 2002-13A support Merrill's position. There, a company had the potential to earn additional money under a multi-year government contract if it met specified goals. To reward "extraordinary efforts" during a calendar year, the company provided certain employees with interests in any future payments the company received under those contracts. But the employees' interests were "worthless" if the company failed to meet those future goals. 2002 WL 3184678, at *2. The DOL found this arrangement provided a "bonus"—a reward (higher cash value) for superior performance (higher corporate earnings). These facts are nothing like those here. Merrill is not rewarding superior performance or giving employees a stake in uncertain future revenue. Rather, Merrill is withholding a portion of the commissions that FAs have already earned, based on revenue Merrill received years earlier.

---

[14] Notably, the "performance" discussed in *Emmenegger* refers to that of the company, not the individual. *See* 197 F.3d at 932-33.

Finally, Merrill's reliance on *McKinsey v. Sentry Ins.*, 986 F.2d 401 (10th Cir. 1993), is misplaced. MSJ, ECF 42-2 at 21. The plaintiff in *McKinsey* acknowledged the money in the plan was a "bonus" but claimed that the plan provided for "systematic deferral" because participants could defer payment. *McKinsey*, 986 F.2d at 406. Merrill reads too much into the fact that the bonuses in *McKinsey* were based on "the amount of Sales Credits" employees generated. MSJ, ECF 42-2, at 17. But *McKinsey* does not describe the method used to determine the bonuses, and the plan in that case provided "a method for sharing in the growth of the Company"—a classic bonus. *McKinsey*, 986 F.2d 406. In contrast, the Plan defers a percentage of revenue generated by each FA—a classic commission.

### 2. Even if the Plan is a bonus program, the systematic-deferral test cannot apply because it conflicts with the underlying statute.

Finally, Merrill's argument that the Plan is a bonus program under 29 C.F.R. § 2510.3-2(c) fails because it reads requirements into the regulation that conflict with ERISA's text. As discussed above, ERISA defines an "employee pension benefit plan" as any plan that "(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . ." 29 U.S.C. § 1002(2)(A). DOL regulations must be read consistently with these statutory commands. *See Helvering v. Sabine Transp. Co.*, 318 U.S. 306, 311–12 (1943) (invalidating regulations "contradictory of [statute's] plain terms"). Even under the *Chevron* doctrine, which afforded binding deference to agency interpretations of ambiguous statutes, courts "must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

At issue here is the DOL's interpretation of the definition of an "employee pension benefit plan" in 29 U.S.C. § 1002(2)(A) to exclude "payments made by an employer to some or all of its employees as bonuses for work performed," unless such payments are "systematically deferred."

-21-

29 C.F.R. § 2510.3-2(c). In *Teague v. S. Elevator Grp., Inc.*, No, 1:02CV00829, 2003 WL 21418100 (M.D.N.C. Mar. 27, 2003), the district court adopted (absent objection) a magistrate judge's report and recommendation affording this regulation *Chevron* deference because Subsection (ii) "is silent on whether the deferral of bonus compensation must be systematic or not in order for a plan to be a pension plan." *Id*. at *3. But it is not silent. Irrespective of the plan's purpose, Subsection (ii) "provides that a 'plan' is a 'pension plan' when a 'deferral of income' arises as an 'effect, issue, or outcome' from that plan." *Tolbert*, 758 F.3d at 625. Nothing in the statute requires any type of compensation to be "systematic."[15] *Cf. id*. at 626 (explaining that "systematically deferred" condition applies under regulation, not statute).

In any event, *Chevron* has been overruled. In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the Supreme Court explained that, even if statutory text is ambiguous, "it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency." *Id*. at 2267. Rather, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Id*. at 2262. Although courts may "seek aid from the interpretations of those responsible for implementing particular statutes," *id*., such interpretations are entitled to deference only proportional to their "power to persuade." *See Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944); *Loper Bright*, 144 S. Ct. at 2262 (same).

