IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KELLY MILLIGAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INC., BANK OF AMERICA CORP., and JOHN/JANE DOE 1, THE SENIOR VICE PRESIDENT–HUMAN RESOURCES GLOBAL BANKING AND GLOBAL WEALTH AND INVESTMENT MANAGEMENT ADMINISTRATION AT BANK OF AMERICA CORP.,<br><br>Defendants. | Case No. 3:24-cv-00440-KDB-DCK<br><br>Judge Kenneth D. Bell<br><br>Magistrate Judge David Keesler |

**DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

MORGAN, LEWIS & BOCKIUS LLP

Sam S. Shaulson (*pro hac vice forthcoming*)
600 Brickell Avenue
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001
samuel.shaulson@morganlewis.com

Sari M. Alamuddin (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
T: (312) 324-1000
F: (312) 324-1001
sari.alamuddin@morganlewis.com
matthew.russell@morganlewis.com

MCGUIRE WOODS LLP

Robert A. Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
T: (704) 343-2000
F: (704) 343-2300
zmccamey@mcguirewoods.com
rmuckenfuss@mcguirewoods.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |
| I. | Congress Enacted ERISA to Protect Promised Retirement Benefits, Not Create New Entitlements to Additional Compensation. | 2 |
| II. | The Plan Does Not Constitute an "Employee Pension Benefit Plan" Under ERISA. | 4 |
| | A. The Plan Pays a Retention Bonus and Does Not Allow a "Deferral of Income." | 4 |
| | B. The Plan Does Not Defer Income to Termination of Employment or Beyond. | 7 |
| III. | The Plan Is a "Bonus Program" Exempt from ERISA's Coverage. | 9 |
| | A. WealthChoice Awards Are Retention Bonuses. | 9 |
| | B. Plaintiff Concedes The Plan Does Not "Systematically Defer" WC Awards. | 11 |
| CONCLUSION | | 12 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Browe v. CTC Corp.*,
 15 F.4th 175 (2d Cir. 2021) ...................................................................................................7

*Callan v. Merrill Lynch & Co.*,
 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ...........................................................7, 9, 10, 11

*Conkright v. Frommert*,
 559 U.S. 506 (2010) ................................................................................................................3

*Gobeille v. Liberty Mut. Ins. Co.*,
 577 U.S. 312 (2016) ................................................................................................................3

*Hansen v. Lab. Corp. of Am.*,
 2024 WL 4564357 (E.D. Wis. Oct. 24, 2024) .......................................................................12

*Loper Bright Enterprises v. Raimondo*,
 144 S. Ct. 2244 (2024) .....................................................................................................11, 12

*Mullett v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
 2002 WL 32298599 (E.D. Pa. Feb. 26, 2002) ....................................................................9, 10

*Murphy v. Inexco Oil Co.*,
 611 F.2d 570 (5th Cir. 1980) ...............................................................................................3, 8

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
 446 U.S. 359 (1980) ............................................................................................................2, 3

*Shafer v. Morgan Stanley*,
 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023) ...............................................................6, 7, 8

*Shafer v. Morgan Stanley*,
 2024 WL 4697235 (S.D.N.Y. Nov. 5, 2024) ...........................................................................7

*Tolbert v. RBC Capital Markets Corp.*,
 758 F.3d 619 (5th Cir. 2014) ....................................................................................6, 7, 9, 11

**Statutes**

26 U.S.C. § 409A .............................................................................................................................6

29 U.S.C. § 1002(2)(A) ........................................................................................................ *passim*

29 U.S.C. § 1135 ...........................................................................................................................12

**Other Authorities**

29 C.F.R. § 2510.3-2(c) ....................................................................................................... *passim*

# INTRODUCTION

Kelly Milligan did not retire from Merrill Lynch. He left voluntarily to start his own firm. Nor did the WealthChoice ("WC") Plan, under which he now seeks payment, promise him any retirement benefits. To the contrary, a 25-year-old financial advisor ("FA") who was granted an award and then completes eight years of service would be paid at age 33. What the Plan did provide to Mr. Milligan was an economic incentive to remain at Merrill. He was issued discretionary and ***contingent*** retention bonuses, which he could earn in exchange for staying with Merrill for eight years. Mr. Milligan did not pay taxes on those contingent awards until he earned them, and their value was then paid promptly. He could not "defer" payment until he retired or left Merrill.