To be sure, ERISA allows the DOL to "define accounting, technical and trade terms used in" the statute. 29 U.S.C. § 1135. But, here, Congress defined the term "employee pension benefit plan." 29 U.S.C. § 1002(2)(A). Nothing empowers the DOL to "clarify" that definition by

---

[15] Notably, the DOL's notice of proposed rulemaking announcing the text of § 2510.3-2(c) described systematic deferral as an "example" of how a bonus program may be a pension plan, rather than suggesting it is the only way. *See* 40 Fed. Reg. 24642 (1975) ("Bonus programs . . . may be pension plans. *For example*, if payments are systematically deferred to the termination of covered employment or beyond" (emphasis added)).

excluding plans that would otherwise fall within it. *Cf. Loper Bright*, 144 S. Ct. at 2273 (explaining that courts must ensure agencies act within scope of delegation). To the contrary, ERISA separately authorizes the DOL to promulgate regulations that would exempt "severance pay arrangements" and "supplemental retirement income payments" from the definition of "employee pension benefit plan" and treat them as welfare plans, instead. *See* 29 U.S.C. § 1002(2)(B). This narrow grant of authority confirms that 29 U.S.C. § 1135 does not confer sweeping authority upon the DOL to categorically exempt plans from the statutory definition of a "pension plan."

Yet that is exactly how Defendants read the regulation. They argue the Plan is exempt from ERISA because its "purpose" is not to provide retirement income, *see* MSJ at 14, and because it does not "systematically defer" payments to termination of employment. *Id*. 17. These proposed requirements together conflict with Congress's command that a plan falling under *either* Subsection (i) or (ii) is covered by ERISA. Even if a plan's purpose is not to provide retirement income under Subsection (i), that plan will still constitute an "employee pension benefit plan" if it "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond," under Subsection (ii). *See Tolbert*, 758 F.3d at 624. Defendants cannot override this statutory coverage by substituting the DOL's systematic-deferral test for ERISA's results-in test. Because the Plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond," under 29 U.S.C. § 1002(2)(A)(ii), it is an ERISA plan, regardless of whether "such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees," under 29 C.F.R. § 2510.3-2.

## V. CONCLUSION

"To protect the interests of the participants and beneficiaries, Congress chose to subject certain plans that govern deferred income of employees to a uniform regulatory system and comprehensive civil enforcement scheme." *Wilson*, 930 F.3d at 438. Merrill created such a plan for its financial advisors. It should not be allowed to evade the vesting requirements of ERISA's uniform regulatory system in a plan which falls within ERISA's scope. The Court should deny the Motion for Summary Judgment.

Dated: December 6, 2024                    Respectfully submitted,


                                           /s/ John D. Hurst
Thomas R. Ajamie*                          John D. Hurst
John S. "Jack" Edwards, Jr.*               N.C. Bar No. 37680
Courtney D. Scobie*                        MOTLEY RICE LLC
AJAMIE LLP                                 50 Clay Street, Suite 1
Pennzoil Place - South Tower               Morgantown, WV  26501
711 Louisiana, Suite 2150                  Telephone: (304) 413-0456
Houston, TX  77002                         Facsimile: (304) 413-0458
Telephone: (713) 860-1600                  jhurst@motleyrice.com
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com                        Mathew P. Jasinski*
cscobie@ajamie.com                         Douglas P. Needham*
                                           M. Zane Johnson*
                                           MOTLEY RICE LLC
Robert A. Izard*                           27 Church Street, 17th Floor
Craig A. Raabe*                            Hartford, CT  06103
Seth R. Klein*                             Telephone: (860) 882-1681
Christopher M. Barrett*                    Facsimile: (860) 882-1682
IZARD, KINDALL & RAABE LLP                 mjasinski@motleyrice.com
29 South Main Street, Suite 305            dneedham@motleyrice.com
West Hartford, CT  06107                   zjohnson@motleyrice.com
Tel: (860) 493-6292
Fax: (860) 493-6290                        *Admitted *pro hac vice*.
rizard@ikrlaw.com
craabe@ikrlaw.com
sklein@ikrlaw.com
cbarrett@ikrlaw.com



## CERTIFICATE ON USE OF ARTIFICIAL INTELLIGENCE

I, John D. Hurst, an attorney, certify, as required by the Court's June 18, 2024 Order in *In

re Use of Artificial Intelligence*, No. 3:24-mc-104 (W.D.N.C.), that:

1.      No artificial intelligence was employed in doing the research
        for the preparation of this document, with the exception of
        such artificial intelligence embedded in the standard on-line
        legal research sources Westlaw, Lexis, FastCase, and
        Bloomberg; and

2.    Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working under his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ John D. Hurst*
John D. Hurst

## CERTIFICATE OF SERVICE

I, John D. Hurst, an attorney, certify that on December 6, 2024, I caused a copy of the foregoing document to be filed through the Court's CM/ECF Electronic Filing System, which will transmit notice of such filing to all counsel of record.

*/s/ John D. Hurst*
John D. Hurst