The Plan was described—in dozens of communications, including his individual Award Agreements—as providing an unsecured, contingent promise of a future payment, if Mr. Milligan met the conditions for earning it. And these documents also stated the specific circumstances under which this contingent promise may be withdrawn. While his WC awards correlated to performance metrics, they were granted separate and apart from the salary and "cash grid" compensation he was paid monthly—which totaled nearly ▓▓▓▓▓▓ from 2015 to 2021 alone. Unlike this normal cash compensation, FAs had to meet minimum production thresholds to be granted a WC award.

Not a single one of these facts is disputed by Plaintiff. Nor does he suggest that he did not (i) understand the terms of the Plan or his individual Award Agreements, (ii) agree to these terms, (iii) work under these terms during his tenure at Merrill, (iv) benefit from the Plan by being paid in cash, while employed, for WC awards he *did* earn, or (v) resign from Merrill fully understanding that unearned awards would *not* be paid. Rather, Plaintiff contorts the law and reality in a cynical effort to avoid those contractual terms and reap an unearned and unjust bounty, by relying on a few narrow exceptions to what he dubs the Plan's "cancellation rule." That is, to avoid penalizing participants or their families in events such as death, disability, or retirement in the ordinary course—and to prevent general unfairness to older individuals—the Plan permits certain FAs to

1

earn WC awards sooner, so a retiree or a decedent's estate might be paid when their employment ends. Even then, other than in death, these FAs must provide further consideration to earn payment.

Put simply, Plaintiff rests his entire case on the untenable foundation that because Merrill allows certain FAs to accelerate their ability to earn payment for a WC award, the entire Plan automatically transforms into an ERISA "pension plan" for *all* participants. According to him, the Plan's intent, the Plan's language, and the reality of its participants' circumstances are wholly irrelevant if even a single FA might be paid after employment. Perversely, Plaintiff is suggesting that because the Plan *protects* FAs who simply happen to reach retirement age while an award is still unearned, then non-retirees like him are owed a windfall and can avoid the clear terms of their own awards. Had the Plan been identical in all respects—but did not allow any post-employment payment at all—even Plaintiff would deem any ERISA connection inconceivable. This logic flips ERISA on its head. Finding the statute applies would not benefit retirees, but rather only FAs who, like Plaintiff, chose to leave Merrill—contrary to the Plan's express purpose and clear terms. On the other hand, such a holding would incentivize employers to end retention bonus programs or eliminate any possibility of any post-employment payment, thus ultimately *harming* retirees.

As shown in the opening Motion (Dkt. 41-1, "MSJ") and herein, Plaintiff's theory distorts the clear purposes of ERISA, the legal framework governing its "pension-plan" definition, and basic notions of equity and common sense. His case must be dismissed.

## ARGUMENT

### I. Congress Enacted ERISA to Protect Promised Retirement Benefits, Not Create New Entitlements to Additional Compensation.

First, Plaintiff's Opposition (Dkt. 53, "Opp.") never reconciles his extreme interpretation of ERISA with the statute's purpose: to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446

2

Case 3:24-cv-00440-KDB-DCK    Document 58    Filed 12/30/24    Page 5 of 17

U.S. 359, 374–75 (1980). "ERISA does not guarantee substantive benefits. The statute, instead, seeks to make the benefits promised by an employer more secure." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320–21 (2016); *Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010) (Congress did not "require employers to establish benefit plans in the first place"). ERISA thus established a "careful balancing" of an employee's right to the benefits an employer promised (if any), and an employer's right to decide whether, and to what extent, to make such promises. *Id*.

Against this backdrop, courts warn against expanding ERISA to wrest "control [of] every aspect of the employer-employee relationship or every promise made to employees," because the statute "sought only to deal with those types of plans that had created the problems [Congress] sought to remedy." *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (5th Cir. 1980). Plaintiff is clearly trying to use ERISA to "deal with" a plan that is ***not*** the "type[] of plan[]" creating the betrayed-retiree problem Congress "sought to remedy." *Id.* He concedes the Plan's purpose is ***not*** to provide retirement benefits. MSJ at 13-14; Opp. at 12-14. And Plaintiff is ***not*** using ERISA to uphold "the benefits promised by" Merrill. *Conkright*, 559 U.S. at 516-17. Just the opposite, he seeks benefits Merrill explicitly did ***not*** promise, conceding he did not satisfy the terms for earning the awards at issue. MSJ at 10-11; Opp. at 3-4. Far from seeking "benefits promised," Plaintiff is trying to use ERISA to override the Plan altogether, to "guarantee substantive benefits" to himself. *Conkright*, 559 U.S. at 516–17; Opp. 18 (arguing ERISA "must presume that [Plan] benefits are being earned on an ongoing basis," despite the Plan and Award Agreements unambiguously stating otherwise).

While Plaintiff ignores ERISA's express and intended reach, that must be the starting point for construing its pension-plan definition. After all, Congress purposefully used the term "***pension*** plan," which alone connotes a retirement purpose or effect. This may include plans making a direct promise to pay income in retirement (e.g., a defined benefit plan), 29 U.S.C. § 1002(2)(A)(i). Or it may include plans that promise to set aside income employees would otherwise earn and commit that this money will be available when they retire or depart (e.g., a defined contribution plan), *id.*

3

§ 1002(2)(A)(ii). Either way, ERISA governs retirement plans and must be construed accordingly.

## II. The Plan Does Not Constitute an "Employee Pension Benefit Plan" Under ERISA.

### A. The Plan Pays a Retention Bonus and Does Not Allow a "Deferral of Income."

With this context in mind, Plaintiff must establish that the Plan "result[s] in a deferral of income." 29 U.S.C. 1002(2)(A)(ii). This means first showing he had some present right to WC awards—otherwise there was no "income" to "defer." MSJ at 20-21 (collecting cases). But the Plan and his Award Agreements expressly state that he and other FAs ***do not*** "earn" any right to payment for any WC award unless they satisfy the terms for doing so. *Id.* at 7-9. Then, once earned, the award's value is paid promptly. The lack of any "deferral" dooms Plaintiff's entire theory.

Plaintiff tries to avoid this by simply declaring (repeatedly) that WC awards are "deferred commissions" he earned immediately upon generating revenue "from [his] clients' investment activities." Opp. at 1, 6-10. But he offers no factual or legal basis whatsoever for this assertion. Nothing in the Plan, Award Agreements, or FA Comp. Plans created any right to an award—much less says (or even implies) they are "commissions" or other earned income. To the contrary, these documents plainly state that awards are granted only after year-end, over and above an FA's salary and monthly cash compensation, and represent "long-term contingent incentive compensation, subject to certain conditions." MSJ at 6. The key "condition" is that an FA must stay at Merrill through the date the WC award becomes earned and payable pursuant to its terms. *Id.* at 7-9.

Plaintiff argues this "condition" seeks to evade ERISA's vesting requirements. But this has it exactly backwards, presupposing WC awards are subject to ERISA in the first place. This inquiry must start with the Plan terms and the nature of the promise, and only then apply the pension-plan definition to determine if this is the sort of benefit ERISA regulates. Indeed, this is the Opposition's biggest flaw: it completely ignores why Merrill granted WC awards in the first place. WC awards do not compensate FAs for merely "generating revenue," the false premise on which Plaintiff's entire "commissions" theory relies. Opp. at 7, 18. They are a retention bonus earned in exchange

4

Case 3:24-cv-00440-KDB-DCK    Document 58    Filed 12/30/24    Page 7 of 17

for future service—i.e., *additional* consideration an FA must provide to earn a right to payment.

The "commissions" label does not fit in any event. Plaintiff says it does simply because the initial *amount* of a WC award is "based on a percentage of the revenue [FAs] generated in the prior year." Opp. at 9; *id.* at 16-17. But that is not unique to commissions. As Merrill explained, the amount of a bonus can just as easily be pegged to productivity. *See* MSJ at 16-17. In fact, Plaintiff proves the point by emphasizing other incentive compensation FAs could earn based on "increasing their prior year's revenue," "acquiring new high-net worth clients," or selling "mortgages or home-equity lines of credit." Opp. at 4-5. He concedes these are "bonuses," not commissions, *id.* at 17, despite that they also are based on a percentage of production. *See* Dkt. 42-10 at 13. This disproves his own made-up rule that only "commissions" can be based on revenue.

Plaintiff also ignores that WC awards lack what *he* insisted is a central hallmark of a commission structure: that FAs "do not have to generate a specific amount of revenue" to earn a "commission." Compl. ¶ 49. In his view, commissions are triggered "with the very first dollar" of sales, meaning they are earned for work "at the absolute minimum level." *Id.* But discovery has proven that FAs *do* have to meet a stated revenue threshold before even qualifying for a WC award. MSJ at 5. This alone disproves his "commissions" theory—and so his Opposition just ignores it.[1] And Plaintiff also completely ignores the additional "Service" component of an FA's WC award in a given year, which not even he contends is a "commission" under any definition. MSJ at 5.[2]

---

[1] Plaintiff also notes that an FA who generated ▓▓▓▓ of revenue in one year and ▓▓▓▓ the next would have been granted contingent WC awards after both years, which he believes should preclude characterizing the awards as "bonuses." *Id.* This makes no sense. In his example, the WC award for the first year would have been around ▓▓▓▓ than the award in the next. *See* Dkt. 42-10, at 2. More importantly, ▓▓▓▓ was still the minimum revenue threshold. *Id.* Without that level of production, an FA did not qualify for *any* WC award. That is, an FA with ▓▓▓▓ would not receive any award, meaning this is not a "commission" under Plaintiff's own definition.

[2] Contrary to Plaintiff's passing suggestion (at 7), the Plan does not "result in a deferral of income" simply because a few unrelated documents refer to "deferred compensation." The cited "accounting statements" carefully *distinguish* "deferred compensation" plans from other "cash-based employee award programs"—i.e., the Plan. *E.g.*, Dkt. 53-3 at 19. Plaintiff notes the Award

5

Lacking any basis in the record, Plaintiff falls back on *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014), and *Shafer v. Morgan Stanley*, 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023), two cases in which materially different compensation plans were found to "result in a deferral of income" under 29 U.S.C. 1002(2)(A)(ii). Opp. at 8-9. The plan in *Tolbert* was a self-described "deferred compensation plan" that allowed employees to elect to defer "a portion of compensation ***to be earned*** with respect to the upcoming Plan Year," including their own voluntary deferrals, company matching contributions, and other earned income. 758 F.3d at 625-26 (emphasis added). These "express terms"—including the "exchange" of a right to income today for payment "at a later date"—led the Fifth Circuit to find this plan "result[ed] in a deferral of income." *Id.* The Plan, by contrast, allows only retention bonuses, makes clear that awards are ***not*** earned until satisfying their terms, and does not permit any FA to defer ***any*** earned income.

Likewise, the plan in *Shafer* first calculated the "Total Credits" an employee was "awarded monthly," based on a single production-based rate. 2023 WL 8100717, at *2. The plan then cleaved off the first portion of the employee's monthly Total Credits as "Deferred Credits." *Id.* Employees did not have to satisfy ***any*** production threshold to earn Deferred Credits. *Id.* at *20. Rather, they were "calculated monthly" based on the first dollar of revenue generated and then subtracted from the Total Credits, with the amount remaining paid monthly in cash. *Id.* This is why the court found this plan "result[ed] in a deferral of income." *Id*. Factual distinctions aside, the ERISA discussion in *Shafer* is plainly dicta, as the court compelled arbitration of the ***same*** merits issue and had no need to resolve it. *Shafer* also conflicts with myriad cases holding that incentive plans like the Plan are "bonus programs" under the DOL regulation, 29 C.F.R. § 2510.3-2(c)—including another case

---

Agreements "refer to 26 U.S.C. § 409A"—but he omits "to the extent applicable." Dkt. 41-4 at 4. And he cites an internal GAAP ledger using a generic label for the Plan—the ***same*** one used for the FACAAP and Growth Award plans that courts have held ***are not*** "pension plans." *Infra* at 7, 10. Regardless, these relate to tax and accounting treatment, which do not control the Plan's ERISA status. None of this suggests Defendants held out WC awards as "deferred compensation." And he is the one who insists the Plan's "purpose . . . is not relevant under Subsection (ii)." Opp. at 12.

6

Case 3:24-cv-00440-KDB-DCK     Document 58     Filed 12/30/24     Page 9 of 17

involving the predecessor plans for Merrill FAs that functioned just like the Plan here. *Callan v. Merrill Lynch & Co.*, 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010); MSJ at 13-14, 17.[3]

Plaintiff also argues (at 10) that a "deferral of income" does not actually "require[] a 'present' right to the money." But this would render the term "deferral" meaningless, as it would encompass any promise today of any payment in the future. A promise to pay a builder $50,000 to build a garage in three months is not a "deferral of income"; he only earns a payment if he finishes the project. Plaintiff's cases do not say otherwise. For example, *Browe v. CTC Corp.*, 15 F.4th 175, 203 (2d Cir. 2021), does not even address a "deferral of income." Opp. at 10. Worse, the full sentence Plaintiff selectively quotes undermines the notion that an unvested, contingent promise is a "deferral" of income: "**Once benefits vest, they are non-forfeitable,** even if their receipt must await the occurrence of future events such as retirement or death." 15 F.4th at 203 (emphasis added to the part Plaintiff omits). Likewise, *Tolbert* unambiguously states that "employees must show that they ***forewent income at some point in exchange*** for receiving income from the plan at a later date." 758 F.3d at 625-26 (emphasis added). That remains the problem with Plaintiff's claim here.[4]

**B.     The Plan Does Not Defer Income to Termination of Employment or Beyond.**

Even if the Plan "results in a deferral of income"—it does not—Plaintiff must still establish that it defers income "for periods extending to the termination of covered employment or beyond." 29 U.S.C. 1002(2)(A)(ii). Plaintiff concedes that his argument rests on the mere possibility that, in limited circumstances, an FA may earn payment of a WC award upon or after leaving Merrill. MSJ

---

[3] Notably, *Callan* also rejected a claim that Merrill FAs had an enforceable wage interest under California law in the very same type of contingent awards issued under the Merrill Growth Award and FACAAP plans. 2010 WL 3452371, at *4-5. Making clear that "the specific terms of the Plans control," the court held that FAs had no "earned and unpaid" wages for contingent awards because they did not satisfy "all conditions agreed to in advance for earning" them. *Id.* (quotations omitted).

[4] Rather than address *Tolbert* head-on, Plaintiff pivots to *Shafer*'s interpretation, Opp. at 10, which stated that some contributions in *Tolbert* did not vest immediately and reasoned that a present right was thus irrelevant. *Shafer*, 2024 WL 4697235, at *17 (S.D.N.Y. Nov. 5, 2024). This is simply wrong; *Tolbert* expressly says otherwise. Rather, vesting was relevant only to *Tolbert*'s distinct conclusion that a deferral of income extended to termination of employment. 758 F.3d at 625-26.

7

at 22-25; Opp. at 11-12 ("Nothing else is required."). By his logic, if Merrill pays just one FA (out of thousands) at or after termination, the entire Plan transforms into an ERISA pension plan. *Id.*[5]

But a long line of cases has rejected his argument. *See* MSJ at 22-23 (collecting cases). Plaintiff claims all of them used a "flawed analysis," Opp. at 13-14, but all that really means is that they declined to treat subsection (ii) of the "pension plan" definition as an overbroad catch-all extending far beyond plans that are, or operate like, a retirement plan. These courts' interpretation makes sense, given that a plan qualifies as a "pension plan" only "***to the extent***" it meets subsection (ii). 29 U.S.C. § 1002(2)(A). Moreover, given the Supreme Court's repeated reminders about what ERISA is meant to do (and not do), *supra* at 2-3, the Court should not stretch the pension-plan definition like "an elastic girdle . . . to cover any content that can conceivably fit within its reach." *Murphy*, 611 F.2d at 575. This is why "the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Id.*

In the face of this authority, Plaintiff can point only to one outlier court that has ever held that the mere fact of ***some*** post-termination payments satisfies the pension-plan definition: *Shafer*. Opp. at 11-12. But *Shafer* is distinguishable, clearly *dicta*, and wrongly decided in any event. As explained, the program in *Shafer* was different, where FAs' "Deferred Credits"—earned from the very first dollar of revenue—were subtracted from their "Total Credits" every month and set aside for future payment. *Supra* at 6. Moreover, the ERISA decision in *Shafer* was wholly unnecessary, as the court compelled arbitration of the same merits issue it then purported to resolve. *Id.* And, regardless, *Shafer* is wrongly decided (and currently on appeal). Among other things, the ruling

---

[5] Plaintiff's position is absolute and does not turn on the degree to which Merrill paid WC awards to FAs at or after termination. Thus, it does not matter that he sliced the Plan's payment data differently than Defendants. *Compare* MSJ at 9 (each year since 2018, between 91.3% and 94.2% of FAs who were paid WC awards were actively employed), *with* Opp. at 4 (for the ***entire*** period of 2018-2024, 82% of FAs paid any WC awards were employed for ***all*** such payments). Notably, Plaintiff ***does not dispute*** the data Merrill cited. And, even under his reframing of this data, it is undisputed that the vast majority of awards are paid to FAs while employed, as the Plan intended.

rests on the same two faulty premises as Plaintiff's claims here, by (1) ignoring the plan terms and simply declaring the awards were "commissions," and (2) misinterpreting ERISA as meaning ***any*** post-termination payment to ***any*** employee creates a "pension plan." Defendants know of no other case to hold that the mere possibility of a post-termination payment implicates ERISA; on the flip side, numerous cases (and DOL guidance) have rejected that same proposition. MSJ at 18-19, 22.

Although Plaintiff suggests *Tolbert* is a second example, Opp. at 12, that is plainly wrong. 758 F.3d at 625 ("The 'mere fact' of post-termination payments [is] the sort of scenario around which we decline[] to stretch the 'elastic girdle.'"). As Defendants explained, the plan in *Tolbert* expressly allowed employees to elect to defer earned income ***until*** termination or retirement (and even 10 years thereafter). MSJ at 23-24. Plaintiff ignores this critical fact. Here, the Plan gives FAs no such option, and any post-termination payment is merely "incidental." *Id.* at 18-19, 22-24.

### III. The Plan Is a "Bonus Program" Exempt from ERISA's Coverage.

#### A. WealthChoice Awards Are Retention Bonuses.

As explained, the Plan falls easily within the DOL's "bonus program" regulation, as its purpose and operation mirror those of similar plans that courts and the DOL have long considered beyond ERISA's scope under 29 C.F.R. § 2510.3-2(c). MSJ at 13-17. Plaintiff's only response is to repeat his mantra that WC awards are "commissions," not a bonus. Opp. at 15-20. This is a false distinction and cannot override the clear terms of the Plan and Award Agreements. *Supra* at 4-7. Most fundamentally, the Opposition again ignores that WC awards are ***not*** compensation for merely "generating revenue," but rather added rewards in exchange for performance ***and*** staying at Merrill until earning them. Plaintiff wants to have his cake and eat it too, by getting the benefit of these retention bonuses, but without rendering the very consideration required to earn them.

Tellingly, the Opposition has no response to other courts that have already held that nearly identical predecessor plans for Merrill FAs are ***not*** "pension plans." *Callan*, 2010 WL 3452371; *see Mullett v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 2002 WL 32298599 (E.D. Pa. Feb. 26,

2002). He buries his only mention of *Callan* (at 18). But even then, he does not dispute that *Callan* held the very same type of contingent awards for FAs under the prior plans (FACAAP and Growth Award plan) were "bonus[es] for work performed" within the meaning of 29 C.F.R. § 2510.3-2(c).

Instead, Plaintiff argues the plans in *Callan* were different. This is false, as confirmed by comparing the plan documents at issue in *Callan* to those here. *Compare* Ex. A, *Callan* Dkt. 95-7 (FACAAP) & Ex. B, *Callan* Dkt. 95-8 (Growth Award), *with* Dkt. 41-3 (WC Plan), Dkts. 41-4 to 41-15 (Award Agmts.). Contrary to the Opposition (at 19), WC awards were just as "discretionary" as awards under the plans in *Callan*.[6] And, again contrary to Plaintiff's assertions, *Callan* expressly stated that both Growth Awards and FACAAP awards "will generally be stated as an amount equal to a percentage of achievement against established goals"—*i.e.*, **production**. 2010 WL 3452371, at *8 (quoting Ex. A at 4); *id.* at *9 (quoting Ex. B at 3); *see also* Ex. B (Growth Award) at 3 (defining "Production Credits"). Moreover, both the FACAAP and Growth Award plans had similar terms allowing FAs to earn awards if they left Merrill under the same limited circumstances as the Plan here—including death, disability, and retiring from the industry. Ex. B (Growth Award) at Art. VII; Ex. A (FACAAP) at Art. 9. There is simply no legitimate basis for differentiating WC awards from those the *Callan* court already held to be a "bonus program." *See also Mullett*, 2002 WL 32298599, at *2-4 (holding the FACAAP is not a pension plan under ERISA "merely because an employee may receive the benefits after he or she has retired or terminated employment").

Plaintiff's only other argument about *Callan* proves Defendants' point. In *Callan*, the plaintiff challenged a third plan, WealthBuilder, which Plaintiff here says "awarded deferred compensation to FAs." Opp. at 19. But this was not disputed: WealthBuilder was established "for

---

[6] *Compare* Ex. B at 3 ("The criteria for Growth Awards will be established periodically by the Advisory Division" and "may vary from Performance Period to Performance Period and according to the type of performance"), *with* Dkt. 41-3 at 3 ("The performance criteria for [WC] Awards will be established periodically by the Administrator and may vary from Performance Period to Performance Period and according to the type of performance").

the purpose of providing deferred compensation." 2010 WL 3452371, at *10; Ex. C, *Callan* Dkt. 95-9 (WealthBuilder) at ML330 (describing deferral of amounts "you have ***earned***"). More importantly, WealthBuilder was expressly designed to be a "pension plan" under ERISA (albeit a "top hat" plan exempt from many statutory provisions). Critically, eligible FAs were not paid any deferrals ***until*** they "become eligible for retirement" or at "qualifying terminations"; there was not even the option or ability to be paid while actively employed. Ex. C, *Callan* Dkt. 95-9 at ML331; *id.* at ML344, § 8.1. So the *Callan* "court did not discuss why the WealthBuilder plan qualified as an ERISA pension plan," as Plaintiff notes (at 19), because the parties agreed it indisputably did. Just like the plan in *Tolbert*, WealthBuilder thus allowed FAs to defer income ***until***—or "to the"— termination of employment or beyond. But that was ***not*** true of the FACAAP and Growth Award plans—which is why the *Callan* court ruled differently—and that also is ***not*** true of the Plan here.

### B. Plaintiff Concedes The Plan Does Not "Systematically Defer" WC Awards.

Plaintiff does not dispute that the Plan—both by its terms and operation—***does not*** "systematically defer" payments "to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c); MSJ at 17-20. Instead, he argues that the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), requires this Court to disregard the DOL's regulation altogether. But that regulation is entirely consistent with both ERISA's text and purpose. There is no conflict with the statute, and no better reading of its text than the one in the regulation (promulgated in 1975, shortly after ERISA's enactment in 1974). Plaintiff cites the requirement that bonus programs fall within ERISA's coverage only if they "systematically defer[]" payments "to the termination of covered employment or beyond." Opp. at 21-23. But the only way this conflicts with ERISA is to first accept his mistaken view that the "pension plan" definition includes ***any*** program that could ever "result in" ***any*** post-employment payment to a departing employee (which would apply even to an end-of-year bonus or one's final paycheck). *Id.* at 23. He is wrong.

To start, nothing in *Loper Bright* casts doubt on Congress's power to authorize agencies

11
Case 3:24-cv-00440-KDB-DCK  Document 58  Filed 12/30/24  Page 14 of 17

"to exercise a degree of discretion," "to give meaning to a particular statutory term," or "to prescribe rules to fill up the details of a statutory scheme." 144 S.Ct. at 2263 (quotations omitted). When a "particular statute delegates authority to an agency consistent with constitutional limits, courts must respect that delegation." *Id.* at 2273. Instead, *Loper Bright* held only that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.*

In this statute, Congress granted the DOL the authority to prescribe "such regulations as [it] finds necessary or appropriate to carry out the provisions of [ERISA]," including defining "technical and trade terms used in such provisions." 29 U.S.C. § 1135. And while ERISA defined "employee pension benefit plan" and "pension plan," Congress, notably, did not define the phrases "provides retirement income" or "results in a deferral of income." 29 U.S.C. § 1002(2)(A). These are "technical and trade terms" Congress left open for the DOL to define. 29 U.S.C. § 1135.

So, acting under its § 1135 authority, the DOL did just that in the regulation, 29 C.F.R. § 2510.3-2(c). That is, the DOL explained that "payments made . . . as bonuses for work performed" do not "result[] in a deferral of income" unless those payments are "systemically deferred" "to the termination of covered employment or beyond." *Id.* These definitions track both the statute's retirement purpose and its textual focus on a plan's impact on "employees" as a group (not any individual employee), bolstering the DOL's reliance on the systemic effect of payments.

The DOL did not simply interpret an ambiguous statute—it exercised the power delegated by Congress to "define accounting, technical and trade terms," 29 U.S.C. § 1135, and this Court "must respect that delegation." *Loper Bright*, 144 S. Ct. at 2254; *see Hansen v. Lab. Corp. of Am.*, 2024 WL 4564357, at *6 (E.D. Wis. Oct. 24, 2024) (holding that § 1135 granted DOL the authority to promulgate regulations clarifying the definition of "employee welfare benefit plan").

## CONCLUSION

For these reasons, and those set forth in Defendants' Motion, the Court should grant summary judgment for Defendants because Plaintiff's claims fail as a matter of law.

Dated: December 30, 2024                                    Respectfully submitted,

By: */s/ Robert A. Muckenfuss*

Robert A. Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
MCGUIRE WOODS LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
(704) 343-2000
zmccamey@mcguirewoods.com
rmuckenfuss@mcguirewoods.com

Sam S. Shaulson (*pro hac vice forthcoming*)
600 Brickell Avenue
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001
samuel.shaulson@morganlewis.com

Sari M. Alamuddin (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive, Suite 2800
Chicago, IL 60606
(312) 324-1000
sari.alamuddin@morganlewis.com
matthew.russell@morganlewis.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Robert A. Muckenfuss, an attorney, hereby certify that on December 30, 2024, I caused a copy of the foregoing document to be filed through the Court's CM/ECF Electronic Filing System, which will transmit notice of such filing to all counsel of record.

*/s/ Robert A. Muckenfuss*
