# Morgan Lewis

**Anahi Cruz**
Associate
+1.213.612.2500
Anahi.Cruz@morganlewis.com

December 2, 2024

**VIA DR PORTAL**

Shubhangi Nangunoori
Case Administrator
FINRA Dispute Resolution Services
300 South Grand Avenue
Suite 1700
Los Angeles, California 90071

Re:     Jeffrey A. DeWees, et al., vs. Merrill Lynch Pierce Fenner & Smith Inc., Case No. 24-02157

Dear Ms. Nangunoori:

We write on behalf of Respondent Merrill, Lynch, Pierce, Fenner & Smith, Incorporated (CRD No. 7691) ("Merrill Lynch") with respect to the above-captioned matter. As outlined below, Merrill Lynch respectfully requests, pursuant to Rules 13203 and 13204, that this case be paused from proceeding, at least temporarily, in the FINRA forum. This relief is warranted in these unique circumstances because—as the Statement of Claim concedes—this arbitration is a copycat of claims that have been pending for months against Merrill Lynch in a first-filed class action in federal court, *Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.*, No. 3:24-cv-00440 (W.D.N.C.). A temporary stay of this arbitration will not foreclose Claimants from pursuing their claims. Rather, Merrill Lynch asks only that these proceedings be held in abeyance to allow the *Milligan* court the opportunity to determine whether these Claimants are part of a mandatory class action from which they cannot opt out.

Merrill Lynch further requests that all existing response deadlines in this matter be stayed temporarily, pending the outcome of Merrill Lynch's request herein. Specifically, Merrill Lynch requests that this Motion be decided before Respondent is required to answer the Statement of Claim. To the extent Merrill Lynch must respond to Claimants' Statement of Claim, Merrill Lynch denies all claims. Merrill Lynch further maintains that neither the WealthChoice Contingent Award Plan nor the equity-based awards issued through restricted stock units ("RSUs") (together, the "Plans") qualify as "employee benefit pension plans" under the Employee Retirement Income Security Act ("ERISA") and that Claimants' ancillary claims either fail to state a claim, are barred by the applicable statute of limitations, and/or are preempted by ERISA (should Claimants prevail in establishing that either Plan is subject to ERISA in the first place). Further, if the Motion to Stay is denied or this matter otherwise proceeds, Merrill Lynch reserves its right to file a full and robust answer at the appropriate time.

Additionally, the Statement of Claim filed in this matter is substantively identical to Statements of Claims filed by the same counsel in at least two other multi-claimant matters filed in FINRA: *Ruben,*

EXHIBIT
C

**Morgan, Lewis & Bockius LLP**

300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
United States

**T** +1.213.612.2500
**F** +1.213.612.2501

Case 3:24-cv-00440-KDB-DCK     Document 67-3     Filed 02/14/25     Page 1 of 298

*et al. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, Case No. 24-02400, and *Foltz, et al. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, Case No. 24-02310. Like these other matters, Claimants here assert various claims under ERISA based on the same factual allegations underpinning the first-filed class action in *Milligan. See* Ex. A (*Ruben* and *Foltz* SOCs). Combined, these three matters now include 32 Claimants asserting identical claims (and seeking identical relief) to those already being pursued on their behalf in the *Milligan* class action.

For the reasons outlined in below, we respectfully request that this matter be paused from proceeding, at least temporarily, in the FINRA forum. We appreciate your attention to this matter and would be happy to meet with you and counsel for Claimants to discuss Merrill Lynch's request.

## I.  Background: The *Milligan* Federal Court Litigation and Plaintiff's Request to Certify a Mandatory Class Under Federal Rule of Civil Procedure 23(b)(1) and (2).

On April 30, 2024, a former Merrill Lynch financial advisor ("FA"), Kelly Milligan, filed a class action complaint in the U.S. District Court for the Western District of North Carolina against Merrill Lynch and its parent company, Bank of America Corp. Ex. B, *Milligan* Compl. Like Claimants, Mr. Milligan alleges that the WealthChoice Plan is actually an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2)(A)(ii). He further claims that if the Plan is a "pension plan" governed by ERISA, certain of its terms are unlawful under that statute's vesting, anti-forfeiture, and other provisions.

Based on this core allegation, Mr. Milligan seeks, on behalf of a putative class, several forms of relief under ERISA. This includes asking the District Court to award declaratory and equitable relief, including (1) a declaration that the Plan "violate[s] ERISA's vesting and anti-forfeiture rules," Ex. B ¶ 64(a); (2) an injunction "requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures [allegedly] caused by" the purported ERISA violations, *id.* ¶ 64(b); and (3) an "accounting," "surcharge," disgorgement, and entry of an "equitable lien," among other equitable relief, *id.* ¶¶ 64(c)–(f).

Moreover, Mr. Milligan seeks an order requiring Bank of America and Merrill Lynch to "reform" the Plan's terms and, once modified, to enforce his and other putative class members' purported rights to payment of past awards under its modified terms. *Id.* ¶¶ 65-80. Finally, Mr. Milligan alleges that, if the Plan is subject to ERISA, Merrill Lynch was a Plan fiduciary, breached the duties it would owe participants under ERISA, and therefore should "restore" alleged "losses" to the Plan. *Id.* ¶¶ 71-80.

Mr. Milligan claims the Plan operates similarly for all Merrill Lynch FAs. He therefore asserts his claims on behalf of a putative class that, as defined, includes all seven Claimants in this matter: "All former Merrill Lynch financial advisors who forfeited deferred compensation in the WealthChoice Contingent Award Plan from April 30, 2018, until the date of judgment[.]" Ex. B ¶ 53.

Significantly, Mr. Milligan seeks to certify this class under Federal Rule of Civil Procedure 23(b)(1)(A) and/or 23(b)(1)(B). Ex. B ¶ 58. Under Rule 23(b)(1)(A), a class may be certified where separate, individual actions "would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class"—here, Merrill Lynch. A class under Rule 23(b)(1)(B) may be appropriate if separate actions would create a risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."

Given these standards for obtaining certification under Rule 23(b)(1), participation in such a class is **mandatory.** That is, class members cannot "opt out" or pursue their claims (or obtain remedies) individually or in another forum. Indeed, allowing such "opt outs" would defeat the purpose of Rule 23(b)(1)'s mandatory participation, because separate actions could result in contradictory and "incompatible standards of conduct." *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 965 (9th Cir. 2016). As the Supreme Court put it, "[c]lasses certified under [Rule 23(b)(1)] share the most traditional justifications for class treatment—that individual adjudications would be ***impossible or unworkable.***" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) (emphasis added). According to some courts, this concern is particularly salient in ERISA cases, where an alleged plan fiduciary "must apply uniform standards to a large number of [alleged] beneficiaries." *Risto v. Screen Actors Guild-Am. Fed'n of Television & Radio Artists*, 2020 WL 5518600, at *10 (C.D. Cal. Sept. 14, 2020); *see also Amchem Products Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (Rule 23(b)(1) often applies "when a party is obligated by law to treat the members of a class in a like manner.").

## II. Claimants' Statement of Claim Mirrors the Milligan Complaint.

This is no debate that Claimants here copied and pasted allegations from *Milligan* into their Statement of Claim. In fact, they admit doing so, in arguing that *Milligan* is not properly pursued in federal court.[1] Their Statement of Claim is based on the same factual allegations and seeks the same relief as Mr. Milligan seeks on behalf of Claimants in the class action. Indeed, even a cursory comparison of the *Milligan* complaint to the Statement of Claim shows that, aside from background facts about Claimants, the claims are copycats of the *Milligan* class action. For example:

| *Milligan* **Complaint (Ex. B)** | *DeWees* **Statement of Claim (Ex. C)** |
|---|---|
| "FAs' deferred compensation in the Plan is not a 'bonus'" (¶ 47). | "Neither plan is a 'bonus program.'" (¶ 44). |
| "… an FA must be employed by Merrill Lynch on the Vesting Date to receive his or her deferred compensation. If an FAs employment ends before that date, Defendants invoke the Cancellation Rule and cancel the FA's Account Balance so that the FA never received his or her deferred compensation." (¶ 24). | "The Plans purport to "cancel" an advisor's earned commissions in the event of "all other terminations" prior to the vesting date (the 'Cancellation Rule'). After each Claimant left Merrill Lynch, Merrill Lynch purported to cancel and failed to pay commissions Claimants had earned performing services for their clients[.]" (¶ 27). |

---

[1] This is simply wrong. Claimants ignore FINRA Rule 13204, which expressly prohibits arbitrating "[c]lass action claims" in FINRA—precisely what Mr. Milligan has filed in federal court. The Rule also prohibits Merrill Lynch from "enforc[ing] any arbitration agreement against a member of a certified or *putative class action* with respect to any claim that is subject of the certified or *putative class action*." *Id.* 13204(a)(4) (emphasis added). As such, Claimant's baseless accusations—including by calling Merrill Lynch's supposed failure to compel Mr. Milligan to arbitration "inexplicabl[e]," "brazen," and "willful bad faith"—only reflects a fundamental misunderstanding of FINRA's rules.

| "The Cancellation Rule also does not apply if an FA's employment ends because of a 'Workforce Reduction, Divestiture or Disability…'" (¶ 26). | "The Plans provide, for example, that advisors whose employment terminates due to Workforce Reduction, Divestiture, Change of Control or Disability are paid in accordance with the specific award's payment schedule[.]"(¶ 42). |
| "The Plan is a 'plan, fund or program' under ERISA because it identifies the intended benefits—deferred compensation—using an objective formula (i.e., a percentage) that determines how FAs earn benefits." (¶ 32). | "Each Plan is a "plan, fund or program" under ERISA because it identifies the intended benefits—earned commissions that are deferred for a period of years up to a decade—using a detailed, objective formula." (¶ 33). |

More problematic still, however, is that the *Milligan* complaint and the Statement of Claim seek the **_same relief_**—including a declaration that the Plan is a "pension plan" subject to ERISA and an order requiring Merrill Lynch to reform or modify the Plan terms. For example, Count I of the *Milligan* complaint and Count I of the Statement of Claim seek the same equitable relief. Ex. B ¶ 64; *DeWees* SOC ¶ 54. The same goes for the claims asking that the Plan be reformed, as shown below:

| *Milligan* **Complaint (Ex. B)** | *DeWees* **Statement of Claim (Ex. C)** |
|---|---|
| "Plaintiff and the Class are entitled…to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA." (¶ 68). | "Merrill Lynch should be ordered to comply with the vesting and anti-forfeiture requirements in ERISA[.]" (¶ 60). |
| "Plaintiffs and the Class are entitled to recover their vested benefits, enforce their rights to the payment of their past vested benefits, and clarify their rights to vested benefits under the Plan." (¶ 70). | "ERISA . . . authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (¶ 58). |

Taken together, it is obvious that, aside from a few definitional changes and stylistic tweaks, the *Milligan* complaint and the Claimants' Statement of Claim before FINRA are substantively similar—in terms of their factual allegations, their core ERISA claims, and their requested relief.[2]

**III.    A Temporary Stay is Warranted, Pending A Class Certification Ruling in *Milligan*.**

**A.    Mr. Milligan's Preexisting Request for a Mandatory Class Under Rule 23(b)(1) Warrants a Stay of This Proceeding.**

The circumstances here justify staying this proceeding in FINRA until the court has an opportunity to resolve class certification in *Milligan*. Under Rule 13204, "[a]ny claim that is based upon the same facts and law, and involves the same defendants as in a . . . putative class action, shall not be arbitrated under the Code[.]" FINRA Rule 13204(a)(2) (emphasis added). This Rule clearly applies

---

[2] Claimants also assert statutory and common law claims that are not present in *Milligan*. But as discussed below (§ III.C), these claims are based on the same facts and are stated in the alternative to Claimant's core ERISA claims. They should not alter the Panel's decision on Merrill Lynch's request.

here. There is no legitimate dispute that Claimants assert claims in FINRA "based upon the same facts and law" as those asserted against Merrill Lynch in *Milligan*. Again, they concede as much. Nor do any of the exceptions to this Rule apply. Claimants have not filed any "notice" that they "will not participate in the class action or in any recovery that may result from the class action," Rule 13204(a)(2)(B), nor have they "withdrawn from the class according to any conditions set by the court," *id.* 13204(a)(2)(A). Rule 13204(a), therefore, precludes Claimants' pursuit of this arbitration.

Merrill Lynch acknowledges that Claimants may try to capitalize on Rule 13204's exceptions. But it is premature to do so. FINRA should not allow Claimants to circumvent a previously filed class action through an "opt out" that may not even exist in *Milligan* itself. That is, the *Milligan* court has not yet reached the very determination required to know whether Claimants will even **have** an ability to opt out of the *Milligan* class, as contemplated by Rule 13204(a)(2)'s express terms. As discussed, Mr. Milligan seeks to certify a class under Rule 23(b)(1), from which participants cannot exclude themselves. If this class is certified, Claimants will be subject to the outcome in *Milligan*—regardless of what they might submit in FINRA. While no class has been certified today, the first-filed *Milligan* action should be allowed to reach the certification stage first, before this arbitration proceeds.

Any other approach could lead to absurd results. Multiple decisionmakers (the *Milligan* court, and this arbitration panel) could potentially reach contradictory conclusions on the core legal issues that Mr. Milligan contends are common to this matter—including whether the Plan is an ERISA "pension plan" and, if so, what relief to award. *Spano v. The Boeing Co.*, 633 F.3d 574, 577 (7th Cir. 2011) (cases may be "treated as a mandatory class action under Rule 23(b)(1), either because individual treatment risked the establishment of inconsistent standards of conduct for the defendants, Fed. R. Civ. P. 23(b)(1)(A), or because individual cases would, as a practical matter, be dispositive of the claims of nonparties, Fed. R. Civ. P. 23(b)(1)(B)"); *see also Dukes*, 564 U.S. at 361.

This risk matters. Put simply, the Plans either are "pension plans" under ERISA, or they are not. They cannot be both. For example, a FINRA panel may decide the Plans are "pension plans" governed by ERISA. But the *Milligan* court might later find—on behalf of a class that *includes Claimants*—that the Plans are not governed by ERISA, confirming that no "reformation" of their terms is needed and no equitable or Plan-wide relief is warranted. These rulings would stand in direct conflict with one another, and Merrill Lynch could not comply with both. Merrill Lynch would be forced to ignore one of these rulings to comply with the other. And its actions will impact thousands of current and former FAs, not only Claimants. If *Milligan* is certified under Rule 23(b)(1), that Rule is designed to avoid potentially conflicting outcomes like these, and instead bind all class members to a single result.

Indeed, the *Milligan* case presses forward. Any stay applied to this matter would be limited. The *Milligan* court has entered an aggressive schedule, with a deadline for completing all discovery by April 4, 2025. Not only that, but as Claimants acknowledge in their Statement of Claim, Merrill Lynch filed a motion for summary judgment in *Milligan* on September 30, 2024. This motion asks the district court to dismiss Mr. Milligan's claims with prejudice because there is no genuine dispute of material fact preventing it from holding that ERISA does not govern the WealthChoice Plan. That is the very same underlying legal issue Claimants now raise here—or, in their own words, "the dispositive question in every one of these disputes with every unnamed putative class member." SOC ¶ 14. Plaintiff's deadline to respond to Merrill Lynch's motion is December 6, 2024, and Merrill Lynch's reply is due on December 20, 2024. Therefore, this motion will be fully briefed within weeks, further underscoring that any stay issued by the Panel would be temporary. Should the motion be granted in Merrill Lynch's favor, there would no longer be a pending class action and, therefore, Rule 13204 would no longer apply and Claimants may then continue to pursue their claims in FINRA.

On these specific facts, Merrill Lynch's request should be granted, and this arbitration stayed temporarily, to allow the *Milligan* court an opportunity to determine class certification or, if sooner, to resolve the central dispute underpinning Claimant's claims at summary judgment. If the *Milligan* court does not certify a mandatory class, or if the summary judgment motion is granted, this matter can proceed (either because no class is certified at all or, if a Rule 23(b)(3) class is certified, assuming Claimants opt out of the *Milligan* class and/or submit any requisite notice under Rule 13204(a)(2)). But if the *Milligan* court certifies a mandatory class under Rule 23(b)(1) and the summary judgment motion is denied, Claimants here would already be members of that certified class and, therefore, would be pursuing the same claims in *Milligan* as they now seek to pursue here. Either way, there is no valid reason to allow Claimants to pursue identical claims in FINRA at the same time a putative class action is pending that may resolve those very same claims on their behalf.

**B.      The Panel Should Not Countenance Claimants' Efforts to Circumvent FINRA's Prohibition on Class Arbitrations.**

As an independent basis for a stay, Claimants' Statement of Claim, along with the other two *Milligan* copycat SOCs, effectively seek an end-run around FINRA's express prohibition against arbitrating class claims. *See* Rule 13204(a)(1) ("Class action claims may not be arbitrated under the Code."). This too warrants granting Merrill Lynch's request, as Claimants' arbitration strategy only reinforces why it is essential to defer these matters temporarily, until the *Milligan* court can determine whether to certify the Rule 23(b)(1) class.

Taken together, these combined FINRA matters are tantamount to a new class or collective action. They consolidate claims of 32 individual Claimants (and counting), assert identical factual allegations, bring the same legal claims, and seek the same relief against Merrill Lynch. But Rule 13204 exists for the express purpose of avoiding this type of large-scale aggregation of claims before FINRA.

In 1992, the SEC's order first approving the prohibition on class arbitration made clear that class and collective action proceedings do not belong in arbitration for two main reasons. First, "the judicial system has already developed the procedures to manage" such claims, whereas arbitrating them "would be difficult, duplicative and wasteful," and "class actions are better handled by the courts." *Order Approving Proposed Rule Change*, 57 Fed. Reg. 52659-02, 52660, 1992 WL 316267 (Nov. 4, 1992); *see also Order Approving Proposed Rule Change*, 59 Fed. Reg. 22032-01, 22033, 1994 WL 150066 (Apr. 28, 1994) (approving same rule for claims by an associated person, noting "courts have developed the procedures and expertise for managing class actions").

Second, the SEC intended to protect and preserve access to the courts for class and collective action claims—for both associated persons and FINRA members. *See id.* ("The Commission also believes that access to the courts for class action litigation should be preserved for associated persons and member firms[.]"); *see also* Fed. Reg. 52659-02, at 52661 (stating that without access for class actions, "both investors and broker-dealers have been put to the expense of wasteful, duplicative litigation. The new rule ends this practice.").

These dual purposes undergirding Rule 13204 are also why associated persons and FINRA members cannot enforce an arbitration agreement "against a member of a certified **or putative** class action with respect to any claim that is the subject of the certified **or putative** class action," until the court either denies certification or decertifies an existing class, or the class member is excluded from, or elects not to participate in, the class "according to conditions set by the court." Rule 13204(a)(4) (emphases added). Put simply, Rule 13204 seeks to preserve access to the courts for class action

claims for all members of the class, at least until a court can resolve certification. Indeed, until the *Milligan* court can resolve that issue, Claimants here necessarily could not be "excluded from" or "elect[] not to participate" in the *Milligan* class, "according to conditions set by the court."

Here, Claimants are trying to avoid both the letter and spirit of Rule 13204, including its prohibition on arbitrating class or collective claims. Worse, they exacerbate the flaws in their approach by trying to disguise it, by splintering their claims into multiple Statements of Claim (including this matter) on behalf of 7-14 former FAs at a time. Claimants presumably rely on Rule 13312(a), which would allow multiple parties to join "claims together in the same arbitration if the claims contain common questions of law or fact" and "arise out of the same transaction or occurrence." But this carbon-copy Statement of Claim does not advance either of the two purposes for Rule 13204, noted above. It still would require the collective adjudication of these claims in FINRA, necessitating inefficient and duplicative efforts. If anything, their piecemeal approach makes matters worse, because it will burden multiple FINRA panels and, in doing so, only increase the odds of inconsistent and contradictory rulings. Moreover, allowing these claims to advance before the *Milligan* court even has a chance to rule on class certification would subvert Rule 13204's second purpose, by undermining Mr. Milligan's right to bring his class claims in federal court. Instead, Claimants are trying to sidestep the *Milligan* class action entirely and, potentially, even jump ahead of it to secure a resolution before the *Milligan* court can rule. Worse, Claimants here expressly try to undermine Mr. Milligan's ability to pursue class action claims in court, by claiming he should not even be allowed to pursue those claims. As explained (at 3 n.1), Claimants are simply wrong in asserting that Merrill Lynch has "[i]nexplicably" failed to seek to compel Mr. Milligan's claims to arbitration in FINRA. It cannot do so.

The Panel should not permit Claimants to exploit Rule 13312 to pursue a *de facto* class action, particularly given the complete overlap with the *actual* (and first-filed) *Milligan* class action.

### C.        Claimants' Ancillary Claims Should Also Be Stayed.

In addition to their core ERISA claims, Claimants have also asserted a variety of common law and statutory claims. These include claims for breach of fiduciary duty, violation of the California Labor Code, violation of the Colorado Wage Act, breach of contract and the implied covenant of good faith and fair dealing, conversion, and unjust enrichment. *See* Ex. C ¶¶ 61-107 (*DeWees* Statement of Claims). Given Claimants' ERISA claims, along with the duplicative claims pending in *Milligan*, the stay should be enacted on these ancillary claims. The reason is straightforward: if the *Milligan* court finds the Plan is an ERISA pension plan, as Claimants and Mr. Milligan contend, all of these claims are preempted by ERISA. *See* 29 U.S.C. § 1144; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983) (ERISA's "pre-emptive scope [is] as broad as its language.").

Each of these ancillary claims is premised on the exact same facts that allegedly support Claimants' ERISA claims. Claimants do not allege any other facts independent of the Plans to support these claims. *See generally* Ex. C. Rather, the Statement of Claim focuses exclusively on the reasons why Claimants believe the Plans are alleged pension plans under ERISA. *See id.*

Against this backdrop, and if the *Milligan* court determines an ERISA pension benefit plan exists (it should not), there is no reasonable dispute that these claims will be preempted by ERISA. Indeed, ERISA expressly "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). And this preemptive effect reaches "all common

Shubhangi Nangunoori
December 2, 2024
Page 8

law causes of action that relate to an employee benefit plan." *Antell v. United Healthcare Ins. Co. of New York*, 2012 WL 13042822, at *1 (S.D.N.Y. Mar. 16, 2012).[3]

It would be inequitable to allow Claimants to proceed on these ancillary claims—**all** premised on misconduct related to alleged ERISA pension plans—and then, if successful, obtain a double recovery if relief is awarded to the class in *Milligan*. The proceeding should thus be stayed entirely.

### D. A Stay Will Not Prejudice Claimants.

As it stands, Claimants' ERISA claims are tolled pending the outcome of the *Milligan* court's decision on a motion to certify a class. Under *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Therefore, Claimants will not be prejudiced by the granting of this request.

Ultimately, if a class is certified under Rule 23(b)(1), Claimants will have to participate in the *Milligan* action; if not, they are free to proceed in FINRA. This too warrants granting Merrill Lynch's request, as any contrary ruling would "result in a needless multiplicity of actions," which is exactly what Fed. R. Civ. P. 23 "and the tolling rule of *American Pipe* were designed to avoid." *China Agritech v. Michael H. Resh*, 584 U.S. 732, 739 (2018) (quoting *Am. Pipe Const. Co.*, 414 U.S. at 351).

\*     \*     \*     \*

To be clear, this request does not aim to prevent Claimants from pursuing their claims against Merrill Lynch. Instead, it is aimed solely at ensuring that any outcome—whether in Merrill Lynch's favor or not—avoids forcing Merrill Lynch into the untenable position of having to comply (and necessarily not comply) with potentially conflicting orders. All Merrill Lynch is asking is to allow the *Milligan* court to resolve a motion to certify a Rule 23(b)(1) class **before** Claimants' arbitration proceeds, thus avoiding this problem. And in either event, Claimants will still be able to pursue their claims. Indeed, once decided, Claimants will either have to participate in *Milligan*, as class members (if certification is granted), or be free to pursue their individual claims with FINRA (if certification is denied).

Therefore, Merrill Lynch respectfully asks that this matter be temporarily stayed, pending a ruling on the motion for certification in *Milligan*. Merrill Lynch further requests that its deadline to respond to the Statement of Claim is stayed, pending the outcome of this request.

Thank you for your attention to this request, and please let us know if we can provide any additional information to aid your review.

---

[3] *See also, e.g.*, *Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996) ("[A] common law fraud claim for misconduct arising from the administration of an [alleged] ERISA plan may be preempted."); *Leventhal v. MandMarblestone Grp. LLC*, 2019 WL 1953247, at *7, (E.D. Pa. May 2, 2019) (stating "breach of contract claims are preempted when the contract breached is considered an employee benefit plan under ERISA"); *Rehab. Inst. of N. Jersey, Inc. v. Home Depot, Inc.*, 2012 WL 5944658, at *2 (D.N.J. Nov. 27, 2012) ("In this lawsuit, the claims for unjust enrichment and breach of the covenant of good faith have a connection with an ERISA plan, and are therefore preempted by ERISA.").

Shubhangi Nangunoori
December 2, 2024
Page 9

Sincerely,

_/s/ Anahi Cruz_

Anahi Cruz


Enclosures Exhibits A - C
cc: All Counsel of Record

# EXHIBIT A

## IN ARBITRATION PROCEEDINGS BEFORE THE
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

-------------------------------------------------------------------X

**WILLIAM MICHAEL COFFEY, MORGAN
ALEXANDRA KELLY, MARK ANDREW
MAYER, PAUL JAMES MCARTHUR, DAVID A
RUBEN, BRETT MONSEIN, ELIZABETH DORA
SNYDER, DAVID MICHAEL SOTSKY, KENNETH
ROBERT CROWLEY, MAX GREEN, JAHAN K
JEWAYNI, GEHRET DAVIS SHEMELD, GUNN
THONGNIYOM, ADHAM S KAIBNI,**

        Claimants,

        - v -

**MERRILL LYNCH, PIERCE, FENNER & SMITH,
INC.,**

        Respondent.

-------------------------------------------------------------------X

<u>**STATEMENT OF CLAIM**</u>

**FINRA No. _____**

        Claimants William Coffey, Morgan Alexandra Kelly, Mark Mayer, Paul McArthur, David Ruben, Brett Monsein, Elizabeth Snyder, David Sotsky, Kenneth Crowley, Max Green, Jahan Jewayni, Gehret Shemeld, Gunn Thongniyom and Adham Kaibni, by and through their counsel Lax & Neville LLP, hereby submit the following claims against Respondent Merrill Lynch, Pierce, Fenner & Smith, Inc., to arbitration pursuant to the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), and allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

        Claimants are former Merrill Lynch financial advisors ("FAs" or "advisors"). Throughout their employment, Merrill Lynch required Claimants to involuntarily defer a portion of their earned commissions, which it subsequently purported to "cancel" in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), its duties, the common law, and state labor and wage laws. Claimants bring this FINRA Arbitration to recover those earned commissions.

Over decades at Merrill Lynch, Claimants generated many tens of millions of dollars in revenue for Merrill Lynch by serving their clients. Claimants, like Merrill Lynch advisors generally, were paid on a commission basis, splitting the revenue they generated serving their clients with Merrill Lynch. Immediately upon joining Merrill Lynch, Claimants, like Merrill Lynch advisors generally, were forced to participate in Merrill Lynch's compensation plan deferring significant portions of their commissions into various deferred compensation plans, including "WealthChoice," which consisted of notional investment "accounts," and "Equity," which consisted of restricted stock units ("RSUs") convertible to Bank of America stock or cash (together the "Plans").

The Plans are ERISA "employee benefit pension plans" as a matter of law because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). Merrill Lynch pays advisors commission for their work (i.e., the revenue they generate) up to a decade after they perform the work and their clients pay Merrill Lynch for their work.

Pursuant to ERISA, Claimants' deferred commissions were "nonforfeitable" and vested when made. In violation of ERISA, Merrill Lynch purported to impose a "rolling" vesting period for each year's earned deferred commissions, cancelled the FAs' earned deferred commissions under various circumstances including voluntary termination and retained hundreds of millions of dollars of commissions from its terminated FAs.

Merrill Lynch has taken the position, in its plans, other arbitrations, and federal litigation, that its deferred compensation plans are not ERISA plans and that it is not required to abide by its clear statutory obligations when it defers employee commissions. This position is frivolous under the plain language of ERISA and blackletter law, carefully examined and rejected most recently in *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023) (rejecting arguments materially identical to Merrill Lynch's here and holding that Morgan Stanley's material

identical plans were ERISA plans), Order attached hereto at Exhibit A.

Merrill Lynch's purported "cancellation" of Claimants' earned deferred commissions on revenue they generated for work they performed up to a decade earlier violated ERISA, Maryland Wage Payment and Collection Law ("Maryland Wage Law"), Virginia Wage Payment Act ("Virginia Wage Act"), and D.C. Wage Payment and Collection Law ("D.C. Wage Law"). Claimants are entitled to recover their unpaid earned deferred commissions in an amount to be proven at the hearing but in no event less than $5 million with statutory penalties, costs, attorneys' fees and interest.

## JURISDICTION

1.     "A dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among ... Members and associated Persons." FINRA Rule 13200(a).

2.     Merrill Lynch is a FINRA member firm.  Each of the Claimants was at all relevant times an "Associated Person" pursuant to FINRA Rule 13100(r) and an employee of Merrill Lynch. This dispute arises from the Claimants' employment with Merrill Lynch.

## PARTIES

**Claimants**

3.     William Michael Coffey (CRD No. 2240258) was at all relevant times an associated person of Merrill Lynch. Mr. Coffey has been a successful financial advisor for over 29 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Coffey joined Merrill Lynch in April 2009. Mr. Coffey left Merrill Lynch in September 2020 with his partners Claimants Kelly, Mayer, and McArthur.

4.     Morgan Alexandra Kelly (CRD No. 6092088) was at all relevant times an associated person of Merrill Lynch. Ms. Kelly has been a successful financial advisor for over 11 years,

providing investment management, retirement and tax planning, and wealth preservation strategies to her clients. Ms. Kelly joined Merrill Lynch in April 2014. Ms. Kelly left Merrill Lynch in September 2020 with her partners Claimants Coffey, Mayer and McArthur.

5.     Mark Andrew Mayer (CRD No. 4183123) was at all relevant times an associated person of Merrill Lynch. Mr. Mayer has been a successful financial advisor for over 24 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Mayer joined Merrill Lynch in April 2009. Mr. Coffey left Merrill Lynch in September 2020 with his partners Claimants Coffey, Kelly and McArthur.

6.     Paul James McArthur (CRD No. 4836288) was at all relevant times an associated person of Merrill Lynch. Mr. McArthur has been a successful financial advisor for over 20 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. McArthur joined Merrill Lynch in April 2009. Mr. McArthur left Merrill Lynch in September 2020 with his partners Claimants Coffey, Kelly and Mayer.

7.     David A Ruben (CRD No. 1263176) was at all relevant times an associated person of Merrill Lynch. Mr. Ruben has been a successful financial advisor for over 40 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Ruben joined Merrill Lynch in February 2008. Mr. Ruben left Merrill Lynch in May 2022 with his partners Claimants Monsein, Snyder and Sotsky.

8.     Brett Monsein (CRD No. 6203260) was at all relevant times an associated person of Merrill Lynch. Mr. Monsein has been a successful financial advisor for over 10 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Monsein joined Merrill Lynch in June 2014. Mr. Monsein left Merrill Lynch in May 2022 with his partners Claimants Ruben, Snyder and Sotsky.

9.     Elizabeth Dora Snyder (CRD No. 6073126) was at all relevant times an associated

person of Merrill Lynch. Ms. Snyder has been a successful financial advisor for over 7 years, providing investment management, retirement and tax planning, and wealth preservation strategies to her clients.  Ms. Snyder joined Merrill Lynch in October 2017. Ms. Snyder left Merrill Lynch in May 2022 with her partners Claimants Ruben, Monsein and Sotsky.

10.     David Michael Sotsky (CRD No. 2927727) was at all relevant times an associated person of Merrill Lynch. Mr. Sotsky has been a successful financial advisor for over 27 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Sotsky joined Merrill Lynch in September 2011. Mr. Sotsky left Merrill Lynch in May 2022 with his partners Claimants Ruben, Snyder and Sotsky.

11.     Kenneth Robert Crowley (CRD No. 4061397) was at all relevant times an associated person of Merrill Lynch. Mr. Crowley has been a successful financial advisor for over 24 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Crowley joined Merrill Lynch in February 2000. Mr. Crowley left Merrill Lynch in September 2019 with his partners Claimants Green, Jewayni, Shemeld and Thongniyom.

12.     Max Green (CRD No. 2534002) was at all relevant times an associated person of Merrill Lynch. Mr. Green has been a successful financial advisor for over 28 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Green joined Merrill Lynch in November 1999. Mr. Green left Merrill Lynch in September 2019 with his partners Claimants Crowley, Jewayni, Shemeld and Thongniyom.

13.     Jahan K Jewayni (CRD No. 4839007) was at all relevant times an associated person of Merrill Lynch. Mr. Jewayni has been a successful financial advisor for over 20 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Jewayni joined Merrill Lynch in November 2004. Mr. Jewayni left Merrill Lynch in September 2019 with his partners Crowley, Green, Shemeld and Thongniyom.

14.     Gehret Davis Shemeld (CRD No. 702482) was at all relevant times an associated person of Merrill Lynch. Mr. Shemeld has been a successful financial advisor for over 44 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Shemeld joined Merrill Lynch in October 2009. Mr. Shemeld left Merrill Lynch in September 2019 with his partners Claimants Crowley, Green, Jewayni and Tongniyom.

15.     Gunn Thongniyom (CRD No. 4793531) was at all relevant times an associated person of Merrill Lynch. Mr. Thongniyom has been a successful financial advisor for over 20 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Thongniyom joined Merrill Lynch in January 2005. Mr. Thongniyom left Merrill Lynch in September 2019 with his partners Claimants Crowley, Green, Jewayni and Shemeld.

16.     Adham S Kaibni (CRD No. 3137931) was at all relevant times an associated person of Merrill Lynch. Mr. Kaibni has been a successful financial advisor for over 24 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Kaibni joined Merrill Lynch in October 2009. Mr. Kaibni left Merrill Lynch in June 2023.

**Respondent**

17.     Merrill Lynch (CRD No. 7691) is a Delaware corporation and FINRA member broker-dealer and registered investment advisory, with its principal place of business is New York, New York.

18.     Merrill Lynch is a wholly owned subsidiary of Bank of America and Participating Employer under the Plans.

**PROCEDURAL HISTORY**

19.     On April 30, 2024, Kelly Milligan, a former Merrill Lynch advisor filed a class action complaint, on behalf of himself and all other similarly situated Merrill Lynch FAs, against Merrill

Lynch, Bank of America Corporation, and John/Jane Doe, in the U.S. District Court for the Western District of North Carolina alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions. *See Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 3:24-cv-00440 (W.D.N.C. 2024).

20.     Inexplicably, Merrill Lynch has not moved to compel arbitration in *Milligan*. As set forth above, the Code unambiguously <u>requires</u> Merrill Lynch, as a member firm, to submit disputes to the Code and provides heavy sanctions, up to and including suspension of membership, for failure to comply. *See* FINRA Regulatory Notice 16-25 ("Through IM-13000, FINRA has made clear to member firms and associated persons that they have the mandatory and nonwaivable duty to arbitrate disputes, and (with certain exceptions) to arbitrate them before FINRA")

21.     It is indisputable that every putative member of the *Milligan* class is an associated person whose dispute with Merrill Lynch arises from Merrill Lynch's business activities, i.e., their compensation for providing services to their clients, as associated persons, by Merrill Lynch, as a member firm. Merrill Lynch has nevertheless answered the Complaint in *Milligan*, engaged in Rule 16 conferences with putative class counsel and the federal district court, submitted a proposed scheduling order that contemplates extensive litigation and discovery, and **filed a motion for summary judgment on the applicability of ERISA to the Plans**, the dispositive question in every one of these disputes with every unnamed putative class member who is not represented in, and has had no opportunity to move to compel arbitration of, *Milligan*. This is a brazen violation of FINRA Rules 13200 and 2010. *See* FINRA Rules 2010 (failure to submit to arbitration under the Code violations a member firm's obligation to observe "high standards of commercial honor and just and equitable principles of trade.").

22.     Leaving aside that Merrill Lynch's position is that the plans in dispute are not ERISA plans, neither ERISA nor the unavailability of the class action mechanism in the Code relieves

member firms and associated persons of their obligation to submit their disputes to arbitration. *See*, *e.g., Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023). In *Shafer*, Matthew T. Shafer, a former Morgan Stanley advisor, filed a class action on December 30, 2020, on behalf of himself and all other similarly situated former Morgan Stanley FAs, against Defendants Morgan Stanley and Morgan Stanley Smith Barney LLC in the United States Southern District of New York, alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions.

23.     On March 24, 2021, Morgan Stanley moved to compel Shafer's claims to arbitration and stay the Class Action, which Shafer opposed on behalf of himself and the Class. On March 24, 2022, Shafer and eleven other named former Morgan Stanley advisors filed an Amended Class Action Complaint on behalf of themselves and the Class.

24.     On May 9, 2022, Morgan Stanley moved again "…for an Order compelling arbitration of all claims brought by Plaintiffs filed in the above-captioned action and staying this action during the pendency of the arbitration proceedings." The Class Action Plaintiffs opposed the motion, arguing, among other things, that the ERISA claims were not subject to Morgan Stanley's arbitration agreement. On September 15, 2023, after extensive briefing, the District Court requested supplemental letter briefing from the parties on the specific question of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan because "[t]he parties' briefing does not adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan."

25.     The Parties submitted their letter briefs to the Court on September 20, 2023, fully litigating the issue of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan. Neither party requested additional briefing on this issue nor reserved their right to supplement their briefing on this issue. On November 21, 2023, the SDNY Court held: "Defendants' motion to compel arbitration [] is granted. Because 'the text, structure, and underlying policy of

[Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested'…the case will be stayed pending arbitration." *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023), Order on Motion to Compel Arbitration at Ex. A, 56.

26.    As part of its determination that the claims regarding the Morgan Stanley advisors' deferred compensation programs were arbitrable, the SDNY Court undertook an in-depth analysis of whether they were ERISA plans.  Based on the parties' respective submissions, the record before it, and the law, the Court concluded:

> **This Court concludes that the deferred compensation programs at issue here are not bonus programs….Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate**….By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation."...**Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan...In sum, the deferred compensation programs at issue here are not bonus plans.**

> [T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (*see* ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." **Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or**

beyond." Id. § 3(2)(A)(ii).  And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" application of ERISA in these circumstances does not unreasonably expand the reach of the Act….**For the reasons stated above, this Court concludes that Morgan Stanley's deferred compensation programs are ERISA plans.**

Ex. A, 36-39 (international case citations omitted) (emphasis added).

27.    In *Shafer*, the Southern District of New York found that the parties' arbitration agreement was binding and ordered the parties to arbitration in FINRA.  As the Panel will hear, Merrill Lynch senior management is aware of *Shafer* and has taken affirmative steps to interfere with its own employees' litigation against Morgan Stanley.  Merrill Lynch cannot be unaware of its obligation under *Shafer*, and numerous decisions across the country, to submit its disputes with Claimants, and every other unnamed, unrepresented employee against whom it has purported to move for summary judgment in *Milligan*, to arbitration under the FINRA Code, notwithstanding that the Plans are governed by ERISA.  Merrill Lynch's failure to do so is willful bad faith.

## STATEMENT OF FACTS

### A.  Claimants Earned Commissions on Revenue They Generated Servicing Their Clients

28.    Claimants provide investment advisory and brokerage services to their clients.  During their employment, Claimants and Merrill Lynch split revenues generated on the services they provided pursuant to an industry-standard, non-discretionary formula known as a "grid."  Claimants' shares of revenue were commissions under both federal law and Maryland, Virginia and D.C. laws.  *See e.g. Medex v. McCabe*, 372 Md. 28, 811 A.2d 297 (2002) (holding that commissions constitute wages under the Maryland Wage Act because they "related directly to sales made by the employees during a defined fiscal year. [The employee] had performed all the work necessary to earn the [commissions], and [the employer] had registered the sales… The work of the employee may have preceded the payment date of the [commissions], but the [commissions] were compensation for work

performed, and, thus, wages under the Act.).

29.     Throughout their employment, Merrill Lynch deferred a portion of Claimants' earned commissions pursuant to a non-discretionary formula.   Earned commissions that were deferred accrued throughout the year.  At the end of the year, the total earned commissions deferred were allocated to the Plans—a percentage to WealthChoice Plan and a percentage to the Equity Plan—and, according to the Plans, "converted" into "awards" with a value exactly equal to the earned commissions deferred.

30.     Awards under the Plans are governed by their respective plan documents and the "Award Agreements" Merrill Lynch issued to Claimants under the plan documents.

31.     Under the WealthChoice Plan, Claimants' earned commissions were purportedly converted to accounts notionally invested through Merrill Lynch's investment platform.

32.     Under the Equity Plan, Claimants' earned commissions were purportedly converted to a RSU equivalent to one share of Bank of America common stock and convertible to either cash or common stock after "vesting."

33.     Under the Plans, Claimants' deferred commissions were purportedly contingent upon vesting on a date scheduled between two and nine years after Claimants earned them.  The Plans purport to vest and pay earned commissions early prior to the scheduled vest date in the event of certain types of termination, including death, "Workforce Reduction, Divestiture or Disability," and "retirement."   With respect to retirement, the Plans provide that advisors are eligible for retirement when they reach age 65 or age 55 with 10 years of service and that the Cancellation Rule is inapplicable in the event of retirement provided the advisor does "not engage in Competition" before the payment date, provides an annual "certification that [they] have not engaged in competition," and agrees to new anti-competition and solicitation covenants.

34.     The Plans purport to "cancel" an advisor's earned commissions in the event of "all

other terminations" prior to the vesting date (the "Cancellation Rule"). After each Claimant left Merrill Lynch, Merrill Lynch purported to cancel and failed to pay commissions Claimants had earned performing services for their clients—on revenue Merrill Lynch actually received from their clients—as long as a <u>decade</u> earlier.

35. As set forth below, the Plans are ERISA plans as a matter of law. The Cancellation Rule, purporting to cancel payment of commissions unless advisors remain employed by Merrill Lynch for up to a decade after the commissions are earned, is a per se violation of ERISA.

**B. The Plans Are "Employee Benefit Pension Plans" Governed by ERISA**

36. ERISA's "purpose is simple: to establish a 'uniform regulatory regime' for plan administration that protects monies belonging to plan beneficiaries while such funds are held and managed by others." *Wilson v. Safelite Grp., Inc.,* 930 F.3d 426, 434 (6th Cir. 2019) ("*Wilson*") (Citations omitted); *Tolbert v. RBC Capital Mkts. Corp.*, 759 F.3d 619, 621 (5th Cir. 2014) ("*Tolbert*"). "ERISA's purpose is among the broadest, if not the broadest, recognized by the Supreme Court...and Congress purposefully designed the scheme so the 'employers can establish ERISA plans rather easily.'" *Wilson*, 930 F.3d at 434 (citations omitted).

37. ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). The test for whether an employee benefit plan is covered by ERISA is straightforward:

> any plan, fund, or program which . . . by its express terms **or as a result of surrounding circumstances** such plan, fund, or program
>
> (i)  provides retirement income to employees, or
>
> (ii)  results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) ("§ 1002(2)(A)") (emphasis added).

38.     Under the plain language of the statute and blackletter law, the Plans are "Employee Benefit Pension Plan[s]" governed by ERISA because, by their express terms and as a result of surrounding circumstances, they "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." § 1002(2)(A)(ii).

**1. Each Plan Is a "Plan, Fund or Program."**

39.     The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'" *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich,* 530 U.S. 211, 223 (2000)). A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994). A "plan, fund or program" does not need to be a formal written document and can be comprised of multiple documents. *Id*. at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA").

40.     Each Plan is a "plan, fund or program" under ERISA because it identifies the intended benefits—earned commissions that are deferred for a period of years up to a decade—using a detailed, objective formula. The Plans also have an ascertainable class of beneficiaries: only advisors defer earned commissions under the Plans and the deferred compensation awards issued to them are specific to the advisors.

41.     Each Plan is ultimately funded by the earned commissions of the advisors themselves, i.e., a specific, defined and fully paid portion of revenue generated by advisors on services performed for their clients. Earned commissions converted dollar for dollar to RSUs are then specifically purported to be funded from Bank of America common stock designated for the purpose of meeting Merrill Lynch's obligations under the RSU award certificates.

**2. The Plans "Result in a Deferral of Income" Under Subsection (ii) of § 1002(2)(A)**

42.     As set forth above, subsections (i) and (ii) of § 1002(2)(A) "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." *Pasternack v. Schrader,* 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert*, 758 F.3d at 624: ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i)"). The second of these two independent tests—whether a "plan, fund or program "results in a deferral of income" under subsection (ii)—is "an effects-based inquiry rather than one based on purpose." *Pasternack*, 863 F.3d at 170, n.5.

43.     The Plans result in a deferral of advisors' earned commissions. At least 5% of an advisor's earned commissions are withheld each year and allocated between the Plans and purportedly converted to an award issued in the first quarter of the next year that purports to defer earned commissions for a further two to nine years.

44.     *Tolbert, supra,* is directly on point.  In *Tolbert*, as here, RBC's plans purported to defer earned commissions and forfeit them in the event an advisor left prior to a "vesting" date years after the commissions were earned.  *Tolbert*, 758 F.3d at 621.  Considering the same question before this Panel, whether the plan at issue was an "employee pension benefit plan" under ERISA, the Fifth Circuit first analyzed whether the plan qualified under subsection (i) of § 1002(2)(A): *i.e.*, whether it "provides retirement income," and concluded it did not.  *Tolbert*, 759 F.3d at 624. The Fifth Circuit then conducted an <u>independent</u> analysis of RBC's plan under subsection (ii) and concluded that the plan was a "'pension plan' under subsection (ii)."[1]  *See, Id*., 759 F.3d at 624.

45.     The Fifth Circuit found that, as here, the "deferral of income therefore 'ensues from' (or 'arises as an effect of') the express terms of the [plan]...Put another way, by participating in the

---

[1] *Tolbert* expressly rejected RBC's attempt to conflate the two sections, noting "[o]ur court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income." *Id.* 759 F.3d at 624.

[plan], the plaintiffs have 'fore[gone] income...in exchange for receiving income' at a later date." *Id.* at 625-26 (citations omitted). It also found significant that, as here, the statement of purpose set forth by RBC's plan documents recited the purpose of deferred compensation. *Id.* 759 F.3d at 625.[2] The plan in *Tolbert* thus satisfied the first prong of subsection (ii) "results in a deferral of income."

46.     In *Wilson, supra*, the Sixth Circuit considered the same question whether the plan at issue was covered by ERISA and noted that the starting point for interpreting the statute is the language of the statute itself. *Wilson,* 930 F.3d at 433. "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (citations omitted). Focusing on the term "results in a deferral of income," the Sixth Circuit concluded that "[i]n light of the ordinary meaning of the word 'results' and Congress's exclusion of the word 'requires,' § 1002(2)(A)(ii) covers plans containing terms that have as **an effect, issue or outcome—even if not as a requirement**—deferral of income by employees to periods extending to the termination of covered employment or beyond." *Id.,* 930 F.3d at 435 (emphasis added).

47.     These decisions are, of course, entirely consistent with the dictionary definitions of "deferred compensation" as (1) "[p]ayment for work ***performed***, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when ***earned.***" BLACK'S LAW DICTIONARY (11th ed. 2019) (*emphasis added*); *see also Kuhbier v. McCartney*, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017) (quoting

---

[2]  Merrill Lynch's Plan prospectuses represent that "in our view, the Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974," a boilerplate disclaimer that has failed to persuade the federal courts, but nowhere does Merrill Lynch disclaim that either Plan is a deferred compensation plan, nor could it. Each Plan's documents and award certificates flatly recites its purpose of deferred compensation, sets forth the terms of deferred compensation, outlines the tax treatment and requirements of deferred compensation, and actually defers the payment of earned commissions for one to ten years.

Black's Law Dictionary definition). Merrill Lynch advisors defer part of their commissions for work *performed* (by generating revenue for Merrill Lynch) until a later date and do not pay taxes on this part of their compensation until it is paid.

48. The Plans self-evidently meet the second prong of subsection (ii) in that, by their express terms or as "a result of surrounding circumstances," they result in advisors deferring income "for periods extending to the end of covered employment or beyond." *See* § 1002(2)(A)(ii). The "end of covered employment" refers to when an employee stops working for a company) and ERISA "covers plans containing terms that have as **an effect, issue, or outcome—even if not a requirement**—deferral of income by employees extending to the termination of covered employment or beyond." *Id*. 930 F.3d at 434-435 (emphasis added). The Sixth Circuit, comparing the plan before it to the one before the Fifth Circuit in *Tolbert*, held that it was irrelevant that the plans provided for payment of deferred commissions both before and after termination:

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in-service distributions.
>
> ***
>
> The statute does not mandate that 'all deferrals extend to the termination of employment' or that payments be 'systematically deferred' until termination

*Id*. at 435, 437. *See also Tolbert*, 759 F.3d at 626 (holding that plan variously deferring payment to times prior to, at and following termination "fits comfortably within the meaning of subsection (ii).

49. The Plans here, which variously defer payment to times prior to, at and following termination, "fit[] comfortably within the meaning of subsection (ii)" for the same reason. The

Plans provide, for example, that advisors whose employment terminates due to Workforce Reduction, Divestiture, Change of Control or Disability are paid in accordance with the specific award's payment schedule, meaning a year to a decade following termination, while termination due to death results in payment as soon as practicable after termination. With respect to retirement, the WealthChoice Plan provides payment in two installments over two years following termination, while the Equity Plan provides for payment in accordance with the specific award's payment schedule. Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, the Plans defer payment of earned commissions to and after termination.

50. Considering the same question whether a materially identical Morgan Stanley deferred compensation plan was an ERISA plan in *Shafer v. Morgan Stanley et al.*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023), the United States District Court for the Southern District of New York took extensive briefing and performed a thorough analysis before concluding:

> [T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - **are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month**." (2018) Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does **not pay out the cash or equity reflecting those "credits" for four to six years, however**. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (*see* ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that **"payment for work performed" in a given month is "paid in the future."** And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, **Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."** Id. § 3(2)(A)(ii).

Ex. A at 38 (emphasis added).

### 3.  Neither Plan Is a "Bonus Program"

51.    In its Answer to the Class Action Complaint in *Milligan*, Merrill Lynch asserted a defense that its Plans are "bonus programs" exempt from ERISA.[3]  Assuming Merrill Lynch raises the same defense to this Arbitration, it is manifestly frivolous.

52.    A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).  By contrast, commissions "relate[] directly to the sales made by the employee during a defined fiscal year." *Medex v. McCabe,* 372 Md. 28, 811 A.2d 297 (2002) (holding that commissions constitute wages under the Maryland Wage Act because they "related directly to sales made by the employees during a defined fiscal year. [Employee] had performed all the work necessary to earn the [commissions], and [employer] had registered the sales… The work of the employee may have preceded the payment date of the [commissions], but the [commissions] were compensation for work performed, and, thus, wages under the Act.); *see also Abelman v. Wells Fargo Bank, N.A.*, 976 F. Supp. 2d 660 (D. Md. 2013).

53.    Merrill Lynch defers payment of *earned commissions* under a non-discretionary, uniformly applied formula known as a "grid."  This is not a bonus as a matter of law, in the industry, in Merrill Lynch's own compensation plan or in the Plan documents themselves.  In *Tolbert*, the Fifth Circuit distinguished deferred commissions under the plan from a "bonus" plan, holding that deferred commissions, *i.e.*, deferring "a portion of...compensation to be earned with

---

[3] The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA. 29 C.F.R. § 2510.3-2(a). Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Id*. at § 2510.3-2(c).

respect to the upcoming Plan Year" is not a "bonus," and that ERISA did not require "systematic" deferral in order for a plan to qualify. *See Tolbert*, 759 F.3d at 626 (citing *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 933 (8th Cir. 1999) (characterizing plans that provide rewards for superior performance as "classic" bonus situations, and noting that RBC's reliance on *Emmenegger*—a case involving a bonus program—was misplaced). *See also Wilson*, 930 F.3d at 435.

54.    In *Shafer*, Morgan Stanley raised the identical "bonus program" argument.   The Southern District of New York flatly rejected it and held that Morgan Stanley's plan, materially identical to the Plans here, is an ERISA Plan:

> **Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission."** *See* Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language - Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language - Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation"). **Courts generally treat these two types of compensation as distinct.** *See Smith v. Rochester Tel. Bus. Mktg. Corp.,* 786 F. Supp. 293,299 (W.D.N.Y. 1992) (in ERISA action, concluding that employee benefits committee did not "err[] in deciding that commissions are not bonuses"), aff d, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiffs] salary was $50,000 per year plus incentive commissions and bonuses."); *Israel v.Voya Institutional Plan Servs., LLC*, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, **deferred compensation payments are not "over and above normal compensation."** Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

In sum, **the deferred compensation programs at issue here are not bonus plans**.

Ex. A, 36 – 37 (emphasis added).

**C. The Plans Violate ERISA**

55.    Under ERISA, employee "contributions are nonforfeitable," meaning that they are 100% vested when made.  ERISA § 203.   Consequently, when an advisor leaves Merrill Lynch for any reason, Merrill Lynch is *required* by statute to timely pay his or her earned commissions, i.e., employee contributions, in full.  The Plans' Cancellation Rule, purporting to cancel payment of commissions years or a decade after they were earned, is a per se violation of ERISA.

56.    The Cancellation Rule would violate ERISA even if the earned commissions, formulaically deferred from advisors' formulaically determined portion of revenues they generate servicing their clients, were misclassified as employer contributions.  Pursuant to § 203(a)(2)(B), employees must be fully vested in employer contributions after they have three years of service or, alternatively, gradually vested under the following schedule:

| Years of Service | Nonforfeitable Percentage |
|------------------|---------------------------|
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 | 80 |
| 6 or more | 100 |

57.    The Plans violate ERISA's vesting requirements because all advisors, regardless of

years of service, vest according to lengthy schedules between one year and a decade after the commissions are earned and purportedly deferred.  Every Claimant in this case exceeded six years of service as of the date of termination.

58.    ERISA permits employers to operate deferred compensation plans for commission-based advisors, but strictly prohibits forfeiture of deferred commissions and requires employers to timely pay them after an advisor leaves.  Merrill Lynch, indisputably in violation of ERISA, the Maryland Wage Law, Virginia Wage Act, and D.C. Wage Law, purported to cancel commissions it was bound by contract to pay Claimants on revenue that they generated, and that clients paid to Merrill Lynch, as long as a decade before they left.  This conduct is systematic.  In addition to the billions of dollars that Merrill Lynch takes as its own contractually allocated share of revenue its advisors generate serving their clients, Merrill Lynch purports to appropriate and retain for itself, in violation of ERISA and the labor laws of states across the country, hundreds of millions of dollars in advisors' commissions when they finally leave.

## CAUSES OF ACTION

### Count I
### Declaratory and Equitable Relief (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

59.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

60.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

61.    Claimants seek a declaration that with respect to Merrill Lynch advisors:

  i. the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);

    ii.   the Cancellation Rule under the Plans violates ERISA;

    iii.   Merrill Lynch's deferral of compensation into the Plans violates ERISA;

    iv.   pending payment in full, with penalties, interest and attorneys' fees as set forth below, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

62.   Claimants seek an injunctive order requiring:

    v.   a complete accounting of all amounts deferred under the Plans;

    vi.   disgorgement to Claimants of all amounts withheld and purportedly forfeited;

    vii.   disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;

    viii.   an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees set forth below; and

    ix.   all other relief the Panel determines is just and proper.

**Count II**
**Recovery of Benefits Under the Plan**
**(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

63.   Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

64.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

65.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

66.     Merrill Lynch improperly denied Claimants their earned deferred commissions that should have been vested and not forfeited under ERISA. By denying Claimants their earned deferred commissions, Merrill Lynch violated ERISA § 203(a), 29 U.S.C. § 1053(a).

67.     Merrill Lynch should be ordered to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

**Count III**
**Breach of Fiduciary Duty Regarding the Plans (ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))**

68.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

69.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

70.     ERISA requires that fiduciaries discharge their duties solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must

act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.* ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan" only to the extent that they "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

71.     Merrill Lynch, a FINRA member firm and Claimants' employer, purported to "defer" and then to forfeit millions of dollars in earned commissions under its compensation plans into the Plans pursuant to vesting terms and schedules that violated the statutory requirements of ERISA.

72.     Merrill Lynch created, imposed, administered and managed the compensation plans under which Claimants' commissions were unlawfully deferred into the Plans, determined the amounts deferred and actually deferred the commissions, managed the deferred amounts and any and all investments, and determined the purported forfeitures of commissions.

73.     Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109. Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as is proper.

74.     Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

75.     Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

76.     Claimants seek the restoration of all earned deferred commissions that were illegally deemed forfeited by Merrill Lynch.

**Count IV**
**Maryland Wage Payment and Collection Law Violations As To Claimants**
**Coffey, Kelly, Mayer, McArthur, Monsein, Ruben, Snyder and Sotsky**

77.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

78.     Claimants Coffey, Kelly, Mayer, McArthur, Monsein, Ruben, Snyder and Sotsky are commissioned salespersons for purposes of the Maryland Wage Payment and Collection Law (Maryland Wage Law). *See* Md. Code Ann., Lab. & Empl. § 3-501 (expressly defining wages to include commissions).   Claimants' deferred commissions, which had been earned constitute "wages" for the purposes of the Maryland Wage Law.

79.     Under the Maryland Wage Law, employers may not make deductions from wages except in very narrowly defined circumstances provided by statute, none of which are applicable here.  *See* Md. Code Ann., Lab. & Empl. § 3-503.

80.     Merrill Lynch set up a deduction plan for Claimants' earned deferred commissions. The deductions Merrill Lynch took from Claimants' and its other advisors' wages were for Merrill Lynch's own benefit, in violation of § 3-503 of the Maryland Wage Law.

81.     Further, upon the discharge, layoff or resignation of an employee, the Maryland Wage Law requires that the employer pay the employee all of his or her earned and unpaid wages immediately.  *See* Md. Code Ann., Lab. & Empl. § 3-505.

82.     Claimants earned their commissions and were forced to defer them pursuant to a fixed, non-discretionary "compensation grid."   Merrill Lynch's forfeiture of earned deferred commissions therefore violates § 3-503 of the Maryland Wage Law.

83.     As of the date of this filing, Merrill Lynch has not paid Claimants their earned deferred commissions in violation of the Maryland Wage Law.  Merrill Lynch has instead declared its intention never to pay Claimants their earned deferred commissions and that their earned deferred commissions were forfeited.

84.     Merrill Lynch's cancellation of Claimants' deferred commissions and failure and refusal to pay Claimants their earned deferred commissions violated §§ 3-502, 503 and 505 of the Maryland Wage Law.  *See* Md. Code Ann., Lab. & Empl. § 3-502 (requiring timely payment of wages); Md. Code Ann., Lab. & Empl. § 3-505 (requiring timely payment of wages "on termination of employment"); Md. Code Ann., Lab. & Empl. § 3-503 (prohibiting deductions from wages).

85.     Pursuant to the Maryland Wage Law, "if an employer fails to pay an employee in accordance with § 3-502 or § 3-505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages" and if "a court finds that an employer withheld the wage of an employee in violation of this subtitle […] the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." Md. Code Ann., Lab. & Empl. § 3-507.2.

### Count V
### Virginia Wage Payment Act Violations
### As To Claimants Crowley, Green, Jewayni, Shemeld and Thongniyom

86.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

87.     Claimants Crowley, Green, Jewayni, Shemeld and Thongniyom are commissioned salespersons as defined by Virginia Law. *See* Va. Code Ann. § 60.2-229 (expressly defining wages to include commissions).  Claimants' deferred commissions, which had been earned constitute "wages" for the purposes of the Virginia Wage Act.

88.     Under the Virginia Wage Act, employers may not make deductions from wages except in very narrowly defined circumstances provided by statute, none of which are applicable here. *See* Va. Code Ann. § 40.1-29(C).

89.     Claimants earned their commissions and were forced to defer them pursuant to a fixed, non-discretionary "compensation grid."  Merrill Lynch's forfeiture of Claimants' earned deferred commissions therefore violates Va. Code Ann. § 40.1-29(C).

90.     Merrill Lynch set up a deduction plan for Claimants' earned deferred commissions. The deductions Merrill Lynch took from Claimants' and its other advisors' wages were for Merrill Lynch's own benefit, in violation of Va. Code Ann. § 40.1-29(C).

91.     Further, upon the discharge, layoff or resignation of an employee, the Virginia Wage Act requires that the employer pay the employee all of his or her earned and unpaid wages immediately. *See* Va. Code Ann. § 40.1-29(A).

92.     As of the date of this filing, Merrill Lynch has not paid Claimants their earned deferred commissions in violation of the Virginia Wage Act.  Merrill Lynch has instead declared its intention never to pay Claimants their earned deferred commissions and that their earned deferred commissions were forfeited.

93.     Pursuant to Va. Code Ann. § 40.1-29 (J) "In addition to any civil or criminal penalty provided by this section […] if an employer fails to pay wages to an employee in accordance with this section, the employee may bring an action […] against the employer in a court of competent jurisdiction to recover payment of the wages, and the court shall award the wages owed, an additional

equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G, and reasonable attorney fees and costs. If the court finds that the employer knowingly failed to pay wages to an employee in accordance with this section, the court shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs."

**Count VI**
**D.C. Wage Payment and Collection Law Violations**
**As To Claimant Kaibni**

94.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

95.     Claimant Kaibni is a commissioned salesperson for purposes of the D.C. Wage Payment and Collection Law (D.C. Wage Law). *See* D.C. Code Ann. § 32-1301 (expressly defining wages to include commissions). Claimant's deferred commissions, which had been earned constitute "wages" for the purposes of the D.C. Wage Law.

96.     Upon the discharge, layoff or resignation of an employee, the D.C. Wage Law requires that the employer pay the employee all of his or her earned and unpaid wages immediately. *See* D.C. Code Ann. § 32-1303

97.     As of the date of this filing, Merrill Lynch has not paid Claimant his earned deferred commissions in violation of the D.C. Wage Law. Merrill Lynch has instead declared its intention never to pay Claimant his earned deferred commissions and that his earned deferred commissions were forfeited.

98.     Pursuant to D.C. Code Ann. § 32-1303 "If an employer fails to pay an employee wages earned as required under paragraphs (1), (2), and (3) of this section, such employer shall pay, or be additionally liable to, the employee, as liquidated damages, 10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller."

28

99. D.C. Code Ann. § 32-1308 provides for the award of costs and attorneys' fees in an action by an employee against the employer for the violation of the D.C. Wage Law.

## Count VII
## Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

100. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

101. As a FINRA member firm, Merrill Lynch had a duty to "observe high standards of commercial honor and just and equitable principles of trade" in the "conduct of its business." FINRA Rule 2010.

102. In every contract there exists an implied covenant of good faith and fair dealing in the course of performance. Breach of the covenant is breach of the agreement itself, the covenant being "part and parcel" of the agreement or contract. The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under the agreement. The covenant encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

103. Merrill Lynch breached its contractual obligations to Claimants when it cancelled their earned deferred commissions.

104. Merrill Lynch falsely and expressly told Claimants that their earned deferred commissions would be a portion of their total earned compensation. Merrill Lynch also omitted to tell them that the plan primarily benefitted Merrill Lynch. Merrill Lynch's misrepresentations and omissions were not in good faith, "just and equitable" or "commercial honor."

105. Merrill Lynch breached its agreement and the implied covenant of good faith and fair dealing and FINRA Rule 2010 and is liable for the total amount of earned deferred commissions it has not paid.

**Count VIII**
**Conversion**

106. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein. In the alternative, Claimants allege that Merrill Lynch is liable for conversion of their earned deferred commissions.

107. A claim for conversion requires a showing of claimant's legal ownership or immediate superior right of possession to property, and defendant's unauthorized interference with claimant's ownership or possession of such property. Where legal ownership or immediate superior right of possession is established, interference with earned compensation is conversion.

108. Pursuant to the terms of the Plans, Claimants' deferred commissions were earned through their production of revenue. Thus, upon earning their deferred commissions, Claimants acquired a possessory interest in the underlying property. By subsequently forcing them to forfeit their earned deferred commissions, Merrill Lynch interfered with Claimants' possessory interest of the property.

109. Merrill Lynch is liable for compensatory damages in the amount of the total earned deferred commissions it withheld from Claimants, valued as of the date of Claimants' forced forfeiture of their earned deferred commissions, to be proven at the hearing.

**Count IX**
**Unjust Enrichment**

110. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

111. In the alternative, Claimants are entitled to relief under the theory of unjust enrichment.

112. A claimant may prevail on a claim for unjust enrichment by demonstrating that the respondent benefitted at the claimant's expense and that equity and good conscience require

restitution.

113.   Here, Merrill Lynch has been enriched by wrongfully retaining Claimants' earned

commissions.

## <u>RELIEF</u>

Based on the foregoing, Claimants respectfully requests the Panel issue an Award against

Merrill Lynch providing for:

a.   monetary damages equal to the unpaid earned compensation in an amount to be proven at the hearing but not less than $5 million;

b.   monetary damages equal to any other earned but unpaid amounts in an amount to be proven at the hearing;

c.   all penalties in accordance with the Maryland Wage Law;

d.   all penalties in accordance with the Virginia Wage Act;

e.   all penalties in accordance with the D.C. Wage Law;

f.   with respect to Claimants Coffey, Kelly, Mayer, McArthur, Monsein Ruben, Snyder and Sotsky, prejudgment interest as required by Maryland Law; with respect to Claimants Crowley, Green, Jewayni, Shemeld and Thongniyom, prejudgment interest as required by Virginia Law; and with respect to Claimant Kaibni prejudgment interest as required by D.C. Law;

g.   attorneys' fees and costs as required by ERISA, Maryland Wage Law, Virginia Wage Act, and D.C. Wage Law;

h.   declaration that, with respect to Merrill Lynch:

i.   the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);

ii.   the Cancellation Rule under the Plans violates ERISA;

iii.   Merrill Lynch's deferral of compensation into the Plans violates ERISA;

iv.   pending payment in full, with penalties, interest and attorneys' fees as set forth above, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

    i.    an injunctive order requiring:

        i.    a complete accounting of all amounts deferred under the Plans;

        ii.    disgorgement to Claimants of all amounts withheld and purportedly forfeited;

        iii.    disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;

        iv.    an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees as set forth above; and

    j.    Such other relief as the Panel deems just, equitable and proper.[4]

Dated: New York, New York
        November 7, 2024

                                  **LAX & NEVILLE LLP**

                                  ***/s/   Barry R. Lax***
                                  Barry R. Lax, Esq.
                                  Sandra P. Lahens
                                  Robert R. Miller
                                  350 Fifth Avenue, Suite 4640
                                  New York, NY 10118
                                  Tel: (212) 696-1999
                                  *Attorneys for Claimants*

---

[4] Claimants reserve their right to amend or supplement their damages pending discovery.

32

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> - against - <br><br> MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, <br><br> Defendants. | **MEMORANDUM <br> OPINION & ORDER** <br><br> 20 Civ. 11047 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

In this putative class action, Plaintiffs Matthew Shafer, Sheri Haugabook, Peter

Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey

Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel assert that Defendants Morgan

Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management

Development and Succession Committee (the "Compensation Committee"), and certain

unnamed members of the Compensation Committee (together, "Morgan Stanley" or the "Bank"),

violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying

Plaintiffs all of their deferred compensation when they left their financial advisor positions at

Morgan Stanley.  Defendants have moved to compel arbitration and for a stay of these

proceedings.  (Dkt. No. 65)  For the reasons stated below, Defendants' motion will be granted.

## BACKGROUND[1]

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney.[2]  They

reside throughout the country and worked for the Bank at various times between 1994 and 2020.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16)

"Defendant Morgan Stanley is a Delaware corporation with a principal place of

business in New York, New York.  Morgan Stanley is a global financial services firm that,

through its subsidiaries and affiliates, including [Defendant Morgan Stanley Smith Barney LLC,

a Delaware limited liability company with its principal place of business in New York, New

York] provides financial advisory services to clients.  Defendant Compensation Committee is a

committee of Morgan Stanley's Board of Directors formed to discharge the Board's

responsibilities related to compensation. . . . The Compensation Committee is an unincorporated

---

[1]  In resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

The facts discussed below are drawn from (1) the Amended Complaint (Dkt. No. 58); (2) the alleged "Plan Documents" cited in the Amended Complaint, which have been docketed as exhibits to Plaintiff's September 15, 2023 letter (Dkt. No. 83); and (3) the declarations and accompanying exhibits submitted by the parties (Porco Decl. (Dkt. No. 67); Krentzman Decl. (Dkt. No. 68); Jasinski Decl. (Dkt. No. 72-1)).

[2]  Morgan Stanley describes the financial advisor's role as "help[ing] [clients] create a wealth plan that takes [their] specific goals and circumstances into account," including providing advice on "retirement income . . . , asset allocation . . . , and changes in tax policy." Morgan Stanley Wealth Mgmt., Why Advice Matters (May 31, 2023), available at https://www.morganstanley.com/articles/advice-matters.

association with its principal place of business in New York.  John and Jane Does 1-20 are the individual members of the Compensation Committee." (Id. ¶¶ 23-26)

Plaintiffs purport to bring this action on behalf of all Morgan Stanley financial advisors who forfeited deferred compensation as a result of leaving their Morgan Stanley employment between December 29, 2014 and the present. (Id. ¶ 90)

Plaintiffs assert general federal question jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA jurisdiction pursuant to 29 U.S.C. § 1132(e). (Id. ¶ 7)

## I.    FACTS

### A.    Financial Advisors' Compensation at Morgan Stanley

Morgan Stanley's "compensation program[]" for financial advisors during the relevant time period largely consists of two components:  salary and incentive compensation.[3] (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[4]

"All Advisors . . . receive a guaranteed monthly salary.  Total compensation in any month will not be lower than the applicable monthly salary by state." (Id. § 1.1)  As of 2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per year. (Id. § 1.1)

Incentive compensation is based on the "Total Credits" that a financial advisor is awarded monthly. (Id. § 1.2.1)  "The Advisor's Total Credits for each month [are] determined based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with

---

[3]  Morgan Stanley also offers certain income and savings programs that are not at issue here, including a "lending growth award program" and a "capital accumulation program." (See generally 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2))

[4] The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

"(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" –

"multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

    Incentive compensation is further divided between (1) "Cash Credits," which are

"calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and

(2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–

1.2.3) The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral

Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5%

(for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue

increases. (Id. §§ 1.2.2–1.2.3)

    The parties' dispute here involves the "Deferred Credits" that result in deferred

compensation paid out years after it is earned.

    The 2018 Financial Advisor Compensation Plan provides the following example

of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
> - Credit Rate is 44.0%
> - Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
> - Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
> - Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

(Id. § 1.2.3)

    "Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in

the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of

Morgan Stanley common stock approximately four years from the grant date" (the "Equity

Incentive Plan"). (Id. § 1.2.2) "[S]eventy-five percent of the cumulative monthly Deferred

Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be

paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. §

1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8))  The Compensation Committee administers both

plans.  (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8) § 5(a))

        "[Financial advisors] have individual, notional accounts in the [Compensation

Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred

compensation.  [Financial advisors] can invest their accounts in notional investments, like in a

401(k) plan, with the value of their accounts tracking the performance of the selected

investments."  (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award

Certificate (Dkt. No. 83-5) § 1))  As to vesting under the Equity Incentive Plan, "a Stock Unit

will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to

the Fair Market Value on the payment date of one Share."  (Equity Incentive Compensation Plan

Document (Dkt. No. 83-8) § 8)

        As to both plans, "[d]eferred compensation awards are contingent upon the

Advisor remaining employed through the grant and vesting dates of the award."  (2018 Financial

Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2)  Plaintiffs refer to this policy as the

"Cancellation Rule."  (Am. Cmplt. (Dkt. No. 58) passim)

        There are several exceptions to the Cancellation Rule.  Deferred cash

compensation and deferred equity compensation both vest after employment if the financial

advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e.,

"termination of . . . [e]mployment . . . for any reason other than under circumstances involving

any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for]

[g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified

combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" –
i.e., layoffs; or (4) departure for governmental service.  (2017 Compensation Incentive Plan
Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan
Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

       "[E]nter[ing] into an employment or consulting relationship with a firm offering
Competitive Services" constitutes "Prohibited Activity."  Accordingly, a long-tenured financial
advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm
is not eligible for the "full career retirement" exception to the Cancellation Rule.  (2017
Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive
Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

    **B.**    **The Arbitration Agreements**

       In moving to compel arbitration, Morgan Stanley cites arbitration clauses in three
types of Morgan Stanley employment agreements:  the "Bonus Agreement"; the "Employment
Agreement"; and the "CARE Program."

    **1.**    **The Bonus Agreement's Arbitration Provision**

       The Bonus Agreement's arbitration provision provides as follows:

7. Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this
Agreement or any benefits or payments available and/or due under this
Agreement, as well as any controversy or claim arising out of or in any way
relating to Employee's employment with Morgan Stanley or termination thereof,
including, but not limited to common law claims for breach of contract or tort,
wage and hour claims, and/or statutory discrimination claims (individually and
collectively referred to herein as "Covered Claims"), will be resolved by final and
binding arbitration before the Financial Industry Regulatory Authority ("FINRA")
in accordance with the FINRA Code of Arbitration Procedure for Industry
Disputes.  Notwithstanding the foregoing, any Covered Claim that has been
initiated or is being maintained on a class, collective, or representative action
basis, or is otherwise brought on behalf of others, may not be submitted to
arbitration before FINRA.  Also, notwithstanding the foregoing, any Covered

Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA").  Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures.  Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims.  Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only.  With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action.  An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7.  Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration.  In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law.  For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected.  Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver.  If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

7

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . .

(2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7; see also 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7) (same); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7) (similar))[5]

## 2.   **The Employment Agreement's Arbitration Provision**

The Employment Agreement contains the following arbitration provision:

7. ARBITRATION

7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.  Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  This Paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provision[al] relief from any court, as provided for in this agreement.

7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ("CARE").  Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Administrator's Office and in the CARE Program explanatory brochure.

(2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7)

## 3.   **The CARE Program**

"For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called 'CARE,' short for Convenient Access to Resolution for Employees.

---

[5]  The cited 2014 and 2015 bonus agreements contain substantially similar – albeit not identical – language addressing the arbitration of claims.  The parties have not argued that language differences in the relevant sections of the 2014 and 2015 bonus agreements are material.

CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the

program is available to employees on Morgan Stanley's intranet site. . . . In 2015, Morgan

Stanley announced an expansion of the CARE [P]rogram.  Morgan Stanley notified all U.S.

employees of the expansion via their individualized Morgan Stanley email accounts.  These

communications were sent in waves. . . .  [and] describ[ed] the process through which employees

could opt out of participating."  (Krentzman Decl. (Dkt. No. 68) ¶¶ 20, 22)

        The 2015 email regarding the CARE Program expansion and opt-out reads as

follows:

> Morgan Stanley is announcing the expansion of CARE and modifications to
> related Firm policies and programs to extend arbitration obligations for all US
> employees – registered and non-registered.  Effective October 2, 2015, arbitration
> under the CARE Arbitration Program will be mandatory for all employees in the
> U.S., and all covered claims between the Firm and employees will be resolved
> through final and binding arbitration on a nonclass, non-collective and non-
> representative action basis as more fully described in the Arbitration Agreement
> and CARE Guidebook. . . .
>
> By continuing your employment with Morgan Stanley, you accept and agree to,
> and will be covered and bound by the terms of the Arbitration Agreement and the
> arbitration provisions of the CARE Guidebook, unless you elect to opt out of the
> CARE Arbitration Program by completing, signing and submitting an effective
> CARE Arbitration Program Opt-Out Form by October 2, 2015.

(Sept. 2, 2015 Morgan Stanley Human Resources email (Dkt. No. 68-3) at 2)

        The 2015 email contains hyperlinks to the "Arbitration Agreement" (the "CARE

Program Arbitration Agreement") and the "CARE Guidebook."  (Id.)

        The CARE Program Arbitration Agreement provides as follows:

> **Binding Mutual Arbitration.**  You and Morgan Stanley agree that any Covered
> Claims (defined below) will be resolved by final and binding arbitration as set
> forth in this Arbitration Agreement and in the arbitration provisions of the CARE
> Guidebook, a copy of which is annexed hereto.  This Arbitration Agreement,
> including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall
> be governed by and interpreted in accordance with the Federal Arbitration Act
> ("FAA").  This Arbitration Agreement applies with respect to all Covered Claims,
> whether initiated by you or Morgan Stanley, and makes arbitration the required

9

and exclusive forum for the resolution of all Covered Claims. By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

**Covered Claims.** Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring. Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized. **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

**Excluded Claims.** The following claims and disputes are not subject to this Arbitration Agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. . . .

Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

(CARE Program Arbitration Agmt. (Dkt. No. 68-5) §§ 1-4 (emphases in original))  The CARE

Guidebook contains similar language.  (CARE Guidebook (Dkt. No. 68-4) at 4-6, 20)

     **C.**     **Applicability of Arbitration Provisions to Plaintiffs**

     Defendants have proffered evidence that Plaintiffs are bound by the arbitration

provisions contained in the following agreements:

- Shafer:  2015 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 6 and Ex. B);

- Haugabook, Heidt, Shover, Livanos, Samsen, Jeffrey Sheresky, Steve Sheresky, Jukel:  2015 CARE Program expansion, by virtue of not having opted out (Krentzman Decl. (Dkt. No. **68**) ¶ 31);

- Tamse:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 8 and Ex. C);

- Loftus:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 10 and Ex. D); and

- Nadler:  2008 Employment Agreement (Krentzman Decl. (Dkt. No. 68) ¶ 18 and Ex. A).

**II.**     **PROCEDURAL HISTORY**

     The Complaint was filed on December 30, 2020, with Shafer as the sole plaintiff.

(Dkt. No. 1)[6]

     On March 24, 2022, Plaintiffs filed the Amended Complaint.  (Dkt. No. 58)  The

Amended Complaint asserts claims for (1) declaratory and equitable relief pursuant to ERISA

§ 502(a)(3), 29 U.S.C. § 1132(a)(3) (id. ¶¶ 98-101); (2) "reformation of the [Financial Advisor]

Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA §§

502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (id. ¶¶ 102-07); and (3) "breach of fiduciary

duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the

---

[6]  On April 5, 2021, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 42)  The Court denied that motion without prejudice on March 10, 2022, after new plaintiffs moved for joinder and stated that they intended to file an Amended Complaint.  (Dkt. No. 57)

[Equity Incentive Plan],” pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).  (Id. ¶¶ 108-17 (capitalization altered))

On June 29, 2022, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 65)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Motion to Compel Arbitration

Under the Federal Arbitration Act (the “FAA”), an arbitration agreement “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.”  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for “an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement.”  9 U.S.C. § 4.  The FAA reflects “a strong federal policy favoring arbitration as an alternative means of dispute resolution.”  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  Given the federal policy favoring arbitration, “doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration.”  Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  However, this “presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made.”  Id.

“‘In deciding whether a dispute is arbitrable, [a court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.’”  Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 394 (2d Cir. 2015) (quoting Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int’l Bhd. of Teamsters, 561 U.S. 287 (2010)).  “When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  As to the scope of the arbitration agreement, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4).  Where, however, "'the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and "avoid the need for further court proceedings."'" Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011); Bensadoun, 316 F.3d at 175).

As noted above, in resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw[] all reasonable inferences in favor of the non-moving party." Id. (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)).  However, "[a] party to an arbitration

agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

**B.    ERISA**

"ERISA's comprehensive regulatory scheme governs most employee benefit plans." Liberty Mut. Ins. Co. v. Donegan, 746 F.3d 497, 503 (2d Cir. 2014), aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312 (2016). "The statute . . . seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." Gobeille, 577 U.S. at 320-21.

ERISA § 502(a), codified at 29 U.S.C. § 1132(a), provides that

[a] civil action may be brought –

> (1) by a participant or beneficiary –
>
>> (A) for the relief provided for in subsection (c) of this section, or
>>
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(1)-(3).

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee benefit plan' that is governed by ERISA." Albers v. Guardian Life Ins. Co., No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999).

ERISA addresses two types of "employee benefit plans":  "welfare plans" and "pension plans."  ERISA § 3(2)(A) defines "pension plan" as follows:

> (A) Except as provided [elsewhere in ERISA], the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
>> (i) provides retirement income to employees, or
>>
>> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A).

ERISA requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable" in most circumstances.  ERISA § 203(a), codified at 29 U.S.C. § 1053(a).  In the case of an "individual account plan,"[7] benefits must generally fully vest (1) after three years of service, or (2) gradually in accordance with a statutorily defined schedule. Id. §§ 203(a)(2)(B)(i)-(iii).

## II.     ANALYSIS

### A.     Whether the Parties Agreed to Arbitrate

As discussed above, Defendants have offered evidence that Plaintiffs Shafer, Tamse, Loftus, and Nadler executed written agreements containing arbitration clauses.  As to the remaining Plaintiffs, Defendants have offered evidence that they continued to work at Morgan Stanley without opting out of the 2015 CARE Program expansion, which provides for binding

---

[7] "The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34).

15

mutual arbitration.  (See Porco Decl. (Dkt. No. 67) and accompanying exhibits; Krentzman Decl.

(Dkt. No. 68) and accompanying exhibits)  Plaintiffs do not dispute the evidence showing their

agreement to the arbitration provisions at issue.  Given this record, the Court concludes that

Defendants have demonstrated that Plaintiffs and Defendants entered into agreements to

arbitrate.  See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004)

(employee's signed contract containing arbitration clause sufficient to establish agreement to

arbitrate under New York law); Victorio v. Sammy's Fishbox Realty Co., LLC, No. 14 CIV.

8678 CM, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (same); Lockette v. Morgan

Stanley, No. 18-CV-876 (JGK), 2018 WL 4778920, at *4–5 (S.D.N.Y. Oct. 3, 2018) (concluding

that plaintiff's continued work at Morgan Stanley after receiving the 2015 CARE Program

expansion email and plaintiff's decision not to opt out were sufficient to demonstrate an

agreement to arbitrate under New York law); Pelligrino v. Morgan Stanley Smith Barney LLC,

No. 17-CV-7865 (RA), 2018 WL 2452768, at *3-5 (S.D.N.Y. May 31, 2018) (same).

   It is likewise clear that the arbitration provisions at issue unambiguously delegate

disputes as to arbitrability to the arbitrator, except as to challenges to the provisions' class action

waivers.  (2014 Tamse Bonus Agmt. (Dkt. No. 67-**3**) § 7(d) ("Any dispute as to the arbitrability

of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.

Notwithstanding the foregoing, any issue concerning the validity of the class action, collective

action, or representative action waiver must be decided by a court, and an arbitrator does not

have authority to consider the issue of the validity of the waiver."); Shafer 2015 Bonus Agmt.

(Dkt. No. 67-2) § 7(d) ("Any issue concerning the arbitrability of a particular issue or claim

pursuant to this arbitration agreement (except for issues concerning the validity or enforceability

of the class action, collective action, or representative action Waivers) must be resolved by the

arbitrator, not the court."); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1 ("Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration."); CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4 ("Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.")) See Frazier v. Morgan Stanley, No. 16 CIV. 804 (RJS), 2018 WL 11585450, at *8 (S.D.N.Y. Nov. 29, 2018) (holding that identical provision in Morgan Stanley employment agreements "clearly provide[d] for the arbitration of questions concerning the arbitrability of any dispute arising out of or relating to those agreements").[8]

While Plaintiffs do not dispute that the signed agreements and Plaintiffs' failure to opt out of the CARE Program expansion signify consent to arbitration, they argue that "[e]ven if the arbitration agreements applied to Plaintiffs' claims, they were superseded by the [Compensation Incentive] [P]lan [D]ocument, which specifically requires disputes about the plan to be resolved in court, **not** arbitration."  (Pltf. Opp. (Dkt. No. 72) at 18-19 (emphasis in original))

In support of this argument, Plaintiffs cite to the Compensation Incentive Plan Document's "Governing Law and Exclusive Jurisdiction" provision:

---

[8]  Citing NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031-32 (2d Cir. 2014), and Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281 (5th Cir. 2019), Plaintiffs contend that "the parties did not clearly and unmistakably commit questions about the arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator."  (Pltf. Opp. (Dkt. No. 72) at 15 n.11)  These cases are not persuasive here, however, because they address arbitration provisions that do not contain the explicitly worded delegations quoted above.  In NASDAQ-OMX Grp., for example the agreement at issue was "silent as to who should decide arbitrability."  NASDAQ OMX Grp., 770 F.3d at 1031.  And in Archer & White Sales, the Fifth Circuit found that "[t]he parties could have unambiguously delegated th[e] question [of who decides arbitrability], but they did not, and we are not empowered to re-write their agreement."  Archer & White Sales, 935 F.3d at 282.

[The Compensation Incentive Plan] and the related legal relations between a
Participant and the Firm shall be governed by, and construed in accordance with,
the laws of the State of New York, without regard to any conflicts or choice of
law rule or principle that might otherwise refer the interpretation of the Award or
Account Value to the substantive law of another jurisdiction.  Following the
timely and proper exhaustion of applicable internal claims and appeals
procedures, the courts of New York shall have exclusive jurisdiction over the Plan
and any dispute arising in connection with the Plan, a Participant's participation
in the Plan or rights under the Plan.

(Compensation Incentive Plan Document (Dkt. No. 83-4) § 17)  The Compensation Incentive

Plan Document – unlike the agreements containing arbitration clauses discussed above – does

not contain a merger clause.[9]

According to Plaintiffs, the "Governing Law and Exclusive Jurisdiction"

provision in the Compensation Incentive Plan Document constitutes "'a subsequent contract

regarding the same matter'" – i.e., arbitration – that "'supersede[s] the prior contract[s].'"  (Pltf.

Opp. (Dkt. No. 72) at 19 (quoting Applied Energetics, 645 F.3d at 526))  But the evidence before

the Court suggests that nearly all of the agreements at issue containing the arbitration provisions

were executed after the Compensation Incentive Plan Document was issued.

---

[9]  The Bonus Agreement's arbitration provision states that "[e]mployee and Morgan Stanley
agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered
Claims, superseding all prior written and oral agreements regarding the resolution of Covered
Claims. . . ."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(k); see also 2014 Tamse Bonus
Agmt. (Dkt. No. 67-3) § 7(e) (same); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7(e) (same))

The Employment Agreement states that "[t]his writing constitutes the entire agreement of the
parties with respect to the subject matter recited in this Agreement.  This Agreement may be
amended only by a writing signed by both you and Morgan Stanley."  (2008 Nadler Employment
Agmt. (Dkt. No. 68-1) § 13)

The CARE Program Arbitration Agreement states that "**[t]his Arbitration Agreement applies
to all Covered Claims, including any Covered Claims based on, arising out of, or which
arose out of or in any way relate to acts and omissions that occurred before you and
Morgan Stanley entered into this Arbitration Agreement.**"  (CARE Program Arbitration
Agmt. (Dkt. No. 68-5) § 2 (emphasis in original))

18

While the Compensation Incentive Plan Document is not dated, Plaintiffs assert "[u]pon information and belief, [that] this document has been in effect since 2008 and [is] part of the 'applicable award documentation' when participants' deferred compensation is credited to their account each January." (Jasinski Decl. (Dkt. No. 72-1) ¶ 4) However, the record does not indicate whether (1) the Compensation Incentive Plan Document has changed over time, or (2) if, when issued as part of the "applicable award documentation" in a given year, it should be considered a document current as of that year or in the alternative, merely a copy of a 2008 document. These matters are material here, because all Plaintiffs other than Nadler signed arbitration agreements after 2008, when Plaintiffs assert that the Compensation Incentive Plan Document was issued. (Porco Decl. (Dkt. No. 67) ¶¶ 6-11; Krentzman Decl. (Dkt. No. 68) ¶¶ 23-30) And given the merger provisions found in the agreements containing arbitration clauses, if these agreements were executed after the Compensation Incentive Plan Document was issued, there is a compelling argument that these agreements supersede the Compensation Incentive Plan Document.

For example, Plaintiff Mark Tamse "was employed by Morgan Stanley as a[] [financial advisor] from March 7, 1994, until March 27, 2015." (Krentzman Decl. (Dkt. No. 68) ¶ 9) On February 18, 2014, he entered in to a Bonus Agreement containing an arbitration provision, which provides that "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof . . . will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) §§ 7(a)) The Bonus Agreement further provides that the arbitration provision "constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered

Claims."  (Id. § 7(e))  Based on the merger provision, it appears that the Bonus Agreement's arbitration clause would supersede the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction clause with respect to any deferred compensation that Tamse received under the Compensation Incentive Plan.

In any event, even if – contrary to the record before the Court – the Compensation Incentive Plan Document was issued after the agreements containing the arbitration provisions, the Governing Law and Exclusive Jurisdiction provision would not vitiate the arbitration provisions, because to the extent that the Compensation Incentive Plan is an ERISA plan – as Plaintiffs allege (Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) – the Governing Law and Exclusive Jurisdiction provision is null and void.

As discussed above, the Amended Complaint asserts that the deferred compensation programs at issue are ERISA plans, and all of the claims alleged in the Amended Complaint are premised on ERISA.  (See Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117)  The "exclusive jurisdiction" provision on which Plaintiffs rely, however, states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that disputes arising under the Compensation Incentive Plan must be resolved by the "courts of New York."  (Id. § 17)

Accepting Plaintiffs' argument that the deferred compensation programs at issue are ERISA plans, the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision is null and void to the extent that it provides that all disputes arising under it are governed by New York law, and that all disputes arising under it must be heard by New York courts.  Claims under ERISA are governed by Federal law and are heard by Federal courts.

"If a state law 'relate[s] to . . . [an ERISA] employee benefit plan,' it is pre-empted." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (quoting ERISA § 514(a), codified at 29 U.S.C. § 1144(a) ("Except as provided in [statutory exceptions not relevant here], the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of [ERISA].") (alterations in Dedeaux).  Moreover, ERISA provides – with a narrow exception not at issue here – that "[t]he district courts of the United States shall have exclusive jurisdiction of an action under [ERISA]."  ERISA § 4301(c), codified at 29 U.S.C. § 1451(c); see Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *4 n.6 (S.D.N.Y. Mar. 30, 2007) ("Federal district courts have exclusive jurisdiction over all claims arising under ERISA except for those arising under § 1132(a)(1)(B).").

Accordingly, the Governing Law and Exclusive Jurisdiction provision in the Compensation Incentive Plan Document – which states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that "the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan" (Dkt. No. 83-4 § 17) – is null and void with respect to the ERISA claims raised in the Amended Complaint.  See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 367 (6th Cir. 2000) ("[I]f ERISA preempts . . . state law . . . , there is no state law to which the administrator of the . . . plan must conform."), aff'd sub nom. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); Matter of HECI Expl. Co., Inc., 862 F.2d 513, 521 (5th Cir. 1988) ("Even if a party may, under some circumstances, waive the application of federal law to a

federally preempted state law claim by failing to raise federal law in a timely fashion, it would go too far to hold that parties could <u>agree</u> to apply state law to an ERISA claim.") (emphasis in original) (citation omitted); <u>Stevenson</u>, 2007 WL 9815654, at *4 n.6.

Finally, where an agreement containing an exclusive jurisdiction provision overlaps with – but does not entirely displace – a related agreement containing an arbitration provision, the issue of which provision applies presents a question of scope, and is thus subject to language in an arbitration provision delegating disputes about arbitrability to an arbitrator.  <u>See CleanSpark, Inc. v. Discover Growth Fund, LLC</u>, 485 F. Supp. 3d 494, 504 & n.10 (S.D.N.Y. 2020) ("where a later-in-time forum selection clause arguably wholly supersedes the earlier-in-time arbitration agreement . . . a court must independently determine whether the agreement to arbitrate is still enforceable"; where the later agreement does not entirely displace the earlier agreement and contains an exclusive jurisdiction provision that applies only to disputes within the scope of the later agreement, the arbitration provision has not been "wholly displaced by the forum selection clause, . . . the Court need not pause on the threshold question [of whether there has been an agreement to arbitrate]," because "'[w]hether the forum-selection clause in the later-in-time agreement supersedes the arbitration clauses in the earlier agreement[] presents a question of arbitrability'" that can be delegated to the arbitrator) (quoting <u>TAPCO Underwriters, Inc. v. Catalina London Ltd.</u>, No. 14-**CV**-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014)) (alteration omitted); <u>PB Life & Annuity Co. v. Universal Life Ins. Co.</u>, No. 20-CV-2284 (LJL), 2020 WL 2476170, at *3, *6–11 (S.D.N.Y. May 12, 2020) (reinsurer and insurer first entered into reinsurance agreement containing an arbitration provision, and then entered into trust agreement containing a New York choice of law and exclusive jurisdiction provision; the court held that, with respect to disputes implicating both agreements, whether the arbitration

22

provision or exclusive jurisdiction provision controlled was a question of arbitrability properly delegated to the arbitrator).

Here, the subject matter of the Compensation Incentive Plan Document is not identical to the subject matter of the employment agreements containing the arbitration provisions, and the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision applies only to the Compensation Incentive Plan. (Dkt. No. 83-4 § 17) The jurisdiction provision does not apply to claims regarding the Equity Incentive Plan. In these circumstances, as in CleanSpark and PB Life, disputes over the jurisdiction provision's application are within the arbitrator's ambit.

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014), Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc., 5 F. Supp. 3d 537 (S.D.N.Y. 2014), Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522 (2d Cir. 2011), and Ruiz v. New Avon LLC, No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) – all cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 72) at 19-20) – are not to the contrary.

In Goldman and Citigroup Glob. Markets, courts concluded that broker-dealer agreements that provided for exclusive jurisdiction in the Southern District of New York, and that contained merger provisions, superseded the "background FINRA arbitration rule." Goldman, 764 F.3d at 212, 216; see also Citigroup Glob. Markets, 5 F. Supp. 3d at 539-40.

In Applied Energetics, plaintiff manufacturer and defendant broker-dealer "entered into a preliminary letter agreement" that required disputes to be submitted to arbitration before the National Association of Securities Dealers, FINRA's predecessor. Applied Energetics, 645 F.3d at 523. The letter agreement "contemplated that the parties would enter into a subsequent, more formal agreement." Id. The parties subsequently entered into the

23

contemplated more formal agreement, which (1) "expressly provided that the agreement would be governed by New York law"; (2) provided that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York"; and (3) contained a merger clause. Id. The Second Circuit concluded that the language in the later formal agreement superseded the arbitration provision in the initial letter agreement because (1) "[the formal agreement's] language that 'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the [letter agreement's] parallel language that 'any dispute shall be resolved through binding arbitration'"; and (2) "[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Id. at 525-26 (quotation and alterations omitted).

And in Ruiz, the plaintiff employee signed (1) a November 14, 2017 employment agreement in which the parties "irrevocably consent and submit to the sole exclusive jurisdiction of the United States District Court for New York, or the Courts of the State of New York," with respect to "[a]ny and all actions arising out of the [employment agreement] or the termination thereof"; (2) a November 27, 2017 "Employment Arbitration Agreement" containing an arbitration provision for employment disputes; and (3) a revised December 19, 2017 employment agreement with a later start date, which contained the same exclusive jurisdiction clause as the original agreement, as well as a merger clause. Ruiz, 2019 WL 4601847, at *2, *7. The court concluded that the exclusive jurisdiction clause in the December employment agreement displaced the arbitration agreement agreed to the previous month, because the "language [of the December agreement] – which encompasses any dispute relating to Ruiz's employment by New

Avon – is both mandatory and exclusive, and cannot be reconciled with the parties' prior agreement to arbitrate all disputes"; and (2) and because of the merger clause. Id. at *9.

These cases are not on point because the circumstances in the instant case are entirely different. As an initial matter, these cases do not involve a situation in which – as here – Plaintiffs have brought exclusively federal ERISA claims and then incongruously cited to a contract provision stating that any disputes are governed by New York law and must be heard by "the courts of New York." Moreover, in all four of Plaintiffs' cases, the later-in-time agreement (1) had the same subject matter as the prior agreement, and/or (2) contained a merger clause. Here, as discussed above, it is not clear that the Compensation Incentive Plan Document is the later document and, in any event, the Compensation Incentive Plan Document does not contain a merger clause and does not address subject matter that is identical to the subject matter of the Employment Agreement, the Bonus Agreement, or the CARE Program. See PB Life, 2020 WL 2476170, at *9 (finding Goldman and Applied Energetics not on point where the subject matter of the contracts at issue overlapped only in part).

In sum, in multiple documents, Plaintiffs agreed – either via a signed writing or by not opting out of the CARE Program expansion – to arbitrate disputes regarding their employment at Morgan Stanley. Morgan Stanley has thus made a "prima facie showing" of "the agreements' contractual validity," and Plaintiffs have not met their "'heavy burden . . . to disprove [the] presumption[]'" that the "'agreement[s] [are] valid.'" Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1996)), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

25

**B.      Whether the Agreements to Arbitrate**
**Encompass the Claims at Issue**

The arbitration provisions at issue here encompass "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof"; "any controversy or claim between Employee and Morgan Stanley . . . based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley"; "[a]ny controversy or claim arising out of or relating to . . . employment by Morgan Stanley"; and "any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof . . . includ[ing] . . . claims under, based on, or relating to any federal . . . statute or regulation."  (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(a); 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(a); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1; CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 2)

"Courts have typically found such language indicative of a broad agreement." Cour Pharms. Dev. Co., Inc. v. Phosphorex, Inc., No. 20-CV-4417 (JPO), 2021 WL 1062568, at *3 (S.D.N.Y. Mar. 19, 2021) (listing cases); see Sportvision, Inc. v. MLB Advanced Media, LP, No. 18 CIV 3025 (PGG), 2020 WL 1957450, at *5 (S.D.N.Y. Apr. 23, 2020) ("A clause 'submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" is the paradigm of a broad clause.'") (quoting <u>Collins & Aikman Prod. Co. v. Bldg.</u>

<u>Sys., Inc.</u>, 58 F.3d 16, 20 (2d Cir. 1995); further citation omitted) (brackets in <u>Sportvision</u>).[10]

---

[10]  Citing <u>Cooper v. Ruane Cunniff & Goldfarb Inc.</u>, 990 F.3d 173 (2d Cir. 2021), Plaintiffs
contend that "Plaintiffs' claims do not 'arise from or relate to their employment' because they do
not involve facts particular to them."  (Pltf. Opp. (Dkt. No. 72) at 12)

In <u>Cooper</u>, plaintiff employees, "[a]cting on behalf of a putative class of plan participants and an
employee benefit plan . . . sued [an investment advisor] under § 502(a)(2) of [ERISA], claiming
damages arising from [the advisor's] alleged breach of fiduciary duty and mismanagement of a
profit-sharing fund sponsored by [plaintiffs'] employer ."  <u>Cooper</u>, 990 F.3d at 175.  In
particular, plaintiffs alleged that the investment advisor had breached its fiduciary duty by
investing "almost 30% of the Plan's total assets" in "shares [of] Valeant Pharmaceuticals," which
precipitously declined in value following a series of scandals involving Valeant's price-gouging
and fraud.  <u>Id.</u> at 175, 177; <u>see</u> Katie Thomas, <u>Battered Valeant Stock Drops a Further 50% After</u>
<u>Weak Guidance</u>, N.Y Times (Mar. 15, 2016), <u>available</u> <u>at</u>
https://www.nytimes.com/2016/03/16/business/valeant-q4-financial-2016-
guidance.html?smid=url-share.

Defendant moved to compel arbitration, citing employment agreements that "mandate[d]
arbitration of 'all legal claims arising out of or relating to employment, application for
employment, or termination of employment, except for claims specifically excluded under the
terms' of the Agreement."  <u>Id.</u> at 178.  The Second Circuit reversed the district court's decision
granting the motion to compel arbitration, holding that plaintiffs' breach of fiduciary duty claim
did not "relate to" their employment:

> Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of
> his claims has no connection to his own work performance, his evaluations, his treatment by
> supervisors, the amount of his compensation, the condition of his workplace, or any other
> fact particular to Cooper's individual experience.  Moreover, . . . others who were never DST
> employees could have brought claims identical to those stated by Cooper – for example, the
> mismanagement claims could have been pursued by other Plan beneficiaries (such as
> spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST itself;
> and by the Secretary of Labor.  <u>See</u> ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing
> plan participants and beneficiaries and the Secretary of Labor to bring a civil action for
> breach of fiduciary duties).

> We therefore [conclude] . . . that in the context of an employment arbitration agreement, a
> claim will "relate to" employment only if the merits of that claim involve facts particular to
> an individual plaintiff's own employment.  Here, the merits of Cooper's claims do not
> involve such facts.

<u>Id.</u> at 183-84 (citations omitted).

Plaintiffs contend, however, that they have brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable.  According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual

---

Here, according to Plaintiffs,

> the arbitration provisions, like the arbitration agreement in <u>Cooper</u>, pertain to Plaintiffs' employment.  But, as in <u>Cooper</u>, the merits of Plaintiffs' claims do not involve facts particular to their employment.  The claims do not concern Plaintiffs' work performance, evaluations, working conditions, amount of compensation, or any other fact particular to their individual experiences at Morgan Stanley.  Rather, Plaintiffs' claims concern whether the [Compensation Incentive Plan] and [Equity Incentive Plan] are governed by ERISA and, if so, whether the Cancellation Rule violates ERISA.  Nothing about these claims "<u>involve facts particular to an individual plaintiff's own employment</u>."  To the contrary, the relevant facts apply equally to every [financial advisor] who forfeited deferred compensation, and each such [financial advisor] can bring the same claims.  Indeed, even the Secretary of Labor could do so.

(Pltf. Opp. (Dkt. No. 72) at 12-13 (quoting <u>Cooper</u>, 990 F.3d at 184) (emphasis in Pltf. Opp.))

Plaintiffs' "relate to employment" argument is not persuasive.  Although both <u>Cooper</u> and the instant case involve § 502(a)(2) breach of fiduciary duty claims, the similarities between the cases end there.  In <u>Cooper</u>, the alleged breach of fiduciary duty was the mismanagement of fund assets, an issue entirely unrelated to plaintiffs' employment.  Here, by contrast, the alleged breach of fiduciary duty is "selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA."  (Am. Cmplt. (Dkt. No. 58) ¶ 113)  These challenged actions "relate to" Plaintiffs' employment, because whether Plaintiffs' deferred compensation vested depends on the timing and circumstances of their separation from Morgan Stanley, including whether they were fired, quit, or retired.  <u>Cooper</u>'s concern that "[r]elatedness" "not encompass everything that touche[s] employment in any way," <u>Cooper</u>, 990 F.3d at 183, is thus not implicated here.  <u>See Duke v. Luxottica U.S. Holdings Corp.</u>, No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *9 (E.D.N.Y. Sept. 30, 2023) (finding that <u>Cooper</u> did not preclude plaintiff's "claims against her former employer directly, challenging her former employer's calculation of her retirement benefits," because there was "a more substantial nexus between Plaintiff's claims and her employment" than in <u>Cooper</u>).

In sum, <u>Cooper</u>'s analysis of "relate to employment" does not support Plaintiffs' position here.

28

arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's

right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21

(quoting <u>Am. Exp. Co. v. Italian Colors Rest.</u>, 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

        In considering Plaintiffs' arguments, this Court must first determine whether (1)

the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so,

whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged

ERISA plan and/or would be contrary to ERISA.[11]

---

[11] Defendants contend that "[b]ecause plaintiffs have agreed to arbitrate arbitrability, the Court need not – and should not – reach arbitrability itself. . . . [T]he validity of plaintiffs' representative action waiver is not at issue. The parties do not dispute whether plaintiffs have waived the right to bring a representative action – they dispute whether plaintiffs' claims seeking individual benefits must be arbitrated. The agreements clearly and unmistakably commit such questions to the arbitrator, and plaintiffs have identified no arbitrability issue reserved to the court that 'at least arguably covers the present dispute.'" (Def. Reply Br. (Dkt. No. 69) at 7-8 (quoting <u>NASDAQ OMX Grp.</u>, 770 F.3d at 1031))

By contrast, Plaintiffs contend that "[t]hree of the four arbitration provisions purport to waive the right to pursue a Covered Claim 'on a class action, collective action, or representative action basis.' To the extent that any such claim is allowed to proceed, it must do so in court. Moreover, 'any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers shall be decided by a court of competent jurisdiction, and not by an arbitrator.' Thus, contrary to Morgan Stanley's argument that any disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, the Court – not an arbitrator – must decide whether Plaintiffs' claims must be allowed to proceed on a class-action or representative-action basis, such that they are not subject to arbitration." (Pltf. Opp. (Dkt. No. 72) at 15 (quoting 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(d); citing 2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d), and CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4; alterations omitted); <u>see also</u> 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1))

In sum, Plaintiffs argue that the arbitration provisions are unenforceable because (1) they "prohibit[] Plaintiffs from bringing [their] claim[s] [on] a representative basis"; and (2) this restriction violates ERISA. And they further contend that the validity of the class action waivers must be determined by a court. (<u>Id.</u> at 15, 22) Because the arbitration provisions provide that the validity of the class action waivers must be determined by a court, this Court concludes that this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator.

1.       <u>**Whether the Deferred Compensation Programs are ERISA Plans**</u>

Plaintiffs contend that Morgan Stanley's deferred compensation programs are "employee benefit pension plan[s]" under ERISA because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  (Am. Cmplt. (Dkt. No. 58) ¶ 64) (capitalization altered).  <u>See</u> ERISA 3(2)(A)(ii), <u>codified at</u> 29 U.S.C. § 1002(2)(A)(ii).[12]  According to Plaintiffs, the deferred compensation programs' deferral of income "extend[s] to the termination of covered employment or beyond" in that (1) financial advisors "whose employment ends because of a disability, involuntary termination, retirement, or full career retirement still receive their deferred compensation on the scheduled distribution date . . . after their employment with Morgan Stanley . . . end[s]"; and (2) financial advisors "who qualify for a government service termination receive their deferred compensation when they leave Morgan Stanley."  (<u>See</u> <u>id.</u> ¶¶ 59-67 (capitalization altered))

a.       <u>**Applicable Law**</u>

As discussed above, ERISA defines "pension plan" to include, <u>inter alia</u>, any employer "plan, fund, or program" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ."  ERISA § 3(2)(A), <u>codified at</u> 29 U.S.C. § 1002(2)(A).  In determining whether an employer's plan or program is an "employee benefit pension plan" under ERISA, the Act directs courts to consider the "express terms" and "surrounding circumstances" of the plan or program.  ERISA § 3(2)(A), <u>codified at</u> 29 U.S.C. § 1002(2)(A).  The Second Circuit has cautioned that the ERISA provision defining pension plans "is 'not to be read as an elastic girdle that can be stretched to cover any content

---

[12]  Plaintiffs do not contend that Morgan Stanley's deferred compensation programs "provide[] retirement income to employees."  ERISA § 3(2)(A)(i).

that can conceivably fit within its reach.'" Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)).

Most cases that have considered whether an employer's plan or program "results in deferral of income" for purposes of § 3(2)(A)(ii) have involved bonus plans, typically in the form of stock options programs or "long-term incentive plans." E.g., Albers, 1999 WL 228367, *1; International Paper Co. v. Suwyn, 978 F. Supp. 506, 508-09 (S.D.N.Y. 1997); Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, *1 (S.D.N.Y. Apr. 20, 1994); Hahn v. Nat'l Bank, N.A., 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); Pasciutti v. LiquidPiston, Inc., No. 3:20-CV-01243 (RNC), 2021 WL 4502950, *2 (D. Conn. Sept. 30, 2021); Oatway v. Am. Int'l Grp., 325 F.3d 184, 187 (3d Cir. 2003); Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 (8th Cir. 1999). In determining whether a bonus plan is subject to ERISA, a court must consider both § 3(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c), which provides that "the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." See, e.g., Albers, 1999 WL 228367, at *3-4 (analyzing deferral of bonus payments under both § 1002(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c)); Foster, 1994 WL 150830, at *2 (same).

In that context, courts consider whether a plan's "purpose [is] to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." Oatway, 325 F.3d at 188. In such an inquiry, "[a] [p]lan's express statement of purpose . . . is entitled to weight when determining the nature of the plan." Hahn, 99 F. Supp. 2d at 279. Courts also consider whether plans "by operation . . . require the deferral of income," or

on the other hand, if "any such deferral to periods extending to termination is merely incidental."

Suwyn, 978 F. Supp. at 512; see id. at 511 (plan does not result in the deferral of income when it "cannot be said to generally defer the receipt of income to the termination of employment");

Foster, 1994 WL 150830, at *2 ("[T]he 'natural reading of [29 U.S.C.] § 1002(2)(A)(ii)'s requirement that there be a "deferral of income . . . to the termination of covered employment or beyond" is that the statute requires that a plan generally defer the receipt of income to the termination of employment.  The statute is not satisfied when, under the facts of a particular case, a portion of withheld income happens to become due after termination.'") (quoting Hagel v. United Land Co., 759 F. Supp. 1199, 1202 (E.D. Va. 1991); emphasis and ellipsis in Foster).

        In Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), the Fifth Circuit considered whether an employer's "wealth accumulation plan" was an "employee benefit pension plan."  The court noted that the "wealth accumulation plan"

> "[was] designed to provide an opportunity for [certain] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share [in defendant] RBC's growth and profitability, if any." . . .  Generally, a participating employee [could] elect to have her account distributed either "In–Service" (i.e., during her employment) or upon separation from employment. . . . Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement.

Id. at 622-23 & n.1 (quoting plan document; alteration omitted).

        RBC argued that its wealth accumulation plan "[was] not a 'pension plan' because 'the primary purpose of the [plan] [was] not to provide retirement or deferred post-termination income, but rather, to attract and retain key employees by awarding bonuses and other incentives.'"  Id. at 623 (quoting RBC's brief) (emphasis in RBC's brief; alteration omitted).

Although the Fifth Circuit found that the wealth accumulation plan "was not designed to provide retirement income," and noted that, under § 3(2)(A)(i), the issue of whether a plan "provides retirement income" depends on the "primary thrust" and "purpose" of the plan, id. at 624, it rejected RBC's arguments with respect to § 3(2)(A)(ii). As to that provision, the Tolbert court holds that the employer's purpose is irrelevant, and that the proper inquiry is whether a deferral of income necessarily ensues as a result of the plan:

> The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i). Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income. Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. . . .

> In analyzing subsection (ii), we begin with the predicate – "results in a deferral of income." The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in Burrage v. United States, 571 U.S. 204 (2014). The Court explained that "a thing 'results' when it arises as an effect, issue, or outcome from some action, process or design." Id. at 210 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)). Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan. The remaining text of subsection (ii) – "by employees for periods extending to the termination of covered employment or beyond" – indicates that the employees must defer the income to the end of their employment or beyond.

> . . . .

> We conclude that the plain language of the statute and the interpretations expressed in [our precedents] all compel one result: The [wealth accumulation plan] is a "pension plan" under subsection (ii). The [wealth accumulation plan's] "express terms" reveal themselves at the outset of the document. The first section of the [wealth accumulation plan], the statement of purpose, refers to the [wealth accumulation plan] as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." Later sections of the [wealth accumulation plan] contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred. A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the [wealth accumulation

33

plan].  Put another way, by participating in the [wealth accumulation plan], the plaintiffs have "[forgone] income in exchange for receiving income" at a later date.  See Boos v. AT&T, Inc., 643 F.3d 127, 134 (5th Cir. 2011).

The "express terms" of the [wealth accumulation plan] also contemplate employees deferring income "to the termination of covered employment or beyond."  The vesting sections explain that, upon separation, unvested amounts vest immediately.  The distribution sections contain further support:  "If distribution is made due to Separation," then "available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years."  Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii).

Id. at 624-26 (citations altered; emphases in original; footnote, further citations, and alterations

omitted).

   The Fifth Circuit goes on to reject RBC's reliance on § 2510.3-2(a) – the

regulation setting out the "systematically deferred" standard for bonuses – and related case law,

finding that RBC's wealth accumulation plan is not a bonus plan:  "The [wealth accumulation

plan] is not among the 'specific plans' identified in § 2510.3-2(c), and we therefore decline to

require the [wealth accumulation plan] to satisfy the 'systematically deferred' condition.  In other

words, the [wealth accumulation plan] fits comfortably within the meaning of § 1002(2)(A)(ii),

and nothing in § 2510.3-2(c) takes it out.  Reliance on [Emmenegger v. Bull Moose Tube Co.,

197 F.3d 929 (8th Cir. 1999)] is thus misplaced."  Id. at 626 (paragraph break omitted).

   In Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), the Sixth Circuit

followed the Tolbert analysis and held that a "similar" "income deferral plan" was an ERISA

pension plan under § 3(2)(A)(ii), because the plan "expressly provide[d] for employees to defer

income from several sources to the future and authorize[d] options for payment of deferred

income both before and after termination"  Id. at 437.

   Although the Second Circuit has not addressed Tolbert and Wilson, much of the

reasoning in Pasternack v. Shrader, 863 F.3d 162 (2d Cir. 2017) is consistent with the analysis in

these cases.  For example, the <u>Pasternack</u> court states that (1) "the two subparagraphs of [§ 3(2)(A)] set out independent tests to determine whether a plan is protected by ERISA"; (2) "[t]he statutory phrase 'provides retirement income' does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement.  The very fact that [§ 3(2)(A)(i)] is an alternative to [§ 3(2)(A)(ii)], which explicitly asks whether a plan 'results' in deferred income, suggests that the phrase 'provides retirement income' considers the plan's primary purpose rather than its result"; and (3) "[s]ubparagraph (ii) extends ERISA coverage to any plan that 'results in a deferral of income by employees.'  The word 'results' calls for an effects-based inquiry rather than one based on purpose."  <u>Id.</u> at 168-69 & 170 n.5.

   Having considered the relevant case law, this Court concludes that the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan.  If it is, a court must consider both the plan's purpose and whether deferral of income is systematic.  If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

**b. Whether Plaintiffs' Deferred Compensation<br>Programs Are Bonus Programs**

   Plaintiffs contend that financial advisors'

> deferred compensation in the [Financial Advisor] Deferred Compensation Program is not a "bonus" . . . [because] [financial advisors] do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits . . . .  Given that [financial advisors] are expected to generate revenue, their compensation for performing this core function – at the absolute minimum level – is not, and cannot, be a "bonus."  Rather, [financial advisors'] compensation – including their deferred compensation – is a "commission." . . . Indeed, the [Financial Advisor] Compensation Plan distinguishes between [financial advisors'] "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. [Financial advisors] earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate.  In

35

> contrast, [financial advisors] earn "year-end bonuses" by achieving
> individualized, performance-based goals such as increasing their prior year's
> revenue by specified percentages or cross-selling products to clients.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 73-79 (citing 2018 Financial Advisor Compensation Plan (Dkt.

No. 83-2) § 1.2.2 (differentiating "deferred compensation award[s]" from "year-end bonuses . . .

paid to Firm employees generally")))

   This Court concludes that the deferred compensation programs at issue here are

not bonus programs.

   As discussed above, Morgan Stanley financial advisors' deferred compensation is

a portion of their incentive compensation, which in turn is a fraction of the revenue they

generate.  Compensation as a percentage of individually generated revenue is a "commission."

See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee

for a particular transaction, usually as a percentage of the money received from the transaction");

Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.)

("a percentage of the money received in a sale or other transaction paid to the agent responsible

for the business").

   By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,]

[especially] a payment by way of division of a business's profits, given over and above normal

compensation."  Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New

International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an

equivalent given in addition to the usual compensation").

   Courts generally treat these two types of compensation as distinct.  See Smith v.

Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action,

concluding that employee benefits committee did not "err[] in deciding that commissions are not

bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New

York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995)

("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v.

Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D.

Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary

definitions).

      The same approach is appropriate here.  Because Morgan Stanley financial

advisors' deferred compensation is premised on the revenue they generate, deferred

compensation payments are not "over and above normal compensation."  Moreover, Morgan

Stanley financial advisors are paid separate year-end bonuses that are distinct from the

Compensation Incentive Plan and Equity Incentive Plan.  (2018 Financial Advisor Compensation

Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus

Agmt. (Dkt. No. **67-3**); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

      In sum, the deferred compensation programs at issue here are not bonus plans.

Accordingly, in deciding whether Morgan Stanley's deferred compensation programs are ERISA

plans under § 3(2)(A)(ii), this Court considers only whether these programs "result[] in" the

deferral of income to a period after employment.

> ### c.  Whether the Deferred Compensation Programs "Result[] in a Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond"

      "Although [ERISA] do[es] not define 'deferral of income' or 'deferred

compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either:  (1)

'[p]ayment for work performed, to be paid in the future or when some future event occurs,' or

(2) 'an employee's earnings that are taxed when received or distributed rather than when earned,

such as contributions to a qualified pension or profit-sharing plan.'"  Kuhbier v. McCartney,

Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017)

(quoting <u>Deferred Compensation</u>, Black's Law Dictionary (10th ed. 2014)). And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan." <u>Tolbert</u>, 758 F.3d at 625 (quoting <u>Burrage</u>, 571 U.S. at 210).

        As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (<u>Id.</u> § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (<u>see</u> ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." <u>Id.</u> § 3(2)(A)(ii).

        And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" <u>Pasternack</u>, 863 F.3d at 168 (quoting <u>Murphy</u>, 611 F.2d at 575), application of ERISA in these circumstances does not unreasonably expand the reach of the Act. Although Plaintiffs in the instant case – unlike plaintiffs in <u>Tolbert</u> and <u>Wilson</u> – cannot elect post-

employment vesting, disability, retirement, layoff, and government service are not unusual

means by which workers leave their employment.  And nothing in the record suggests that post-

employment deferred compensation payments are rare.

Defendants argue, however, that Plaintiffs did not earn payments under the

Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments,

because financial advisors "have no right to payment until and unless they remain employed at

vesting – a condition [P]laintiffs [did not] meet."  (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4)

Defendants thus argue that "Morgan Stanley's program does not entail <u>any</u> 'deferral of income

by employees.'"  (<u>Id.</u> at 4 (emphasis in original))  This argument is not persuasive, because it

exalts form over substance.  Whenever an action (here, leaving Morgan Stanley's employ)

results in the forfeiture of a contractual right, those facts can always be recharacterized by stating

that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to

the performance of the contract.

In sum, Morgan Stanley's deferred compensation programs result in the deferral

of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii).

\*       \*       \*       \*

For the reasons stated above, this Court concludes that Morgan Stanley's deferred

compensation programs are ERISA plans.

## 2.       Whether Plaintiffs' ERISA Claims Are Arbitrable

Second Circuit law makes clear that compulsory arbitration of ERISA claims is

lawful.  <u>Bird v. Shearson Lehman/Am. Exp., Inc.</u>, 926 F.2d 116, 122 (2d Cir. 1991) ("[S]tatutory

claims arising under ERISA may be the subject of compulsory arbitration.").

Plaintiffs contend, however, that their claims are not arbitrable, because they are

§ 502(a)(2) claims for breach of fiduciary duty, and § 502(a)(3) claims for equitable relief that

are brought in a representative capacity on behalf of the plans.  According to Plaintiffs, their

§ 502(a)(2) claims "can be brought <u>only</u> in a representative capacity."  (Pltf. Opp. (Dkt. No. 72)

at 16 (emphasis in original))  Moreover, their "representative [§ 502(a)(3)] claims should not be

litigated in individual arbitrations," because these "claims 'belong' to the [Financial Advisor]

Deferred Compensation Program, including the [Compensation Incentive Plan] and [Equity

Incentive Plan], [and] Plaintiffs' individual arbitration agreements do not cover them."  (<u>Id.</u> at

18)  "[T]he ERISA plan[s] [thus] never agreed to arbitrate any claims."  (<u>Id.</u>)  Plaintiffs further

argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs'

right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of

ERISA" – namely, the ability to remediate the plans as a whole via a representative action.  (<u>Id.</u>

at 21)[13]

> Defendants respond that
>
>> [P]laintiffs do <u>not</u> actually bring these claims in a representative capacity. . . .
>> Here, [P]laintiffs seek the recovery of alleged benefits that were not paid **to them**,
>> and their claims "fall comfortably within the scope of § 502(a)(1)(B), which
>> allows a plan participant 'to recover benefits due to him,'". . . . [P]laintiffs cannot
>> avoid their agreements to arbitrate their individual claims by slapping a
>> "representative" label on them. . . .
>>
>> [T]he plan need not agree to arbitrate claims that plaintiffs bring on their own
>> behalf. . . . The complaint here . . . alleges injuries that are personal to <u>these</u>
>> [P]laintiffs; the complaint individually describes each plaintiff's tenure at Morgan
>> Stanley and the deferred compensation each purportedly "earned" in that time and
>> now seeks.  Seeking "plan-wide relief" is not the same as seeking relief on behalf
>> of the plan, and plaintiffs' claims seeking benefits <u>from</u> the plan cannot "belong

---

[13]  Plaintiffs do not argue that § 502(a)(1) claims for benefits are, as a general matter, non-
arbitrable.  Plaintiffs' claims for benefits are brought as part of the "two-step" Second Cause of
Action, however, in which Plaintiffs first seek (1) reformation under § 502(a)(3), and then (2)
recovery of benefits from the reformed plans pursuant to § 502(a)(1).  (Am. Cmplt. (Dkt. No. 58)
¶¶ 102-07)  <u>See</u> <u>Laurent v. PricewaterhouseCoopers LLP</u>, 945 F.3d 739, 747 (2d Cir. 2019)
("[W]e have previously affirmed the entry of a two-step reformation and enforcement remedy
under ERISA.") (citing <u>Amara v. CIGNA Corp.</u>, 775 F.3d 510, 532 (2d Cir. 2014)).

to" the plan.  Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them. . . .

Plaintiffs can obtain complete relief, if any, through their individual claims for benefits.  It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class – plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims. . . . Arbitration of plaintiffs' claims accordingly does not frustrate anyone's ability to obtain any ERISA remedy that they may be due.

(Def. Reply Br. (Dkt. No. 69) at 9-11 (quoting Frommert v. Conkright, 433 F.3d 254, 270 (2d

Cir. 2006) (in turn quoting 29 U.S.C. § 1132(a)(1)(B); further citations and quotations omitted;

alterations omitted) (emphasis in original))

Accordingly, this Court must determine (1) whether Plaintiffs' § 502(a)(2) claims

are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a

representative capacity; (2) whether Plaintiff's § 502(a)(3) claims are subject to arbitration,

notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; and (3)

whether arbitration would impermissibly curtail Plaintiffs' statutory rights.

### a.    ERISA § 502(a)(2) Claim for Breach of Fiduciary Duty

The Amended Complaint's Third Cause of Action alleges that

[t]he Compensation Committee is a fiduciary under the [Financial Advisor] Deferred Compensation Program because it is the administrator of the [Compensation Incentive Plan] and [Equity Incentive Plan] and is responsible for, among other things, reviewing and establishing the rules and procedures of the [Financial Advisor] Deferred Compensation Program, including the ability to determine that it is governed by ERISA.

ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries.  ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.  Id.

ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but **only if** the plan's terms "are consistent" with ERISA's substantive requirements.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA.

. . . .

Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 108-13, 117 (emphasis in original))

### i.    Applicable Law

ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought . . .  by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section [409] of this title."

ERISA § 409, codified at 29 U.S.C. § 1109, in turn provides that

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

The "responsibilities, obligations, or duties imposed upon fiduciaries" are set out in ERISA § 404, codified at 29 U.S.C. § 1104, which provides in relevant part that fiduciaries must adhere to the "prudent man standard of care":

(a) Prudent man standard of care

(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

42

          (i) providing benefits to participants and their beneficiaries; and

          (ii) defraying reasonable expenses of administering the plan;

     (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

     (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

     (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a).

Thus, "ERISA imposes 'four distinct, but interrelated duties' on fiduciaries, including the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to comply with the provisions of the plan." Anderson v. Advance Publications, Inc., No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *2 (S.D.N.Y. June 13, 2023) (quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715-16 (2d Cir. 2013)). "[T]these fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

The Supreme Court has explained that it was "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs authorized to bring breach of fiduciary duty actions] is in the financial integrity of the plan." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985); see also Browe v. CTC Corp., 15 F.4th 175, 205-06 (2d

Cir. 2021) ("[T]he remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary).").

Plaintiffs allege – and this Court agrees – that the deferred compensation programs at issue are "individual account plans." (Am. Cmplt. (Dkt. No. 58) § 68)  Under ERISA, "[t]he term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34); see Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008) ("A 401(k) plan is a common defined contribution plan.").[14]  In the context of a defined contribution plan, § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," notwithstanding the tension between the individualized nature of each employee's pension and the representative nature of claims brought under § 502(a)(2). LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008).

In Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit held that "the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." Coan, 457 F.3d at 259.  "[A]lthough plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

---

[14] By contrast, a "defined benefit plan" under ERISA "'conventional[ly] . . . credit[s] the employee with a specific percentage of salary for each year of employment.'" Hirt, 533 F.3d at 104-05 (quoting Esden v. Bank of Bos., 229 F.3d 154, 158 n.4 (2d Cir. 2000)).

in a 'representative capacity' properly for purposes of section 502(a)(2)." Id. at 261 (footnote omitted).

ii.     **Application**

In arguing that the procedural safeguards applicable to representative claims under § 502(a)(2) preclude compelled arbitration of their claims, Plaintiffs must – of course – establish that they have actually asserted representative claims under § 502(a)(2).

As both Plaintiffs and Defendants recognize (Pltf. Opp. (Dkt. No. 72) at 21; Def. Reply Br. (Dkt. No. 69) at 9-10), "section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, requires plan fiduciaries '"to make good to such plan any losses to the plan"' resulting from a breach of fiduciary duty." Coan, 457 F.3d at 259 (quoting Russell, 473 U.S. at 140) (in turn quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added in Russell).

Here, the Amended Complaint seeks – pursuant to § 502(a)(2) – "the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117)  This type of claim is not properly brought under § 502(a)(2), however, because it is not a claim for "losses to the plan."

While "ERISA does not define 'loss' as that term is used in section 409," Donovan v. Bierwirth, 754 F.2d 1049, 1052 (2d Cir. 1985), "its draftsmen were primarily concerned with the possible misuse of plan assets." Russell, 473 U.S. at 142. "[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." Id. at 140 n.8.  Accordingly, the case law indicates that "loss" is defined with reference to investment losses or other financial diminutions of plan assets that are attributable to a fiduciary's mismanagement.  See Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir.

2016) ("'If, but for the breach, the plan would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.' Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'") (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989), and Donovan, 754 F.2d at 1056) (alteration omitted). And while the Supreme Court in LaRue held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches" with respect to individual accounts, its holding is limited to "fiduciary breaches that impair the value of plan assets in . . . [such] account[s]." LaRue, 552 U.S. at 256 (emphasis added).

Here, Plaintiffs have not alleged that the Compensation Committee – the alleged fiduciary – mismanaged plan assets or otherwise "impair[ed] [their] value" (LaRue, 552 U.S. at 256), such as by making imprudent or conflicted investment decisions, or by incurring unnecessary administrative costs.

Plaintiffs instead "seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) Any such forfeited compensation, however, would be equivalent to "the balance of [each] individual's account" – which ERISA defines as an "accrued benefit" in an "individual account plan." ERISA § 3(23), codified at 29 U.S.C. § 1002(23). The relief Plaintiffs seek in their § 502(a)(2) breach of fiduciary cause of action is thus redundant of their claim for benefits under § 502(a)(1), in which they seek to "recover their vested benefits [and] enforce their rights to the payment of their past vested benefits . . . after reformation [of the plan to comply with ERISA's anti-forfeiture rules]." (Am. Cmplt. (Dkt. No. 58) ¶ 107; see Russell, 473 U.S. at 147 (explaining that ERISA provides for "an action pursuant to § 502(a)(1)(B) to recover accrued benefits").

In <u>L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.</u>, 710 F.3d 57 (2d Cir. 2013), the Second Circuit observed that "a 'claim for benefits' under ERISA § 502(a)(1)(B)" is by definition distinct from "a claim for recovery of 'losses to the plan' caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and 409(a)." <u>Id.</u> at 66. <u>L.I. Head Start</u> cites with approval Chief Justice Roberts' concurring opinion in <u>LaRue</u>, in which he states that "[i]f LaRue may bring his claim under § 502(a)(1)(B), it is not clear that he may do so under § 502(a)(2) as well. . . . The significance of the distinction between a § 502(a)(1)(B) claim and one under § 502(a)(2) is not merely a matter of picking the right provision to cite in the complaint. Allowing a § 502(a)(1)(B) action to be recast as one under § 502(a)(2) might permit plaintiffs to circumvent safeguards for plan administrators that have developed under § 502(a)(1)(B)." <u>LaRue</u>, 552 U.S. at 258 (Roberts, C.J., concurring).

Moreover, other circuits have cautioned that plaintiffs may not use artful pleading to bring what are, in reality, § 502(a)(1) claims, under § 502(a)(2). See <u>Stephens v. Pension Ben. Guar. Corp.</u>, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) ("[The] exception to the exhaustion requirement [for § 502(a)(2) claims] does not embrace plan-based claims artfully dressed in statutory clothing, such as where a plaintiff seeks to avoid the exhaustion requirement [of § 502(a)(1)] by recharacterizing a claim for benefits as a claim for breach of fiduciary duty.") (quotation omitted); <u>Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc.</u>, 102 F.3d 712, 714 (4th Cir. 1996) ("Although [plaintiff employer] directs our attention to sections 502(a)(2) and (a)(3), the analysis of who may recover benefits under ERISA must begin with section 502(a)(1)(B), the section which specifically provides a cause of action for benefits. [Plaintiff employer's] description of its claim as one for breach of [defendant] Blue Cross' fiduciary duty does not alter the fact that it is seeking medical benefits which it claims are owed

to [plaintiff's employee].  To permit the suit to proceed as a breach of fiduciary duty action

would encourage parties to avoid the implications of section 502(a)(1)(B) by artful pleading;

indeed <u>every</u> wrongful denial of benefits could be characterized as a breach of fiduciary duty

under [plaintiff's] theory.") (emphasis in original).

        The same reasoning applies here.  The Amended Complaint's Third Cause of

Action for breach of fiduciary duty is a disguised claim for benefits; while actually bringing a

claim under § 502(a)(1)(B), Plaintiffs invoke the procedural safeguards associated with a claim

under § 502(a)(2).  But because Plaintiffs have not alleged "losses to the plan," they are not, in

fact, proceeding in a representative capacity, and are therefore not entitled to the procedural

safeguards available under § 502(a)(2).

        In arguing that they have brought a § 502(a)(2) claim on behalf of the plans, and

therefore cannot be compelled to arbitrate, Plaintiffs cite <u>Cooper v. Ruane Cunniff & Goldfarb

Inc.</u>, 990 F.3d 173 (2d Cir. 2021), <u>Ferguson v. Ruane Cuniff & Goldfarb Inc.</u>, No. 17-CV-6685

(ALC), 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), <u>Hawkins v. Cintas Corp.</u>, 32 F.4th 625

(6th Cir. 2022), and <u>Munro v. U.S.C.</u>, 896 F.3d 1088 (9th Cir. 2018).  (Pltf. Opp. (Dkt. No. 72) at

16, 18)

        In <u>Cooper</u>, the Second Circuit reversed a district court order granting defendant's

motion to compel arbitration of an employee's breach of fiduciary duty claim.  That claim had

been brought on behalf of a class of plan participants regarding the "catastrophic over-allocation

of Plan assets" to a single company's stock.  The motion to compel arbitration was premised on

an arbitration provision in an employee handbook that (1) applied to "all legal claims arising out

of or relating to employment," and (2) "prohibit[ed] joinder of multiple parties and class or

collective actions."  <u>Cooper</u>, 990 F.3d at 177-78, 184.  While the Second Circuit disagreed with

the district court's interpretation of the phrase "relating to employment" and reversed on that basis (id. at 180-84), the Circuit went on to state in dicta that the defendant's "[broad] reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the Coan representative adequacy requirement." Id. at 184 (citing Coan, 457 F.3d at 261).

        In Ferguson, the court applied the dicta in Cooper and, on that basis, rejected arbitration claimants' objections to certification of a settlement class regarding the same claims, made against the same third-party benefits administrator as in Cooper, even though the plan documents in Ferguson themselves – rather than an employee handbook – contained the arbitration provision. Ferguson, 2021 WL 3667979, at *3-4.

        In Hawkins, plaintiff employees brought a putative class action, alleging that plan fiduciaries had breached the duty of loyalty and the duty of prudence by "offer[ing] participants the ability to invest only in actively managed funds, rather than more cost-effective passively managed funds[,] . . . [and by] charg[ing] the Plan imprudently expensive recordkeeping fees." Hawkins, 32 F.4th at 628. And in Munro, plaintiff employees, "as representatives of a class of participants and beneficiaries of the Plans," alleged that defendant plan administrators had "squandered [their negotiating] leverage by allowing the Plans' conflicted third party service providers – TIAA-CREF, Vanguard, Fidelity, and Prudential – to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products." Munro v. U.S.C., 16 Civ. 6191, Am. Cmplt. (Dkt. No. 40) ¶¶ 4-5 (C.D. Cal. Nov. 17, 2016). In these cases the Sixth and Ninth Circuits, respectively, held that plaintiffs could not be compelled to arbitrate based on arbitration provisions in their individual employment agreements, because

their breach of fiduciary claims "should be thought of as Plan claims, not [p]laintiffs' claims. And because the arbitration provisions only establish the [p]laintiffs' consent to arbitration, the employment agreements do not subject these claims to arbitration." Hawkins, 32 F.4th at 635; accord Munro, 896 F.3d at 1094.

These cases do not support Plaintiffs' arguments, because they involve significantly different factual circumstances. As described above, Cooper, Ferguson, Hawkins, and Munro all involve mismanagement of plan assets – i.e., straightforward "losses to the plan." Given these circumstances, plaintiffs properly raised claims under § 502(a)(2), and benefitted from the procedural safeguards available under that statutory provision. As discussed above, however, those procedural safeguards are not available to Plaintiffs, who have brought a disguised claim for recovery of benefits, rather than a true § 502(a)(2) claim. Cf. Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *5 (S.D.N.Y. Mar. 30, 2007) ("[a] court's . . . inquiry ultimately must focus on the factual nature of the claims rather than the . . . label that has been applied by the plaintiff") (quotation omitted).[15]

_____

[15] Plaintiffs have also not alleged a "breach[] [of] any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), codified at 29 U.S.C. § 1109(a). Although the Amended Complaint alleges that "[t]he Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA" (Am. Cmplt. (Dkt. No. 58) ¶ 113), "'[t]rustees do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions, but rather, where the trustee fails to discharge one or more of the duties described in 29 U.S.C. § 1104.' 'The proposition that a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA, while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.'" Roe v. Empire Blue Cross Blue Shield, No. 12-CV-04788 NSR, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) (quoting Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2005)) (alterations omitted), aff'd, 589 F.

Having failed to allege a true § 502(a)(2) claim, Plaintiffs will not be heard to complain that claims under § 502(a)(2) are non-arbitrable.

### b.   ERISA § 502(a)(3) Claims for Equitable Relief

ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Amended Complaint asserts § 502(a)(3) claims in the first and second causes of action.  In the First Cause of Action,

> Plaintiffs seek a declaration that the [Financial Advisor] Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).
>
> Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:
>
> a.   A declaration that the [Financial Advisor] Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;
>
> b.   An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;
>
> c.   Surcharge;
>
> d.   An "accounting" of all deferred compensation wrongfully withheld from [financial advisors] because of the Cancellation Rule;
>
> e.   Disgorgement of all amounts wrongfully withheld;

---

App'x 8 (2d Cir. 2014).  Plaintiffs' failure to identify any fiduciary duty that the Compensation Committee breached supports this Court's conclusion that they have not brought a true § 502(a)(2) claim.

     f.   Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

     g.   A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

     h.   An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

     i.   All other relief the Court determines is just and proper under its equitable powers.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 98-101)

In the Second Cause of Action, Plaintiffs assert that they and the putative class "are entitled to reformation of the [Financial Advisor] Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a)." (Id. ¶ 105) As discussed above, the requested reformation is a prelude to recovery of benefits from the reformed plan under § 502(a)(1). (Id. ¶¶ 106-07)

Plaintiffs argue that they "assert claims in a representative capacity under ERISA § 502(a)(3)," and "[t]hese representative claims should not be litigated in individual arbitrations." (Pltf. Opp. (Dkt. No. 72) at 16-18)

The case law does not support Plaintiffs' assertion that (1) § 502(a)(3) claims must be brought on behalf of a plan, or (2) it is unlawful to compel individual arbitration of such claims. To the contrary, the Supreme Court has held that – in contrast to § 502(a)(2) breach of fiduciary duty claims – "§ 502(a)(3) authorizes . . . lawsuit[s] for individual relief." Varity, 516 U.S. at 507. And the case law indicates that plaintiffs who bring putative class actions alleging § 502(a)(3) claims may nevertheless be required to arbitrate their claims individually. See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *10 (E.D.N.Y. Sept. 30, 2023) (granting motion to compel arbitration of § 502(a)(3) claims brought

by plaintiffs on behalf of a putative class; stating that "the concerns [regarding procedural

safeguards for § 502(a)(2) claims] do not apply").

       Plaintiffs cite no case demonstrating that § 502(a)(3) claims are non-arbitrable.

At best, Plaintiffs have cited case law stating that § 502(a)(3) claims are not inherently limited to

individual relief.  See Banyai v. Mazur, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3

(S.D.N.Y. Mar. 29, 2007) ("[N]othing suggests that section 502(a)(3) authorizes only individual

relief, thereby precluding suits seeking 'other appropriate equitable relief' – on behalf of the plan

– against non-fiduciaries.") (emphasis in original).[16]

       In sum, Plaintiffs have not demonstrated that their § 502(a)(3) claims are non-

arbitrable.

### c.    Whether Arbitration Would Void Statutory Rights

       The Supreme Court has held that courts cannot compel arbitration when enforcing

an arbitration clause would entail a "prospective waiver of a party's right to pursue statutory

remedies."  Italian Colors, 570 U.S. at 229 (quotation omitted).

       Under the prospective waiver doctrine, courts have denied motions to compel

arbitration where the arbitration provision at issue contains limitations on remedies that are

inconsistent with ERISA.  See, e.g., Lloyd v. Argent Tr. Co., No. 22CV4129 (DLC), 2022 WL

17542071, at *3 (S.D.N.Y. Dec. 6, 2022) ("The Plan states that . . . arbitration cannot provide

---

[16] Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) – also cited by Plaintiffs (Pltf. Opp. (Dkt. No. 72) at 17) – is not on point.  In Browe, the Second Circuit considered a district court post-bench trial opinion addressing, inter alia, § 502(a)(3) claims.  Browe, 15 F.4th at 188-89.  The court ordered the disbursement of an award on remand, and directed the district court to "include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled."  Id. at 206.  Plaintiffs contend that this direction is an example of a plan-wide application of § 502(a)(3) relief.  (Pltf. Opp. (Dkt. No. 72) at 17)  The portion of Browe cited by Plaintiffs does not address § 502(a)(3), however, and it is thus not clear that § 502(a)(3) was the statutory basis for the disbursement.  See Browe, 15 F.4th at 206.

'any remedy which has the purpose or effect of providing additional benefits or monetary relief

to any other Employee, Participant, or Beneficiary other than the Claimant.' . . .  This provision

imposes a limitation on relief that ERISA does not contain, and precludes remedies that ERISA

expressly authorizes, such as the removal of a fiduciary."); Cedeno v. Argent Tr. Co., No. 20-

CV-9987 (JGK), 2021 WL 5087898, at *2 (S.D.N.Y. Nov. 2, 2021) (same).

        Prohibiting class treatment does not inherently limit statutory remedies, however,

because class treatment is a procedural matter, and not a substantive right.  See Smith v. Bd. of

Directors of Triad Mfg., 13 F.4th 613, 622 (7th Cir. 2021) ("[T]he problem with the plan's

arbitration provision is its prohibition on certain plan-wide remedies, not plan-wide

representation.  It is not that the plan funnels its participants away from class actions."); Shady

Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408 (2010) (plurality opinion)

("A class action, no less than traditional joinder (of which it is a species), merely enables a

federal court to adjudicate claims of multiple parties at once, instead of in separate suits.  And

like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of

decision unchanged.").[17]

        Here, Plaintiffs argue that, "if applied to Plaintiffs' claims, the arbitration

provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under

sections 502(a)(2) and 502(a)(3) of ERISA."  (Pltf. Opp. (Dkt. No. 72) at 21)  Plaintiffs have not

---

[17]  To the extent that "the Second Circuit's opinion in Cooper indicates that the ability to bring a
representative action is a 'statutory right' that an arbitration agreement cannot override," Lloyd,
2022 WL 17542071, at *4 (citing Cooper, 990 F.3d at 184), that is the result of Coan's
requirement – reiterated in Cooper – that in § 502(a)(2) cases "'plan participants must employ
procedures to protect effectively the interests they purport to represent.'"  Cooper, 990 F.3d at
184 (quoting Coan, 457 F.3d at 259).  As explained above, Coan's procedural requirements are
not at issue here, because Plaintiffs have not brought a claim for "losses to the plan," as required
by § 502(a)(2).  See Duke, 2023 WL 6385389, at *10 (holding that concerns regarding
compelling arbitration of § 502(a)(2) claims do not apply in the § 502(a)(3) context).

identified any limitation on remedies that would apply in an arbitration, however, other than the class waiver.  Moreover, the arbitration provisions in the Bonus Agreement and CARE Program Arbitration Agreement provide that "[a]rbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(g); see CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 5(d) (same))  Accordingly, Plaintiffs have not demonstrated that the prospective waiver doctrine applies.

*       *       *       *

For the reasons stated above, Plaintiffs have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed.[18]

---

[18] Plaintiffs argue that "[i]ndividual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants."  (Pltf. Opp. (Dkt. No. 72) at 24)  But this argument is foreclosed by the Second Circuit's decision in Bird. See Bird, 926 F.2d at 122 ("We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.").

55

**CONCLUSION**

Defendants' motion to compel arbitration (Dkt. No. 65) is granted.  Because "the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), the case will be stayed pending arbitration.

The Clerk of Court is directed to terminate the motion (Dkt. No. 65).

Dated: New York, New York
       November 21, 2023

                                      SO ORDERED.

                                      _Paul G. Gardephe_
                                      Paul G. Gardephe
                                      United States District Judge

## IN ARBITRATION PROCEEDINGS BEFORE THE
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

-----------------------------------------------------------------X

**ROBERT DOUGLAS FOLTZ, THOMAS ANDREW PAULSON, WILLIAM MERRITT HOLMAN JR, STEVEN E GATTO, JOHN JOSEPH BIRKHAUSER, RYAN M BIRKHAUSER, MEHGAN E ZUNIGA, TERRI B UCCI, KURT DUANE VELDHUIZEN, MATTHEW A KOCK, JOHN MICHAEL BENNETT**

        Claimants,

   - v -

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,**

        Respondent.

-----------------------------------------------------------------X

<u>**STATEMENT OF CLAIM**</u>

**FINRA No. _____**

Claimants Robert Foltz, Thomas Paulson, William Holman, Steven Gatto, John Birkhauser, Ryan Birkhauser, Mehgan Zuniga, Terri Ucci, Kurt Veldhuizen, Matthew Kock and John Bennett, by and through their counsel Lax & Neville LLP, hereby submit the following claims against Respondent Merrill Lynch, Pierce, Fenner & Smith, Inc., to arbitration pursuant to the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), and allege as follows:

### <u>PRELIMINARY STATEMENT</u>

Claimants are former Merrill Lynch financial advisors ("FAs" or "advisors"). Throughout their employment, Merrill Lynch required Claimants to involuntarily defer a portion of their earned commissions, which it subsequently purported to "cancel" in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), its duties, the common law, and state labor and wage laws. Claimants bring this FINRA Arbitration to recover those earned commissions.

Over decades at Merrill Lynch, Claimants generated many tens of millions of dollars in revenue for Merrill Lynch by serving their clients. Claimants, like Merrill Lynch advisors generally, were paid on a commission basis, splitting the revenue they generated serving their clients with Merrill Lynch. Immediately upon joining Merrill Lynch, Claimants, like Merrill Lynch advisors generally, were forced to participate in Merrill Lynch's compensation plan deferring significant portions of their commissions into various deferred compensation plans, including "WealthChoice," which consisted of notional investment "accounts," and "Equity," which consisted of restricted stock units ("RSUs") convertible to Bank of America stock or cash (together the "Plans").

The Plans are ERISA "employee benefit pension plans" as a matter of law because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). Merrill Lynch pays advisors commission for their work (i.e., the revenue they generate) up to a decade after they perform the work and their clients pay Merrill Lynch for their work.

Pursuant to ERISA, Claimants' deferred commissions were "nonforfeitable" and vested when made. In violation of ERISA, Merrill Lynch purported to impose a "rolling" vesting period for each year's earned deferred commissions, cancelled the FAs' earned deferred commissions under various circumstances including voluntary termination and retained hundreds of millions of dollars of commissions from its terminated FAs.

Merrill Lynch has taken the position, in its plans, other arbitrations, and federal litigation, that its deferred compensation plans are not ERISA plans and that it is not required to abide by its clear statutory obligations when it defers employee commissions. This position is frivolous under the plain language of ERISA and blackletter law, carefully examined and rejected most recently in *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023) (rejecting arguments materially identical to Merrill Lynch's here and holding that Morgan Stanley's material

identical plans were ERISA plans), Order attached hereto at Exhibit A.

Merrill Lynch's purported "cancellation" of Claimants' earned deferred commissions on revenue they generated for work they performed up to a decade earlier violated ERISA, Illinois Wage Payment and Collection Act ("Illinois Wage Act") and the Wisconsin Wage Payment and Collection Laws (Wisconsin Wage Laws). Claimants are entitled to recover their unpaid earned deferred commissions in an amount to be proven at the hearing but in no event less than $6.2 million with statutory penalties, costs, attorneys' fees and interest.

## JURISDICTION

1. "A dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among ... Members and associated Persons." FINRA Rule 13200(a).

2. Merrill Lynch is a FINRA member firm. Each of the Claimants was at all relevant times an "Associated Person" pursuant to FINRA Rule 13100(r) and an employee of Merrill Lynch. This dispute arises from the Claimants' employment with Merrill Lynch.

## PARTIES

**Claimants**

3. Robert Douglas Foltz (CRD No. 4743026) was at all relevant times an associated person of Merrill Lynch. Mr. Foltz has been a successful financial advisor for over 20 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Foltz joined Merrill Lynch in February 2011. Mr. Foltz left Merrill Lynch in March 2022.

4. Thomas Andrew Paulson (CRD No. 1703308) was at all relevant times an associated person of Merrill Lynch. Mr. Paulson has been a successful financial advisor for over 36 years, providing investment management, retirement and tax planning, and wealth preservation strategies

to his clients.  Mr. Paulson joined Merrill Lynch in November 2008. Mr. Paulson left Merrill Lynch in April 2021 with his partners, Claimants Holman and Gatto.

5.      William Merritt Holman Jr (CRD No. 2520483) was at all relevant times an associated person of Merrill Lynch. Mr. Holman has been a successful financial advisor for over 30 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Holman joined Merrill Lynch in November 2008. Mr. Holman left Merrill Lynch in April 2021 with his partners, Claimants Paulson and Gatto.

6.      Steven E Gatto (CRD No. 4407233) was at all relevant times an associated person of Merrill Lynch. Mr. Gatto has been a successful financial advisor for over 23 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Gatto joined Merrill Lynch in November 2008. Mr. Gatto left Merrill Lynch in April 2021 with his partners, Claimants Holman and Paulson.

7.      John Joseph Birkhauser (CRD No. 864365) was at all relevant times an associated person of Merrill Lynch. Mr. Birkhauser has been a successful financial advisor for over 45 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Birkhauser joined Merrill Lynch in April 1979. Mr. Birkhauser left Merrill Lynch in August 2021 with his partner, Claimants Ryan Birkhauser.

8.      Ryan M Birkhauser (CRD No. 5135019) was at all relevant times an associated person of Merrill Lynch. Mr. Birkhauser has been a successful financial advisor for over 12 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Birkhauser joined Merrill Lynch in November 2011. Mr. Birkhauser left Merrill Lynch in August 2021 with his partner, Claimant John Birkhauser.

9.      Mehgan E Zuniga (CRD No. 4095198), also known by her maiden name Mehgan Spear, was at all relevant times an associated person of Merrill Lynch. Ms. Zuniga has been a

successful financial advisor for over 8 years, providing investment management, retirement and tax planning, and wealth preservation strategies to her clients. Ms. Zuniga first joined Merrill Lynch in February 2003 and started working as a Financial Advisor in 2016. Ms. Zuniga left Merrill Lynch in January 2022 with her partner, Claimant Ucci.

10. Terri B Ucci (CRD No. 2006712) was at all relevant times an associated person of Merrill Lynch. Ms. Ucci has been a successful financial advisor for over 34 years, providing investment management, retirement and tax planning, and wealth preservation strategies to her clients. Ms. Ucci joined Merrill Lynch in November 1989. Ms. Ucci left Merrill Lynch in January 2022 with her partner, Claimant Zuniga.

11. Kurt Duane Veldhuizen (CRD No. 1969413) was at all relevant times an associated person of Merrill Lynch. Mr. Veldhuizen has been a successful financial advisor for over 35 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Veldhuizen joined Merrill Lynch in May 2008. Mr. Veldhuizen left Merrill Lynch in August 2019 with his partners, Claimants Kock and Bennett.

12. Matthew A Kock (CRD No. 4006551) was at all relevant times an associated person of Merrill Lynch. Mr. Kock has been a successful financial advisor for over 21 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Kock joined Merrill Lynch in May 2008. Mr. Kock left Merrill Lynch in August 2019 with his partners, Claimants Veldhuizen and Bennett.

13. John Michael Bennett (CRD No. 3222759) was at all relevant times an associated person of Merrill Lynch. Mr. Bennett has been a successful financial advisor for over 24 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. Bennett joined Merrill Lynch in July 2010. Mr. Bennett left Merrill Lynch in August 2019 with his partners, Claimants Veldhuizen and Kock.

**Respondent**

14.     Merrill Lynch (CRD No. 7691) is a Delaware corporation and FINRA member broker-dealer and registered investment advisory, with its principal place of business is New York, New York.

15.     Merrill Lynch is a wholly owned subsidiary of Bank of America and Participating Employer under the Plans.

## PROCEDURAL HISTORY

16.     On April 30, 2024, Kelly Milligan, a former Merrill Lynch advisor filed a class action complaint, on behalf of himself and all other similarly situated Merrill Lynch FAs, against Merrill Lynch, Bank of America Corporation, and John/Jane Doe, in the U.S. District Court for the Western District of North Carolina alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions. *See Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:24-cv-00440 (W.D.N.C. 2024).

17.     Inexplicably, Merrill Lynch has not moved to compel arbitration in *Milligan*. As set forth above, the Code unambiguously <u>requires</u> Merrill Lynch, as a member firm, to submit disputes to the Code and provides heavy sanctions, up to and including suspension of membership, for failure to comply. *See* FINRA Regulatory Notice 16-25 ("Through IM-13000, FINRA has made clear to member firms and associated persons that they have the mandatory and nonwaivable duty to arbitrate disputes, and (with certain exceptions) to arbitrate them before FINRA")

18.     It is indisputable that every putative member of the *Milligan* class is an associated person whose dispute with Merrill Lynch arises from Merrill Lynch's business activities, i.e., their compensation for providing services to their clients, as associated persons, by Merrill Lynch, as a member firm. Merrill Lynch has nevertheless answered the Complaint in *Milligan*, engaged in Rule 16 conferences with putative class counsel and the federal district court, submitted a proposed

scheduling order that contemplates extensive litigation and discovery, and **filed a motion for summary judgment on the applicability of ERISA to the Plans**, the dispositive question in every one of these disputes with every unnamed putative class member who is not represented in, and has had no opportunity to move to compel arbitration of, *Milligan*. This is a brazen violation of FINRA Rules 13200 and 2010. *See* FINRA Rules 2010 (failure to submit to arbitration under the Code violations a member firm's obligation to observe "high standards of commercial honor and just and equitable principles of trade.").

19. Leaving aside that Merrill Lynch's position is that the plans in dispute are not ERISA plans, neither ERISA nor the unavailability of the class action mechanism in the Code relieves member firms and associated persons of their obligation to submit their disputes to arbitration. *See, e.g., Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023). In *Shafer*, Matthew T. Shafer, a former Morgan Stanley advisor, filed a class action on December 30, 2020, on behalf of himself and all other similarly situated former Morgan Stanley FAs, against Defendants Morgan Stanley and Morgan Stanley Smith Barney LLC in the United States Southern District of New York, alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions.

20. On March 24, 2021, Morgan Stanley moved to compel Shafer's claims to arbitration and stay the Class Action, which Shafer opposed on behalf of himself and the Class. On March 24, 2022, Shafer and eleven other named former Morgan Stanley advisors filed an Amended Class Action Complaint on behalf of themselves and the Class.

21. On May 9, 2022, Morgan Stanley moved again "…for an Order compelling arbitration of all claims brought by Plaintiffs filed in the above-captioned action and staying this action during the pendency of the arbitration proceedings." The Class Action Plaintiffs opposed the motion, arguing, among other things, that the ERISA claims were not subject to Morgan Stanley's arbitration

agreement. On September 15, 2023, after extensive briefing, the District Court requested supplemental letter briefing from the parties on the specific question of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan because "[t]he parties' briefing does not adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan."

22.     The Parties submitted their letter briefs to the Court on September 20, 2023, fully litigating the issue of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan.  Neither party requested additional briefing on this issue nor reserved their right to supplement their briefing on this issue.  On November 21, 2023, the SDNY Court held: "Defendants' motion to compel arbitration [] is granted. Because 'the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested'…the case will be stayed pending arbitration." *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023), Order on Motion to Compel Arbitration at Ex. A, 56.

23.     As part of its determination that the claims regarding the Morgan Stanley advisors' deferred compensation programs were arbitrable, the SDNY Court undertook an in-depth analysis of whether they were ERISA plans.  Based on the parties' respective submissions, the record before it, and the law, the Court concluded:

> **This Court concludes that the deferred compensation programs at issue here are not bonus programs….Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate**….By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation."…**Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan…In sum, the deferred compensation programs at issue here are not bonus plans.**

[T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (*see* ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." **Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."** Id. § 3(2)(A)(ii).  And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" application of ERISA in these circumstances does not unreasonably expand the reach of the Act….**For the reasons stated above, this Court concludes that Morgan Stanley's deferred compensation programs are ERISA plans.**

Ex. A, 36-39 (international case citations omitted) (emphasis added).

24.     In *Shafer*, the Southern District of New York found that the parties' arbitration agreement was binding and ordered the parties to arbitration in FINRA.  As the Panel will hear, Merrill Lynch senior management is aware of *Shafer* and has taken affirmative steps to interfere with its own employees' litigation against Morgan Stanley.  Merrill Lynch cannot be unaware of its obligation under *Shafer*, and numerous decisions across the country, to submit its disputes with Claimants, and every other unnamed, unrepresented employee against whom it has purported to move for summary judgment in *Milligan*, to arbitration under the FINRA Code, notwithstanding that the Plans are governed by ERISA.  Merrill Lynch's failure to do so is willful bad faith.

# STATEMENT OF FACTS

**A. Claimants Earned Commissions on Revenue They Generated Servicing Their Clients**

25.     Claimants provide investment advisory and brokerage services to their clients.  During their employment, Claimants and Merrill Lynch split revenues generated on the services they provided pursuant to an industry-standard, non-discretionary formula known as a "grid."  Claimants' shares of revenue were commissions under both federal law and Illinois and Wisconsin law.  *See Sutula-Johnson v. Office Depot, Inc.,* 893 F.3d 967, 977 (7th Cir. 2018) ("commission is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price.") (internal citation omitted).

26.     Throughout their employment, Merrill Lynch deferred a portion of Claimants' earned commissions pursuant to a non-discretionary formula.   Earned commissions that were deferred accrued throughout the year.  At the end of the year, the total earned commissions deferred were allocated to the Plans—a percentage to WealthChoice Plan and a percentage to the Equity Plan— and, according to the Plans, "converted" into "awards" with a value exactly equal to the earned commissions deferred.

27.     Awards under the Plans are governed by their respective plan documents and the "Award Agreements" Merrill Lynch issued to Claimants under the plan documents.

28.     Under the WealthChoice Plan, Claimants' earned commissions were purportedly converted to accounts notionally invested through Merrill Lynch's investment platform.

29.     Under the Equity Plan, Claimants' earned commissions were purportedly converted to a RSU equivalent to one share of Bank of America common stock and convertible to either cash or common stock after "vesting."

30.     Under the Plans, Claimants' deferred commissions were purportedly contingent upon vesting on a date scheduled between two and nine years after Claimants earned them.  The Plans

purport to vest and pay earned commissions early prior to the scheduled vest date in the event of certain types of termination, including death, "Workforce Reduction, Divestiture or Disability," and "retirement." With respect to retirement, the Plans provide that advisors are eligible for retirement when they reach age 65 or age 55 with 10 years of service and that the Cancellation Rule is inapplicable in the event of retirement provided the advisor does "not engage in Competition" before the payment date, provides an annual "certification that [they] have not engaged in competition," and agrees to new anti-competition and solicitation covenants.

31. The Plans purport to "cancel" an advisor's earned commissions in the event of "all other terminations" prior to the vesting date (the "Cancellation Rule"). After each Claimant left Merrill Lynch, Merrill Lynch purported to cancel and failed to pay commissions Claimants had earned performing services for their clients—on revenue Merrill Lynch actually received from their clients—as long as a <u>decade</u> earlier.

32. As set forth below, the Plans are ERISA plans as a matter of law. The Cancellation Rule, purporting to cancel payment of commissions unless advisors remain employed by Merrill Lynch for up to a decade after the commissions are earned, is a per se violation of ERISA.

**B. The Plans Are "Employee Benefit Pension Plans" Governed by ERISA**

33. ERISA's "purpose is simple: to establish a 'uniform regulatory regime' for plan administration that protects monies belonging to plan beneficiaries while such funds are held and managed by others." *Wilson v. Safelite Grp., Inc.,* 930 F.3d 426, 434 (6th Cir. 2019) ("*Wilson*") (Citations omitted); *Tolbert v. RBC Capital Mkts. Corp.*, 759 F.3d 619, 621 (5th Cir. 2014) ("*Tolbert*"). "ERISA's purpose is among the broadest, if not the broadest, recognized by the Supreme Court...and Congress purposefully designed the scheme so the 'employers can establish ERISA plans rather easily.'" *Wilson*, 930 F.3d at 434 (citations omitted).

34. ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a

term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). The test for whether an employee benefit plan is covered by ERISA is straightforward:

> any plan, fund, or program which . . . by its express terms **or as a result of surrounding circumstances** such plan, fund, or program
>
> (i)  provides retirement income to employees, or
>
> (ii)  results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) ("§ 1002(2)(A)") (emphasis added).

35.     Under the plain language of the statute and blackletter law, the Plans are "Employee Benefit Pension Plan[s]" governed by ERISA because, by their express terms and as a result of surrounding circumstances, they "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." § 1002(2)(A)(ii).

**1.  Each Plan Is a "Plan, Fund or Program."**

36.     The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'" *Feifer v. Prudential Ins. Co*., 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich,* 530 U.S. 211, 223 (2000)). A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994).  A "plan, fund or program" does not need to be a formal written document and can be comprised of multiple documents.  *Id*. at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA").

37.     Each Plan is a "plan, fund or program" under ERISA because it identifies the intended

benefits—earned commissions that are deferred for a period of years up to a decade—using a detailed, objective formula. The Plans also have an ascertainable class of beneficiaries: only advisors defer earned commissions under the Plans and the deferred compensation awards issued to them are specific to the advisors.

38.    Each Plan is ultimately funded by the earned commissions of the advisors themselves, i.e., a specific, defined and fully paid portion of revenue generated by advisors on services performed for their clients. Earned commissions converted dollar for dollar to RSUs are then specifically purported to be funded from Bank of America common stock designated for the purpose of meeting Merrill Lynch's obligations under the RSU award certificates.

## 2. The Plans "Result in a Deferral of Income" Under Subsection (ii) of § 1002(2)(A)

39.    As set forth above, subsections (i) and (ii) of § 1002(2)(A) "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert*, 758 F.3d at 624: ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i)"). The second of these two independent tests—whether a "plan, fund or program" "results in a deferral of income" under subsection (ii)—is "an effects-based inquiry rather than one based on purpose." *Pasternack*, 863 F.3d at 170, n.5.

40.    The Plans result in a deferral of advisors' earned commissions. At least 5% of an advisor's earned commissions are withheld each year and allocated between the Plans and purportedly converted to an award issued in the first quarter of the next year that purports to defer earned commissions for a further two to nine years.

41.    *Tolbert, supra,* is directly on point. In *Tolbert*, as here, RBC's plans purported to defer earned commissions and forfeit them in the event an advisor left prior to a "vesting" date years after the commissions were earned. *Tolbert*, 758 F.3d at 621. Considering the same question before

this Panel, whether the plan at issue was an "employee pension benefit plan" under ERISA, the Fifth Circuit first analyzed whether the plan qualified under subsection (i) of § 1002(2)(A): *i.e.*, whether it "provides retirement income," and concluded it did not. *Tolbert*, 759 F.3d at 624. The Fifth Circuit then conducted an <u>independent</u> analysis of RBC's plan under subsection (ii) and concluded that the plan was a "'pension plan' under subsection (ii)."[1] *See*, *Id*., 759 F.3d at 624.

42.    The Fifth Circuit found that, as here, the "deferral of income therefore 'ensues from' (or 'arises as an effect of') the express terms of the [plan]...Put another way, by participating in the [plan], the plaintiffs have 'fore[gone] income...in exchange for receiving income' at a later date." *Id.* at 625-26 (citations omitted).  It also found significant that, as here, the statement of purpose set forth by RBC's plan documents recited the purpose of deferred compensation. *Id.* 759 F.3d at 625.[2] The plan in *Tolbert* thus satisfied the first prong of subsection (ii) "results in a deferral of income."

43.    In *Wilson, supra*, the Sixth Circuit considered the same question whether the plan at issue was covered by ERISA and noted that the starting point for interpreting the statute is the language of the statute itself. *Wilson,* 930 F.3d at 433. "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (citations omitted).  Focusing on the term "results in a deferral of income," the Sixth Circuit concluded that "[i]n light of the ordinary meaning of the word 'results' and Congress's exclusion of the word 'requires,' § 1002(2)(A)(ii) covers plans containing

---

[1] *Tolbert* expressly rejected RBC's attempt to conflate the two sections, noting "[o]ur court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income." *Id.* 759 F.3d at 624.

[2]  Merrill Lynch's Plan prospectuses represent that "in our view, the Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974," a boilerplate disclaimer that has failed to persuade the federal courts, but nowhere does Merrill Lynch disclaim that either Plan is a deferred compensation plan, nor could it.  Each Plan's documents and award certificates flatly recites its purpose of deferred compensation, sets forth the terms of deferred compensation, outlines the tax treatment and requirements of deferred compensation, and actually defers the payment of earned commissions for one to ten years.

terms that have as **an effect, issue or outcome—even if not as a requirement**—deferral of income by employees to periods extending to the termination of covered employment or beyond." *Id.,* 930 F.3d at 435 (emphasis added).

44.     These decisions are, of course, entirely consistent with the dictionary definitions of "deferred compensation" as (1) "[p]ayment for work ***performed***, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when ***earned.***" BLACK'S LAW DICTIONARY (11th ed. 2019) (*emphasis added*); *see also Kuhbier v. McCartney*, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017) (quoting Black's Law Dictionary definition).  Merrill Lynch advisors defer part of their commissions for work ***performed*** (by generating revenue for Merrill Lynch) until a later date and do not pay taxes on this part of their compensation until it is paid.

45.     The Plans self-evidently meet the second prong of subsection (ii) in that, by their express terms or as "a result of surrounding circumstances," they result in advisors deferring income "for periods extending to the end of covered employment or beyond."  *See* § 1002(2)(A)(ii). The "end of covered employment" refers to when an employee stops working for a company) and ERISA "covers plans containing terms that have as **an effect, issue, or outcome— even if not a requirement**—deferral of income by employees extending to the termination of covered employment or beyond." *Id*. 930 F.3d at 434-435 (emphasis added).  The Sixth Circuit, comparing the plan before it to the one before the Fifth Circuit in *Tolbert*, held that it was irrelevant that the plans provided for payment of deferred commissions both before and after termination:

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in-service distributions.

***

> The statute does not mandate that 'all deferrals extend to the termination of employment' or that payments be 'systematically deferred' until termination

*Id*. at 435, 437. *See also Tolbert*, 759 F.3d at 626 (holding that plan variously deferring payment to times prior to, at and following termination "fits comfortably within the meaning of subsection (ii).

46.    The Plans here, which variously defer payment to times prior to, at and following termination, "fit[] comfortably within the meaning of subsection (ii)" for the same reason.  The Plans provide, for example, that advisors whose employment terminates due to Workforce Reduction, Divestiture, Change of Control or Disability are paid in accordance with the specific award's payment schedule, meaning a year to a decade following termination, while termination due to death results in payment as soon as practicable after termination.  With respect to retirement, the WealthChoice Plan provides payment in two installments over two years following termination, while the Equity Plan provides for payment in accordance with the specific award's payment schedule.   Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, the Plans defer payment of earned commissions to and after termination.

47.    Considering the same question whether a materially identical Morgan Stanley deferred compensation plan was an ERISA plan in *Shafer v. Morgan Stanley et al.*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023), the United States District Court for the Southern District of New York took extensive briefing and performed a thorough analysis before concluding:

> [T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - **are calculated on a monthly basis, based on "the Creditable Revenue**

generated [by the financial advisor] in such month." (2018) Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does **not pay out the cash or equity reflecting those "credits" for four to six years, however**. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (*see* ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that **"payment for work performed" in a given month is "paid in the future."** And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, **Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."** Id. § 3(2)(A)(ii).

Ex. A at 38 (emphasis added).

### 3. Neither Plan Is a "Bonus Program"

48.    In its Answer to the Class Action Complaint in *Milligan*, Merrill Lynch asserted a defense that its Plans are "bonus programs" exempt from ERISA.[3]  Assuming Merrill Lynch raises the same defense to this Arbitration, it is manifestly frivolous.

49.    A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).  By contrast, "'commission' is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price." *Sutula-Johnson v. Office Depot, Inc.,* 893 F.3d 967, 977 (7th Cir. 2018) (internal citation omitted) (holding that an employee's commissions were "wages" under the Illinois Wage Act because the "payments were mandatory

---

[3] The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA. 29 C.F.R. § 2510.3-2(a). Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Id.* at § 2510.3-2(c).

rather than discretionary," "paid according to a set formula," "based on the value of the individual employee's sales rather than on company- or department-wide performance," and "were a significant portion of the [employee's] pay […] which makes them seem more like 'compensation for services performed' than 'compensation given in addition to the required compensation for services performed.'")

50.     Merrill Lynch defers payment of *earned commissions* under a non-discretionary, uniformly applied formula known as a "grid."  This is not a bonus as a matter of law, in the industry, in Merrill Lynch's own compensation plan or in the Plan documents themselves.  In *Tolbert*, the Fifth Circuit distinguished deferred commissions under the plan from a "bonus" plan, holding that deferred commissions, *i.e.*, deferring "a portion of...compensation to be earned with respect to the upcoming Plan Year" is not a "bonus," and that ERISA did not require "systematic" deferral in order for a plan to qualify.  *See Tolbert*, 759 F.3d at 626 (citing *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 933 (8th Cir. 1999) (characterizing plans that provide rewards for superior performance as "classic" bonus situations, and noting that RBC's reliance on *Emmenegger*—a case involving a bonus program—was misplaced).  *See also Wilson*, 930 F.3d at 435.

51.     In *Shafer*, Morgan Stanley raised the identical "bonus program" argument.  The Southern District of New York flatly rejected it and held that Morgan Stanley's plan, materially identical to the Plans here, is an ERISA Plan:

> **Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission."** *See* Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the

English Language - Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").

By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language - Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation"). **Courts generally treat these two types of compensation as distinct.** *See Smith v. Rochester Tel. Bus. Mktg. Corp.,* 786 F. Supp. 293,299 (W.D.N.Y. 1992) (in ERISA action, concluding that employee benefits committee did not "err[] in deciding that commissions are not bonuses"), aff d, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiffs] salary was $50,000 per year plus incentive commissions and bonuses."); *Israel v. Voya Institutional Plan Servs., LLC*, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, **deferred compensation payments are not "over and above normal compensation."** Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

In sum, **the deferred compensation programs at issue here are not bonus plans**.

Ex. A, 36 – 37 (emphasis added).

## C.  The Plans Violate ERISA

52.    Under ERISA, employee "contributions are nonforfeitable," meaning that they are 100% vested when made.  ERISA § 203.   Consequently, when an advisor leaves Merrill Lynch for any reason, Merrill Lynch is *required* by statute to timely pay his or her earned commissions, i.e., employee contributions, in full.  The Plans' Cancellation Rule, purporting to cancel payment of commissions years or a decade after they were earned, is a per se violation of ERISA.

53.    The Cancellation Rule would violate ERISA even if the earned commissions, formulaically deferred from advisors' formulaically determined portion of revenues they generate servicing their clients, were misclassified as employer contributions.  Pursuant to § 203(a)(2)(B), employees must be fully vested in employer contributions after they have three years of service or, alternatively, gradually vested under the following schedule:

| Years of Service | Nonforfeitable Percentage |
| --- | --- |
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 | 80 |
| 6 or more | 100 |

54.    The Plans violate ERISA's vesting requirements because all advisors, regardless of years of service, vest according to lengthy schedules between one year and a decade after the commissions are earned and purportedly deferred.  Every Claimant in this case exceeded six years of service as of the date of termination.

55.    ERISA permits employers to operate deferred compensation plans for commission-based advisors, but strictly prohibits forfeiture of deferred commissions and requires employers to timely pay them after an advisor leaves.  Merrill Lynch, indisputably in violation of ERISA, the Illinois Wage Act, and Wisconsin Wage Laws, purported to cancel commissions it was bound by contract to pay Claimants on revenue that they generated, and that clients paid to Merrill Lynch, as long as a decade before they left.  This conduct is systematic.  In addition to the billions of dollars that Merrill Lynch takes as its own contractually allocated share of revenue its advisors generate serving their clients, Merrill Lynch purports to appropriate and retain for itself, in violation of ERISA and the labor laws of states across the country, hundreds of millions of dollars in advisors' commissions when they finally leave.

# CAUSES OF ACTION

## Count I
## Declaratory and Equitable Relief (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

56. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

57. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

58. Claimants seek a declaration that with respect to Merrill Lynch advisors:

   i. the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);

   ii. the Cancellation Rule under the Plans violates ERISA;

   iii. Merrill Lynch's deferral of compensation into the Plans violates ERISA;

   iv. pending payment in full, with penalties, interest and attorneys' fees as set forth below, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

59. Claimants seek an injunctive order requiring:

   v. a complete accounting of all amounts deferred under the Plans;

   vi. disgorgement to Claimants of all amounts withheld and purportedly forfeited;

   vii. disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;

   viii. an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees set forth below; and

   ix. all other relief the Panel determines is just and proper.

**Count II**
**Recovery of Benefits Under the Plan**
**(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

60. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

61. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

62. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

63. Merrill Lynch improperly denied Claimants their earned deferred commissions that should have been vested and not forfeited under ERISA. By denying Claimants their earned deferred commissions, Merrill Lynch violated ERISA § 203(a), 29 U.S.C. § 1053(a).

64. Merrill Lynch should be ordered to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

**Count III**
**Breach of Fiduciary Duty Regarding the Plans (ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))**

65. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

66. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or

discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

67.   ERISA requires that fiduciaries discharge their duties solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.*  ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan" only to the extent that they "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

68.   Merrill Lynch, a FINRA member firm and Claimants' employer, purported to "defer" and then to forfeit millions of dollars in earned commissions under its compensation plans into the Plans pursuant to vesting terms and schedules that violated the statutory requirements of ERISA.

69.   Merrill Lynch created, imposed, administered and managed the compensation plans under which Claimants' commissions were unlawfully deferred into the Plans, determined the

amounts deferred and actually deferred the commissions, managed the deferred amounts and any and all investments, and determined the purported forfeitures of commissions.

70.    Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109.  Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as is proper.

71.    Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

72.    Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

73.    Claimants seek the restoration of all earned deferred commissions that were illegally deemed forfeited by Merrill Lynch.

**Count IV**
**Illinois Wage Payment and Collection Act Violations As To Claimants**
**Foltz, Paulson, Holman, Gatto, R. Birkhauser, J. Birkhauser, Zuniga and Ucci**

74.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

75.    Claimants Foltz, Paulson, Holman, Gatto, R. Birkhauser, J. Birkhauser, Zuniga and Ucci are commissioned salespersons for purposes of the Illinois Wage Payment and Collection Act (Illinois Wage Act). The Illinois Wage Act defines wages broadly:

        "wages" shall be defined as any compensation owed an employee by an employer

pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. **Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.**

820 Ill. Comp. Stat. Ann. § 115/2 (emphasis added).

76.     Claimants' deferred commissions constitute "wages" for purposes of the Illinois Wage Act. *See Sutula-Johnson v. Office Depot, Inc.,* 893 F.3d 967, 977 (7th Cir. 2018) (holding that an employee's commissions were "wages" under the Illinois Wage Act because the "payments were mandatory rather than discretionary," "paid according to a set formula," "based on the value of the individual employee's sales rather than on company- or department-wide performance," and "were a significant portion of the [employee's] pay […] which makes them seem more like 'compensation for services performed' than 'compensation given in addition to the required compensation for services performed.")

77.     Under the Illinois Wage Act, employers may not make deductions from wages except in very narrowly defined circumstances provided by statute, none of which are applicable here. *See* 820 Ill. Comp. Stat. Ann. §115/9.

78.     Merrill Lynch set up a deduction plan for Claimants' earned deferred commissions. The deductions Merrill Lynch took from Claimants' and its other advisors' wages were for Merrill Lynch's own benefit, in violation of 820 Ill. Comp. Stat. Ann. §115/9.

79.     Further, upon the discharge, layoff or resignation of an employee, the Illinois Wage Act requires that the employer pay the employee all of his or her earned and unpaid wages immediately. *See* 820 Ill. Comp. Stat. Ann. §115/5.

80.     820 Ill. Comp. Stat. Ann. 115/5 states that "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case

later than the next regularly scheduled payday for such employee."

81. Claimants earned their commissions and were forced to defer them pursuant to a fixed, non-discretionary "compensation grid." Merrill Lynch's forfeiture of earned deferred commissions therefore violates 820 Ill. Comp. Stat. Ann. §115/5.

82. As of the date of this filing, Merrill Lynch has not paid Claimants their earned deferred commissions in violation of the Illinois Wage Act. Merrill Lynch has instead declared its intention never to pay Claimants their earned deferred commissions and that their earned deferred commissions were forfeited.

83. Merrill Lynch's cancellation of Claimants' deferred commissions and failure and refusal to pay Claimants their earned deferred commissions violated §115/3-5, 9 of the Illinois Wage Act. *See* 820 IL ST § 115/3 (requiring timely payment of commissions); 820 IL ST § 115/4 (requiring timely payment of all wages); 820 IL ST § 115/5 (requiring timely payment of "final compensation"); 820 IL ST §115/9 (prohibiting authorized deductions from wages or final compensation).

84. Pursuant to the Illinois Wage Act, "[a]ny employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees." 820 IL ST § 115/14.

**Count V**
**Wisconsin's Wage Payment and Collection Laws Violations**
**As To Claimants Veldhuizen, Kock and Bennett**

85. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully

set forth herein.

86. Claimants Veldhuizen, Kock and Bennett are commissioned employees for purposes of the Wisconsin Wage Payment and Collection Laws (Wisconsin Wage Laws). *See* Wis. Stat. Ann. § 109.01(3) (expressly defining wages to include commissions). Claimants' deferred commissions, which had been earned constitute "wages" for the purposes of the Wisconsin Wage Laws.

87. Pursuant to Wis. Stat. Ann. § 109.03 "Any employee [...] who quits employment or who is discharged from employment shall be paid in full by no later than the date on which the employee regularly would have been paid under the employer's established payroll schedule or the date of payment required under sub. (1), whichever is earlier."

88. As of the date of this filing, Merrill Lynch has not paid Claimants their earned deferred commissions in violation of the Wisconsin Wage Laws. Merrill Lynch has instead declared its intention never to pay Claimants their earned deferred commissions and that their earned deferred commissions were forfeited.

89. Pursuant to Wis. Stat. Ann. § 109.03 "... Each employee shall have a right of action against any employer for the full amount of the employee's wages due on each regular pay day as provided in this section and for increased wages as provided in s. 109.11(2), in any court of competent jurisdiction."

90. Wis. Stat. Ann. § 109.11 (2) provides for the award of "increased wages of not more than 50 percent of the amount of wages due and unpaid" in addition to the amount of wages due and unpaid.

91. Wis. Stat. Ann. § 109.03 provides for the award of costs and a reasonable sum for expenses in an action by an employee against the employer for the violation of the Wisconsin Wage Laws. Wisconsin courts have interpreted § 109.03 to include attorney's fees awards. *See Jacobson*

*v. Am. Tool Companies, Inc.,* 222 Wis. 2d 384, 401, 588 N.W.2d 67, 74 (Ct. App. 1998).

## Count VI
### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

92.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

93.     As a FINRA member firm, Merrill Lynch had a duty to "observe high standards of commercial honor and just and equitable principles of trade" in the "conduct of its business." FINRA Rule 2010.

94.     In every contract there exists an implied covenant of good faith and fair dealing in the course of performance. Breach of the covenant is breach of the agreement itself, the covenant being "part and parcel" of the agreement or contract. The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under the agreement. The covenant encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

95.     Merrill Lynch breached its contractual obligations to Claimants when it cancelled their earned deferred commissions.

96.     Merrill Lynch falsely and expressly told Claimants that their earned deferred commissions would be a portion of their total earned compensation. Merrill Lynch also omitted to tell them that the plan primarily benefitted Merrill Lynch. Merrill Lynch's misrepresentations and omissions were not in good faith, "just and equitable" or "commercial honor."

97.     Merrill Lynch breached its agreement and the implied covenant of good faith and fair dealing and FINRA Rule 2010 and is liable for the total amount of earned deferred commissions it has not paid.

## Count VII
## Conversion

98.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein. In the alternative, Claimants allege that Merrill Lynch is liable for conversion of their earned deferred commissions.

99.     A claim for conversion requires a showing of claimant's legal ownership or immediate superior right of possession to property, and defendant's unauthorized interference with claimant's ownership or possession of such property. Where legal ownership or immediate superior right of possession is established, interference with earned compensation is conversion.

100.    Pursuant to the terms of the Plans, Claimants' deferred commissions were earned through their production of revenue. Thus, upon earning their deferred commissions, Claimants acquired a possessory interest in the underlying property. By subsequently forcing them to forfeit their earned deferred commissions, Merrill Lynch interfered with Claimants' possessory interest of the property.

101.    Merrill Lynch is liable for compensatory damages in the amount of the total earned deferred commissions it withheld from Claimants, valued as of the date of Claimants' forced forfeiture of their earned deferred commissions, to be proven at the hearing.

## Count VIII
## Unjust Enrichment

102.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

103.    In the alternative, Claimants are entitled to relief under the theory of unjust enrichment.

104.    A claimant may prevail on a claim for unjust enrichment by demonstrating that the respondent benefitted at the claimant's expense and that equity and good conscience require

restitution.

105.  Here, Merrill Lynch has been enriched by wrongfully retaining Claimants' earned commissions.

## **RELIEF**

Based on the foregoing, Claimants respectfully requests the Panel issue an Award against Merrill Lynch providing for:

    a.    monetary damages equal to the unpaid earned compensation in an amount to be proven at the hearing but not less than $6.2 million.

    b.    monetary damages equal to any other earned but unpaid amounts in an amount to be proven at the hearing;

    c.    all penalties in accordance with the Illinois Wage Act;

    d.    all penalties in accordance with the Wisconsin Wage Laws;

    e.    prejudgment interest as required by Illinois Law and, with respect to Mr. Veldhuizen, Mr. Kock and Mr. Bennett, prejudgment interest as required by Wisconsin Law;

    f.    attorneys' fees and costs as required by ERISA, Illinois Wage Act, and Wisconsin Wage Laws;

    g.    declaration that, with respect to Merrill Lynch:

        i.    the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);

        ii.    the Cancellation Rule under the Plans violates ERISA;

        iii.    Merrill Lynch's deferral of compensation into the Plans violates ERISA;

        iv.    pending payment in full, with penalties, interest and attorneys' fees as set forth above, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

    h.    an injunctive order requiring:

        i.    a complete accounting of all amounts deferred under the Plans;

ii.    disgorgement to Claimants of all amounts withheld and purportedly forfeited;

iii.    disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;

iv.    an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees as set forth above; and

i.    Such other relief as the Panel deems just, equitable and proper.[4]

Dated: New York, New York
       October 25, 2024

                                            **LAX & NEVILLE LLP**

                                            ***/s/ Barry R. Lax***
                                            Barry R. Lax, Esq.
                                            Sandra P. Lahens
                                            Robert R. Miller
                                            350 Fifth Avenue, Suite 4640
                                            New York, NY 10118
                                            Tel: (212) 696-1999
                                            *Attorneys for Claimants*

---

[4] Claimants reserve their right to amend or supplement their damages pending discovery.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>      - against -<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>                    Defendants. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>20 Civ. 11047 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

      In this putative class action, Plaintiffs Matthew Shafer, Sheri Haugabook, Peter

Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey

Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel assert that Defendants Morgan

Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management

Development and Succession Committee (the "Compensation Committee"), and certain

unnamed members of the Compensation Committee (together, "Morgan Stanley" or the "Bank"),

violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying

Plaintiffs all of their deferred compensation when they left their financial advisor positions at

Morgan Stanley.  Defendants have moved to compel arbitration and for a stay of these

proceedings.  (Dkt. No. 65)  For the reasons stated below, Defendants' motion will be granted.

### BACKGROUND[1]

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney.[2]  They

reside throughout the country and worked for the Bank at various times between 1994 and 2020.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16)

"Defendant Morgan Stanley is a Delaware corporation with a principal place of

business in New York, New York.  Morgan Stanley is a global financial services firm that,

through its subsidiaries and affiliates, including [Defendant Morgan Stanley Smith Barney LLC,

a Delaware limited liability company with its principal place of business in New York, New

York] provides financial advisory services to clients.  Defendant Compensation Committee is a

committee of Morgan Stanley's Board of Directors formed to discharge the Board's

responsibilities related to compensation. . . . The Compensation Committee is an unincorporated

---

[1]  In resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

The facts discussed below are drawn from (1) the Amended Complaint (Dkt. No. 58); (2) the alleged "Plan Documents" cited in the Amended Complaint, which have been docketed as exhibits to Plaintiff's September 15, 2023 letter (Dkt. No. 83); and (3) the declarations and accompanying exhibits submitted by the parties (Porco Decl. (Dkt. No. 67); Krentzman Decl. (Dkt. No. 68); Jasinski Decl. (Dkt. No. 72-1)).

[2]  Morgan Stanley describes the financial advisor's role as "help[ing] [clients] create a wealth plan that takes [their] specific goals and circumstances into account," including providing advice on "retirement income . . . , asset allocation . . . , and changes in tax policy."  Morgan Stanley Wealth Mgmt., Why Advice Matters (May 31, 2023), available at https://www.morganstanley.com/articles/advice-matters.

2

association with its principal place of business in New York.  John and Jane Does 1-20 are the

individual members of the Compensation Committee." (Id. ¶¶ 23-26)

   Plaintiffs purport to bring this action on behalf of all Morgan Stanley financial

advisors who forfeited deferred compensation as a result of leaving their Morgan Stanley

employment between December 29, 2014 and the present.  (Id. ¶ 90)

   Plaintiffs assert general federal question jurisdiction pursuant to 28 U.S.C.

§ 1331 and ERISA jurisdiction pursuant to 29 U.S.C. § 1132(e).  (Id. ¶ 7)

I.  **FACTS**

  A.  **Financial Advisors' Compensation at Morgan Stanley**

   Morgan Stanley's "compensation program[]" for financial advisors during the

relevant time period largely consists of two components:  salary and incentive compensation.[3]

(2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[4]

   "All Advisors . . . receive a guaranteed monthly salary.  Total compensation in

any month will not be lower than the applicable monthly salary by state." (Id. § 1.1)  As of

2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per

year.  (Id. § 1.1)

   Incentive compensation is based on the "Total Credits" that a financial advisor is

awarded monthly.  (Id. § 1.2.1)  "The Advisor's Total Credits for each month [are] determined

based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with

---

[3]  Morgan Stanley also offers certain income and savings programs that are not at issue here,
including a "lending growth award program" and a "capital accumulation program."  (See
generally 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2))

[4] The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

3

"(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" –

"multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

Incentive compensation is further divided between (1) "Cash Credits," which are

"calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and

(2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–

1.2.3) The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral

Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5%

(for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue

increases. (Id. §§ 1.2.2–1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred

compensation paid out years after it is earned.

The 2018 Financial Advisor Compensation Plan provides the following example

of incentive compensation:

An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross
Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
- Credit Rate is 44.0%
- Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
- Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
- Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

(Id. § 1.2.3)

"Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in

the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of

Morgan Stanley common stock approximately four years from the grant date" (the "Equity

Incentive Plan"). (Id. § 1.2.2) "[S]eventy-five percent of the cumulative monthly Deferred

Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be

paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. §

4

1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8))  The Compensation Committee administers both

plans.  (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8) § 5(a))

   "[Financial advisors] have individual, notional accounts in the [Compensation

Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred

compensation.  [Financial advisors] can invest their accounts in notional investments, like in a

401(k) plan, with the value of their accounts tracking the performance of the selected

investments."  (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award

Certificate (Dkt. No. 83-5) § 1))  As to vesting under the Equity Incentive Plan, "a Stock Unit

will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to

the Fair Market Value on the payment date of one Share."  (Equity Incentive Compensation Plan

Document (Dkt. No. 83-8) § 8)

   As to both plans, "[d]eferred compensation awards are contingent upon the

Advisor remaining employed through the grant and vesting dates of the award."  (2018 Financial

Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2)  Plaintiffs refer to this policy as the

"Cancellation Rule."  (Am. Cmplt. (Dkt. No. 58) passim)

   There are several exceptions to the Cancellation Rule.  Deferred cash

compensation and deferred equity compensation both vest after employment if the financial

advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e.,

"termination of . . . [e]mployment . . . for any reason other than under circumstances involving

any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for]

[g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified

combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" –
i.e., layoffs; or (4) departure for governmental service. (2017 Compensation Incentive Plan
Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan
Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

"[E]nter[ing] into an employment or consulting relationship with a firm offering
Competitive Services" constitutes "Prohibited Activity." Accordingly, a long-tenured financial
advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm
is not eligible for the "full career retirement" exception to the Cancellation Rule. (2017
Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive
Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

### B.    The Arbitration Agreements

In moving to compel arbitration, Morgan Stanley cites arbitration clauses in three
types of Morgan Stanley employment agreements:  the "Bonus Agreement"; the "Employment
Agreement"; and the "CARE Program."

### 1.    The Bonus Agreement's Arbitration Provision

The Bonus Agreement's arbitration provision provides as follows:

7. Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this
Agreement or any benefits or payments available and/or due under this
Agreement, as well as any controversy or claim arising out of or in any way
relating to Employee's employment with Morgan Stanley or termination thereof,
including, but not limited to common law claims for breach of contract or tort,
wage and hour claims, and/or statutory discrimination claims (individually and
collectively referred to herein as "Covered Claims"), will be resolved by final and
binding arbitration before the Financial Industry Regulatory Authority ("FINRA")
in accordance with the FINRA Code of Arbitration Procedure for Industry
Disputes. Notwithstanding the foregoing, any Covered Claim that has been
initiated or is being maintained on a class, collective, or representative action
basis, or is otherwise brought on behalf of others, may not be submitted to
arbitration before FINRA. Also, notwithstanding the foregoing, any Covered

6

Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA"). Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures. Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims. Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only. With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action. An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7. Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration. In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law. For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

7

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . .

(2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7; see also 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7) (same); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7) (similar))[5]

### 2.    The Employment Agreement's Arbitration Provision

The Employment Agreement contains the following arbitration provision:

7. ARBITRATION

7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.  Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  This Paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provision[al] relief from any court, as provided for in this agreement.

7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ("CARE").  Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Administrator's Office and in the CARE Program explanatory brochure.

(2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7)

### 3.    The CARE Program

"For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called 'CARE,' short for Convenient Access to Resolution for Employees.

---

[5]  The cited 2014 and 2015 bonus agreements contain substantially similar – albeit not identical – language addressing the arbitration of claims.  The parties have not argued that language differences in the relevant sections of the 2014 and 2015 bonus agreements are material.

CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the

program is available to employees on Morgan Stanley's intranet site. . . . In 2015, Morgan

Stanley announced an expansion of the CARE [P]rogram.  Morgan Stanley notified all U.S.

employees of the expansion via their individualized Morgan Stanley email accounts.  These

communications were sent in waves. . . .  [and] describe[ed] the process through which employees

could opt out of participating."  (Krentzman Decl. (Dkt. No. 68) ¶¶ 20, 22)

The 2015 email regarding the CARE Program expansion and opt-out reads as

follows:

> Morgan Stanley is announcing the expansion of CARE and modifications to
> related Firm policies and programs to extend arbitration obligations for all US
> employees – registered and non-registered.  Effective October 2, 2015, arbitration
> under the CARE Arbitration Program will be mandatory for all employees in the
> U.S., and all covered claims between the Firm and employees will be resolved
> through final and binding arbitration on a nonclass, non-collective and non-
> representative action basis as more fully described in the Arbitration Agreement
> and CARE Guidebook. . . .
>
> By continuing your employment with Morgan Stanley, you accept and agree to,
> and will be covered and bound by the terms of the Arbitration Agreement and the
> arbitration provisions of the CARE Guidebook, unless you elect to opt out of the
> CARE Arbitration Program by completing, signing and submitting an effective
> CARE Arbitration Program Opt-Out Form by October 2, 2015.

(Sept. 2, 2015 Morgan Stanley Human Resources email (Dkt. No. 68-3) at 2)

The 2015 email contains hyperlinks to the "Arbitration Agreement" (the "CARE

Program Arbitration Agreement") and the "CARE Guidebook."  (Id.)

The CARE Program Arbitration Agreement provides as follows:

> **Binding Mutual Arbitration.**  You and Morgan Stanley agree that any Covered
> Claims (defined below) will be resolved by final and binding arbitration as set
> forth in this Arbitration Agreement and in the arbitration provisions of the CARE
> Guidebook, a copy of which is annexed hereto.  This Arbitration Agreement,
> including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall
> be governed by and interpreted in accordance with the Federal Arbitration Act
> ("FAA").  This Arbitration Agreement applies with respect to all Covered Claims,
> whether initiated by you or Morgan Stanley, and makes arbitration the required

and exclusive forum for the resolution of all Covered Claims.  By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

**Covered Claims.**  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring.  Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.  **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

**Excluded Claims.**  The following claims and disputes are not subject to this Arbitration Agreement:  (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. . . .

Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

(CARE Program Arbitration Agmt. (Dkt. No. 68-5) §§ 1-4 (emphases in original))  The CARE

Guidebook contains similar language.  (CARE Guidebook (Dkt. No. 68-4) at 4-6, 20)

       **C.**      **<u>Applicability of Arbitration Provisions to Plaintiffs</u>**

          Defendants have proffered evidence that Plaintiffs are bound by the arbitration

provisions contained in the following agreements:

-   Shafer:  2015 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 6 and Ex. B);

-   Haugabook, Heidt, Shover, Livanos, Samsen, Jeffrey Sheresky, Steve Sheresky, Jukel:  2015 CARE Program expansion, by virtue of not having opted out (Krentzman Decl. (Dkt. No. **68**) ¶ 31);

-   Tamse:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 8 and Ex. C);

-   Loftus:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 10 and Ex. D); and

-   Nadler:  2008 Employment Agreement (Krentzman Decl. (Dkt. No. 68) ¶ 18 and Ex. A).

**II.**      **<u>PROCEDURAL HISTORY</u>**

          The Complaint was filed on December 30, 2020, with Shafer as the sole plaintiff.

(Dkt. No. 1)[6]

          On March 24, 2022, Plaintiffs filed the Amended Complaint.  (Dkt. No. 58)  The

Amended Complaint asserts claims for (1) declaratory and equitable relief pursuant to ERISA

§ 502(a)(3), 29 U.S.C. § 1132(a)(3) (<u>id.</u> ¶¶ 98-101); (2) "reformation of the [Financial Advisor]

Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA §§

502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (<u>id.</u> ¶¶ 102-07); and (3) "breach of fiduciary

duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the

---

[6]  On April 5, 2021, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 42)  The Court denied that motion without prejudice on March 10, 2022, after new plaintiffs moved for joinder and stated that they intended to file an Amended Complaint.  (Dkt. No. 57)

[Equity Incentive Plan]," pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).  (Id. ¶¶ 108-17 (capitalization altered))

On June 29, 2022, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 65)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Motion to Compel Arbitration

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement."  9 U.S.C. § 4.  The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  Given the federal policy favoring arbitration, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration."  Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  However, this "presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made."  Id.

"'In deciding whether a dispute is arbitrable, [a court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'"  Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 394 (2d Cir. 2015) (quoting Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010)).  "When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). As to the scope of the arbitration agreement, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4). Where, however, "'the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and "avoid the need for further court proceedings."'" Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011); Bensadoun, 316 F.3d at 175).

As noted above, in resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw[] all reasonable inferences in favor of the non-moving party." Id. (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)). However, "[a] party to an arbitration

agreement seeking to avoid arbitration generally bears the burden of showing the agreement to

be inapplicable or invalid." Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir.

2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

     **B.**     **ERISA**

     "ERISA's comprehensive regulatory scheme governs most employee benefit

plans." Liberty Mut. Ins. Co. v. Donegan, 746 F.3d 497, 503 (2d Cir. 2014), aff'd sub nom.

Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312 (2016). "The statute . . . seeks to make the

benefits promised by an employer more secure by mandating certain oversight systems and other

standard procedures." Gobeille, 577 U.S. at 320-21.

     ERISA § 502(a), codified at 29 U.S.C. § 1132(a), provides that

[a] civil action may be brought –

     (1) by a participant or beneficiary –

          (A) for the relief provided for in subsection (c) of this section, or

          (B) to recover benefits due to him under the terms of his plan, to
          enforce his rights under the terms of the plan, or to clarify his
          rights to future benefits under the terms of the plan;

     (2) by the Secretary, or by a participant, beneficiary or fiduciary for
     appropriate relief under section 1109 of this title; [or]

     (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or
     practice which violates any provision of this subchapter or the terms of the
     plan, or (B) to obtain other appropriate equitable relief (i) to redress such
     violations or (ii) to enforce any provisions of this subchapter or the terms
     of the plan.

29 U.S.C. § 1132(a)(1)-(3).

     "To state a claim under ERISA, a plaintiff must allege and establish the existence

of an 'employee benefit plan' that is governed by ERISA." Albers v. Guardian Life Ins. Co., No.

98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999).

ERISA addresses two types of "employee benefit plans":  "welfare plans" and "pension plans."  ERISA § 3(2)(A) defines "pension plan" as follows:

> (A) Except as provided [elsewhere in ERISA], the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A).

ERISA requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable" in most circumstances.  ERISA § 203(a), codified at 29 U.S.C. § 1053(a).  In the case of an "individual account plan,"[7] benefits must generally fully vest (1) after three years of service, or (2) gradually in accordance with a statutorily defined schedule. Id. §§ 203(a)(2)(B)(i)-(iii).

## II.      ANALYSIS

### A.      Whether the Parties Agreed to Arbitrate

As discussed above, Defendants have offered evidence that Plaintiffs Shafer, Tamse, Loftus, and Nadler executed written agreements containing arbitration clauses.  As to the remaining Plaintiffs, Defendants have offered evidence that they continued to work at Morgan Stanley without opting out of the 2015 CARE Program expansion, which provides for binding

---

[7] "The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34).

15

mutual arbitration.  (See Porco Decl. (Dkt. No. 67) and accompanying exhibits; Krentzman Decl.

(Dkt. No. 68) and accompanying exhibits)  Plaintiffs do not dispute the evidence showing their

agreement to the arbitration provisions at issue.  Given this record, the Court concludes that

Defendants have demonstrated that Plaintiffs and Defendants entered into agreements to

arbitrate.  See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004)

(employee's signed contract containing arbitration clause sufficient to establish agreement to

arbitrate under New York law); Victorio v. Sammy's Fishbox Realty Co., LLC, No. 14 CIV.

8678 CM, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (same); Lockette v. Morgan

Stanley, No. 18-CV-876 (JGK), 2018 WL 4778920, at *4–5 (S.D.N.Y. Oct. 3, 2018) (concluding

that plaintiff's continued work at Morgan Stanley after receiving the 2015 CARE Program

expansion email and plaintiff's decision not to opt out were sufficient to demonstrate an

agreement to arbitrate under New York law); Pelligrino v. Morgan Stanley Smith Barney LLC,

No. 17-CV-7865 (RA), 2018 WL 2452768, at *3-5 (S.D.N.Y. May 31, 2018) (same).

       It is likewise clear that the arbitration provisions at issue unambiguously delegate

disputes as to arbitrability to the arbitrator, except as to challenges to the provisions' class action

waivers.  (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d) ("Any dispute as to the arbitrability

of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.

Notwithstanding the foregoing, any issue concerning the validity of the class action, collective

action, or representative action waiver must be decided by a court, and an arbitrator does not

have authority to consider the issue of the validity of the waiver."); Shafer 2015 Bonus Agmt.

(Dkt. No. 67-2) § 7(d) ("Any issue concerning the arbitrability of a particular issue or claim

pursuant to this arbitration agreement (except for issues concerning the validity or enforceability

of the class action, collective action, or representative action Waivers) must be resolved by the

arbitrator, not the court."); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1 ("Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration."); CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4 ("Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.")) See Frazier v. Morgan Stanley, No. 16 CIV. 804 (RJS), 2018 WL 11585450, at *8 (S.D.N.Y. Nov. 29, 2018) (holding that identical provision in Morgan Stanley employment agreements "clearly provide[d] for the arbitration of questions concerning the arbitrability of any dispute arising out of or relating to those agreements").[8]

While Plaintiffs do not dispute that the signed agreements and Plaintiffs' failure to opt out of the CARE Program expansion signify consent to arbitration, they argue that "[e]ven if the arbitration agreements applied to Plaintiffs' claims, they were superseded by the [Compensation Incentive] [P]lan [D]ocument, which specifically requires disputes about the plan to be resolved in court, **not** arbitration." (Pltf. Opp. (Dkt. No. 72) at 18-19 (emphasis in original))

In support of this argument, Plaintiffs cite to the Compensation Incentive Plan Document's "Governing Law and Exclusive Jurisdiction" provision:

---

[8] Citing NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031-32 (2d Cir. 2014), and Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281 (5th Cir. 2019), Plaintiffs contend that "the parties did not clearly and unmistakably commit questions about the arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator." (Pltf. Opp. (Dkt. No. 72) at 15 n.11) These cases are not persuasive here, however, because they address arbitration provisions that do not contain the explicitly worded delegations quoted above. In NASDAQ-OMX Grp., for example the agreement at issue was "silent as to who should decide arbitrability." NASDAQ OMX Grp., 770 F.3d at 1031. And in Archer & White Sales, the Fifth Circuit found that "[t]he parties could have unambiguously delegated th[e] question [of who decides arbitrability], but they did not, and we are not empowered to re-write their agreement." Archer & White Sales, 935 F.3d at 282.

[The Compensation Incentive Plan] and the related legal relations between a
Participant and the Firm shall be governed by, and construed in accordance with,
the laws of the State of New York, without regard to any conflicts or choice of
law rule or principle that might otherwise refer the interpretation of the Award or
Account Value to the substantive law of another jurisdiction.  Following the
timely and proper exhaustion of applicable internal claims and appeals
procedures, the courts of New York shall have exclusive jurisdiction over the Plan
and any dispute arising in connection with the Plan, a Participant's participation
in the Plan or rights under the Plan.

(Compensation Incentive Plan Document (Dkt. No. 83-4) § 17)  The Compensation Incentive

Plan Document – unlike the agreements containing arbitration clauses discussed above – does

not contain a merger clause.[9]

According to Plaintiffs, the "Governing Law and Exclusive Jurisdiction"

provision in the Compensation Incentive Plan Document constitutes "'a subsequent contract

regarding the same matter'" – i.e., arbitration – that "'supersede[s] the prior contract[s].'"  (Pltf.

Opp. (Dkt. No. 72) at 19 (quoting Applied Energetics, 645 F.3d at 526))  But the evidence before

the Court suggests that nearly all of the agreements at issue containing the arbitration provisions

were executed after the Compensation Incentive Plan Document was issued.

---

[9]  The Bonus Agreement's arbitration provision states that "[e]mployee and Morgan Stanley
agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered
Claims, superseding all prior written and oral agreements regarding the resolution of Covered
Claims. . . ."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(k); see also 2014 Tamse Bonus
Agmt. (Dkt. No. 67-3) § 7(e) (same); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7(e) (same))

The Employment Agreement states that "[t]his writing constitutes the entire agreement of the
parties with respect to the subject matter recited in this Agreement.  This Agreement may be
amended only by a writing signed by both you and Morgan Stanley."  (2008 Nadler Employment
Agmt. (Dkt. No. 68-1) § 13)

The CARE Program Arbitration Agreement states that "**[t]his Arbitration Agreement applies
to all Covered Claims, including any Covered Claims based on, arising out of, or which
arose out of or in any way relate to acts and omissions that occurred before you and
Morgan Stanley entered into this Arbitration Agreement.**"  (CARE Program Arbitration
Agmt. (Dkt. No. 68-5) § 2 (emphasis in original))

18

While the Compensation Incentive Plan Document is not dated, Plaintiffs assert "[u]pon information and belief, [that] this document has been in effect since 2008 and [is] part of the 'applicable award documentation' when participants' deferred compensation is credited to their account each January." (Jasinski Decl. (Dkt. No. 72-1) ¶ 4)  However, the record does not indicate whether (1) the Compensation Incentive Plan Document has changed over time, or (2) if, when issued as part of the "applicable award documentation" in a given year, it should be considered a document current as of that year or in the alternative, merely a copy of a 2008 document.  These matters are material here, because all Plaintiffs other than Nadler signed arbitration agreements <u>after</u> 2008, when Plaintiffs assert that the Compensation Incentive Plan Document was issued.  (Porco Decl. (Dkt. No. 67) ¶¶ 6-11; Krentzman Decl. (Dkt. No. 68) ¶¶ 23-30)  And given the merger provisions found in the agreements containing arbitration clauses, if these agreements were executed after the Compensation Incentive Plan Document was issued, there is a compelling argument that these agreements supersede the Compensation Incentive Plan Document.

For example, Plaintiff Mark Tamse "was employed by Morgan Stanley as a[] [financial advisor] from March 7, 1994, until March 27, 2015."  (Krentzman Decl. (Dkt. No. 68) ¶ 9)  On February 18, 2014, he entered into a Bonus Agreement containing an arbitration provision, which provides that "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof . . . will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) §§ 7(a))  The Bonus Agreement further provides that the arbitration provision "constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered

Claims." (Id. § 7(e))  Based on the merger provision, it appears that the Bonus Agreement's arbitration clause would supersede the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction clause with respect to any deferred compensation that Tamse received under the Compensation Incentive Plan.

In any event, even if – contrary to the record before the Court – the Compensation Incentive Plan Document was issued after the agreements containing the arbitration provisions, the Governing Law and Exclusive Jurisdiction provision would not vitiate the arbitration provisions, because to the extent that the Compensation Incentive Plan is an ERISA plan – as Plaintiffs allege (Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) – the Governing Law and Exclusive Jurisdiction provision is null and void.

As discussed above, the Amended Complaint asserts that the deferred compensation programs at issue are ERISA plans, and all of the claims alleged in the Amended Complaint are premised on ERISA.  (See Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117)  The "exclusive jurisdiction" provision on which Plaintiffs rely, however, states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that disputes arising under the Compensation Incentive Plan must be resolved by the "courts of New York."  (Id. § 17)

Accepting Plaintiffs' argument that the deferred compensation programs at issue are ERISA plans, the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision is null and void to the extent that it provides that all disputes arising under it are governed by New York law, and that all disputes arising under it must be heard by New York courts.  Claims under ERISA are governed by Federal law and are heard by Federal courts.

"If a state law 'relate[s] to . . . [an ERISA] employee benefit plan,' it is pre-empted." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (quoting ERISA § 514(a), codified at 29 U.S.C. § 1144(a) ("Except as provided in [statutory exceptions not relevant here], the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of [ERISA].") (alterations in Dedeaux).  Moreover, ERISA provides – with a narrow exception not at issue here – that "[t]he district courts of the United States shall have exclusive jurisdiction of an action under [ERISA]."  ERISA § 4301(c), codified at 29 U.S.C. § 1451(c); see Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *4 n.6 (S.D.N.Y. Mar. 30, 2007) ("Federal district courts have exclusive jurisdiction over all claims arising under ERISA except for those arising under § 1132(a)(1)(B).").

Accordingly, the Governing Law and Exclusive Jurisdiction provision in the Compensation Incentive Plan Document – which states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that "the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan" (Dkt. No. 83-4 § 17) – is null and void with respect to the ERISA claims raised in the Amended Complaint.  See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 367 (6th Cir. 2000) ("[I]f ERISA preempts . . . state law . . . , there is no state law to which the administrator of the . . . plan must conform."), aff'd sub nom. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); Matter of HECI Expl. Co., Inc., 862 F.2d 513, 521 (5th Cir. 1988) ("Even if a party may, under some circumstances, waive the application of federal law to a

federally preempted state law claim by failing to raise federal law in a timely fashion, it would

go too far to hold that parties could <u>agree</u> to apply state law to an ERISA claim.") (emphasis in

original) (citation omitted); <u>Stevenson</u>, 2007 WL 9815654, at *4 n.6**.**

    Finally, where an agreement containing an exclusive jurisdiction provision

overlaps with – but does not entirely displace – a related agreement containing an arbitration

provision, the issue of which provision applies presents a question of scope, and is thus subject to

language in an arbitration provision delegating disputes about arbitrability to an arbitrator.  <u>See</u>

<u>CleanSpark, Inc. v. Discover Growth Fund, LLC</u>, 485 F. Supp. 3d 494, 504 & n.10 (S.D.N.Y.

2020) ("where a later-in-time forum selection clause arguably wholly supersedes the earlier-in-

time arbitration agreement . . . a court must independently determine whether the agreement to

arbitrate is still enforceable"; where the later agreement does not entirely displace the earlier

agreement and contains an exclusive jurisdiction provision that applies only to disputes within

the scope of the later agreement, the arbitration provision has not been "wholly displaced by the

forum selection clause, . . . the Court need not pause on the threshold question [of whether there

has been an agreement to arbitrate]," because "'[w]hether the forum-selection clause in the later-

in-time agreement supersedes the arbitration clauses in the earlier agreement[] presents a

question of arbitrability'" that can be delegated to the arbitrator) (quoting <u>TAPCO Underwriters,</u>

<u>Inc. v. Catalina London Ltd.</u>, No. 14-**CV**-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8,

2014)) (alteration omitted); <u>PB Life & Annuity Co. v. Universal Life Ins. Co.</u>, No. 20-CV-2284

(LJL), 2020 WL 2476170, at *3, *6–11 (S.D.N.Y. May 12, 2020) (reinsurer and insurer first

entered into reinsurance agreement containing an arbitration provision, and then entered into

trust agreement containing a New York choice of law and exclusive jurisdiction provision; the

court held that, with respect to disputes implicating both agreements, whether the arbitration

provision or exclusive jurisdiction provision controlled was a question of arbitrability properly delegated to the arbitrator).

Here, the subject matter of the Compensation Incentive Plan Document is not identical to the subject matter of the employment agreements containing the arbitration provisions, and the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision applies only to the Compensation Incentive Plan. (Dkt. No. 83-4 § 17) The jurisdiction provision does not apply to claims regarding the Equity Incentive Plan. In these circumstances, as in CleanSpark and PB Life, disputes over the jurisdiction provision's application are within the arbitrator's ambit.

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014), Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc., 5 F. Supp. 3d 537 (S.D.N.Y. 2014), Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522 (2d Cir. 2011), and Ruiz v. New Avon LLC, No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) – all cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 72) at 19-20) – are not to the contrary.

In Goldman and Citigroup Glob. Markets, courts concluded that broker-dealer agreements that provided for exclusive jurisdiction in the Southern District of New York, and that contained merger provisions, superseded the "background FINRA arbitration rule." Goldman, 764 F.3d at 212, 216; see also Citigroup Glob. Markets, 5 F. Supp. 3d at 539-40.

In Applied Energetics, plaintiff manufacturer and defendant broker-dealer "entered into a preliminary letter agreement" that required disputes to be submitted to arbitration before the National Association of Securities Dealers, FINRA's predecessor. Applied Energetics, 645 F.3d at 523. The letter agreement "contemplated that the parties would enter into a subsequent, more formal agreement." Id. The parties subsequently entered into the

contemplated more formal agreement, which (1) "expressly provided that the agreement would be governed by New York law"; (2) provided that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York"; and (3) contained a merger clause. Id. The Second Circuit concluded that the language in the later formal agreement superseded the arbitration provision in the initial letter agreement because (1) "[the formal agreement's] language that 'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the [letter agreement's] parallel language that 'any dispute shall be resolved through binding arbitration'"; and (2) "[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Id. at 525-26 (quotation and alterations omitted).

And in Ruiz, the plaintiff employee signed (1) a November 14, 2017 employment agreement in which the parties "irrevocably consent and submit to the sole exclusive jurisdiction of the United States District Court for New York, or the Courts of the State of New York," with respect to "[a]ny and all actions arising out of the [employment agreement] or the termination thereof"; (2) a November 27, 2017 "Employment Arbitration Agreement" containing an arbitration provision for employment disputes; and (3) a revised December 19, 2017 employment agreement with a later start date, which contained the same exclusive jurisdiction clause as the original agreement, as well as a merger clause. Ruiz, 2019 WL 4601847, at *2, *7. The court concluded that the exclusive jurisdiction clause in the December employment agreement displaced the arbitration agreement agreed to the previous month, because the "language [of the December agreement] – which encompasses any dispute relating to Ruiz's employment by New

Avon – is both mandatory and exclusive, and cannot be reconciled with the parties' prior agreement to arbitrate all disputes"; and (2) and because of the merger clause. Id. at *9.

These cases are not on point because the circumstances in the instant case are entirely different. As an initial matter, these cases do not involve a situation in which – as here – Plaintiffs have brought exclusively federal ERISA claims and then incongruously cited to a contract provision stating that any disputes are governed by New York law and must be heard by "the courts of New York." Moreover, in all four of Plaintiffs' cases, the later-in-time agreement (1) had the same subject matter as the prior agreement, and/or (2) contained a merger clause. Here, as discussed above, it is not clear that the Compensation Incentive Plan Document is the later document and, in any event, the Compensation Incentive Plan Document does not contain a merger clause and does not address subject matter that is identical to the subject matter of the Employment Agreement, the Bonus Agreement, or the CARE Program. See PB Life, 2020 WL 2476170, at *9 (finding Goldman and Applied Energetics not on point where the subject matter of the contracts at issue overlapped only in part).

In sum, in multiple documents, Plaintiffs agreed – either via a signed writing or by not opting out of the CARE Program expansion – to arbitrate disputes regarding their employment at Morgan Stanley. Morgan Stanley has thus made a "prima facie showing" of "the agreements' contractual validity," and Plaintiffs have not met their "'heavy burden . . . to disprove [the] presumption[]'" that the "'agreement[s] [are] valid.'" Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1996)), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

**B.**      **Whether the Agreements to Arbitrate**
             **Encompass the Claims at Issue**

The arbitration provisions at issue here encompass "any controversy or claim

arising out of or in any way relating to Employee's employment with Morgan Stanley or

termination thereof"; "any controversy or claim between Employee and Morgan Stanley . . .

based on, arising out of, or which arose out of or in any way relate to Employee's employment,

compensation, and terms and conditions of employment with Morgan Stanley"; "[a]ny

controversy or claim arising out of or relating to . . . employment by Morgan Stanley"; and "any

and all claims or disputes between you and Morgan Stanley or any of its current, former, and

future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or

which arose out of or in any way relate to your employment, compensation, and terms and

conditions of employment with Morgan Stanley anywhere in the world, or the termination

thereof . . . includ[ing] . . . claims under, based on, or relating to any federal . . . statute or

regulation."  (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(a); 2015 Shafer Bonus Agmt. (Dkt.

No. 67-2) § 7(a); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1; CARE Program

Arbitration Agmt. (Dkt. No. 68-5) § 2)

            "Courts have typically found such language indicative of a broad agreement."

Cour Pharms. Dev. Co., Inc. v. Phosphorex, Inc., No. 20-CV-4417 (JPO), 2021 WL 1062568, at

*3 (S.D.N.Y. Mar. 19, 2021) (listing cases); see Sportvision, Inc. v. MLB Advanced Media, LP,

No. 18 CIV 3025 (PGG), 2020 WL 1957450, at *5 (S.D.N.Y. Apr. 23, 2020) ("A clause

'submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" is the paradigm of a broad clause.'") (quoting <u>Collins & Aikman Prod. Co. v. Bldg.</u>

<u>Sys., Inc.</u>, 58 F.3d 16, 20 (2d Cir. 1995); further citation omitted) (brackets in <u>Sportvision</u>).[10]

---

[10]  Citing <u>Cooper v. Ruane Cunniff & Goldfarb Inc.</u>, 990 F.3d 173 (2d Cir. 2021), Plaintiffs contend that "Plaintiffs' claims do not 'arise from or relate to their employment' because they do not involve facts particular to them."  (Pltf. Opp. (Dkt. No. 72) at 12)

In <u>Cooper</u>, plaintiff employees, "[a]cting on behalf of a putative class of plan participants and an employee benefit plan . . . sued [an investment advisor] under § 502(a)(2) of [ERISA], claiming damages arising from [the advisor's] alleged breach of fiduciary duty and mismanagement of a profit-sharing fund sponsored by [plaintiffs'] employer ."  <u>Cooper</u>, 990 F.3d at 175.  In particular, plaintiffs alleged that the investment advisor had breached its fiduciary duty by investing "almost 30% of the Plan's total assets" in "shares [of] Valeant Pharmaceuticals," which precipitously declined in value following a series of scandals involving Valeant's price-gouging and fraud.  <u>Id.</u> at 175, 177; <u>see</u> Katie Thomas, <u>Battered Valeant Stock Drops a Further 50% After Weak Guidance</u>, N.Y Times (Mar. 15, 2016), <u>available</u> <u>at</u> https://www.nytimes.com/2016/03/16/business/valeant-q4-financial-2016-guidance.html?smid=url-share.

Defendant moved to compel arbitration, citing employment agreements that "mandate[d] arbitration of 'all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms' of the Agreement."  <u>Id.</u> at 178.  The Second Circuit reversed the district court's decision granting the motion to compel arbitration, holding that plaintiffs' breach of fiduciary duty claim did not "relate to" their employment:

> Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to Cooper's individual experience.  Moreover, . . . others who were never DST employees could have brought claims identical to those stated by Cooper – for example, the mismanagement claims could have been pursued by other Plan beneficiaries (such as spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST itself; and by the Secretary of Labor.  <u>See</u> ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing plan participants and beneficiaries and the Secretary of Labor to bring a civil action for breach of fiduciary duties).

> We therefore [conclude] . . . that in the context of an employment arbitration agreement, a claim will "relate to" employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment.  Here, the merits of Cooper's claims do not involve such facts.

<u>Id.</u> at 183-84 (citations omitted).

Plaintiffs contend, however, that they have brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable. According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual

_____

Here, according to Plaintiffs,

> the arbitration provisions, like the arbitration agreement in <u>Cooper</u>, pertain to Plaintiffs'
> employment. But, as in <u>Cooper</u>, the merits of Plaintiffs' claims do not involve facts
> particular to their employment. The claims do not concern Plaintiffs' work performance,
> evaluations, working conditions, amount of compensation, or any other fact particular to their
> individual experiences at Morgan Stanley. Rather, Plaintiffs' claims concern whether the
> [Compensation Incentive Plan] and [Equity Incentive Plan] are governed by ERISA and, if
> so, whether the Cancellation Rule violates ERISA. Nothing about these claims "<u>involve
> facts particular to an individual plaintiff's own employment</u>." To the contrary, the
> relevant facts apply equally to every [financial advisor] who forfeited deferred compensation, and
> each such [financial advisor] can bring the same claims. Indeed, even the Secretary of Labor
> could do so.

(Pltf. Opp. (Dkt. No. 72) at 12-13 (quoting <u>Cooper</u>, 990 F.3d at 184) (emphasis in Pltf. Opp.))

Plaintiffs' "relate to employment" argument is not persuasive. Although both <u>Cooper</u> and the instant case involve § 502(a)(2) breach of fiduciary duty claims, the similarities between the cases end there. In <u>Cooper</u>, the alleged breach of fiduciary duty was the mismanagement of fund assets, an issue entirely unrelated to plaintiffs' employment. Here, by contrast, the alleged breach of fiduciary duty is "selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA." (Am. Cmplt. (Dkt. No. 58) ¶ 113) These challenged actions "relate to" Plaintiffs' employment, because whether Plaintiffs' deferred compensation vested depends on the timing and circumstances of their separation from Morgan Stanley, including whether they were fired, quit, or retired. <u>Cooper</u>'s concern that "[r]elatedness" "not encompass everything that touche[s] employment in any way," <u>Cooper</u>, 990 F.3d at 183, is thus not implicated here. <u>See Duke v. Luxottica U.S. Holdings Corp.</u>, No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *9 (E.D.N.Y. Sept. 30, 2023) (finding that <u>Cooper</u> did not preclude plaintiff's "claims against her former employer directly, challenging her former employer's calculation of her retirement benefits," because there was "a more substantial nexus between Plaintiff's claims and her employment" than in <u>Cooper</u>).

In sum, <u>Cooper</u>'s analysis of "relate to employment" does not support Plaintiffs' position here.

28

arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's

right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21

(quoting <u>Am. Exp. Co. v. Italian Colors Rest.</u>, 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

    In considering Plaintiffs' arguments, this Court must first determine whether (1)

the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so,

whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged

ERISA plan and/or would be contrary to ERISA.[11]

---

[11] Defendants contend that "[b]ecause plaintiffs have agreed to arbitrate arbitrability, the Court need not – and should not – reach arbitrability itself. . . . [T]he validity of plaintiffs' representative action waiver is not at issue. The parties do not dispute whether plaintiffs have waived the right to bring a representative action – they dispute whether plaintiffs' claims seeking individual benefits must be arbitrated. The agreements clearly and unmistakably commit such questions to the arbitrator, and plaintiffs have identified no arbitrability issue reserved to the court that 'at least arguably covers the present dispute.'" (Def. Reply Br. (Dkt. No. 69) at 7-8 (quoting <u>NASDAQ OMX Grp.</u>, 770 F.3d at 1031))

By contrast, Plaintiffs contend that "[t]hree of the four arbitration provisions purport to waive the right to pursue a Covered Claim 'on a class action, collective action, or representative action basis.' To the extent that any such claim is allowed to proceed, it must do so in court. Moreover, 'any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers shall be decided by a court of competent jurisdiction, and not by an arbitrator.' Thus, contrary to Morgan Stanley's argument that any disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, the Court – not an arbitrator – must decide whether Plaintiffs' claims must be allowed to proceed on a class-action or representative-action basis, such that they are not subject to arbitration." (Pltf. Opp. (Dkt. No. 72) at 15 (quoting 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(d); citing 2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d), and CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4; alterations omitted); <u>see also</u> 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1)

In sum, Plaintiffs argue that the arbitration provisions are unenforceable because (1) they "prohibit[] Plaintiffs from bringing [their] claim[s] [on] a representative basis"; and (2) this restriction violates ERISA. And they further contend that the validity of the class action waivers must be determined by a court. (<u>Id.</u> at 15, 22) Because the arbitration provisions provide that the validity of the class action waivers must be determined by a court, this Court concludes that this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator.

1.     __Whether the Deferred Compensation Programs are ERISA Plans__

Plaintiffs contend that Morgan Stanley's deferred compensation programs are "employee benefit pension plan[s]" under ERISA because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  (Am. Cmplt. (Dkt. No. 58) ¶ 64) (capitalization altered).  See ERISA 3(2)(A)(ii), codified at 29 U.S.C. § 1002(2)(A)(ii).[12]  According to Plaintiffs, the deferred compensation programs' deferral of income "extend[s] to the termination of covered employment or beyond" in that (1) financial advisors "whose employment ends because of a disability, involuntary termination, retirement, or full career retirement still receive their deferred compensation on the scheduled distribution date . . . after their employment with Morgan Stanley . . . end[s]"; and (2) financial advisors "who qualify for a government service termination receive their deferred compensation when they leave Morgan Stanley."  (See id. ¶¶ 59-67 (capitalization altered))

a.     __Applicable Law__

As discussed above, ERISA defines "pension plan" to include, inter alia, any employer "plan, fund, or program" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ."  ERISA § 3(2)(A), codified at 29 U.S.C. § 1002(2)(A).  In determining whether an employer's plan or program is an "employee benefit pension plan" under ERISA, the Act directs courts to consider the "express terms" and "surrounding circumstances" of the plan or program.  ERISA § 3(2)(A), codified at 29 U.S.C. § 1002(2)(A).  The Second Circuit has cautioned that the ERISA provision defining pension plans "is 'not to be read as an elastic girdle that can be stretched to cover any content

---

[12]  Plaintiffs do not contend that Morgan Stanley's deferred compensation programs "provide[] retirement income to employees."  ERISA § 3(2)(A)(i).

that can conceivably fit within its reach.'" Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir.

2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)).

        Most cases that have considered whether an employer's plan or program "results

in deferral of income" for purposes of § 3(2)(A)(ii) have involved bonus plans, typically in the

form of stock options programs or "long-term incentive plans." E.g., Albers, 1999 WL 228367,

*1; International Paper Co. v. Suwyn, 978 F. Supp. 506, 508-09 (S.D.N.Y. 1997); Foster v. Bell

Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, *1 (S.D.N.Y. Apr. 20,

1994); Hahn v. Nat'l Bank, N.A., 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); Pasciutti v.

LiquidPiston, Inc., No. 3:20-CV-01243 (RNC), 2021 WL 4502950, *2 (D. Conn. Sept. 30,

2021); Oatway v. Am. Int'l Grp., 325 F.3d 184, 187 (3d Cir. 2003); Emmenegger v. Bull Moose

Tube Co., 197 F.3d 929, 932 (8th Cir. 1999).  In determining whether a bonus plan is subject to

ERISA, a court must consider both § 3(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c), which provides

that "the terms 'employee pension benefit plan' and 'pension plan' shall not include payments

made by an employer to some or all of its employees as bonuses for work performed, unless such

payments are systematically deferred to the termination of covered employment or beyond, or so

as to provide retirement income to employees." See, e.g., Albers, 1999 WL 228367, at *3-4

(analyzing deferral of bonus payments under both § 1002(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c));

Foster, 1994 WL 150830, at *2 (same).

        In that context, courts consider whether a plan's "purpose [is] to operate as an

incentive and bonus program, and not as a means to defer compensation or provide retirement

benefits." Oatway, 325 F.3d at 188.  In such an inquiry, "[a] [p]lan's express statement of

purpose . . . is entitled to weight when determining the nature of the plan." Hahn, 99 F. Supp. 2d

at 279.  Courts also consider whether plans "by operation . . . require the deferral of income," or

on the other hand, if "any such deferral to periods extending to termination is merely incidental."

Suwyn, 978 F. Supp. at 512; see id. at 511 (plan does not result in the deferral of income when it "cannot be said to generally defer the receipt of income to the termination of employment");

Foster, 1994 WL 150830, at *2 ("[T]he 'natural reading of [29 U.S.C.] § 1002(2)(A)(ii)'s requirement that there be a "deferral of income . . . to the termination of covered employment or beyond" is that the statute requires that a plan generally defer the receipt of income to the termination of employment. The statute is not satisfied when, under the facts of a particular case, a portion of withheld income happens to become due after termination.'") (quoting Hagel v. United Land Co., 759 F. Supp. 1199, 1202 (E.D. Va. 1991); emphasis and ellipsis in Foster).

In Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), the Fifth Circuit considered whether an employer's "wealth accumulation plan" was an "employee benefit pension plan."  The court noted that the "wealth accumulation plan"

> "[was] designed to provide an opportunity for [certain] employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share [in defendant] RBC's growth and profitability, if any." . . .  Generally, a participating employee [could] elect to have her account distributed either "In–Service" (i.e., during her employment) or upon separation from employment. . . . Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement.

Id. at 622-23 & n.1 (quoting plan document; alteration omitted).

RBC argued that its wealth accumulation plan "[was] not a 'pension plan' because 'the primary purpose of the [plan] [was] not to provide retirement or deferred post-termination income, but rather, to attract and retain key employees by awarding bonuses and other incentives.'"  Id. at 623 (quoting RBC's brief) (emphasis in RBC's brief; alteration omitted).

Although the Fifth Circuit found that the wealth accumulation plan "was not designed to provide retirement income," and noted that, under § 3(2)(A)(i), the issue of whether a plan "provides retirement income" depends on the "primary thrust" and "purpose" of the plan, id. at 624, it rejected RBC's arguments with respect to § 3(2)(A)(ii). As to that provision, the Tolbert court holds that the employer's purpose is irrelevant, and that the proper inquiry is whether a deferral of income necessarily ensues as a result of the plan:

> The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i). Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income. Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. . . .

> In analyzing subsection (ii), we begin with the predicate – "results in a deferral of income." The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in Burrage v. United States, 571 U.S. 204 (2014). The Court explained that "a thing 'results' when it arises as an effect, issue, or outcome from some action, process or design." Id. at 210 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)). Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan. The remaining text of subsection (ii) – "by employees for periods extending to the termination of covered employment or beyond" – indicates that the employees must defer the income to the end of their employment or beyond.

> . . . .

> We conclude that the plain language of the statute and the interpretations expressed in [our precedents] all compel one result: The [wealth accumulation plan] is a "pension plan" under subsection (ii). The [wealth accumulation plan's] "express terms" reveal themselves at the outset of the document. The first section of the [wealth accumulation plan], the statement of purpose, refers to the [wealth accumulation plan] as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." Later sections of the [wealth accumulation plan] contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred. A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the [wealth accumulation

plan].  Put another way, by participating in the [wealth accumulation plan], the plaintiffs have "[forgone] income in exchange for receiving income" at a later date.  See Boos v. AT&T, Inc., 643 F.3d 127, 134 (5th Cir. 2011).

The "express terms" of the [wealth accumulation plan] also contemplate employees deferring income "to the termination of covered employment or beyond."  The vesting sections explain that, upon separation, unvested amounts vest immediately.  The distribution sections contain further support:  "If distribution is made due to Separation," then "available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years."  Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii).

Id. at 624-26 (citations altered; emphases in original; footnote, further citations, and alterations omitted).

The Fifth Circuit goes on to reject RBC's reliance on § 2510.3-2(a) – the regulation setting out the "systematically deferred" standard for bonuses – and related case law, finding that RBC's wealth accumulation plan is not a bonus plan:  "The [wealth accumulation plan] is not among the 'specific plans' identified in § 2510.3-2(c), and we therefore decline to require the [wealth accumulation plan] to satisfy the 'systematically deferred' condition.  In other words, the [wealth accumulation plan] fits comfortably within the meaning of § 1002(2)(A)(ii), and nothing in § 2510.3-2(c) takes it out.  Reliance on [Emmenegger v. Bull Moose Tube Co., 197 F.3d 929 (8th Cir. 1999)] is thus misplaced."  Id. at 626 (paragraph break omitted).

In Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), the Sixth Circuit followed the Tolbert analysis and held that a "similar" "income deferral plan" was an ERISA pension plan under § 3(2)(A)(ii), because the plan "expressly provide[d] for employees to defer income from several sources to the future and authorize[d] options for payment of deferred income both before and after termination"  Id. at 437.

Although the Second Circuit has not addressed Tolbert and Wilson, much of the reasoning in Pasternack v. Shrader, 863 F.3d 162 (2d Cir. 2017) is consistent with the analysis in

these cases.  For example, the <u>Pasternack</u> court states that (1) "the two subparagraphs of [§ 3(2)(A)] set out independent tests to determine whether a plan is protected by ERISA"; (2) "[t]he statutory phrase 'provides retirement income' does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement.  The very fact that [§ 3(2)(A)(i)] is an alternative to [§ 3(2)(A)(ii)], which explicitly asks whether a plan 'results' in deferred income, suggests that the phrase 'provides retirement income' considers the plan's primary purpose rather than its result"; and (3) "[s]ubparagraph (ii) extends ERISA coverage to any plan that 'results in a deferral of income by employees.'  The word 'results' calls for an effects-based inquiry rather than one based on purpose."  <u>Id.</u> at 168-69 & 170 n.5.

      Having considered the relevant case law, this Court concludes that the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan.  If it is, a court must consider both the plan's purpose and whether deferral of income is systematic.  If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

### b.    Whether Plaintiffs' Deferred Compensation Programs Are Bonus Programs

      Plaintiffs contend that financial advisors'

> deferred compensation in the [Financial Advisor] Deferred Compensation Program is not a "bonus" . . . [because] [financial advisors] do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits . . . .  Given that [financial advisors] are expected to generate revenue, their compensation for performing this core function – at the absolute minimum level – is not, and cannot, be a "bonus."  Rather, [financial advisors'] compensation – including their deferred compensation – is a "commission." . . . Indeed, the [Financial Advisor] Compensation Plan distinguishes between [financial advisors'] "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. [Financial advisors] earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate.  In

35

> contrast, [financial advisors] earn "year-end bonuses" by achieving
> individualized, performance-based goals such as increasing their prior year's
> revenue by specified percentages or cross-selling products to clients.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 73-79 (citing 2018 Financial Advisor Compensation Plan (Dkt.

No. 83-2) § 1.2.2 (differentiating "deferred compensation award[s]" from "year-end bonuses . . .

paid to Firm employees generally")))

       This Court concludes that the deferred compensation programs at issue here are

not bonus programs.

       As discussed above, Morgan Stanley financial advisors' deferred compensation is

a portion of their incentive compensation, which in turn is a fraction of the revenue they

generate.  Compensation as a percentage of individually generated revenue is a "commission."

See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee

for a particular transaction, usually as a percentage of the money received from the transaction");

Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.)

("a percentage of the money received in a sale or other transaction paid to the agent responsible

for the business").

       By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,]

[especially] a payment by way of division of a business's profits, given over and above normal

compensation."  Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New

International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an

equivalent given in addition to the usual compensation").

       Courts generally treat these two types of compensation as distinct.  See Smith v.

Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action,

concluding that employee benefits committee did not "err[] in deciding that commissions are not

bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New

36

York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995)

("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v.

Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D.

Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary

definitions).

        The same approach is appropriate here.  Because Morgan Stanley financial

advisors' deferred compensation is premised on the revenue they generate, deferred

compensation payments are not "over and above normal compensation."  Moreover, Morgan

Stanley financial advisors are paid separate year-end bonuses that are distinct from the

Compensation Incentive Plan and Equity Incentive Plan.  (2018 Financial Advisor Compensation

Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus

Agmt. (Dkt. No. **67-3**); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

        In sum, the deferred compensation programs at issue here are not bonus plans.

Accordingly, in deciding whether Morgan Stanley's deferred compensation programs are ERISA

plans under § 3(2)(A)(ii), this Court considers only whether these programs "result[] in" the

deferral of income to a period after employment.

        **c.**        **Whether the Deferred Compensation Programs "Result[] in a Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond"**

        "Although [ERISA] do[es] not define 'deferral of income' or 'deferred

compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either:  (1)

'[p]ayment for work performed, to be paid in the future or when some future event occurs,' or

(2) 'an employee's earnings that are taxed when received or distributed rather than when earned,

such as contributions to a qualified pension or profit-sharing plan.'"  Kuhbier v. McCartney,

Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017)

37

(quoting Deferred Compensation, Black's Law Dictionary (10th ed. 2014)).  And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan."  Tolbert, 758 F.3d at 625 (quoting Burrage, 571 U.S. at 210).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month."  (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1)  Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however.  (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future."  And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond."  Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  Id. § 3(2)(A)(ii).

And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" Pasternack, 863 F.3d at 168 (quoting Murphy, 611 F.2d at 575), application of ERISA in these circumstances does not unreasonably expand the reach of the Act.  Although Plaintiffs in the instant case – unlike plaintiffs in Tolbert and Wilson – cannot elect post-

employment vesting, disability, retirement, layoff, and government service are not unusual

means by which workers leave their employment.  And nothing in the record suggests that post-

employment deferred compensation payments are rare.

        Defendants argue, however, that Plaintiffs did not earn payments under the

Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments,

because financial advisors "have no right to payment until and unless they remain employed at

vesting – a condition [P]laintiffs [did not] meet."  (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4)

Defendants thus argue that "Morgan Stanley's program does not entail <u>any</u> 'deferral of income

by employees.'"  (<u>Id.</u> at 4 (emphasis in original))  This argument is not persuasive, because it

exalts form over substance.  Whenever an action (here, leaving Morgan Stanley's employ)

results in the forfeiture of a contractual right, those facts can always be recharacterized by stating

that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to

the performance of the contract.

        In sum, Morgan Stanley's deferred compensation programs result in the deferral

of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii).

*     *     *     *

        For the reasons stated above, this Court concludes that Morgan Stanley's deferred

compensation programs are ERISA plans.

### 2.    <u>Whether Plaintiffs' ERISA Claims Are Arbitrable</u>

        Second Circuit law makes clear that compulsory arbitration of ERISA claims is

lawful.  <u>Bird v. Shearson Lehman/Am. Exp., Inc.</u>, 926 F.2d 116, 122 (2d Cir. 1991) ("[S]tatutory

claims arising under ERISA may be the subject of compulsory arbitration.").

        Plaintiffs contend, however, that their claims are not arbitrable, because they are

§ 502(a)(2) claims for breach of fiduciary duty, and § 502(a)(3) claims for equitable relief that

39

are brought in a representative capacity on behalf of the plans. According to Plaintiffs, their

§ 502(a)(2) claims "can be brought <u>only</u> in a representative capacity." (Pltf. Opp. (Dkt. No. 72)

at 16 (emphasis in original)) Moreover, their "representative [§ 502(a)(3)] claims should not be

litigated in individual arbitrations," because these "claims 'belong' to the [Financial Advisor]

Deferred Compensation Program, including the [Compensation Incentive Plan] and [Equity

Incentive Plan], [and] Plaintiffs' individual arbitration agreements do not cover them." (Id. at

18) "[T]he ERISA plan[s] [thus] never agreed to arbitrate any claims." (Id.) Plaintiffs further

argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs'

right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of

ERISA" – namely, the ability to remediate the plans as a whole via a representative action. (Id.

at 21)[13]

Defendants respond that

> [P]laintiffs do <u>not</u> actually bring these claims in a representative capacity. . . .
> Here, [P]laintiffs seek the recovery of alleged benefits that were not paid **to them**,
> and their claims "fall comfortably within the scope of § 502(a)(1)(B), which
> allows a plan participant 'to recover benefits due to him,'". . . . [P]laintiffs cannot
> avoid their agreements to arbitrate their individual claims by slapping a
> "representative" label on them. . . .
>
> [T]he plan need not agree to arbitrate claims that plaintiffs bring on their own
> behalf. . . . The complaint here . . . alleges injuries that are personal to <u>these</u>
> [P]laintiffs; the complaint individually describes each plaintiff's tenure at Morgan
> Stanley and the deferred compensation each purportedly "earned" in that time and
> now seeks. Seeking "plan-wide relief" is not the same as seeking relief on behalf
> of the plan, and plaintiffs' claims seeking benefits <u>from</u> the plan cannot "belong

---

[13] Plaintiffs do not argue that § 502(a)(1) claims for benefits are, as a general matter, non-arbitrable. Plaintiffs' claims for benefits are brought as part of the "two-step" Second Cause of Action, however, in which Plaintiffs first seek (1) reformation under § 502(a)(3), and then (2) recovery of benefits from the reformed plans pursuant to § 502(a)(1). (Am. Cmplt. (Dkt. No. 58) ¶¶ 102-07) <u>See</u> <u>Laurent v. PricewaterhouseCoopers LLP</u>, 945 F.3d 739, 747 (2d Cir. 2019) ("[W]e have previously affirmed the entry of a two-step reformation and enforcement remedy under ERISA.") (citing <u>Amara v. CIGNA Corp.</u>, 775 F.3d 510, 532 (2d Cir. 2014)).

<u>to</u>" the plan.  Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them. . . .

> Plaintiffs can obtain complete relief, if any, through their individual claims for benefits.  It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class – plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims. . . . Arbitration of plaintiffs' claims accordingly does not frustrate <u>anyone</u>'s ability to obtain any ERISA remedy that they may be due.

(Def. Reply Br. (Dkt. No. 69) at 9-11 (quoting <u>Frommert v. Conkright</u>, 433 F.3d 254, 270 (2d Cir. 2006) (in turn quoting 29 U.S.C. § 1132(a)(1)(B); further citations and quotations omitted; alterations omitted) (emphasis in original))

Accordingly, this Court must determine (1) whether Plaintiffs' § 502(a)(2) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; (2) whether Plaintiff's § 502(a)(3) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; and (3) whether arbitration would impermissibly curtail Plaintiffs' statutory rights.

### a. ERISA § 502(a)(2) Claim for Breach of Fiduciary Duty

The Amended Complaint's Third Cause of Action alleges that

> [t]he Compensation Committee is a fiduciary under the [Financial Advisor] Deferred Compensation Program because it is the administrator of the [Compensation Incentive Plan] and [Equity Incentive Plan] and is responsible for, among other things, reviewing and establishing the rules and procedures of the [Financial Advisor] Deferred Compensation Program, including the ability to determine that it is governed by ERISA.

> ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries.  ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.  <u>Id.</u>

41

ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but **only if** the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA.

. . . .

Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 108-13, 117 (emphasis in original))

### i.    Applicable Law

ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section [409] of this title."

ERISA § 409, codified at 29 U.S.C. § 1109, in turn provides that

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

The "responsibilities, obligations, or duties imposed upon fiduciaries" are set out in ERISA § 404, codified at 29 U.S.C. § 1104, which provides in relevant part that fiduciaries must adhere to the "prudent man standard of care":

(a) Prudent man standard of care

(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

42

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a).

Thus, "ERISA imposes 'four distinct, but interrelated duties' on fiduciaries, including the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to comply with the provisions of the plan." Anderson v. Advance Publications, Inc., No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *2 (S.D.N.Y. June 13, 2023) (quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715-16 (2d Cir. 2013)). "[T]these fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

The Supreme Court has explained that it was "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs authorized to bring breach of fiduciary duty actions] is in the financial integrity of the plan." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985); see also Browe v. CTC Corp., 15 F.4th 175, 205-06 (2d

Cir. 2021) ("[T]he remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary).").

Plaintiffs allege – and this Court agrees – that the deferred compensation programs at issue are "individual account plans."  (Am. Cmplt. (Dkt. No. 58) § 68)  Under ERISA, "[t]he term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34); see Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008) ("A 401(k) plan is a common defined contribution plan.").[14]  In the context of a defined contribution plan, § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," notwithstanding the tension between the individualized nature of each employee's pension and the representative nature of claims brought under § 502(a)(2). LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008).

In Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit held that "the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." Coan, 457 F.3d at 259.  "[A]lthough plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

---

[14]  By contrast, a "defined benefit plan" under ERISA "'conventional[ly] . . . credit[s] the employee with a specific percentage of salary for each year of employment.'"  Hirt, 533 F.3d at 104-05 (quoting Esden v. Bank of Bos., 229 F.3d 154, 158 n.4 (2d Cir. 2000)).

in a 'representative capacity' properly for purposes of section 502(a)(2)." Id. at 261 (footnote omitted).

###### ii.      <u>Application</u>

In arguing that the procedural safeguards applicable to representative claims under § 502(a)(2) preclude compelled arbitration of their claims, Plaintiffs must – of course – establish that they have actually asserted representative claims under § 502(a)(2).

As both Plaintiffs and Defendants recognize (Pltf. Opp. (Dkt. No. 72) at 21; Def. Reply Br. (Dkt. No. 69) at 9-10), "section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, requires plan fiduciaries '"to make good <u>to such plan</u> any losses <u>to the plan</u>"' resulting from a breach of fiduciary duty." <u>Coan</u>, 457 F.3d at 259 (quoting <u>Russell</u>, 473 U.S. at 140) (in turn quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added in <u>Russell</u>).

Here, the Amended Complaint seeks – pursuant to § 502(a)(2) – "the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) This type of claim is not properly brought under § 502(a)(2), however, because it is not a claim for "losses to the plan."

While "ERISA does not define 'loss' as that term is used in section 409," <u>Donovan v. Bierwirth</u>, 754 F.2d 1049, 1052 (2d Cir. 1985), "its draftsmen were primarily concerned with the possible misuse of plan assets." <u>Russell</u>, 473 U.S. at 142. "[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." <u>Id.</u> at 140 n.8. Accordingly, the case law indicates that "loss" is defined with reference to investment losses or other financial diminutions of plan assets that are attributable to a fiduciary's mismanagement. <u>See Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.</u>, 843 F.3d 561, 567 (2d Cir.

2016) ("'If, but for the breach, the plan would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.' Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'") (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989), and Donovan, 754 F.2d at 1056) (alteration omitted). And while the Supreme Court in LaRue held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches" with respect to individual accounts, its holding is limited to "fiduciary breaches that impair the value of plan assets in . . . [such] account[s]." LaRue, 552 U.S. at 256 (emphasis added).

Here, Plaintiffs have not alleged that the Compensation Committee – the alleged fiduciary – mismanaged plan assets or otherwise "impair[ed] [their] value" (LaRue, 552 U.S. at 256), such as by making imprudent or conflicted investment decisions, or by incurring unnecessary administrative costs.

Plaintiffs instead "seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) Any such forfeited compensation, however, would be equivalent to "the balance of [each] individual's account" – which ERISA defines as an "accrued benefit" in an "individual account plan." ERISA § 3(23), codified at 29 U.S.C. § 1002(23). The relief Plaintiffs seek in their § 502(a)(2) breach of fiduciary cause of action is thus redundant of their claim for benefits under § 502(a)(1), in which they seek to "recover their vested benefits [and] enforce their rights to the payment of their past vested benefits . . . after reformation [of the plan to comply with ERISA's anti-forfeiture rules]." (Am. Cmplt. (Dkt. No. 58) ¶ 107; see Russell, 473 U.S. at 147 (explaining that ERISA provides for "an action pursuant to § 502(a)(1)(B) to recover accrued benefits").

46

In <u>L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of</u>

<u>Nassau Cnty., Inc.</u>, 710 F.3d 57 (2d Cir. 2013), the Second Circuit observed that "a 'claim for

benefits' under ERISA § 502(a)(1)(B)" is by definition distinct from "a claim for recovery of

'losses to the plan' caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and

409(a)." <u>Id.</u> at 66.  <u>L.I. Head Start</u> cites with approval Chief Justice Roberts' concurring opinion

in <u>LaRue</u>, in which he states that "[i]f LaRue may bring his claim under § 502(a)(1)(B), it is not

clear that he may do so under § 502(a)(2) as well. . . . The significance of the distinction between

a § 502(a)(1)(B) claim and one under § 502(a)(2) is not merely a matter of picking the right

provision to cite in the complaint.  Allowing a § 502(a)(1)(B) action to be recast as one under

§ 502(a)(2) might permit plaintiffs to circumvent safeguards for plan administrators that have

developed under § 502(a)(1)(B)."  <u>LaRue</u>, 552 U.S. at 258 (Roberts, C.J., concurring).

Moreover, other circuits have cautioned that plaintiffs may not use artful pleading

to bring what are, in reality, § 502(a)(1) claims, under § 502(a)(2).  See <u>Stephens v. Pension Ben.</u>

<u>Guar. Corp.</u>, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) ("[The] exception to the exhaustion

requirement [for § 502(a)(2) claims] does not embrace plan-based claims artfully dressed in

statutory clothing, such as where a plaintiff seeks to avoid the exhaustion requirement [of §

502(a)(1)] by recharacterizing a claim for benefits as a claim for breach of fiduciary duty.")

(quotation omitted); <u>Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc.</u>, 102

F.3d 712, 714 (4th Cir. 1996) ("Although [plaintiff employer] directs our attention to sections

502(a)(2) and (a)(3), the analysis of who may recover benefits under ERISA must begin with

section 502(a)(1)(B), the section which specifically provides a cause of action for benefits.

[Plaintiff employer's] description of its claim as one for breach of [defendant] Blue Cross'

fiduciary duty does not alter the fact that it is seeking medical benefits which it claims are owed

47

to [plaintiff's employee].  To permit the suit to proceed as a breach of fiduciary duty action would encourage parties to avoid the implications of section 502(a)(1)(B) by artful pleading; indeed <u>every</u> wrongful denial of benefits could be characterized as a breach of fiduciary duty under [plaintiff's] theory.") (emphasis in original).

The same reasoning applies here.  The Amended Complaint's Third Cause of Action for breach of fiduciary duty is a disguised claim for benefits; while actually bringing a claim under § 502(a)(1)(B), Plaintiffs invoke the procedural safeguards associated with a claim under § 502(a)(2).  But because Plaintiffs have not alleged "losses to the plan," they are not, in fact, proceeding in a representative capacity, and are therefore not entitled to the procedural safeguards available under § 502(a)(2).

In arguing that they have brought a § 502(a)(2) claim on behalf of the plans, and therefore cannot be compelled to arbitrate, Plaintiffs cite <u>Cooper v. Ruane Cunniff & Goldfarb Inc.</u>, 990 F.3d 173 (2d Cir. 2021), <u>Ferguson v. Ruane Cuniff & Goldfarb Inc.</u>, No. 17-CV-6685 (ALC), 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), <u>Hawkins v. Cintas Corp.</u>, 32 F.4th 625 (6th Cir. 2022), and <u>Munro v. U.S.C.</u>, 896 F.3d 1088 (9th Cir. 2018).  (Pltf. Opp. (Dkt. No. 72) at 16, 18)

In <u>Cooper</u>, the Second Circuit reversed a district court order granting defendant's motion to compel arbitration of an employee's breach of fiduciary duty claim.  That claim had been brought on behalf of a class of plan participants regarding the "catastrophic over-allocation of Plan assets" to a single company's stock.  The motion to compel arbitration was premised on an arbitration provision in an employee handbook that (1) applied to "all legal claims arising out of or relating to employment," and (2) "prohibit[ed] joinder of multiple parties and class or collective actions."  <u>Cooper</u>, 990 F.3d at 177-78, 184.  While the Second Circuit disagreed with

the district court's interpretation of the phrase "relating to employment" and reversed on that basis (id. at 180-84), the Circuit went on to state in dicta that the defendant's "[broad] reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the Coan representative adequacy requirement." Id. at 184 (citing Coan, 457 F.3d at 261).

In Ferguson, the court applied the dicta in Cooper and, on that basis, rejected arbitration claimants' objections to certification of a settlement class regarding the same claims, made against the same third-party benefits administrator as in Cooper, even though the plan documents in Ferguson themselves – rather than an employee handbook – contained the arbitration provision.  Ferguson, 2021 WL 3667979, at *3-4.

In Hawkins, plaintiff employees brought a putative class action, alleging that plan fiduciaries had breached the duty of loyalty and the duty of prudence by "offer[ing] participants the ability to invest only in actively managed funds, rather than more cost-effective passively managed funds[,] . . . [and by] charg[ing] the Plan imprudently expensive recordkeeping fees." Hawkins, 32 F.4th at 628.  And in Munro, plaintiff employees, "as representatives of a class of participants and beneficiaries of the Plans," alleged that defendant plan administrators had "squandered [their negotiating] leverage by allowing the Plans' conflicted third party service providers – TIAA-CREF, Vanguard, Fidelity, and Prudential – to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products." Munro v. U.S.C., 16 Civ. 6191, Am. Cmplt. (Dkt. No. 40) ¶¶ 4-5 (C.D. Cal. Nov. 17, 2016).  In these cases the Sixth and Ninth Circuits, respectively, held that plaintiffs could not be compelled to arbitrate based on arbitration provisions in their individual employment agreements, because

their breach of fiduciary claims "should be thought of as Plan claims, not [p]laintiffs' claims. And because the arbitration provisions only establish the [p]laintiffs' consent to arbitration, the employment agreements do not subject these claims to arbitration." Hawkins, 32 F.4th at 635; accord Munro, 896 F.3d at 1094.

       These cases do not support Plaintiffs' arguments, because they involve significantly different factual circumstances. As described above, Cooper, Ferguson, Hawkins, and Munro all involve mismanagement of plan assets – i.e., straightforward "losses to the plan." Given these circumstances, plaintiffs properly raised claims under § 502(a)(2), and benefitted from the procedural safeguards available under that statutory provision. As discussed above, however, those procedural safeguards are not available to Plaintiffs, who have brought a disguised claim for recovery of benefits, rather than a true § 502(a)(2) claim. Cf. Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *5 (S.D.N.Y. Mar. 30, 2007) ("[a] court's . . . inquiry ultimately must focus on the factual nature of the claims rather than the . . . label that has been applied by the plaintiff") (quotation omitted).[15]

---

[15] Plaintiffs have also not alleged a "breach[] [of] any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), codified at 29 U.S.C. § 1109(a). Although the Amended Complaint alleges that "[t]he Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA" (Am. Cmplt. (Dkt. No. 58) ¶ 113), "'[t]rustees do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions, but rather, where the trustee fails to discharge one or more of the duties described in 29 U.S.C. § 1104.' 'The proposition that a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA, while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.'" Roe v. Empire Blue Cross Blue Shield, No. 12-CV-04788 NSR, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) (quoting Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2005)) (alterations omitted), aff'd, 589 F.

50

Having failed to allege a true § 502(a)(2) claim, Plaintiffs will not be heard to complain that claims under § 502(a)(2) are non-arbitrable.

### b.    ERISA § 502(a)(3) Claims for Equitable Relief

ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Amended Complaint asserts § 502(a)(3) claims in the first and second causes of action.  In the First Cause of Action,

> Plaintiffs seek a declaration that the [Financial Advisor] Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).
>
> Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:
>
> a.   A declaration that the [Financial Advisor] Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;
>
> b.   An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;
>
> c.   Surcharge;
>
> d.   An "accounting" of all deferred compensation wrongfully withheld from [financial advisors] because of the Cancellation Rule;
>
> e.   Disgorgement of all amounts wrongfully withheld;

---

App'x 8 (2d Cir. 2014).  Plaintiffs' failure to identify any fiduciary duty that the Compensation Committee breached supports this Court's conclusion that they have not brought a true § 502(a)(2) claim.

    f.   Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

    g.   A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

    h.   An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

    i.   All other relief the Court determines is just and proper under its equitable powers.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 98-101)

In the Second Cause of Action, Plaintiffs assert that they and the putative class "are entitled to reformation of the [Financial Advisor] Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a)." (Id. ¶ 105)  As discussed above, the requested reformation is a prelude to recovery of benefits from the reformed plan under § 502(a)(1). (Id. ¶¶ 106-07)

Plaintiffs argue that they "assert claims in a representative capacity under ERISA § 502(a)(3)," and "[t]hese representative claims should not be litigated in individual arbitrations." (Pltf. Opp. (Dkt. No. 72) at 16-18)

The case law does not support Plaintiffs' assertion that (1) § 502(a)(3) claims must be brought on behalf of a plan, or (2) it is unlawful to compel individual arbitration of such claims.  To the contrary, the Supreme Court has held that – in contrast to § 502(a)(2) breach of fiduciary duty claims – "§ 502(a)(3) authorizes . . . lawsuit[s] for individual relief." Varity, 516 U.S. at 507.  And the case law indicates that plaintiffs who bring putative class actions alleging § 502(a)(3) claims may nevertheless be required to arbitrate their claims individually. See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *10 (E.D.N.Y. Sept. 30, 2023) (granting motion to compel arbitration of § 502(a)(3) claims brought

by plaintiffs on behalf of a putative class; stating that "the concerns [regarding procedural safeguards for § 502(a)(2) claims] do not apply").

Plaintiffs cite no case demonstrating that § 502(a)(3) claims are non-arbitrable. At best, Plaintiffs have cited case law stating that § 502(a)(3) claims are not inherently limited to individual relief.  See Banyai v. Mazur, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) ("[N]othing suggests that section 502(a)(3) authorizes only individual relief, thereby precluding suits seeking 'other appropriate equitable relief' – on behalf of the plan – against non-fiduciaries.") (emphasis in original).[16]

In sum, Plaintiffs have not demonstrated that their § 502(a)(3) claims are non-arbitrable.

### c.  Whether Arbitration Would Void Statutory Rights

The Supreme Court has held that courts cannot compel arbitration when enforcing an arbitration clause would entail a "prospective waiver of a party's right to pursue statutory remedies."  Italian Colors, 570 U.S. at 229 (quotation omitted).

Under the prospective waiver doctrine, courts have denied motions to compel arbitration where the arbitration provision at issue contains limitations on remedies that are inconsistent with ERISA.  See, e.g., Lloyd v. Argent Tr. Co., No. 22CV4129 (DLC), 2022 WL 17542071, at *3 (S.D.N.Y. Dec. 6, 2022) ("The Plan states that . . . arbitration cannot provide

---

[16] Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) – also cited by Plaintiffs (Pltf. Opp. (Dkt. No. 72) at 17) – is not on point.  In Browe, the Second Circuit considered a district court post-bench trial opinion addressing, inter alia, § 502(a)(3) claims.  Browe, 15 F.4th at 188-89.  The court ordered the disbursement of an award on remand, and directed the district court to "include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled."  Id. at 206.  Plaintiffs contend that this direction is an example of a plan-wide application of § 502(a)(3) relief.  (Pltf. Opp. (Dkt. No. 72) at 17)  The portion of Browe cited by Plaintiffs does not address § 502(a)(3), however, and it is thus not clear that § 502(a)(3) was the statutory basis for the disbursement.  See Browe, 15 F.4th at 206.

'any remedy which has the purpose or effect of providing additional benefits or monetary relief to any other Employee, Participant, or Beneficiary other than the Claimant.' . . . This provision imposes a limitation on relief that ERISA does not contain, and precludes remedies that ERISA expressly authorizes, such as the removal of a fiduciary."); <u>Cedeno v. Argent Tr. Co.</u>, No. 20-CV-9987 (JGK), 2021 WL 5087898, at *2 (S.D.N.Y. Nov. 2, 2021) (same).

       Prohibiting class treatment does not inherently limit statutory remedies, however, because class treatment is a procedural matter, and not a substantive right.  <u>See</u> <u>Smith v. Bd. of Directors of Triad Mfg.</u>, 13 F.4th 613, 622 (7th Cir. 2021) ("[T]he problem with the plan's arbitration provision is its prohibition on certain plan-wide remedies, not plan-wide representation.  It is not that the plan funnels its participants away from class actions."); <u>Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 408 (2010) (plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.  And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.").[17]

       Here, Plaintiffs argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA."  (Pltf. Opp. (Dkt. No. 72) at 21)  Plaintiffs have not

---

[17]  To the extent that "the Second Circuit's opinion in <u>Cooper</u> indicates that the ability to bring a representative action is a 'statutory right' that an arbitration agreement cannot override," <u>Lloyd</u>, 2022 WL 17542071, at *4 (citing <u>Cooper</u>, 990 F.3d at 184), that is the result of <u>Coan</u>'s requirement – reiterated in <u>Cooper</u> – that in § 502(a)(2) cases "'plan participants must employ procedures to protect effectively the interests they purport to represent.'"  <u>Cooper</u>, 990 F.3d at 184 (quoting <u>Coan</u>, 457 F.3d at 259).  As explained above, <u>Coan</u>'s procedural requirements are not at issue here, because Plaintiffs have not brought a claim for "losses to the plan," as required by § 502(a)(2).  <u>See</u> <u>Duke</u>, 2023 WL 6385389, at *10 (holding that concerns regarding compelling arbitration of § 502(a)(2) claims do not apply in the § 502(a)(3) context).

identified any limitation on remedies that would apply in an arbitration, however, other than the class waiver.  Moreover, the arbitration provisions in the Bonus Agreement and CARE Program Arbitration Agreement provide that "[a]rbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(g); see CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 5(d) (same))  Accordingly, Plaintiffs have not demonstrated that the prospective waiver doctrine applies.

*       *       *       *

For the reasons stated above, Plaintiffs have not demonstrated that the instant claims are outside the scope of the arbitration provisions to which they agreed.[18]

---

[18]  Plaintiffs argue that "[i]ndividual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants."  (Pltf. Opp. (Dkt. No. 72) at 24)  But this argument is foreclosed by the Second Circuit's decision in Bird. See Bird, 926 F.2d at 122 ("We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.").

55

## CONCLUSION

Defendants' motion to compel arbitration (Dkt. No. 65) is granted. Because "the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), the case will be stayed pending arbitration.

The Clerk of Court is directed to terminate the motion (Dkt. No. 65).

Dated: New York, New York
    November 21, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

KELLY MILLIGAN,
ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED,

        Plaintiff,

        vs.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

        Defendants.

Civil Action No. _____

CLASS ACTION

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Kelly Milligan, on behalf of himself and all others similarly situated, files this Class Action Complaint against Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), Bank of America Corp. ("BOA"), and John/Jane Doe 1, the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration at BOA  (together, "Defendants").

## INTRODUCTION

1.      This is a class action under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover the deferred compensation that financial advisors ("FAs") forfeited in violation of ERISA § 203(a), 29 U.S.C. § 1053(a), when they left Merrill Lynch.

2.      FAs receive salary plus commissions. Commissions are based on the revenue generated by client investment activities. Defendants automatically allocate a portion of

1

commissions into the WealthChoice Contingent Award Plan (the "Plan"). The commissions are allocated to individual Plan accounts for each FA. Under the relevant Plan award agreements, commissions "vest" in eight years. Merrill Lynch causes FAs to forfeit the value in their Plan accounts if they leave Merrill Lynch before these vesting dates (the "Cancellation Rule").

3.      The Plan is an "employee benefit pension plan" under ERISA because it "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).

4.      Specifically, the Plan "results in a deferral of income" because FAs are paid for work (i.e., the revenue they generate) years after they perform the work. The Plan also "results in" income being deferred "for periods extending to the termination of covered employment or beyond" because FAs receive the value of their Plan accounts after their employment ends if they retire, are laid off, or become disabled.

5.      Plaintiff worked as an FA at Merrill Lynch and, when he left Merrill Lynch, Defendants invoked the Cancellation Rule to deny him the deferred compensation that he earned under the FA Deferred Compensation Program.

6.      Plaintiff seeks an Order from the Court under ERISA § 502(a)(3) declaring that the Plan is subject to ERISA and that the Cancellation Rule violates ERISA's vesting and anti-forfeiture requirements. He seeks the payment of his and the other class members' deferred compensation that was wrongfully forfeited. He also asserts a claim against John/Jane Doe 1, the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration, who administers the deferred-compensation plan, for breach of fiduciary duty under ERISA § 502(a)(2) and (a)(3) for applying the Cancellation Rule in violation of ERISA. Alternatively, Plaintiff seeks an Order reforming the Plan so that it complies with

ERISA's vesting and anti-forfeiture requirements by, among other things, eliminating the Cancellation Rule. Plaintiff also asserts a claim under ERISA 502(a)(1)(B) to recover the benefits due to him and the other class members under the Plan, as reformed.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and under 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

8.     This Court has personal jurisdiction over Defendants because they are headquartered, transact business, reside in, or have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District, and Defendants may be found in this District. Venue is also proper in this District under 28 U.S.C. § 1391 because Defendants do business in this District, and a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred within this District.

10.     Venue is also proper in this District because the relevant award agreements provide any dispute related to the Plan shall be resolved "solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina."

## PARTIES

### Plaintiff

11.     Plaintiff Kelly Milligan resides in the State of California. He is a Certified 401(k) Professional, Certified Plan Fiduciary Advisor, Certified Private Wealth Advisor, and Chartered

3

Retirement Planning Counselor, with more than 20 years of experience as a financial advisor. Milligan worked as an FA at Merrill Lynch from 2000–2021. When he left Merrill Lynch, he forfeited over $500,000 in deferred compensation as a result of the Cancellation Rule.

**Defendants**

12.     Defendant BOA is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Bank of America is a global financial services firm that, through its subsidiaries and affiliates, including Merrill Lynch, provides financial advisory services to clients.

13.     Defendant Merrill Lynch is a registered broker-dealer, registered investment adviser, and wholly owned subsidiary of BOA. It is a Participating Employer under the Plan.

14.     Defendant John/Jane Doe 1 is the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position at BOA during the Class Period. This individual administers the deferred-compensation plan.

## SUBSTANTIVE ALLEGATIONS

**A.     Merrill Lynch's Compensation Program for FAs.**

**1.     The FA Compensation System.**

15.     FAs receive a combination of salary and commissions on the revenue generated through their clients' investment activities.

16.     To calculate commissions, Merrill Lynch applies a specified percentage to the amount of revenue an FA generates. For example, Milligan earned commissions ranging from approximately 38% to 46% of the revenue he generated in any given year. At least 5% of an FA's commission is then deferred into the Plan. A "grid" determines the exact deferral percentage. This deferral percentage is applied to the first dollar of commissions earned by an FA each month.

4

17.    In February of each year, the total of an FA's deferred compensation from the previous calendar year is granted to the FA as a Plan award. The terms and conditions of each award are contained in an Award Agreement. Plan, § 2 (definition of "Award Agreement"). The Administrator determines the terms and conditions of each award. *Id*. at § 4.1 ("Awards").

18.    FAs receive the remainder of their (non-deferred) commissions each month in their paychecks.

### 2.    The WealthChoice Contingent Award Plan.

19.    Bank of America sponsors the Plan.    This Plan is administered by BOA's Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position ("Administrator"). The Administrator has "all of the powers necessary to enable it to properly carry out its duties" under the Plan, including the power to "construe and interpret the Plan and to determine all questions that shall arise thereunder." *Id*. at § 3.

20.    The terms and conditions that apply to FAs are contained in the Plan document and the Award Agreements that Merrill Lynch issues to FAs when they receive Plan awards. *Id.* at § 4.1.

21.    FAs have individual, notional Plan accounts for each award they receive, i.e., they have an account for each year's deferred compensation. FAs can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments. 2018 Award Agreement, § 1.

22.    FAs' Plan awards are subject to a "Vesting Date," which is the date the award's account balance "becomes earned and payable" under the Plan. Plan, § 2; 2018 Award Agreement, § 3 and Exhibit A, §(a). The Vesting Date for awards granted in February 2019 (based on deferred

compensation earned in 2018) was February 15, 2027, i.e., an 8-year vesting schedule. 2018 Award Agreement, Exhibit A, §(a).

23.     According to the Plan document, Merrill Lynch pays FAs their vested deferred compensation in the Plan. Plan, § 6.1; 2018 Award Agreement, ¶ 8 ("Your Account Balance represents an unsecured, unfounded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date."). Merrill Lynch makes the payment "as soon as practicable" after the Vesting Date. Plan, § 7.1; 2018 Award Agreement, Exhibit A, §(a).

24.     Subject to certain exceptions described below, an FA must be employed by Merrill Lynch on the Vesting Date to receive his or her deferred compensation. If an FA's employment ends before that date, Defendants invoke the Cancellation Rule and cancel the FA's Account Balance so that the FA never receives his or her deferred compensation. 2018 Award Agreement, Exhibit A, §(b).

25.     The Award Agreements contain several exceptions to the Cancellation Rule. *Id.* at §§(b), (c). The Cancellation Rule does not apply if an FA dies. *Id.* at §(b)(i) ("Death"). If this occurs, the FA's Account Balance "shall become immediately earned and payable." *Id.*

26.     The Cancellation Rule also does not apply if an FA's employment ends because of a "Workforce Reduction, Divestiture or Disability," as long as the FA agrees to certain "Covenants." *Id.* at §(b)(ii) ("Workforce Reduction, Divestiture or Disability"). The first Covenant is that the FA agrees to not (1) "solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries . . . [any] employee of Bank of America or its Subsidiaries; or (2) "solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries." *Id.* at §(d)(i) ("Non-

6

Solicitation"). The second Covenant is that the FA agrees to "not engage in Detrimental Conduct" until the payment date. *Id.* at §(d)(ii) ("Detrimental Conduct"). If an FA complies with these Covenants, then the FA's Account Balance "shall continue to become earned and payable" on the payment date. *Id.* at §(b)(ii). But if the FA fails to comply with these Covenants, Defendants will invoke the Cancellation Rule and cancel the FA's Account Balance. *Id.* at §(e) ("Remedies").

27.     The Cancellation Rule does not apply if an FA retires, as long as the FA does "not engage in Competition" before the payment date, provides Bank of America with an annual "certification that [they] have not engaged in competition," and agrees to the non-solicitation and detrimental-conduct Covenants described above. *Id.* at §§(c) ("Retirement"), (d). FAs are eligible for retirement when they reach age 65 or age 55 with 10 years of service. *Id.* at §(e) ("Retirement"). Once they meet these requirements, their Account Balance "will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which [their] Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year." *Id.* at §(e).

28.     FAs, including retirement-eligible FAs, who end their employment to work for another brokerage firm or change careers do not receive the value of their Plan accounts because of the Cancellation Rule. *Id.* at §(v) ("All Other Terminations").

**B.      The Plan Is an "Employee Benefit Pension Plan" Governed by ERISA.**

29.     ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). An "employee benefit pension plan" is:

> any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances such plan, fund, or program—

7

(i)     provides retirement income to employees, **or**

(ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (emphasis added).

30.     As described below, the Plan is an "employee benefit pension plan" under ERISA.

**1.      The Plan Is a "Plan, Fund or Program."**

31.     The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'" *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich*, 530 U.S. 211, 223 (2000)). A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994). A "plan, fund or program" does not be a formal written document and can be comprised of multiple documents. *Id*. at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA).

32.     The Plan  is a "plan, fund or program" under ERISA because it identifies the intended benefits—deferred compensation—using an objective formula (i.e., a percentage) that determines how FAs earn benefits.

33.     The Plan also has an ascertainable class of beneficiaries. Only FAs are eligible to participate in the program, and the Award Agreements that are issued to them about their deferred compensation are specific to FAs.

8

34. The Plan also has an identifiable source of financing. FAs' deferred compensation in the Plan is paid out of the general assets of Merrill Lynch on the payment date. Plan, § 6.1; 2018 Award Agreement, § 8.

**2. The Plan "Results in a Deferral of Income."**

35. Subparagraphs (i) and (ii) in Section 3(2)(A) of ERISA "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014) ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i)."). The second of these two independent tests—whether a "plan, fund or program" "results in a deferral of income" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii)—is "an effects-based inquiry rather than one based on purpose." *Pasternack*, 863 F.3d at 170, n.5.

36. The Plan results in a deferral of FAs' income. At least 5% of an FA's commissions are withheld from their paychecks each year, allocated to a Plan award of deferred compensation that the FA receives in February of the next year, and ultimately paid to the FA eight years later. FAs receive their remaining commissions at the end of the next month as cash compensation. In other words, Merrill Lynch forces FAs to defer the first portion of their compensation, instead of receiving it right away in cash.

37. While ERISA does not define the phrase "deferral of income," it has the same meaning as "deferred compensation." *See, e.g., Tolbert*, 758 F.3d at 625. Accordingly, "by its express terms," Merrill Lynch's compensation program for FAs "results in a deferral of income." *See, e.g., id.* at 625-26 (plan covered by ERISA because it "contain[ed] provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly

9

refer to income that is deferred."); *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 434 (6th Cir. 2019) (ERISA applied "when a deferral of income by employees . . . arises as an effect, issue, or outcome from' the provisions of that plan.").

38.     These cases are consistent with the dictionary definition of "deferred compensation" as (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when earned . . . ." BLACK'S LAW DICTIONARY (11th ed. 2019). Here, FAs defer part of their compensation for work performed (by generating revenue) until a later date and do not pay taxes on this compensation until it is distributed. Plan, § 11; 2018 Award Agreement, § 10.

### 3.     The Plans Result in a Deferral of Income "For Periods Extending to the Termination of Covered Employment or Beyond."

39.     The Plan results in FAs deferring income "for periods extending to the end of covered employment or beyond." ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii). The phrase "end of covered employment" refers to when an employee stops working for a company. *Wilson*, 930 F.3d at 435.

40.     A plan need ***not*** require employees to defer income until "the end of covered employment or beyond" in order to be governed by ERISA. *Wilson*, 930 F.3d at 434. ERISA "covers plans containing terms that have as an effect, issue, or outcome—even if not a requirement—deferral of income by employees extending to the termination of covered employment or beyond." *Id*. at 435. As the court explained in *Wilson*,

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in service distributions.

10

*Id*.

41.     The Plan contains several provisions that contemplate FAs receiving their deferred compensation at or after the end of their employment with Merrill Lynch. FAs whose employment ends because of Retirement receive their deferred compensation in two installments in the two years after they retire. And FAs whose employment ends because of a Workforce Reduction, Divestiture, Disability, or Retirement still receive their deferred compensation on the payment date, which occurs after their employments have ended. Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, Merrill Lynch pays FAs their deferred compensation on or after the termination of employment.

**D.     The Cancellation Rule Violates ERISA's Vesting Requirements.**

42.     ERISA has strict vesting rules that apply to "individual account plans" like the Plan. Contributions to the Plan are employee contributions and, therefore, 100% vested when made under ERISA § 203.

43.     Even if contributions to the Plan were to be considered employer contributions under ERISA § 203(a)(2)(B), employees must be fully vested in their accounts plans after they have three years of service or, alternatively, gradually vested in their accounts under the following schedule:

| Years of Service | Nonforfeitable Percentage |
|:---:|:---:|
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 | 80 |
| 6 or more | 100 |

44.     The Plan violates ERISA's vesting requirements because FAs vest in their deferred compensation in eight years under the Plan, with the vesting schedule not impacted by the FA's years of service.

45.     Based upon his years of service, Plaintiff should have been fully vested in his deferred compensation under ERISA.

**E.     The Plan Is Not a "Bonus Program."**

46.     The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA. 29 C.F.R. § 2510.3-2(a). Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Id.* at § 2510.3-2(c).

47.     FAs' deferred compensation in the Plan is not a "bonus."

48.     A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).

49.     FAs do not have to do anything "in addition to what is expected" of them in order to earn the commissions allocated to the Plan. For example, they do not have to generate a specified amount of revenue or improve their previous year's production in order to earn deferred commissions. Indeed, FAs automatically receive deferred compensation with the ***very first dollar of commissions*** they earn as part of their compensation structure. Given that FAs are expected to generate revenue, their compensation for performing this core function—at the absolute minimum level—is not, and cannot, be a "bonus." Rather, FAs' compensation—including their deferred compensation—is a "commission."

50.     "A commission is a 'fee or percentage allowed to a sales representative or an agent for services rendered.'" *Wolfe v. Advance Ins. Co. of Kansas*, No. 07-1406-DWB, 2009 WL

2106138, at \*8 (D. Kan. July 16, 2009) (quoting The American Heritage Dictionary (3d ed. 1992)). A "'commission' is commonly understood to refer to those in the business of selling goods, services or real estate set typically as a percentage of the sales price." *Israel v. Voya Institutional Plan Servs. LLC*, No. 15-cv-11914-ADB, 2017 WL 1026416, at \*4 (D. Mass. Mar. 16, 2017).

51.     FAs automatically earn deferred compensation as a fixed percentage of the revenue they generate from the sale of Merrill Lynch investment services. Therefore, this deferred compensation constitutes "commissions."

52.     Indeed, FAs can receive separate discretionary "bonuses," which are in addition to their commissions. FAs earn deferred compensation under a non-discretionary, uniformly applied "grid" starting at the first dollar of revenue they generate. In contrast, FAs earn "year-end bonuses" by achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients. "Achieving individualized, performance-based goals is "in addition to what is expected," and, therefore, a classic bonus. *Israel*, 2017 WL 1026416, at \*6.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") defined as follows:

> All former Merrill Lynch financial advisors who forfeited deferred compensation in the WealthChoice Contingent Award Plan from April 30, 2018, until the date of judgement because of the Cancellation Rule. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the WealthChoice Contingent Award Plan.

54.     The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons.

13

55.     Plaintiff's claims are typical of the claims of the members of the Class because his claims and the claims of all Class members arise out of the same policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

56.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include:

(a)     Whether ERISA applies to the Plan;

(b)     Whether the Cancellation Rule is invalid under ERISA;

(c)     Whether Class Members are entitled to equitable relief under ERISA § 502(a)(3);

(d)     Whether John/Jane Doe 1 violated fiduciary duties under ERISA § 502(a)(2) in selecting and enforcing a vesting schedule that violated ERISA; and

(e)     Whether Class Members should receive additional benefits under the Plan.

57.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in managing this litigation as a class action.

58.     This action may be properly certified under Rule 23(b)(1). Certification is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Certification is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of

the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59.     Alternatively, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or other equitable relief appropriate to the Class as a whole.

60.     Alternatively, certification is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

61.     Plaintiff re-alleges all prior allegations.

62.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

63.     Under this section of ERISA, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks a declaration that the Plan is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

64.     Plaintiff also seeks orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:

(a)    A declaration that the Plan and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

(b)    An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

(c)    Surcharge;

(d)    An "accounting" of all deferred compensation wrongfully withheld from FAs because of the Cancellation Rule;

(e)    Disgorgement of all amounts wrongfully withheld;

(f)    Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

(g)    A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiff and the Class;

(h)    An order granting Plaintiff and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

(i)    All other relief the Court determines is just and proper under its equitable powers.

### SECOND CLAIM
### Reformation of the FA Deferred Compensation Plan
### and to Recover Benefits Under the Reformed Plan
### (ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))

65.    Plaintiff re-alleges all prior allegations.

66.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

16

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

67.     Defendants improperly denied Plaintiff and the members of the Class their deferred compensation that should have been vested and not forfeited under ERISA. By denying Plaintiff and the members of the Class their deferred compensation, Defendants violated ERISA § 203(a), 29 U.S.C. § 1053(a).

68.     Plaintiff and the Class are entitled to reformation of the Plan to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

69.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

70.     Plaintiff and the Class are entitled to recover their vested benefits, enforce their rights to the payment of their past vested benefits, and clarify their rights to vested benefits under the Plan after reformation.

### THIRD CLAIM
### Breach of Fiduciary Duty Against John/Jane Doe 1 Regarding the Plan
### (ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))

71.     Plaintiff re-alleges all prior allegations in the Amended Complaint.

72.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

17

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

73.     John/Jane Doe 1 is a fiduciary under the Plan because he/she is the administrator of the Plan and is responsible for, among other things, reviewing and establishing the rules and procedures of the Plan, including the ability to determine that it is governed by ERISA.

74.     ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.*

75.     ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but ***only if*** the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

76.     John/Jane Doe 1 breached this fiduciary duty by implementing Vesting Dates for the Plan that violated ERISA's vesting requirements and then applying the Cancellation Rule to

Case 3:24-cv-03240-KDB-DCK Document 1 67 Filed 04/30/24 11/25 Page 18 Page 206 of 298

deny the FAs who left Merrill Lynch their deferred compensation that should have been vested under ERISA.

77.     Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109. Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. *Id.*

78.     Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

79.     Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

80.     Plaintiff and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

## PRAYER FOR RELIEF

For these reasons, Plaintiff prays that judgment be entered against Defendants and requests that the Court award the following relief:

A.     Certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     A declaration that the Plan and the Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

C.	An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

D.	Surcharge;

E.	An "accounting" of all deferred compensation wrongfully withheld from Plaintiff and the Class;

F.	Disgorgement of the amounts that have been wrongfully withheld from Plaintiff and the Class;

G.	Disgorgement of the profits Defendants earned on the amounts wrongfully withheld from Plaintiff and the Class;

H.	A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiff and the Class;

I.	An order granting Plaintiff and the Class an equitable lien on Defendants' assets equal to the amount that has been wrongfully withheld;

J.	Reformation of the FA Deferred Compensation Program;

K.	An Order directing Defendants to remedy their past violations of ERISA, including the re-instatement and payment of forfeited amounts and benefits of Plaintiff and the Class;

L.	An Order directing Defendants to pay all benefits improperly withheld under the Plan as reformed;

M.	Compensatory damages;

N.	Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law that the Court deems proper;

20

O.  Attorneys' fees and expenses as provided by the common fund doctrine, ERISA

§ 502(g), 29 U.S.C. § 1132(g), or other applicable doctrine;

P.  Prejudgment and post-judgment interest; and

Q.  Any other relief the Court determines is just and proper.

Dated: April 30, 2024                    Respectfully submitted,

                                         */s/ John D. Hurst*
Thomas R. Ajamie*                        John D. Hurst
John S. "Jack" Edwards, Jr.*             N.C. Bar No. 37680
Courtney D. Scobie*                      MOTLEY RICE LLC
AJAMIE LLP                               50 Clay Street, Suite 1
Pennzoil Place - South Tower             Morgantown, WV 26501
711 Louisiana, Suite 2150                Telephone: (304) 413-0456
Houston, TX 77002                        Facsimile: (304) 413-0458
Telephone: (713) 860-1600                jhurst@motleyrice.com
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com
cscobie@ajamie.com                       Mathew P. Jasinski*
                                         Douglas P. Needham*
                                         MOTLEY RICE LLC
                                         27 Church Street, 17th Floor
Robert A. Izard*                         Hartford, CT 06103
Christopher M. Barrett*                  Telephone: (860) 882-1681
IZARD, KINDALL & RAABE LLP               Facsimile: (860) 882-1682
29 South Main Street, Suite 305          bnarwold@motleyrice.com
West Hartford, CT 06107                  mjasinski@motleyrice.com
Tel: (860) 493-6292                      dneedham@motleyrice.com
Fax: (860) 493-6290
rizard@ikrlaw.com
cbarrett@ikrlaw.com                      *Pro hac vice motions forthcoming.

21

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Kelly Milligan

## DEFENDANTS
Merrill Lynch, Pierce, Fenner & Smith Inc., et al.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Motley Rice LLC
50 Clay Street, Ste. 1, Morgantown, WV 26501
304-413-0456

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☒ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §§ 1053(a) and 1132(a)
Brief description of cause:
Declaratory and equitable relief under ERISA regarding deferred compensation.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE: Apr 30, 2024
SIGNATURE OF ATTORNEY OF RECORD: /s/ John D. Hurst

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# EXHIBIT C

## IN ARBITRATION PROCEEDINGS BEFORE THE
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

----------------------------------------------------------------X

**JEFFREY A DEWEES, LUKE ROY MCKELVY,
WILLIAM A SCHELLENBERG, JAY TAMKOC,
ALON HAIM, MATTHEW D MENDOZA,
and REINHOLD WIGAND,**

Claimants,

- v -

**MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC.,**

Respondent.

----------------------------------------------------------------X

**<u>STATEMENT OF CLAIM</u>**

**FINRA No. _____**

Claimants Jeffrey A DeWees, Luke Roy McKelvy, William A Schellenberg, Jay Tamkoc, Alon Haim, Matthew D Mendoza, and Reinhold Wigand, by and through their counsel Lax & Neville LLP, hereby submit the following claims against Respondent Merrill Lynch, Pierce, Fenner & Smith, Inc., to arbitration pursuant to the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), and allege as follows:

### <u>PRELIMINARY STATEMENT</u>

Claimants are former Merrill Lynch financial advisors ("FAs" or "advisors"). Throughout their employment, Merrill Lynch required Claimants to involuntarily defer a portion of their earned commissions, which it subsequently purported to "cancel" in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), its duties, the common law, and state labor and wage laws. Claimants bring this FINRA Arbitration to recover those earned commissions.

Over decades at Merrill Lynch, Claimants generated many tens of millions of dollars in revenue for Merrill Lynch by serving their clients. Claimants, like Merrill Lynch advisors generally, were paid on a commission basis, splitting the revenue they generated serving their clients with

Merrill Lynch.   Immediately upon joining Merrill Lynch, Claimants, like Merrill Lynch advisors generally, were forced to participate in Merrill Lynch's compensation plan deferring significant portions of their commissions into various deferred compensation plans, including "WealthChoice," which consisted of notional investment "accounts," and "Equity," which consisted of restricted stock units ("RSUs") convertible to Bank of America stock or cash (together the "Plans").

The Plans are ERISA "employee benefit pension plans" as a matter of law because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  29 U.S.C. § 1002(2)(A)(ii).  Merrill Lynch pays advisors commission for their work (i.e., the revenue they generate) up to a decade after they perform the work and their clients pay Merrill Lynch for their work.

Pursuant to ERISA, Claimants' deferred commissions were "nonforfeitable" and vested when made.  In violation of ERISA, Merrill Lynch purported to impose a "rolling" vesting period for each year's earned deferred commissions, cancelled the FAs' earned deferred commissions under various circumstances including voluntary termination and retained hundreds of millions of dollars of commissions from its terminated FAs.

Merrill Lynch has taken the position, in its plans, other arbitrations, and federal litigation, that its deferred compensation plans are not ERISA plans and that it is not required to abide by its clear statutory obligations when it defers employee commissions.  This position is frivolous under the plain language of ERISA and blackletter law, carefully examined and rejected most recently in *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023) (rejecting arguments materially identical to Merrill Lynch's here and holding that Morgan Stanley's material identical plans were ERISA plans), Order attached hereto at Exhibit A.

Merrill Lynch's purported "cancellation" of Claimants' earned deferred commissions on revenue they generated for work they performed up to a decade earlier violated ERISA, the

California Labor Code ("CLC") and the Colorado Wage Act. Claimants are entitled to recover their unpaid earned deferred commissions in an amount to be proven at the hearing but in no event less than $2 million, with statutory penalties, costs, attorneys' fees and interest.

## JURISDICTION

1. "A dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among ... Members and associated Persons." FINRA Rule 13200(a).

2. Merrill Lynch is a FINRA member firm. Each of the Claimants was at all relevant times an "Associated Person" pursuant to FINRA Rule 13100(r) and an employee of Merrill Lynch. This dispute arises from the Claimants' employment with Merrill Lynch.

## PARTIES

**Claimants**

3. Jeffrey A DeWees (CRD No. 2857223) was at all relevant times an associated person of Merrill Lynch. Mr. DeWees has been a successful financial advisor for over 27 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. DeWees joined Merrill Lynch in February 1997. Mr. DeWees left Merrill Lynch in September 2022 with his partners Mr. McKelvy, Mr. Schellenberg and Mr. Tamkoc.

4. Luke Roy McKelvy (CRD No. 3123057) was at all relevant times an associated person of Merrill Lynch. Mr. McKelvy has been a successful financial advisor for over 25 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients. Mr. McKelvy joined Merrill Lynch in September 1998. Mr. McKelvy left Merrill Lynch in September 2022 with his partners Mr. DeWees, Mr. Schellenberg and Mr. Tamkoc.

5. William A Schellenberg (CRD No. 2376086) was at all relevant times an associated person of Merrill Lynch. Mr. Schellenberg has been a successful financial advisor for over 31 years,

providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Schellenberg joined Merrill Lynch in July 1997.  Mr. Schellenberg left Merrill Lynch in September 2022 with his partners, Claimants Mr. DeWees, Mr. McKelvy and Mr. Tamkoc.

6.    Jay Tamkoc (CRD No. 5821927) was at all relevant times an associated person of Merrill Lynch.  Mr. Tamkoc has been a successful financial advisor for over 14 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Tamkoc joined Merrill Lynch in August 2010. Mr. Tamkoc left Merrill Lynch in September 2022 with his partners, Claimants Mr. DeWees, Mr. McKelvy and Mr. Schellenberg.

7.    Alon Haim (CRD No. 6675480) was at all relevant times an associated person of Merrill Lynch.  Mr. Haim has been a successful financial advisor for over 8 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Haim joined Merrill Lynch in August 2016, and left Merrill Lynch in August 2019.

8.    Matthew D Mendoza (CRD No. 5460925) was at all relevant times an associated person of Merrill Lynch.  Mr. Mendoza has been a successful financial advisor for over 16 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Mendoza joined Merrill Lynch in February 2008, and left Merrill Lynch in June 2022.

9.    Reinhold Wigand (CRD No. 2974190) was at all relevant times an associated person of Merrill Lynch.  Mr. Wigand has been a successful financial advisor for over 26 years, providing investment management, retirement and tax planning, and wealth preservation strategies to his clients.  Mr. Wigand joined Merrill Lynch in January 1998, and left Merrill Lynch in June 2020.

**Respondent**

10.    Merrill Lynch (CRD No. 7691) is a Delaware corporation and FINRA member broker-dealer and registered investment advisory, with its principal place of business is New York,

New York.

11.    Merrill Lynch is a wholly owned subsidiary of Bank of America and Participating Employer under the Plans.

**PROCEDURAL HISTORY**

12.    On April 30, 2024, Kelly Milligan, a former Merrill Lynch advisor filed a class action complaint, on behalf of himself and all other similarly situated Merrill Lynch FAs, against Merrill Lynch, Bank of America Corporation, and John/Jane Doe, in the U.S. District Court for the Western District of North Carolina alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions. *See Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 3:24-cv-00440 (W.D.N.C. 2024).

13.    Inexplicably, Merrill Lynch has not moved to compel arbitration in *Milligan*. As set forth above, the Code unambiguously <u>requires</u> Merrill Lynch, as a member firm, to submit disputes to the Code and provides heavy sanctions, up to and including suspension of membership, for failure to comply. *See* FINRA Regulatory Notice 16-25 ("Through IM-13000, FINRA has made clear to member firms and associated persons that they have the mandatory and nonwaivable duty to arbitrate disputes, and (with certain exceptions) to arbitrate them before FINRA")

14.    It is indisputable that every putative member of the *Milligan* class is an associated person whose dispute with Merrill Lynch arises from Merrill Lynch's business activities, i.e., their compensation for providing services to their clients, as associated persons, by Merrill Lynch, as a member firm. Merrill Lynch has nevertheless answered the Complaint in *Milligan*, engaged in Rule 16 conferences with putative class counsel and the federal district court, submitted a proposed scheduling order that contemplates extensive litigation and discovery, and **filed a motion for summary judgment on the applicability of ERISA to the Plans**, the dispositive question in every one of these disputes with every unnamed putative class member who is not represented in, and has

had no opportunity to move to compel arbitration of, *Milligan*. This is a brazen violation of FINRA Rules 13200 and 2010. *See* FINRA Rules 2010 (failure to submit to arbitration under the Code violations a member firm's obligation to observe "high standards of commercial honor and just and equitable principles of trade.").

15. Leaving aside that Merrill Lynch's position is that the plans in dispute are not ERISA plans, neither ERISA nor the unavailability of the class action mechanism in the Code relieves member firms and associated persons of their obligation to submit their disputes to arbitration. *See, e.g., Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023). In *Shafer*, Matthew T. Shafer, a former Morgan Stanley advisor, filed a class action on December 30, 2020, on behalf of himself and all other similarly situated former Morgan Stanley FAs, against Defendants Morgan Stanley and Morgan Stanley Smith Barney LLC in the United States Southern District of New York, alleging, among other things, violation of ERISA and seeking to recover the FA's earned deferred commissions.

16. On March 24, 2021, Morgan Stanley moved to compel Shafer's claims to arbitration and stay the Class Action, which Shafer opposed on behalf of himself and the Class. On March 24, 2022, Shafer and eleven other named former Morgan Stanley advisors filed an Amended Class Action Complaint on behalf of themselves and the Class.

17. On May 9, 2022, Morgan Stanley moved again "…for an Order compelling arbitration of all claims brought by Plaintiffs filed in the above-captioned action and staying this action during the pendency of the arbitration proceedings." The Class Action Plaintiffs opposed the motion, arguing, among other things, that the ERISA claims were not subject to Morgan Stanley's arbitration agreement. On September 15, 2023, after extensive briefing, the District Court requested supplemental letter briefing from the parties on the specific question of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan because "[t]he parties' briefing does not

adequately address whether Morgan Stanley's deferred compensation program is an ERISA plan."

18.     The Parties submitted their letter briefs to the Court on September 20, 2023, fully litigating the issue of whether Morgan Stanley's advisors' deferred compensation program is an ERISA plan. Neither party requested additional briefing on this issue nor reserved their right to supplement their briefing on this issue. On November 21, 2023, the SDNY Court held: "Defendants' motion to compel arbitration [] is granted. Because 'the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested'…the case will be stayed pending arbitration." *Shafer v. Morgan Stanley*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023), Order on Motion to Compel Arbitration at Ex. A, 56.

19.     As part of its determination that the claims regarding the Morgan Stanley advisors' deferred compensation programs were arbitrable, the SDNY Court undertook an in-depth analysis of whether they were ERISA plans. Based on the parties' respective submissions, the record before it, and the law, the Court concluded:

> **This Court concludes that the deferred compensation programs at issue here are not bonus programs….Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate**….By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation."...**Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, deferred compensation payments are not "over and above normal compensation." Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan...In sum, the deferred compensation programs at issue here are not bonus plans.**
>
> [T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation

Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (<u>Id</u>. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future." And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond." **Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."** Id. § 3(2)(A)(ii). And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" application of ERISA in these circumstances does not unreasonably expand the reach of the Act….**For the reasons stated above, this Court concludes that Morgan Stanley's deferred compensation programs are ERISA plans.**

Ex. A, 36-39 (international case citations omitted) (emphasis added).

20.     In *Shafer*, the Southern District of New York found that the parties' arbitration agreement was binding and ordered the parties to arbitration in FINRA. As the Panel will hear, Merrill Lynch senior management is aware of *Shafer* and has taken affirmative steps to interfere with its own employees' litigation against <u>Morgan Stanley</u>. Merrill Lynch cannot be unaware of its obligation under *Shafer*, and numerous decisions across the country, to submit its disputes with Claimants, and every other unnamed, unrepresented employee against whom it has purported to move for summary judgment in *Milligan*, to arbitration under the FINRA Code, notwithstanding that the Plans are governed by ERISA. Merrill Lynch's failure to do so is willful bad faith.

<u>**STATEMENT OF FACTS**</u>

**A. Claimants Earned Commissions on Revenue They Generated Servicing Their Clients**

21.     Claimants provide investment advisory and brokerage services to their clients. During their employment, Claimants and Merrill Lynch split revenues generated on the services they provided pursuant to an industry-standard, non-discretionary formula known as a "grid." Claimants'

shares of revenue were commissions under both federal and California law. "Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Cal. Lab.Code § 204.1; *see also Keyes Motors, Inc. v. Div. of Lab. Standards Enf't,* 197 Cal. App. 3d 557, 564, 242 Cal. Rptr. 873, 876 (Ct. App. 1987).

22.     Throughout their employment, Merrill Lynch deferred a portion of Claimants' earned commissions pursuant to a non-discretionary formula. Earned commissions that were deferred accrued throughout the year. At the end of the year, the total earned commissions deferred were allocated to the Plans—a percentage to WealthChoice Plan and a percentage to the Equity Plan—and, according to the Plans, "converted" into "awards" with a value exactly equal to the earned commissions deferred.

23.     Awards under the Plans are governed by their respective plan documents and the "Award Agreements" Merrill Lynch issued to Claimants under the plan documents. \

24.     Under the WealthChoice Plan, Claimants' earned commissions were purportedly converted to accounts notionally invested through Merrill Lynch's investment platform.

25.     Under the Equity Plan, Claimants' earned commissions were purportedly converted to a RSU equivalent to one share of Bank of America common stock and convertible to either cash or common stock after "vesting."

26.     Under the Plans, Claimants' deferred commissions were purportedly contingent upon vesting on a date scheduled between two and nine years after Claimants earned them. The Plans purport to vest and pay earned commissions early prior to the scheduled vest date in the event of certain types of termination, including death, "Workforce Reduction, Divestiture or Disability," and "retirement." With respect to retirement, the Plans provide that advisors are eligible for retirement when they reach age 65 or age 55 with 10 years of service and that the Cancellation Rule is

inapplicable in the event of retirement provided the advisor does "not engage in Competition" before the payment date, provides an annual "certification that [they] have not engaged in competition," and agrees to new anti-competition and solicitation covenants.

27.     The Plans purport to "cancel" an advisor's earned commissions in the event of "all other terminations" prior to the vesting date (the "Cancellation Rule"). After each Claimant left Merrill Lynch, Merrill Lynch purported to cancel and failed to pay commissions Claimants had earned performing services for their clients—on revenue Merrill Lynch actually received from their clients—as long as a <u>decade</u> earlier.

28.     As set forth below, the Plans are ERISA plans as a matter of law. The Cancellation Rule, purporting to cancel payment of commissions unless advisors remain employed by Merrill Lynch for up to a decade after the commissions are earned, is a per se violation of ERISA.

**B.  The Plans Are "Employee Benefit Pension Plans" Governed by ERISA**

29.     ERISA's "purpose is simple: to establish a 'uniform regulatory regime' for plan administration that protects monies belonging to plan beneficiaries while such funds are held and managed by others." *Wilson v. Safelite Grp., Inc.,* 930 F.3d 426, 434 (6th Cir. 2019) ("*Wilson*") (Citations omitted); *Tolbert v. RBC Capital Mkts. Corp.*, 759 F.3d 619, 621 (5th Cir. 2014) ("*Tolbert*"). "ERISA's purpose is among the broadest, if not the broadest, recognized by the Supreme Court...and Congress purposefully designed the scheme so the 'employers can establish ERISA plans rather easily.'" *Wilson*, 930 F.3d at 434 (citations omitted).

30.     ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). The test for whether an employee benefit plan is covered by ERISA is straightforward:

> any plan, fund, or program which . . . by its express terms **or as a result of surrounding circumstances** such plan, fund, or program

(i)  provides retirement income to employees, or

(ii)  results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) ("§ 1002(2)(A)") (emphasis added).

31.     Under the plain language of the statute and blackletter law, the Plans are "Employee Benefit Pension Plan[s]" governed by ERISA because, by their express terms and as a result of surrounding circumstances, they "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." § 1002(2)(A)(ii).

**1.  Each Plan Is a "Plan, Fund or Program."**

32.     The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'"  *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich,* 530 U.S. 211, 223 (2000)). A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994).  A "plan, fund or program" does not need to be a formal written document and can be comprised of multiple documents.  *Id*. at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA").

33.     Each Plan is a "plan, fund or program" under ERISA because it identifies the intended benefits—earned commissions that are deferred for a period of years up to a decade—using a detailed, objective formula.  The Plans also have an ascertainable class of beneficiaries: only advisors defer earned commissions under the Plans and the deferred compensation awards issued to them are specific to the advisors.

34.     Each Plan is ultimately funded by the earned commissions of the advisors themselves, i.e., a specific, defined and fully paid portion of revenue generated by advisors on services performed for their clients.  Earned commissions converted dollar for dollar to RSUs are then specifically purported to be funded from Bank of America common stock designated for the purpose of meeting Merrill Lynch's obligations under the RSU award certificates.

**2.  The Plans "Result in a Deferral of Income" Under Subsection (ii) of § 1002(2)(A)**

35.     As set forth above, subsections (i) and (ii) of § 1002(2)(A) "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert*, 758 F.3d at 624: ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i)"). The second of these two independent tests—whether a "plan, fund or program" "results in a deferral of income" under subsection (ii)—is "an effects-based inquiry rather than one based on purpose." *Pasternack*, 863 F.3d at 170, n.5.

36.     The Plans result in a deferral of advisors' earned commissions. At least 5% of an advisor's earned commissions are withheld each year and allocated between the Plans and purportedly converted to an award issued in the first quarter of the next year that purports to defer earned commissions for a further two to nine years.

37.     *Tolbert, supra,* is directly on point.  In *Tolbert*, as here, RBC's plans purported to defer earned commissions and forfeit them in the event an advisor left prior to a "vesting" date years after the commissions were earned.  *Tolbert*, 758 F.3d at 621.  Considering the same question before this Panel, whether the plan at issue was an "employee pension benefit plan" under ERISA, the Fifth Circuit first analyzed whether the plan qualified under subsection (i) of § 1002(2)(A): *i.e.*, whether it "provides retirement income," and concluded it did not.  *Tolbert*, 759 F.3d at 624. The Fifth Circuit then conducted an <u>independent</u> analysis of RBC's plan under subsection (ii) and concluded that the

plan was a "'pension plan' under subsection (ii)."[1]  *See, Id.*, 759 F.3d at 624.

38.    The Fifth Circuit found that, as here, the "deferral of income therefore 'ensues from' (or 'arises as an effect of') the express terms of the [plan]...Put another way, by participating in the [plan], the plaintiffs have 'fore[gone] income...in exchange for receiving income' at a later date." *Id.* at 625-26 (citations omitted).  It also found significant that, as here, the statement of purpose set forth by RBC's plan documents recited the purpose of deferred compensation.  *Id.* 759 F.3d at 625.[2] The plan in *Tolbert* thus satisfied the first prong of subsection (ii) "results in a deferral of income."

39.    In *Wilson, supra*, the Sixth Circuit considered the same question whether the plan at issue was covered by ERISA and noted that the starting point for interpreting the statute is the language of the statute itself.  *Wilson,* 930 F.3d at 433. "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (citations omitted).  Focusing on the term "results in a deferral of income," the Sixth Circuit concluded that "[i]n light of the ordinary meaning of the word 'results' and Congress's exclusion of the word 'requires,' § 1002(2)(A)(ii) covers plans containing terms that have as **an effect, issue or outcome—even if not as a requirement**—deferral of income by employees to periods extending to the termination of covered employment or beyond." *Id.,* 930 F.3d at 435 (emphasis added).

40.    These decisions are, of course, entirely consistent with the dictionary definitions of

---

[1]  *Tolbert* expressly rejected RBC's attempt to conflate the two sections, noting "[o]ur court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income." *Id.* 759 F.3d at 624.

[2]  Merrill Lynch's Plan prospectuses represent that "in our view, the Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974," a boilerplate disclaimer that has failed to persuade the federal courts, but nowhere does Merrill Lynch disclaim that either Plan is a deferred compensation plan, nor could it.  Each Plan's documents and award certificates flatly recites its purpose of deferred compensation, sets forth the terms of deferred compensation, outlines the tax treatment and requirements of deferred compensation, and actually defers the payment of earned commissions for one to ten years.

"deferred compensation" as (1) "[p]ayment for work *performed*, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when *earned.*" BLACK'S LAW DICTIONARY (11th ed. 2019) (*emphasis added*); see also *Kuhbier v. McCartney*, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017) (quoting Black's Law Dictionary definition). Merrill Lynch advisors defer part of their commissions for work *performed* (by generating revenue for Merrill Lynch) until a later date and do not pay taxes on this part of their compensation until it is paid.

41. The Plans self-evidently meet the second prong of subsection (ii) in that, by their express terms or as "a result of surrounding circumstances," they result in advisors deferring income "for periods extending to the end of covered employment or beyond." *See* § 1002(2)(A)(ii). The "end of covered employment" refers to when an employee stops working for a company) and ERISA "covers plans containing terms that have as **an effect, issue, or outcome—even if not a requirement**—deferral of income by employees extending to the termination of covered employment or beyond." *Id*. 930 F.3d at 434-435 (emphasis added). The Sixth Circuit, comparing the plan before it to the one before the Fifth Circuit in *Tolbert*, held that it was irrelevant that the plans provided for payment of deferred commissions both before and after termination:

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in-service distributions.
>
> ***
>
> The statute does not mandate that 'all deferrals extend to the termination of employment' or that payments be 'systematically deferred' until termination

*Id*. at 435, 437. *See also Tolbert*, 759 F.3d at 626 (holding that plan variously deferring payment

to times prior to, at and following termination "fits comfortably within the meaning of subsection (ii).

42.    The Plans here, which variously defer payment to times prior to, at and following termination, "fit[] comfortably within the meaning of subsection (ii)" for the same reason.  The Plans provide, for example, that advisors whose employment terminates due to Workforce Reduction, Divestiture, Change of Control or Disability are paid in accordance with the specific award's payment schedule, meaning a year to a decade following termination, while termination due to death results in payment as soon as practicable after termination.  With respect to retirement, the WealthChoice Plan provides payment in two installments over two years following termination, while the Equity Plan provides for payment in accordance with the specific award's payment schedule.   Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, the Plans defer payment of earned commissions to and after termination.

43.    Considering the same question whether a materially identical Morgan Stanley deferred compensation plan was an ERISA plan in *Shafer v. Morgan Stanley et al.*, No. 20 CIV. 11047 (PGG), 2023 WL 8100717 (S.D.N.Y. 2023), the United States District Court for the Southern District of New York took extensive briefing and performed a thorough analysis before concluding:

> [T]he "credits" that determine a Morgan Stanley financial advisor's incentive compensation - which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan - **are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month**." (2018) Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1) Morgan Stanley does **not pay out the cash or equity reflecting those "credits" for four to six years, however**. (Id. § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (see ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that **"payment for work performed" in a given month is "paid in the future."** And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure

for governmental service, these future payments sometimes occur at "the end of employment or beyond." Therefore, **Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond."** Id. § 3(2)(A)(ii).

Ex. A at 38 (emphasis added).

### 3. Neither Plan Is a "Bonus Program"

44.     In its Answer to the Class Action Complaint in *Milligan*, Merrill Lynch asserted a defense that its Plans are "bonus programs" exempt from ERISA.[3]  Assuming Merrill Lynch raises the same defense to this Arbitration, it is manifestly frivolous.

45.     A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).   By contrast, "[c]ommission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Cal. Lab.Code § 204.1; *see also Keyes Motors, Inc. v. Div. of Lab. Standards Enf't,* 197 Cal. App. 3d 557, 564, 242 Cal. Rptr. 873, 876 (Ct. App. 1987).

46.     Merrill Lynch defers payment of *earned commissions* under a non-discretionary, uniformly applied formula known as a "grid."   This is not a bonus as a matter of law, in the industry, in Merrill Lynch's own compensation plan or in the Plan documents themselves.   In *Tolbert,* the Fifth Circuit distinguished deferred commissions under the plan from a "bonus" plan,

---

[3] The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA. 29 C.F.R. § 2510.3-2(a). Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." Id. at § 2510.3-2(c).

holding that deferred commissions, *i.e.*, deferring "a portion of...compensation to be earned with respect to the upcoming Plan Year" is not a "bonus," and that ERISA did not require "systematic" deferral in order for a plan to qualify. *See Tolbert*, 759 F.3d at 626 (citing *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 933 (8th Cir. 1999) (characterizing plans that provide rewards for superior performance as "classic" bonus situations, and noting that RBC's reliance on *Emmenegger*—a case involving a bonus program—was misplaced). *See also Wilson*, 930 F.3d at 435.

47. In *Shafer*, Morgan Stanley raised the identical "bonus program" argument. The Southern District of New York flatly rejected it and held that Morgan Stanley's plan, materially identical to the Plans here, is an ERISA Plan:

> **Morgan Stanley financial advisors' deferred compensation is a portion of their incentive compensation, which in turn is a fraction of the revenue they generate. Compensation as a percentage of individually generated revenue is a "commission."** See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction"); Webster's Third New International Dictionary of the English Language - Unabridged (1993 ed.) ("a percentage of the money received in a sale or other transaction paid to the agent responsible for the business").
>
> By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation." Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New International Dictionary of the English Language - Unabridged (1993 ed.) ("money or an equivalent given in addition to the usual compensation"). **Courts generally treat these two types of compensation as distinct.** See Smith v. Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293,299 (W.D.N.Y. 1992) (in ERISA action, concluding that employee benefits committee did not "err[] in deciding that commissions are not bonuses"), aff d, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995) ("[Plaintiffs] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v.Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D. Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary definitions).

The same approach is appropriate here. Because Morgan Stanley financial advisors' deferred compensation is premised on the revenue they generate, **deferred compensation payments are not "over and above normal compensation."** Moreover, Morgan Stanley financial advisors are paid separate year-end bonuses that are distinct from the Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus Agmt. (Dkt. No. 67-3); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

In sum, **the deferred compensation programs at issue here are not bonus plans**.

Ex. A, 36 – 37 (emphasis added).

### C. The Plans Violate ERISA

48.    Under ERISA, employee "contributions are nonforfeitable," meaning that they are 100% vested when made.  ERISA § 203.   Consequently, when an advisor leaves Merrill Lynch for any reason, Merrill Lynch is *required* by statute to timely pay his or her earned commissions, i.e., employee contributions, in full.  The Plans' Cancellation Rule, purporting to cancel payment of commissions years or a decade after they were earned, is a per se violation of ERISA.

49.    The Cancellation Rule would violate ERISA even if the earned commissions, formulaically deferred from advisors' formulaically determined portion of revenues they generate servicing their clients, were misclassified as employer contributions.  Pursuant to § 203(a)(2)(B), employees must be fully vested in employer contributions after they have three years of service or, alternatively, gradually vested under the following schedule:

| Years of Service | Nonforfeitable Percentage |
| --- | --- |
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 | 80 |
| 6 or more | 100 |

50.    The Plans violate ERISA's vesting requirements because all advisors, regardless of years of service, vest according to lengthy schedules between one year and a decade after the commissions are earned and purportedly deferred.  Every Claimant in this case exceeded six years of service as of the date of termination.

51.    ERISA permits employers to operate deferred compensation plans for commission-based advisors, but strictly prohibits forfeiture of deferred commissions and requires employers to timely pay them after an advisor leaves.  Merrill Lynch, indisputably in violation of ERISA and the California Labor Code, purported to cancel commissions it was bound by contract to pay Claimants on revenue that they generated, and that clients paid to Merrill Lynch, as long as a decade before they left.  This conduct is systematic.  In addition to the billions of dollars that Merrill Lynch takes as <u>its own contractually allocated share</u> of revenue its advisors generate serving their clients, Merrill Lynch purports to appropriate and retain for itself, in violation of ERISA and the labor laws of states across the country, hundreds of millions of dollars in advisors' commissions when they finally leave.

## CAUSES OF ACTION

### Count I
### Declaratory and Equitable Relief (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

52.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

53.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

54.    Claimants seek a declaration that with respect to Merrill Lynch advisors:

i. the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);

ii. the Cancellation Rule under the Plans violates ERISA;

iii. Merrill Lynch's deferral of compensation into the Plans violates ERISA;

iv. pending payment in full, with penalties, interest and attorneys' fees as set forth below, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

55. Claimants seek an injunctive order requiring:

v. a complete accounting of all amounts deferred under the Plans;

vi. disgorgement to Claimants of all amounts withheld and purportedly forfeited;

vii. disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;

viii. an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees set forth below; and

ix. all other relief the Panel determines is just and proper.

**Count II**
**Recovery of Benefits Under the Plan**
**(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

56. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

57. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

58. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) authorizes a participant or

beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

59.     Merrill Lynch improperly denied Claimants their earned deferred commissions that should have been vested and not forfeited under ERISA. By denying Claimants their earned deferred commissions, Merrill Lynch violated ERISA § 203(a), 29 U.S.C. § 1053(a).

60.     Merrill Lynch should be ordered to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

## Count III
## Breach of Fiduciary Duty Regarding the Plans (ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))

61.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

62.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

63.     ERISA requires that fiduciaries discharge their duties solely in the interest of the

participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.* ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan" only to the extent that they "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

64. Merrill Lynch, a FINRA member firm and Claimants' employer, purported to "defer" and then to forfeit millions of dollars in earned commissions under its compensation plans into the Plans pursuant to vesting terms and schedules that violated the statutory requirements of ERISA.

65. Merrill Lynch created, imposed, administered and managed the compensation plans under which Claimants' commissions were unlawfully deferred into the Plans, determined the amounts deferred and actually deferred the commissions, managed the deferred amounts and any and all investments, and determined the purported forfeitures of commissions.

66. Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109. Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as is proper.

67. Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to

bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

68.     Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

69.     Claimants seek the restoration of all earned deferred commissions that were illegally deemed forfeited by Merrill Lynch.

**Count IV**
**California Labor Code Violations As To Claimants DeWees, McKelvy,**
**Schellenberg, Tamkoc, Haim and Mendoza**

70.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

71.     Claimants DeWees, McKelvy, Schellenberg, Tamkoc, Haim and Mendoza are commissioned salespersons for the purposes of the California Labor Law. See CLC § 200(a) ("wages includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, **commission basis**, or other method of calculation." (emphasis added)).  Claimants' deferred commissions constitute "wages" for the purposes of the California Labor Law. See, e.g., *Steinhebel v. Los Angeles Times Communications, LLC*, 126 Cal.App.4th 696, 705 (Cal. Ct. App. 2005) (holding "commissions are 'wages'" for the purposes of the CLC; ); *Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302 (Cal. Ct. App. 2016) ("'Wages' protected by the Labor Code include not just salaries earned hourly, but also bonuses, profit-sharing plans, and commissions.").

72.     Under the California Labor Code, employers may not make deductions from wages except in very narrowly defined circumstances provided by statute, none of which are applicable here. *See* CLC §§ 221, 224.

73.    Upon the discharge, layoff or resignation of an employee, the California Labor Code requires that the employer pay the employee all of his or her earned and unpaid wages immediately. CLC § 201(a), 202(a); *Davis v. Farmers Ins. Exch.,* 245 Cal. App. 4th 1302, 1331 (Cal. Ct. App. 2016)

74.    CLC § 202(a) states that "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting."

75.    Claimants earned their commissions and were forced to defer them pursuant to a fixed, non-discretionary "compensation grid."  Merrill Lynch's forfeiture of earned deferred commissions therefore violates CLC § 202(a).

76.    As of the date of this filing, Merrill Lynch has not paid Claimants their earned deferred commissions in violation of the California Labor Code.  Merrill Lynch has instead declared its intention never to pay Claimants their earned deferred commissions and that their earned deferred commissions were forfeited.

77.    Merrill Lynch set up a deduction plan for their earned deferred commissions.  The deductions Merrill Lynch took from Claimants and its other advisors' wages were for Merrill Lynch's own benefit, in violation of the California Labor Code.

78.    Further, pursuant to the California Unfair Competition Law under the California Business and Professions Code, "specific or preventative relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition."   BPC § 17202.

79.    The California Unfair Competition Law under the California Business and Professions Code provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice."  BPC § 17200.

80.     Merrill Lynch's cancellation of Claimants' deferred commissions and failure and refusal to pay Claimants' their earned deferred commissions violated the California Labor Code § 202(a) and the California Unfair Competition Law under the California Business and Professions Code §§ 17200, 17202.

81.     Pursuant to the California Labor Code, "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201 […], 202 […], any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."  CLC § 203.

82.     CLC § 210 requires that, in addition to any other penalties therein, an employer pay 25% of the total amount of earned and unpaid wages unlawfully withheld.

83.     Pursuant to CLC § 218.5 "[i]n any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action."

84.     Pursuant to CLC § 218.6 "[i]n any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2."

## Count V
## Colorado Wage Act Violations As To Claimant Wigand

85.     Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

86.     Mr. Wigand is a commissioned salesperson for the purposes of the Colorado Wage

Act. *See* Colo. Rev. Stat. Ann. § 8-4-101(14)(a) (expressly defining wages to include commissions). Mr. Wigand's deferred commissions, which had been earned constitute "wages" for the purposes of the Colorado Wage Act.

87. Under the Colorado Wage Act, employers may not make deductions from wages except in very narrowly defined circumstances provided by statute, none of which are applicable here. *See* Colo. Rev. Stat. Ann. § 8-4-105(1)

88. Mr. Wigand earned his commissions and was forced to defer them pursuant to a fixed, non-discretionary "compensation grid." Merrill Lynch's forfeiture of Mr. Wigand's earned deferred commissions therefore violates Colo. Rev. Stat. Ann. § 8-4-105(1).

89. Merrill Lynch set up a deduction plan for his earned deferred commissions. The deductions Merrill Lynch took from Mr. Wigand and its other advisors' wages were for Merrill Lynch's own benefit, in violation Colo. Rev. Stat. Ann. § 8-4-105(1). The purported tax deferment benefits touted by Merrill Lynch to its advisors were illusory since, in order to benefit from such tax deferments, the advisors would have had to actually receive their earned deferred commissions.

90. Further, pursuant to Colo. Rev. Stat. Ann. § 8-4-109(1)(b) "[w]hen an employee quits or resigns such employee's employment, the wages or compensation shall become due and payable upon the next regular payday."

91. As of the date of this filing, Merrill Lynch has not paid Mr. Wigand his earned deferred commissions in violation of the Colorado Wage Act. Merrill Lynch has instead declared its intention never to pay Mr. Wigand his earned deferred commissions and that his earned deferred commissions were forfeited.

92. Pursuant to Colo. Rev. Stat. Ann. § 8-4-109(3)(b) "On or after January 1, 2023, if an employer fails or refuses to pay [...] all earned, vested, and determinable wages or compensation within fourteen days after the written demand is sent or within fourteen days after a civil action or

administrative claim for the wages or compensation is sent to or served on the employer, the employer is liable to the employee or group of similarly situated employees for the amount of the earned, vested, determinable, and unpaid wages or compensation plus an automatic penalty of: (I) The greater of two times the amount of the unpaid wages or compensation or one thousand dollars; or (II) If the employee can show that the employer's failure or refusal to pay wages or compensation was willful, the greater of three times the amount of the unpaid wages or compensation or three thousand dollars."

93. Colo. Rev. Stat. Ann. § 8-4-110 provides for reasonable costs and attorney fees for violation of the Colorado Wage Act.

## Count VII
### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

94. Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

95. As a FINRA member firm, Merrill Lynch had a duty to "observe high standards of commercial honor and just and equitable principles of trade" in the "conduct of its business." FINRA Rule 2010.

96. In every contract there exists an implied covenant of good faith and fair dealing in the course of performance. Breach of the covenant is breach of the agreement itself, the covenant being "part and parcel" of the agreement or contract. The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under the agreement. The covenant encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

97. Merrill Lynch breached its contractual obligations to Claimants when it cancelled their earned deferred commissions.

98. Merrill Lynch falsely and expressly told Claimants that their earned deferred

commissions would be a portion of their total earned compensation. Merrill Lynch also omitted to tell them that the plan primarily benefitted Merrill Lynch. Merrill Lynch's misrepresentations and omissions were not in good faith, "just and equitable" or "commercial honor."

99.    Merrill Lynch breached its agreement and the implied covenant of good faith and fair dealing and FINRA Rule 2010 and is liable for the total amount of earned deferred commissions it has not paid.

## Count VIII
## Conversion

100.    Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein. In the alternative, Claimants allege that Merrill Lynch is liable for conversion of their earned deferred commissions.

101.    A claim for conversion requires a showing of claimant's legal ownership or immediate superior right of possession to property; and defendant's unauthorized interference with claimant's ownership or possession of such property. Where legal ownership or immediate superior right of possession is established, interference with earned compensation is conversion.

102.    Pursuant to the terms of the Plans, Claimants' deferred commissions were earned through their production of revenue. Thus, upon earning their deferred commissions, Claimants acquired a possessory interest in the underlying property. By subsequently forcing them to forfeit their earned deferred commissions, Merrill Lynch interfered with Claimants' possessory interest of the property.

103.    Merrill Lynch is liable for compensatory damages in the amount of the total earned deferred commissions it withheld from Claimants, valued as of the date of Claimants' forced forfeiture of their earned deferred commissions, to be proven at the hearing.

## Count IX
## Unjust Enrichment

104.   Claimants repeat and re-allege each allegation of the preceding paragraphs as if fully set forth herein.

105.   In the alternative, Claimants are entitled to relief under the theory of unjust enrichment.

106.   A claimant may prevail on a claim for unjust enrichment by demonstrating that the respondent benefitted at the claimant's expense and that equity and good conscience require restitution.

107.   Here, Merrill Lynch has been enriched by wrongfully retaining Claimants' earned commissions.

## **RELIEF**

Based on the foregoing, Claimants respectfully requests the Panel issue an Award against Merrill Lynch providing for:

    a.    monetary damages equal to the unpaid earned compensation in an amount to be proven at the hearing but not less than $2 million;

    b.    monetary damages equal to any other earned but unpaid amounts in an amount to be proven at the hearing;

    c.    all penalties in accordance with the California Labor Code, including but not limited to 25% of amounts unlawfully withheld;

    d.    all penalties in accordance with the Colorado Wage Act;

    e.    interest at the California prejudgment rate of 10% per annum and, with respect to Mr. Wigand, interest at the Colorado prejudgment rate of 9% per annum;

    f.    attorneys' fees and costs as required by ERISA and the CLC and, with respect to Mr. Wigand, attorneys' fees and costs as required by the Colorado Wage Act;

    g.    declaration that, with respect to Merrill Lynch:

> i. the Equity Plan and WealthChoice Plan are "employee benefit pension plans" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A);
>
> ii. the Cancellation Rule under the Plans violates ERISA;
>
> iii. Merrill Lynch's deferral of compensation into the Plans violates ERISA;
>
> iv. pending payment in full, with penalties, interest and attorneys' fees as set forth below, all amounts withheld and purportedly forfeited in violation of ERISA, interest and attorneys' fees have and continued to be held in constructive trust for the benefit of Claimants.

h. an injunctive order requiring:

> i. a complete accounting of all amounts deferred under the Plans;
>
> ii. disgorgement to Claimants of all amounts withheld and purportedly forfeited;
>
> iii. disgorgement to Claimants of all profits Merrill Lynch earned on the amounts withheld;
>
> iv. an equitable lien on Merrill Lynch's assets equal to the amount that Merrill Lynch withheld and purported to forfeit and all profits Merrill Lynch earned on the amounts withheld, with interest and attorneys' fees set forth below; and

i. Such other relief as the Panel deems just, equitable and proper.[4]

Dated: New York, New York
      October 7, 2024

**LAX & NEVILLE LLP**

***/s/ Barry R. Lax***
Barry R. Lax, Esq.
Sandra P. Lahens
Robert R. Miller
350 Fifth Avenue, Suite 4640
New York, NY 10118
Tel: (212) 696-1999
*Attorneys for Claimants*

---

[4] Claimants reserve their right to amend or supplement their damages pending discovery.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, and SANDY JUKEL, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  - against -<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>      Defendants. | **MEMORANDUM<br>OPINION & ORDER**<br><br>20 Civ. 11047 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    In this putative class action, Plaintiffs Matthew Shafer, Sheri Haugabook, Peter

Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey

Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel assert that Defendants Morgan

Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management

Development and Succession Committee (the "Compensation Committee"), and certain

unnamed members of the Compensation Committee (together, "Morgan Stanley" or the "Bank"),

violated the Employee Retirement Income Security Act of 1974 ("ERISA") by not paying

Plaintiffs all of their deferred compensation when they left their financial advisor positions at

Morgan Stanley.  Defendants have moved to compel arbitration and for a stay of these

proceedings.  (Dkt. No. 65)  For the reasons stated below, Defendants' motion will be granted.

**BACKGROUND**[1]

Plaintiffs are former financial advisors at Morgan Stanley Smith Barney.[2]  They

reside throughout the country and worked for the Bank at various times between 1994 and 2020.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 11-22; Krentzman Decl. (Dkt. No. 68) ¶¶ 5-16)

"Defendant Morgan Stanley is a Delaware corporation with a principal place of

business in New York, New York.  Morgan Stanley is a global financial services firm that,

through its subsidiaries and affiliates, including [Defendant Morgan Stanley Smith Barney LLC,

a Delaware limited liability company with its principal place of business in New York, New

York] provides financial advisory services to clients.  Defendant Compensation Committee is a

committee of Morgan Stanley's Board of Directors formed to discharge the Board's

responsibilities related to compensation. . . . The Compensation Committee is an unincorporated

---

[1]  In resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).

The facts discussed below are drawn from (1) the Amended Complaint (Dkt. No. 58); (2) the alleged "Plan Documents" cited in the Amended Complaint, which have been docketed as exhibits to Plaintiff's September 15, 2023 letter (Dkt. No. 83); and (3) the declarations and accompanying exhibits submitted by the parties (Porco Decl. (Dkt. No. 67); Krentzman Decl. (Dkt. No. 68); Jasinski Decl. (Dkt. No. 72-1)).

[2]  Morgan Stanley describes the financial advisor's role as "help[ing] [clients] create a wealth plan that takes [their] specific goals and circumstances into account," including providing advice on "retirement income . . . , asset allocation . . . , and changes in tax policy." Morgan Stanley Wealth Mgmt., Why Advice Matters (May 31, 2023), available at https://www.morganstanley.com/articles/advice-matters.

2

association with its principal place of business in New York.  John and Jane Does 1-20 are the

individual members of the Compensation Committee." (Id. ¶¶ 23-26)

Plaintiffs purport to bring this action on behalf of all Morgan Stanley financial

advisors who forfeited deferred compensation as a result of leaving their Morgan Stanley

employment between December 29, 2014 and the present.  (Id. ¶ 90)

Plaintiffs assert general federal question jurisdiction pursuant to 28 U.S.C.

§ 1331 and ERISA jurisdiction pursuant to 29 U.S.C. § 1132(e).  (Id. ¶ 7)

I.      **FACTS**

A.      **Financial Advisors' Compensation at Morgan Stanley**

Morgan Stanley's "compensation program[]" for financial advisors during the

relevant time period largely consists of two components:  salary and incentive compensation.[3]

(2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) at 2)[4]

"All Advisors . . . receive a guaranteed monthly salary.  Total compensation in

any month will not be lower than the applicable monthly salary by state." (Id. § 1.1)  As of

2018, the salary for New York-based financial advisors was $4,225 per month, or $50,700 per

year.  (Id. § 1.1)

Incentive compensation is based on the "Total Credits" that a financial advisor is

awarded monthly.  (Id. § 1.2.1)  "The Advisor's Total Credits for each month [are] determined

based on the applicable Credit Rate" – a percentage between 28% and 55.5% that increases with

---

[3]  Morgan Stanley also offers certain income and savings programs that are not at issue here,
including a "lending growth award program" and a "capital accumulation program."  (See
generally 2018 Financial Advisor Compensation Plan (Dkt. No. 83-2))

[4]  The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

"(1) the Advisor's trailing 12-month Gross Revenue and (2) his/her Length of Service" –

"multiplied by the Creditable Revenue generated [by the Advisor] in such month." (Id. § 1.2.1)

Incentive compensation is further divided between (1) "Cash Credits," which are

"calculated monthly and [result in cash compensation] paid in arrears on a monthly basis," and

(2) "Deferred Credits," which result in deferred compensation paid out years later. (Id. §§ 1.2.2–

1.2.3)  The percentage of Total Credits allotted to "Deferred Credits" is "based on a Deferral

Ratio determined by the Advisor's Trailing 12-month Gross Revenue," which varies from 1.5%

(for the $0 to $239,999 revenue band) to 15% (for the $5 million+ revenue band) as such revenue

increases. (Id. §§ 1.2.2–1.2.3)

The parties' dispute here involves the "Deferred Credits" that result in deferred

compensation paid out years after it is earned.

The 2018 Financial Advisor Compensation Plan provides the following example

of incentive compensation:

> An Advisor with a Length of Service ("LOS") of 15 years produces $800,000 in Trailing 12-month Gross Revenue as of May 31, 2018. The Advisor's Creditable Revenue for June 2018 is $70,000.
> - Credit Rate is 44.0%
> - Monthly Total Credits are $30,800 [$70,000 × 44.0% = $30,800]
> - Monthly Deferred Credits are $2,002 [$30,800 × 6.5% = $2,002]
> - Monthly Cash Credits are $28,798 [$30,800-$2,002 = $28,798]

(Id. § 1.2.3)

"Twenty-five percent of the cumulative monthly Deferred Credits [are] granted in

the form of a restricted stock unit [('RSU')] award that is scheduled to convert to shares of

Morgan Stanley common stock approximately four years from the grant date" (the "Equity

Incentive Plan"). (Id. § 1.2.2)  "[S]eventy-five percent of the cumulative monthly Deferred

Credits [are] granted in the form of a cash-based deferred compensation award scheduled to be

paid approximately six years from the grant date" (the "Compensation Incentive Plan"). (Id. §

4

1.2.2; see Compensation Incentive Plan Document (Dkt. No. 83-4); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8))  The Compensation Committee administers both

plans.  (Compensation Incentive Plan Document (Dkt. No. 83-4) § 2(a)(i); Equity Incentive

Compensation Plan Document (Dkt. No. 83-8) § 5(a))

> "[Financial advisors] have individual, notional accounts in the [Compensation Incentive Plan] for each award they receive, i.e., they have an account for each year's deferred compensation.  [Financial advisors] can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments."  (Am. Cmplt. (Dkt. No. 58) ¶ 38 (citing 2017 Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 1))  As to vesting under the Equity Incentive Plan, "a Stock Unit will be payable, at the discretion of the [Compensation] Committee, in Stock or in cash equal to the Fair Market Value on the payment date of one Share."  (Equity Incentive Compensation Plan Document (Dkt. No. 83-8) § 8)

> As to both plans, "[d]eferred compensation awards are contingent upon the Advisor remaining employed through the grant and vesting dates of the award."  (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.2)  Plaintiffs refer to this policy as the "Cancellation Rule."  (Am. Cmplt. (Dkt. No. 58) passim)

> There are several exceptions to the Cancellation Rule.  Deferred cash compensation and deferred equity compensation both vest after employment if the financial advisor's employment ends because of (1) disability; (2) "full career retirement" – i.e., "termination of . . . [e]mployment . . . for any reason other than under circumstances involving any Prohibited Activity, and other than due to [a financial advisor's] death or [departure for] [g]overnmental [s]ervice," after a financial advisor has achieved a contractually specified

combination of age and years of service; (3) "[i]nvoluntary termination by [Morgan Stanley]" –
i.e., layoffs; or (4) departure for governmental service.  (2017 Compensation Incentive Plan
Award Certificate (Dkt. No. 83-5) §§ 3(c)-(d), 4-5, 16(j); Equity Incentive Compensation Plan
Award Certificate (Dkt. No. 83-9) §§ 5(c), 6-7, 22(n))

"[E]nter[ing] into an employment or consulting relationship with a firm offering
Competitive Services" constitutes "Prohibited Activity."  Accordingly, a long-tenured financial
advisor who, after leaving Morgan Stanley, accepts a position at another bank or brokerage firm
is not eligible for the "full career retirement" exception to the Cancellation Rule.  (2017
Compensation Incentive Plan Award Certificate (Dkt. No. 83-5) § 16(p)(3)-(4); Equity Incentive
Compensation Plan Award Certificate (Dkt. No. 83-9) §§ 10(c)(1), 22(f)(1), 22(n))

    **B.**    **The Arbitration Agreements**

In moving to compel arbitration, Morgan Stanley cites arbitration clauses in three
types of Morgan Stanley employment agreements:  the "Bonus Agreement"; the "Employment
Agreement"; and the "CARE Program."

    **1.**    **The Bonus Agreement's Arbitration Provision**

The Bonus Agreement's arbitration provision provides as follows:

7. Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this
Agreement or any benefits or payments available and/or due under this
Agreement, as well as any controversy or claim arising out of or in any way
relating to Employee's employment with Morgan Stanley or termination thereof,
including, but not limited to common law claims for breach of contract or tort,
wage and hour claims, and/or statutory discrimination claims (individually and
collectively referred to herein as "Covered Claims"), will be resolved by final and
binding arbitration before the Financial Industry Regulatory Authority ("FINRA")
in accordance with the FINRA Code of Arbitration Procedure for Industry
Disputes.  Notwithstanding the foregoing, any Covered Claim that has been
initiated or is being maintained on a class, collective, or representative action
basis, or is otherwise brought on behalf of others, may not be submitted to
arbitration before FINRA.  Also, notwithstanding the foregoing, any Covered

Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA"). Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures. Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims. Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only. With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action. An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7. Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration. In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law. For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

7

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. . . .

(2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7; see also 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7) (same); Shafer 2015 Bonus Agmt. (Dkt. No. 67-2) § 7) (similar))[5]

## 2.   The Employment Agreement's Arbitration Provision

The Employment Agreement contains the following arbitration provision:

### 7. ARBITRATION

7.1 Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.  Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.  This Paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provision[al] relief from any court, as provided for in this agreement.

7.2 Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ("CARE").  Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Administrator's Office and in the CARE Program explanatory brochure.

(2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7)

## 3.   The CARE Program

"For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called 'CARE,' short for Convenient Access to Resolution for Employees.

---

[5]  The cited 2014 and 2015 bonus agreements contain substantially similar – albeit not identical – language addressing the arbitration of claims.  The parties have not argued that language differences in the relevant sections of the 2014 and 2015 bonus agreements are material.

CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the

program is available to employees on Morgan Stanley's intranet site. . . . In 2015, Morgan

Stanley announced an expansion of the CARE [P]rogram.  Morgan Stanley notified all U.S.

employees of the expansion via their individualized Morgan Stanley email accounts.  These

communications were sent in waves. . . .  [and] describ[ed] the process through which employees

could opt out of participating."  (Krentzman Decl. (Dkt. No. 68) ¶¶ 20, 22)

> The 2015 email regarding the CARE Program expansion and opt-out reads as

follows:

> Morgan Stanley is announcing the expansion of CARE and modifications to
> related Firm policies and programs to extend arbitration obligations for all US
> employees – registered and non-registered.  Effective October 2, 2015, arbitration
> under the CARE Arbitration Program will be mandatory for all employees in the
> U.S., and all covered claims between the Firm and employees will be resolved
> through final and binding arbitration on a nonclass, non-collective and non-
> representative action basis as more fully described in the Arbitration Agreement
> and CARE Guidebook. . . .
>
> By continuing your employment with Morgan Stanley, you accept and agree to,
> and will be covered and bound by the terms of the Arbitration Agreement and the
> arbitration provisions of the CARE Guidebook, unless you elect to opt out of the
> CARE Arbitration Program by completing, signing and submitting an effective
> CARE Arbitration Program Opt-Out Form by October 2, 2015.

(Sept. 2, 2015 Morgan Stanley Human Resources email (Dkt. No. 68-3) at 2)

> The 2015 email contains hyperlinks to the "Arbitration Agreement" (the "CARE

Program Arbitration Agreement") and the "CARE Guidebook."  (Id.)

> The CARE Program Arbitration Agreement provides as follows:

> **Binding Mutual Arbitration.**  You and Morgan Stanley agree that any Covered
> Claims (defined below) will be resolved by final and binding arbitration as set
> forth in this Arbitration Agreement and in the arbitration provisions of the CARE
> Guidebook, a copy of which is annexed hereto.  This Arbitration Agreement,
> including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall
> be governed by and interpreted in accordance with the Federal Arbitration Act
> ("FAA").  This Arbitration Agreement applies with respect to all Covered Claims,
> whether initiated by you or Morgan Stanley, and makes arbitration the required

9

and exclusive forum for the resolution of all Covered Claims.  By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

**Covered Claims.**  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring.  Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.  **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

**Excluded Claims.**  The following claims and disputes are not subject to this Arbitration Agreement:  (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. . . .

Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

(CARE Program Arbitration Agmt. (Dkt. No. 68-5) §§ 1-4 (emphases in original))  The CARE

Guidebook contains similar language.  (CARE Guidebook (Dkt. No. 68-4) at 4-6, 20)

      **C.**      **<u>Applicability of Arbitration Provisions to Plaintiffs</u>**

      Defendants have proffered evidence that Plaintiffs are bound by the arbitration

provisions contained in the following agreements:

-   Shafer:  2015 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 6 and Ex. B);

-   Haugabook, Heidt, Shover, Livanos, Samsen, Jeffrey Sheresky, Steve Sheresky, Jukel:  2015 CARE Program expansion, by virtue of not having opted out (Krentzman Decl. (Dkt. No. **68**) ¶ 31);

-   Tamse:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 8 and Ex. C);

-   Loftus:  2014 Bonus Agreement (Porco Decl. (Dkt. No. 67) ¶ 10 and Ex. D); and

-   Nadler:  2008 Employment Agreement (Krentzman Decl. (Dkt. No. 68) ¶ 18 and Ex. A).

## II.      <u>PROCEDURAL HISTORY</u>

      The Complaint was filed on December 30, 2020, with Shafer as the sole plaintiff.

(Dkt. No. 1)[6]

      On March 24, 2022, Plaintiffs filed the Amended Complaint.  (Dkt. No. 58)  The

Amended Complaint asserts claims for (1) declaratory and equitable relief pursuant to ERISA

§ 502(a)(3), 29 U.S.C. § 1132(a)(3) (<u>id.</u> ¶¶ 98-101); (2) "reformation of the [Financial Advisor]

Deferred Compensation Plan and [for] benefits under the reformed plan," pursuant to ERISA §§

502(a)(1) and (3), 29 U.S.C. §§ 1132(a)(1) and (3) (<u>id.</u> ¶¶ 102-07); and (3) "breach of fiduciary

duty against the Compensation Committee regarding the [Compensation Incentive Plan] and the

---

[6]  On April 5, 2021, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 42)  The Court denied that motion without prejudice on March 10, 2022, after new plaintiffs moved for joinder and stated that they intended to file an Amended Complaint.  (Dkt. No. 57)

[Equity Incentive Plan],” pursuant to ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).  (Id. ¶¶ 108-17 (capitalization altered))

       On June 29, 2022, Defendants moved to compel arbitration and for a stay of proceedings.  (Dkt. No. 65)

<b>DISCUSSION</b>

**I.     LEGAL STANDARDS**

     **A.    Motion to Compel Arbitration**

       Under the Federal Arbitration Act (the “FAA”), an arbitration agreement “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.”  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for “an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement.”  9 U.S.C. § 4.  The FAA reflects “a strong federal policy favoring arbitration as an alternative means of dispute resolution.”  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  Given the federal policy favoring arbitration, “doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration.”  Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  However, this “presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made.”  Id.

       “‘In deciding whether a dispute is arbitrable, [a court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.’”  Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 394 (2d Cir. 2015) (quoting Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int’l Bhd. of Teamsters, 561 U.S. 287 (2010)).  “When deciding whether the parties agreed to arbitrate a certain matter (including

12

arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). As to the scope of the arbitration agreement, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4). Where, however, "'the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and "avoid the need for further court proceedings."'" Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011); Bensadoun, 316 F.3d at 175).

As noted above, in resolving a motion to compel arbitration, courts consider "'all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' . . . and draw[] all reasonable inferences in favor of the non-moving party." Id. (first omission in original) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)). However, "[a] party to an arbitration

agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

**B.**      **ERISA**

"ERISA's comprehensive regulatory scheme governs most employee benefit plans." Liberty Mut. Ins. Co. v. Donegan, 746 F.3d 497, 503 (2d Cir. 2014), aff'd sub nom. Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312 (2016). "The statute . . . seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." Gobeille, 577 U.S. at 320-21.

ERISA § 502(a), codified at 29 U.S.C. § 1132(a), provides that

[a] civil action may be brought –

 (1) by a participant or beneficiary –

  (A) for the relief provided for in subsection (c) of this section, or

  (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

 (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]

 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(1)-(3).

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee benefit plan' that is governed by ERISA." Albers v. Guardian Life Ins. Co., No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999).

ERISA addresses two types of "employee benefit plans": "welfare plans" and "pension plans." ERISA § 3(2)(A) defines "pension plan" as follows:

> (A) Except as provided [elsewhere in ERISA], the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

29 U.S.C. § 1002(2)(A).

ERISA requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable" in most circumstances. ERISA § 203(a), codified at 29 U.S.C. § 1053(a). In the case of an "individual account plan,"[7] benefits must generally fully vest (1) after three years of service, or (2) gradually in accordance with a statutorily defined schedule. Id. §§ 203(a)(2)(B)(i)-(iii).

## II.   ANALYSIS

### A.   Whether the Parties Agreed to Arbitrate

As discussed above, Defendants have offered evidence that Plaintiffs Shafer, Tamse, Loftus, and Nadler executed written agreements containing arbitration clauses. As to the remaining Plaintiffs, Defendants have offered evidence that they continued to work at Morgan Stanley without opting out of the 2015 CARE Program expansion, which provides for binding

---

[7] "The term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." ERISA § 3(34), codified at 29 U.S.C. § 1002(34).

mutual arbitration.  (See Porco Decl. (Dkt. No. 67) and accompanying exhibits; Krentzman Decl.

(Dkt. No. 68) and accompanying exhibits)  Plaintiffs do not dispute the evidence showing their

agreement to the arbitration provisions at issue.  Given this record, the Court concludes that

Defendants have demonstrated that Plaintiffs and Defendants entered into agreements to

arbitrate.  See Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004)

(employee's signed contract containing arbitration clause sufficient to establish agreement to

arbitrate under New York law); Victorio v. Sammy's Fishbox Realty Co., LLC, No. 14 CIV.

8678 CM, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (same); Lockette v. Morgan

Stanley, No. 18-CV-876 (JGK), 2018 WL 4778920, at *4–5 (S.D.N.Y. Oct. 3, 2018) (concluding

that plaintiff's continued work at Morgan Stanley after receiving the 2015 CARE Program

expansion email and plaintiff's decision not to opt out were sufficient to demonstrate an

agreement to arbitrate under New York law); Pelligrino v. Morgan Stanley Smith Barney LLC,

No. 17-CV-7865 (RA), 2018 WL 2452768, at *3-5 (S.D.N.Y. May 31, 2018) (same).

   It is likewise clear that the arbitration provisions at issue unambiguously delegate

disputes as to arbitrability to the arbitrator, except as to challenges to the provisions' class action

waivers.  (2014 Tamse Bonus Agmt. (Dkt. No. 67-**3**) § 7(d) ("Any dispute as to the arbitrability

of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.

Notwithstanding the foregoing, any issue concerning the validity of the class action, collective

action, or representative action waiver must be decided by a court, and an arbitrator does not

have authority to consider the issue of the validity of the waiver."); Shafer 2015 Bonus Agmt.

(Dkt. No. 67-2) § 7(d) ("Any issue concerning the arbitrability of a particular issue or claim

pursuant to this arbitration agreement (except for issues concerning the validity or enforceability

of the class action, collective action, or representative action Waivers) must be resolved by the

arbitrator, not the court."); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1 ("Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration."); CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4 ("Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.")) See Frazier v. Morgan Stanley, No. 16 CIV. 804 (RJS), 2018 WL 11585450, at *8 (S.D.N.Y. Nov. 29, 2018) (holding that identical provision in Morgan Stanley employment agreements "clearly provide[d] for the arbitration of questions concerning the arbitrability of any dispute arising out of or relating to those agreements").[8]

While Plaintiffs do not dispute that the signed agreements and Plaintiffs' failure to opt out of the CARE Program expansion signify consent to arbitration, they argue that "[e]ven if the arbitration agreements applied to Plaintiffs' claims, they were superseded by the [Compensation Incentive] [P]lan [D]ocument, which specifically requires disputes about the plan to be resolved in court, **not** arbitration." (Pltf. Opp. (Dkt. No. 72) at 18-19 (emphasis in original))

In support of this argument, Plaintiffs cite to the Compensation Incentive Plan Document's "Governing Law and Exclusive Jurisdiction" provision:

---

[8]  Citing NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031-32 (2d Cir. 2014), and Archer & White Sales, Inc. v. Henry Schein, Inc., 935 F.3d 274, 281 (5th Cir. 2019), Plaintiffs contend that "the parties did not clearly and unmistakably commit questions about the arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator." (Pltf. Opp. (Dkt. No. 72) at 15 n.11)  These cases are not persuasive here, however, because they address arbitration provisions that do not contain the explicitly worded delegations quoted above.  In NASDAQ-OMX Grp., for example the agreement at issue was "silent as to who should decide arbitrability." NASDAQ OMX Grp., 770 F.3d at 1031.  And in Archer & White Sales, the Fifth Circuit found that "[t]he parties could have unambiguously delegated th[e] question [of who decides arbitrability], but they did not, and we are not empowered to re-write their agreement." Archer & White Sales, 935 F.3d at 282.

> [The Compensation Incentive Plan] and the related legal relations between a
> Participant and the Firm shall be governed by, and construed in accordance with,
> the laws of the State of New York, without regard to any conflicts or choice of
> law rule or principle that might otherwise refer the interpretation of the Award or
> Account Value to the substantive law of another jurisdiction.  Following the
> timely and proper exhaustion of applicable internal claims and appeals
> procedures, the courts of New York shall have exclusive jurisdiction over the Plan
> and any dispute arising in connection with the Plan, a Participant's participation
> in the Plan or rights under the Plan.

(Compensation Incentive Plan Document (Dkt. No. 83-4) § 17)  The Compensation Incentive

Plan Document – unlike the agreements containing arbitration clauses discussed above – does

not contain a merger clause.[9]

　　　　According to Plaintiffs, the "Governing Law and Exclusive Jurisdiction"

provision in the Compensation Incentive Plan Document constitutes "'a subsequent contract

regarding the same matter'" – i.e., arbitration – that "'supersede[s] the prior contract[s].'"  (Pltf.

Opp. (Dkt. No. 72) at 19 (quoting Applied Energetics, 645 F.3d at 526))  But the evidence before

the Court suggests that nearly all of the agreements at issue containing the arbitration provisions

were executed after the Compensation Incentive Plan Document was issued.

---

[9]  The Bonus Agreement's arbitration provision states that "[e]mployee and Morgan Stanley
agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered
Claims, superseding all prior written and oral agreements regarding the resolution of Covered
Claims. . . ."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(k); see also 2014 Tamse Bonus
Agmt. (Dkt. No. 67-3) § 7(e) (same); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4) § 7(e) (same))

The Employment Agreement states that "[t]his writing constitutes the entire agreement of the
parties with respect to the subject matter recited in this Agreement.  This Agreement may be
amended only by a writing signed by both you and Morgan Stanley."  (2008 Nadler Employment
Agmt. (Dkt. No. 68-1) § 13)

The CARE Program Arbitration Agreement states that "**[t]his Arbitration Agreement applies
to all Covered Claims, including any Covered Claims based on, arising out of, or which
arose out of or in any way relate to acts and omissions that occurred before you and
Morgan Stanley entered into this Arbitration Agreement.**"  (CARE Program Arbitration
Agmt. (Dkt. No. 68-5) § 2 (emphasis in original))

While the Compensation Incentive Plan Document is not dated, Plaintiffs assert "[u]pon information and belief, [that] this document has been in effect since 2008 and [is] part of the 'applicable award documentation' when participants' deferred compensation is credited to their account each January." (Jasinski Decl. (Dkt. No. 72-1) ¶ 4) However, the record does not indicate whether (1) the Compensation Incentive Plan Document has changed over time, or (2) if, when issued as part of the "applicable award documentation" in a given year, it should be considered a document current as of that year or in the alternative, merely a copy of a 2008 document. These matters are material here, because all Plaintiffs other than Nadler signed arbitration agreements <u>after</u> 2008, when Plaintiffs assert that the Compensation Incentive Plan Document was issued. (Porco Decl. (Dkt. No. 67) ¶¶ 6-11; Krentzman Decl. (Dkt. No. 68) ¶¶ 23-30) And given the merger provisions found in the agreements containing arbitration clauses, if these agreements were executed after the Compensation Incentive Plan Document was issued, there is a compelling argument that these agreements supersede the Compensation Incentive Plan Document.

For example, Plaintiff Mark Tamse "was employed by Morgan Stanley as a[] [financial advisor] from March 7, 1994, until March 27, 2015." (Krentzman Decl. (Dkt. No. 68) ¶ 9) On February 18, 2014, he entered into a Bonus Agreement containing an arbitration provision, which provides that "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof . . . will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority." (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) §§ 7(a)) The Bonus Agreement further provides that the arbitration provision "constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered

Claims." (Id. § 7(e))  Based on the merger provision, it appears that the Bonus Agreement's arbitration clause would supersede the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction clause with respect to any deferred compensation that Tamse received under the Compensation Incentive Plan.

In any event, even if – contrary to the record before the Court – the Compensation Incentive Plan Document was issued after the agreements containing the arbitration provisions, the Governing Law and Exclusive Jurisdiction provision would not vitiate the arbitration provisions, because to the extent that the Compensation Incentive Plan is an ERISA plan – as Plaintiffs allege (Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117) – the Governing Law and Exclusive Jurisdiction provision is null and void.

As discussed above, the Amended Complaint asserts that the deferred compensation programs at issue are ERISA plans, and all of the claims alleged in the Amended Complaint are premised on ERISA.  (See Am. Cmplt. (Dkt. No. 58) ¶¶ 56, 98-117)  The "exclusive jurisdiction" provision on which Plaintiffs rely, however, states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that disputes arising under the Compensation Incentive Plan must be resolved by the "courts of New York."  (Id. § 17)

Accepting Plaintiffs' argument that the deferred compensation programs at issue are ERISA plans, the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision is null and void to the extent that it provides that all disputes arising under it are governed by New York law, and that all disputes arising under it must be heard by New York courts.  Claims under ERISA are governed by Federal law and are heard by Federal courts.

"If a state law 'relate[s] to . . . [an ERISA] employee benefit plan,' it is pre-empted."  Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (quoting ERISA § 514(a), codified at 29 U.S.C. § 1144(a) ("Except as provided in [statutory exceptions not relevant here], the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of [ERISA].") (alterations in Dedeaux).  Moreover, ERISA provides – with a narrow exception not at issue here – that "[t]he district courts of the United States shall have exclusive jurisdiction of an action under [ERISA]."  ERISA § 4301(c), codified at 29 U.S.C. § 1451(c); see Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *4 n.6 (S.D.N.Y. Mar. 30, 2007) ("Federal district courts have exclusive jurisdiction over all claims arising under ERISA except for those arising under § 1132(a)(1)(B).").

Accordingly, the Governing Law and Exclusive Jurisdiction provision in the Compensation Incentive Plan Document – which states that "[the Compensation Incentive Plan] and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York," and that "the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan" (Dkt. No. 83-4 § 17) – is null and void with respect to the ERISA claims raised in the Amended Complaint.  See Kentucky Ass'n of Health Plans, Inc. v. Nichols, 227 F.3d 352, 367 (6th Cir. 2000) ("[I]f ERISA preempts . . . state law . . . , there is no state law to which the administrator of the . . . plan must conform."), aff'd sub nom. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); Matter of HECI Expl. Co., Inc., 862 F.2d 513, 521 (5th Cir. 1988) ("Even if a party may, under some circumstances, waive the application of federal law to a

federally preempted state law claim by failing to raise federal law in a timely fashion, it would go too far to hold that parties could <u>agree</u> to apply state law to an ERISA claim.") (emphasis in original) (citation omitted); <u>Stevenson</u>, 2007 WL 9815654, at *4 n.6**.**

Finally, where an agreement containing an exclusive jurisdiction provision overlaps with – but does not entirely displace – a related agreement containing an arbitration provision, the issue of which provision applies presents a question of scope, and is thus subject to language in an arbitration provision delegating disputes about arbitrability to an arbitrator.  <u>See CleanSpark, Inc. v. Discover Growth Fund, LLC</u>, 485 F. Supp. 3d 494, 504 & n.10 (S.D.N.Y. 2020) ("where a later-in-time forum selection clause arguably wholly supersedes the earlier-in-time arbitration agreement . . . a court must independently determine whether the agreement to arbitrate is still enforceable"; where the later agreement does not entirely displace the earlier agreement and contains an exclusive jurisdiction provision that applies only to disputes within the scope of the later agreement, the arbitration provision has not been "wholly displaced by the forum selection clause, . . . the Court need not pause on the threshold question [of whether there has been an agreement to arbitrate]," because "'[w]hether the forum-selection clause in the later-in-time agreement supersedes the arbitration clauses in the earlier agreement[] presents a question of arbitrability'" that can be delegated to the arbitrator) (quoting <u>TAPCO Underwriters, Inc. v. Catalina London Ltd.</u>, No. 14-**CV**-8434, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014)) (alteration omitted); <u>PB Life & Annuity Co. v. Universal Life Ins. Co.</u>, No. 20-CV-2284 (LJL), 2020 WL 2476170, at *3, *6–11 (S.D.N.Y. May 12, 2020) (reinsurer and insurer first entered into reinsurance agreement containing an arbitration provision, and then entered into trust agreement containing a New York choice of law and exclusive jurisdiction provision; the court held that, with respect to disputes implicating both agreements, whether the arbitration

provision or exclusive jurisdiction provision controlled was a question of arbitrability properly delegated to the arbitrator).

Here, the subject matter of the Compensation Incentive Plan Document is not identical to the subject matter of the employment agreements containing the arbitration provisions, and the Compensation Incentive Plan Document's Governing Law and Exclusive Jurisdiction provision applies only to the Compensation Incentive Plan. (Dkt. No. 83-4 § 17) The jurisdiction provision does not apply to claims regarding the Equity Incentive Plan. In these circumstances, as in CleanSpark and PB Life, disputes over the jurisdiction provision's application are within the arbitrator's ambit.

Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014), Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc., 5 F. Supp. 3d 537 (S.D.N.Y. 2014), Applied Energetics, Inc. v. NewOak Cap. Markets, LLC, 645 F.3d 522 (2d Cir. 2011), and Ruiz v. New Avon LLC, No. 18-CV-9033 (VSB), 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) – all cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 72) at 19-20) – are not to the contrary.

In Goldman and Citigroup Glob. Markets, courts concluded that broker-dealer agreements that provided for exclusive jurisdiction in the Southern District of New York, and that contained merger provisions, superseded the "background FINRA arbitration rule." Goldman, 764 F.3d at 212, 216; see also Citigroup Glob. Markets, 5 F. Supp. 3d at 539-40.

In Applied Energetics, plaintiff manufacturer and defendant broker-dealer "entered into a preliminary letter agreement" that required disputes to be submitted to arbitration before the National Association of Securities Dealers, FINRA's predecessor. Applied Energetics, 645 F.3d at 523. The letter agreement "contemplated that the parties would enter into a subsequent, more formal agreement." Id. The parties subsequently entered into the

contemplated more formal agreement, which (1) "expressly provided that the agreement would be governed by New York law"; (2) provided that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York"; and (3) contained a merger clause. Id. The Second Circuit concluded that the language in the later formal agreement superseded the arbitration provision in the initial letter agreement because (1) "[the formal agreement's] language that 'any dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the [letter agreement's] parallel language that 'any dispute shall be resolved through binding arbitration'"; and (2) "[u]nder New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." Id. at 525-26 (quotation and alterations omitted).

And in Ruiz, the plaintiff employee signed (1) a November 14, 2017 employment agreement in which the parties "irrevocably consent and submit to the sole exclusive jurisdiction of the United States District Court for New York, or the Courts of the State of New York," with respect to "[a]ny and all actions arising out of the [employment agreement] or the termination thereof"; (2) a November 27, 2017 "Employment Arbitration Agreement" containing an arbitration provision for employment disputes; and (3) a revised December 19, 2017 employment agreement with a later start date, which contained the same exclusive jurisdiction clause as the original agreement, as well as a merger clause. Ruiz, 2019 WL 4601847, at *2, *7. The court concluded that the exclusive jurisdiction clause in the December employment agreement displaced the arbitration agreement agreed to the previous month, because the "language [of the December agreement] – which encompasses any dispute relating to Ruiz's employment by New

Avon – is both mandatory and exclusive, and cannot be reconciled with the parties' prior agreement to arbitrate all disputes"; and (2) and because of the merger clause. Id. at *9.

These cases are not on point because the circumstances in the instant case are entirely different. As an initial matter, these cases do not involve a situation in which – as here – Plaintiffs have brought exclusively federal ERISA claims and then incongruously cited to a contract provision stating that any disputes are governed by New York law and must be heard by "the courts of New York." Moreover, in all four of Plaintiffs' cases, the later-in-time agreement (1) had the same subject matter as the prior agreement, and/or (2) contained a merger clause. Here, as discussed above, it is not clear that the Compensation Incentive Plan Document is the later document and, in any event, the Compensation Incentive Plan Document does not contain a merger clause and does not address subject matter that is identical to the subject matter of the Employment Agreement, the Bonus Agreement, or the CARE Program. See PB Life, 2020 WL 2476170, at *9 (finding Goldman and Applied Energetics not on point where the subject matter of the contracts at issue overlapped only in part).

In sum, in multiple documents, Plaintiffs agreed – either via a signed writing or by not opting out of the CARE Program expansion – to arbitrate disputes regarding their employment at Morgan Stanley. Morgan Stanley has thus made a "prima facie showing" of "the agreements' contractual validity," and Plaintiffs have not met their "'heavy burden . . . to disprove [the] presumption[]'" that the "'agreement[s] [are] valid.'" Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020) (quoting Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1996)), objections overruled, No. 10 Civ. 6950 (AT) (RWL), 2021 WL 4199912 (S.D.N.Y. Sept. 15, 2021).

25

B.       **Whether the Agreements to Arbitrate**
         **Encompass the Claims at Issue**

The arbitration provisions at issue here encompass "any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof"; "any controversy or claim between Employee and Morgan Stanley . . . based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley"; "[a]ny controversy or claim arising out of or relating to . . . employment by Morgan Stanley"; and "any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof . . . includ[ing] . . . claims under, based on, or relating to any federal . . . statute or regulation."  (2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(a); 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(a); 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1; CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 2)

"Courts have typically found such language indicative of a broad agreement." Cour Pharms. Dev. Co., Inc. v. Phosphorex, Inc., No. 20-CV-4417 (JPO), 2021 WL 1062568, at *3 (S.D.N.Y. Mar. 19, 2021) (listing cases); see Sportvision, Inc. v. MLB Advanced Media, LP, No. 18 CIV 3025 (PGG), 2020 WL 1957450, at *5 (S.D.N.Y. Apr. 23, 2020) ("A clause 'submitting to arbitration "[a]ny claim or controversy arising out of or relating to th[e]

agreement" is the paradigm of a broad clause.'") (quoting <u>Collins & Aikman Prod. Co. v. Bldg.</u>

<u>Sys., Inc.</u>, 58 F.3d 16, 20 (2d Cir. 1995); further citation omitted) (brackets in <u>Sportvision</u>).[10]

---

[10]  Citing <u>Cooper v. Ruane Cunniff & Goldfarb Inc.</u>, 990 F.3d 173 (2d Cir. 2021), Plaintiffs contend that "Plaintiffs' claims do not 'arise from or relate to their employment' because they do not involve facts particular to them." (Pltf. Opp. (Dkt. No. 72) at 12)

In <u>Cooper</u>, plaintiff employees, "[a]cting on behalf of a putative class of plan participants and an employee benefit plan . . . sued [an investment advisor] under § 502(a)(2) of [ERISA], claiming damages arising from [the advisor's] alleged breach of fiduciary duty and mismanagement of a profit-sharing fund sponsored by [plaintiffs'] employer ." <u>Cooper</u>, 990 F.3d at 175. In particular, plaintiffs alleged that the investment advisor had breached its fiduciary duty by investing "almost 30% of the Plan's total assets" in "shares [of] Valeant Pharmaceuticals," which precipitously declined in value following a series of scandals involving Valeant's price-gouging and fraud. <u>Id.</u> at 175, 177; <u>see</u> Katie Thomas, <u>Battered Valeant Stock Drops a Further 50% After Weak Guidance</u>, N.Y Times (Mar. 15, 2016), <u>available at</u> https://www.nytimes.com/2016/03/16/business/valeant-q4-financial-2016-guidance.html?smid=url-share.

Defendant moved to compel arbitration, citing employment agreements that "mandate[d] arbitration of 'all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms' of the Agreement." <u>Id.</u> at 178.  The Second Circuit reversed the district court's decision granting the motion to compel arbitration, holding that plaintiffs' breach of fiduciary duty claim did not "relate to" their employment:

> Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to Cooper's individual experience.  Moreover, . . . others who were never DST employees could have brought claims identical to those stated by Cooper – for example, the mismanagement claims could have been pursued by other Plan beneficiaries (such as spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST itself; and by the Secretary of Labor.  <u>See</u> ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing plan participants and beneficiaries and the Secretary of Labor to bring a civil action for breach of fiduciary duties).

> We therefore [conclude] . . . that in the context of an employment arbitration agreement, a claim will "relate to" employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment.  Here, the merits of Cooper's claims do not involve such facts.

<u>Id.</u> at 183-84 (citations omitted).

Plaintiffs contend, however, that they have brought their claims in a representative capacity on behalf of ERISA plans, and that as a result their claims are not arbitrable.  According to Plaintiffs, (1) "[t]he parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity"; (2) "[t]he ERISA plan[s] did not agree to arbitrate Plaintiffs' claims"; and (3) "[e]ven if the parties agreed to arbitrate Plaintiffs' claims in individual

_____

Here, according to Plaintiffs,

> the arbitration provisions, like the arbitration agreement in Cooper, pertain to Plaintiffs' employment.  But, as in Cooper, the merits of Plaintiffs' claims do not involve facts particular to their employment.  The claims do not concern Plaintiffs' work performance, evaluations, working conditions, amount of compensation, or any other fact particular to their individual experiences at Morgan Stanley.  Rather, Plaintiffs' claims concern whether the [Compensation Incentive Plan] and [Equity Incentive Plan] are governed by ERISA and, if so, whether the Cancellation Rule violates ERISA.  Nothing about these claims "involve facts particular to an individual plaintiff's own employment."  To the contrary, the relevant facts apply equally to every [financial advisor] who forfeited deferred compensation, and each such [financial advisor] can bring the same claims.  Indeed, even the Secretary of Labor could do so.

(Pltf. Opp. (Dkt. No. 72) at 12-13 (quoting Cooper, 990 F.3d at 184) (emphasis in Pltf. Opp.))

Plaintiffs' "relate to employment" argument is not persuasive.  Although both Cooper and the instant case involve § 502(a)(2) breach of fiduciary duty claims, the similarities between the cases end there.  In Cooper, the alleged breach of fiduciary duty was the mismanagement of fund assets, an issue entirely unrelated to plaintiffs' employment.  Here, by contrast, the alleged breach of fiduciary duty is "selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA."  (Am. Cmplt. (Dkt. No. 58) ¶ 113) These challenged actions "relate to" Plaintiffs' employment, because whether Plaintiffs' deferred compensation vested depends on the timing and circumstances of their separation from Morgan Stanley, including whether they were fired, quit, or retired.  Cooper's concern that "[r]elatedness" "not encompass everything that touche[s] employment in any way," Cooper, 990 F.3d at 183, is thus not implicated here.  See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *9 (E.D.N.Y. Sept. 30, 2023) (finding that Cooper did not preclude plaintiff's "claims against her former employer directly, challenging her former employer's calculation of her retirement benefits," because there was "a more substantial nexus between Plaintiff's claims and her employment" than in Cooper).

In sum, Cooper's analysis of "relate to employment" does not support Plaintiffs' position here.

28

arbitrations, those arbitration agreements are unenforceable as 'prospective waiver[s] of a party's

right to pursue statutory remedies' under ERISA § 502." (Pltf. Opp. (Dkt. No. 72) at 15, 18, 21

(quoting <u>Am. Exp. Co. v. Italian Colors Rest.</u>, 570 U.S. 228, 235 (2013)) (brackets in Pltf. Opp.))

        In considering Plaintiffs' arguments, this Court must first determine whether (1)

the Compensation Incentive Plan and the Equity Incentive Plan are ERISA plans; and (2) if so,

whether – as Plaintiffs contend – arbitration of their claims was not consented-to by each alleged

ERISA plan and/or would be contrary to ERISA.[11]

---

[11]  Defendants contend that "[b]ecause plaintiffs have agreed to arbitrate arbitrability, the Court need not – and should not – reach arbitrability itself. . . . [T]he validity of plaintiffs' representative action waiver is not at issue.  The parties do not dispute whether plaintiffs have waived the right to bring a representative action – they dispute whether plaintiffs' claims seeking individual benefits must be arbitrated.  The agreements clearly and unmistakably commit such questions to the arbitrator, and plaintiffs have identified no arbitrability issue reserved to the court that 'at least arguably covers the present dispute.'"  (Def. Reply Br. (Dkt. No. 69) at 7-8 (quoting <u>NASDAQ OMX Grp.</u>, 770 F.3d at 1031))

By contrast, Plaintiffs contend that "[t]hree of the four arbitration provisions purport to waive the right to pursue a Covered Claim 'on a class action, collective action, or representative action basis.'  To the extent that any such claim is allowed to proceed, it must do so in court.  Moreover, 'any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers shall be decided by a court of competent jurisdiction, and not by an arbitrator.'  Thus, contrary to Morgan Stanley's argument that any disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, the Court – not an arbitrator – must decide whether Plaintiffs' claims must be allowed to proceed on a class-action or representative-action basis, such that they are not subject to arbitration."  (Pltf. Opp. (Dkt. No. 72) at 15 (quoting 2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(d); citing 2014 Tamse Bonus Agmt. (Dkt. No. 67-3) § 7(d), and CARE Program Arbitration Agmt. (Dkt. No. 68-5) § 4; alterations omitted); <u>see also</u> 2008 Nadler Employment Agmt. (Dkt. No. 68-1) § 7.1)

In sum, Plaintiffs argue that the arbitration provisions are unenforceable because (1) they "prohibit[] Plaintiffs from bringing [their] claim[s] [on] a representative basis"; and (2) this restriction violates ERISA.  And they further contend that the validity of the class action waivers must be determined by a court.  (<u>Id.</u> at 15, 22)  Because the arbitration provisions provide that the validity of the class action waivers must be determined by a court, this Court concludes that this aspect of the parties' arbitrability dispute must be determined by the Court and not by an arbitrator.

1.       <u>**Whether the Deferred Compensation Programs are ERISA Plans**</u>

Plaintiffs contend that Morgan Stanley's deferred compensation programs are "employee benefit pension plan[s]" under ERISA because they "result in a deferral of income by employees for periods extending to the termination of covered employment or beyond." (Am. Cmplt. (Dkt. No. 58) ¶ 64) (capitalization altered). <u>See</u> ERISA 3(2)(A)(ii), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A)(ii).[12]   According to Plaintiffs, the deferred compensation programs' deferral of income "extend[s] to the termination of covered employment or beyond" in that (1) financial advisors "whose employment ends because of a disability, involuntary termination, retirement, or full career retirement still receive their deferred compensation on the scheduled distribution date . . . after their employment with Morgan Stanley . . . end[s]"; and (2) financial advisors "who qualify for a government service termination receive their deferred compensation when they leave Morgan Stanley." (<u>See</u> <u>id.</u> ¶¶ 59-67 (capitalization altered))

a.       <u>**Applicable Law**</u>

As discussed above, ERISA defines "pension plan" to include, <u>inter</u> <u>alia</u>, any employer "plan, fund, or program" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. . . ."  ERISA § 3(2)(A), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A).  In determining whether an employer's plan or program is an "employee benefit pension plan" under ERISA, the Act directs courts to consider the "express terms" and "surrounding circumstances" of the plan or program.  ERISA § 3(2)(A), <u>codified</u> <u>at</u> 29 U.S.C. § 1002(2)(A).  The Second Circuit has cautioned that the ERISA provision defining pension plans "is 'not to be read as an elastic girdle that can be stretched to cover any content

---

[12]  Plaintiffs do not contend that Morgan Stanley's deferred compensation programs "provide[] retirement income to employees."  ERISA § 3(2)(A)(i).

that can conceivably fit within its reach.'" Pasternack v. Shrader, 863 F.3d 162, 168 (2d Cir. 2017) (quoting Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980)).

Most cases that have considered whether an employer's plan or program "results in deferral of income" for purposes of § 3(2)(A)(ii) have involved bonus plans, typically in the form of stock options programs or "long-term incentive plans." E.g., Albers, 1999 WL 228367, *1; International Paper Co. v. Suwyn, 978 F. Supp. 506, 508-09 (S.D.N.Y. 1997); Foster v. Bell Atl. Tricon Leasing Corp., No. 93 CIV. 4527 (LAP), 1994 WL 150830, *1 (S.D.N.Y. Apr. 20, 1994); Hahn v. Nat'l Bank, N.A., 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); Pasciutti v. LiquidPiston, Inc., No. 3:20-CV-01243 (RNC), 2021 WL 4502950, *2 (D. Conn. Sept. 30, 2021); Oatway v. Am. Int'l Grp., 325 F.3d 184, 187 (3d Cir. 2003); Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 (8th Cir. 1999). In determining whether a bonus plan is subject to ERISA, a court must consider both § 3(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c), which provides that "the terms 'employee pension benefit plan' and 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." See, e.g., Albers, 1999 WL 228367, at *3-4 (analyzing deferral of bonus payments under both § 1002(2)(A)(ii) and 29 C.F.R. § 2510.3-2(c)); Foster, 1994 WL 150830, at *2 (same).

In that context, courts consider whether a plan's "purpose [is] to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." Oatway, 325 F.3d at 188. In such an inquiry, "[a] [p]lan's express statement of purpose . . . is entitled to weight when determining the nature of the plan." Hahn, 99 F. Supp. 2d at 279. Courts also consider whether plans "by operation . . . require the deferral of income," or

31

on the other hand, if "any such deferral to periods extending to termination is merely incidental."
Suwyn, 978 F. Supp. at 512; see id. at 511 (plan does not result in the deferral of income when it
"cannot be said to generally defer the receipt of income to the termination of employment");
Foster, 1994 WL 150830, at *2 ("[T]he 'natural reading of [29 U.S.C.] § 1002(2)(A)(ii)'s
requirement that there be a "deferral of income . . . to the termination of covered employment or
beyond" is that the statute requires that a plan generally defer the receipt of income to the
termination of employment.  The statute is not satisfied when, under the facts of a particular
case, a portion of withheld income happens to become due after termination.'") (quoting Hagel
v. United Land Co., 759 F. Supp. 1199, 1202 (E.D. Va. 1991); emphasis and ellipsis in Foster).

In Tolbert v. RBC Cap. Markets Corp., 758 F.3d 619 (5th Cir. 2014), the Fifth
Circuit considered whether an employer's "wealth accumulation plan" was an "employee benefit
pension plan."  The court noted that the "wealth accumulation plan"

> "[was] designed to provide an opportunity for [certain] employees to invest a
> portion of their compensation in tax-deferred savings and investment options in
> an effort to support long-term savings and allow such employees to share [in
> defendant] RBC's growth and profitability, if any." . . .  Generally, a participating
> employee [could] elect to have her account distributed either "In–Service" (i.e.,
> during her employment) or upon separation from employment. . . . Vesting where
> the employee has separated from employment is dependent on the employee
> either (1) entering into a "business transition agreement" or (2) satisfying the
> requirements "under the Plan for Retirement" and entering into a non-competition
> agreement.

Id. at 622-23 & n.1 (quoting plan document; alteration omitted).

RBC argued that its wealth accumulation plan "[was] not a 'pension plan' because
'the primary purpose of the [plan] [was] not to provide retirement or deferred post-termination
income, but rather, to attract and retain key employees by awarding bonuses and other
incentives.'"  Id. at 623 (quoting RBC's brief) (emphasis in RBC's brief; alteration omitted).

Although the Fifth Circuit found that the wealth accumulation plan "was not designed to provide retirement income," and noted that, under § 3(2)(A)(i), the issue of whether a plan "provides retirement income" depends on the "primary thrust" and "purpose" of the plan, id. at 624, it rejected RBC's arguments with respect to § 3(2)(A)(ii).  As to that provision, the Tolbert court holds that the employer's purpose is irrelevant, and that the proper inquiry is whether a deferral of income necessarily ensues as a result of the plan:

> The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i).  Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income.  Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. . . .

> In analyzing subsection (ii), we begin with the predicate – "results in a deferral of income."  The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in Burrage v. United States, 571 U.S. 204 (2014).  The Court explained that "a thing 'results' when it arises as an effect, issue, or outcome from some action, process or design."  Id. at 210 (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)).  Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan.  The remaining text of subsection (ii) – "by employees for periods extending to the termination of covered employment or beyond" – indicates that the employees must defer the income to the end of their employment or beyond.

> . . . .

> We conclude that the plain language of the statute and the interpretations expressed in [our precedents] all compel one result:  The [wealth accumulation plan] is a "pension plan" under subsection (ii).  The [wealth accumulation plan's] "express terms" reveal themselves at the outset of the document.  The first section of the [wealth accumulation plan], the statement of purpose, refers to the [wealth accumulation plan] as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year."  Later sections of the [wealth accumulation plan] contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred.  A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the [wealth accumulation

plan]. Put another way, by participating in the [wealth accumulation plan], the plaintiffs have "[forgone] income in exchange for receiving income" at a later date. See Boos v. AT&T, Inc., 643 F.3d 127, 134 (5th Cir. 2011).

The "express terms" of the [wealth accumulation plan] also contemplate employees deferring income "to the termination of covered employment or beyond." The vesting sections explain that, upon separation, unvested amounts vest immediately. The distribution sections contain further support: "If distribution is made due to Separation," then "available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." Accordingly, the [wealth accumulation plan] fits comfortably within the meaning of subsection (ii).

Id. at 624-26 (citations altered; emphases in original; footnote, further citations, and alterations omitted).

The Fifth Circuit goes on to reject RBC's reliance on § 2510.3-2(a) – the regulation setting out the "systematically deferred" standard for bonuses – and related case law, finding that RBC's wealth accumulation plan is not a bonus plan: "The [wealth accumulation plan] is not among the 'specific plans' identified in § 2510.3-2(c), and we therefore decline to require the [wealth accumulation plan] to satisfy the 'systematically deferred' condition. In other words, the [wealth accumulation plan] fits comfortably within the meaning of § 1002(2)(A)(ii), and nothing in § 2510.3-2(c) takes it out. Reliance on [Emmenegger v. Bull Moose Tube Co., 197 F.3d 929 (8th Cir. 1999)] is thus misplaced." Id. at 626 (paragraph break omitted).

In Wilson v. Safelite Grp., 930 F.3d 429 (6th Cir. 2019), the Sixth Circuit followed the Tolbert analysis and held that a "similar" "income deferral plan" was an ERISA pension plan under § 3(2)(A)(ii), because the plan "expressly provide[d] for employees to defer income from several sources to the future and authorize[d] options for payment of deferred income both before and after termination" Id. at 437.

Although the Second Circuit has not addressed Tolbert and Wilson, much of the reasoning in Pasternack v. Shrader, 863 F.3d 162 (2d Cir. 2017) is consistent with the analysis in

34

these cases.  For example, the <u>Pasternack</u> court states that (1) "the two subparagraphs of [§ 3(2)(A)] set out independent tests to determine whether a plan is protected by ERISA"; (2) "[t]he statutory phrase 'provides retirement income' does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement.  The very fact that [§ 3(2)(A)(i)] is an alternative to [§ 3(2)(A)(ii)], which explicitly asks whether a plan 'results' in deferred income, suggests that the phrase 'provides retirement income' considers the plan's primary purpose rather than its result"; and (3) "[s]ubparagraph (ii) extends ERISA coverage to any plan that 'results in a deferral of income by employees.'  The word 'results' calls for an effects-based inquiry rather than one based on purpose."  <u>Id.</u> at 168-69 & 170 n.5.

Having considered the relevant case law, this Court concludes that the test to be applied for determining ERISA coverage is whether the deferred compensation program at issue is a bonus plan.  If it is, a court must consider both the plan's purpose and whether deferral of income is systematic.  If the deferred compensation program is not a bonus plan, a court should consider only whether the deferred compensation program "results in" deferred income.

### b.    Whether Plaintiffs' Deferred Compensation Programs Are Bonus Programs

Plaintiffs contend that financial advisors'

> deferred compensation in the [Financial Advisor] Deferred Compensation Program is not a "bonus" . . . [because] [financial advisors] do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits . . . .  Given that [financial advisors] are expected to generate revenue, their compensation for performing this core function – at the absolute minimum level – is not, and cannot, be a "bonus."  Rather, [financial advisors'] compensation – including their deferred compensation – is a "commission." . . . Indeed, the [Financial Advisor] Compensation Plan distinguishes between [financial advisors'] "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. [Financial advisors] earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate.  In

35

> contrast, [financial advisors] earn "year-end bonuses" by achieving
> individualized, performance-based goals such as increasing their prior year's
> revenue by specified percentages or cross-selling products to clients.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 73-79 (citing 2018 Financial Advisor Compensation Plan (Dkt.

No. 83-2) § 1.2.2 (differentiating "deferred compensation award[s]" from "year-end bonuses . . .

paid to Firm employees generally")))

        This Court concludes that the deferred compensation programs at issue here are

not bonus programs.

        As discussed above, Morgan Stanley financial advisors' deferred compensation is

a portion of their incentive compensation, which in turn is a fraction of the revenue they

generate.  Compensation as a percentage of individually generated revenue is a "commission."

See Commission, Black's Law Dictionary (11th ed. 2019) ("[a] fee paid to an agent or employee

for a particular transaction, usually as a percentage of the money received from the transaction");

Webster's Third New International Dictionary of the English Language – Unabridged (1993 ed.)

("a percentage of the money received in a sale or other transaction paid to the agent responsible

for the business").

        By contrast, a bonus is "[a] premium paid in addition to what is due or expected[,]

[especially] a payment by way of division of a business's profits, given over and above normal

compensation."  Bonus, Black's Law Dictionary (11th ed. 2019); accord Webster's Third New

International Dictionary of the English Language – Unabridged (1993 ed.) ("money or an

equivalent given in addition to the usual compensation").

        Courts generally treat these two types of compensation as distinct.  See Smith v.

Rochester Tel. Bus. Mktg. Corp., 786 F. Supp. 293, 299 (W.D.N.Y. 1992) (in ERISA action,

concluding that employee benefits committee did not "err[] in deciding that commissions are not

bonuses"), aff'd, 40 F.3d 1236 (2d Cir. 1994); Haropulos v. First Am. Title Ins. Co. of New

York, No. 93 CIV. 2369 (MGC), 1995 WL 274456, at *1 (S.D.N.Y. May 10, 1995)

("[Plaintiff's] salary was $50,000 per year plus incentive commissions and bonuses."); Israel v.

Voya Institutional Plan Servs., LLC, No. 15-CV-11914-ADB, 2017 WL 1026416, at *6 (D.

Mass. Mar. 16, 2017) (distinguishing "commissions" from "bonuses" based on their dictionary

definitions).

      The same approach is appropriate here. Because Morgan Stanley financial

advisors' deferred compensation is premised on the revenue they generate, deferred

compensation payments are not "over and above normal compensation." Moreover, Morgan

Stanley financial advisors are paid separate year-end bonuses that are distinct from the

Compensation Incentive Plan and Equity Incentive Plan. (2018 Financial Advisor Compensation

Plan (Dkt. No. 83-2) § 1.2.2; 2015 Shafer Bonus Agmt. (Dkt. No. 67-2); 2014 Tamse Bonus

Agmt. (Dkt. No. **67-3**); 2014 Loftus Bonus Agmt. (Dkt. No. 67-4))

      In sum, the deferred compensation programs at issue here are not bonus plans.

Accordingly, in deciding whether Morgan Stanley's deferred compensation programs are ERISA

plans under § 3(2)(A)(ii), this Court considers only whether these programs "result[] in" the

deferral of income to a period after employment.

### c.     Whether the Deferred Compensation Programs "Result[] in a Deferral of Income by Employees for Periods Extending to the Termination of Covered Employment or Beyond"

      "Although [ERISA] do[es] not define 'deferral of income' or 'deferred

compensation,' Black's Law Dictionary defines '[d]eferred compensation' as either: (1)

'[p]ayment for work performed, to be paid in the future or when some future event occurs,' or

(2) 'an employee's earnings that are taxed when received or distributed rather than when earned,

such as contributions to a qualified pension or profit-sharing plan.'" Kuhbier v. McCartney,

Verrino & Rosenberry Vested Producer Plan, 239 F. Supp. 3d 710, 724 (S.D.N.Y. 2017)

(quoting <u>Deferred Compensation</u>, Black's Law Dictionary (10th ed. 2014)).  And "a 'plan' is a 'pension plan' [under ERISA] when a 'deferral of income' . . . to the end of . . . employment or beyond . . . arises as an 'effect, issue, or outcome' from that plan." <u>Tolbert</u>, 758 F.3d at 625 (quoting <u>Burrage</u>, 571 U.S. at 210).

As described above, the "credits" that determine a Morgan Stanley financial advisor's incentive compensation – which includes deferred compensation under both the Compensation Incentive Plan and Equity Incentive Plan – are calculated on a monthly basis, based on "the Creditable Revenue generated [by the financial advisor] in such month." (2018 Financial Advisor Compensation Plan (Dkt. No. 83-2) § 1.2.1)  Morgan Stanley does not pay out the cash or equity reflecting those "credits" for four to six years, however. (<u>Id.</u> § 1.2.2) Accordingly, under the "express terms" of Morgan Stanley's deferred compensation programs (<u>see</u> ERISA § 3(2)(A)), an "effect, issue, or outcome" of these programs is that "payment for work performed" in a given month is "paid in the future."  And because the Compensation Incentive Plan and Equity Incentive Plan both provide for payment following disability, full career retirement, layoffs, or departure for governmental service, these future payments sometimes occur at "the end of employment or beyond."  Therefore, Morgan Stanley's deferred compensation programs "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond." <u>Id.</u> § 3(2)(A)(ii).

And while this Court must take care not to "'read [ERISA's definition of a pension plan] as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach,'" <u>Pasternack</u>, 863 F.3d at 168 (quoting <u>Murphy</u>, 611 F.2d at 575), application of ERISA in these circumstances does not unreasonably expand the reach of the Act.  Although Plaintiffs in the instant case – unlike plaintiffs in <u>Tolbert</u> and <u>Wilson</u> – cannot elect post-

38

employment vesting, disability, retirement, layoff, and government service are not unusual

means by which workers leave their employment.  And nothing in the record suggests that post-

employment deferred compensation payments are rare.

      Defendants argue, however, that Plaintiffs did not earn payments under the

Compensation Incentive Plan and Equity Incentive Plan in advance of receiving such payments,

because financial advisors "have no right to payment until and unless they remain employed at

vesting – a condition [P]laintiffs [did not] meet."  (Sept. 20, 2023 Def. Ltr. (Dkt. No. 85) at 4)

Defendants thus argue that "Morgan Stanley's program does not entail <u>any</u> 'deferral of income

by employees.'"  (<u>Id.</u> at 4 (emphasis in original))  This argument is not persuasive, because it

exalts form over substance.  Whenever an action (here, leaving Morgan Stanley's employ)

results in the forfeiture of a contractual right, those facts can always be recharacterized by stating

that the opposite action (here, remaining in Morgan Stanley's employ) is a condition precedent to

the performance of the contract.

      In sum, Morgan Stanley's deferred compensation programs result in the deferral

of income to the post-employment period within the meaning of ERISA § 3(2)(A)(ii).

*     *     *     *

      For the reasons stated above, this Court concludes that Morgan Stanley's deferred

compensation programs are ERISA plans.

### 2.    <u>Whether Plaintiffs' ERISA Claims Are Arbitrable</u>

      Second Circuit law makes clear that compulsory arbitration of ERISA claims is

lawful.  <u>Bird v. Shearson Lehman/Am. Exp., Inc.</u>, 926 F.2d 116, 122 (2d Cir. 1991) ("[S]tatutory

claims arising under ERISA may be the subject of compulsory arbitration.").

      Plaintiffs contend, however, that their claims are not arbitrable, because they are

§ 502(a)(2) claims for breach of fiduciary duty, and § 502(a)(3) claims for equitable relief that

39

are brought in a representative capacity on behalf of the plans.  According to Plaintiffs, their

§ 502(a)(2) claims "can be brought <u>only</u> in a representative capacity."  (Pltf. Opp. (Dkt. No. 72)

at 16 (emphasis in original))  Moreover, their "representative [§ 502(a)(3)] claims should not be

litigated in individual arbitrations," because these "claims 'belong' to the [Financial Advisor]

Deferred Compensation Program, including the [Compensation Incentive Plan] and [Equity

Incentive Plan], [and] Plaintiffs' individual arbitration agreements do not cover them."  (<u>Id.</u> at

18)  "[T]he ERISA plan[s] [thus] never agreed to arbitrate any claims."  (<u>Id.</u>)  Plaintiffs further

argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs'

right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of

ERISA" – namely, the ability to remediate the plans as a whole via a representative action.  (<u>Id.</u>

at 21)[13]

> Defendants respond that
>
>> [P]laintiffs do <u>not</u> actually bring these claims in a representative capacity. . . .
>> Here, [P]laintiffs seek the recovery of alleged benefits that were not paid **to them**,
>> and their claims "fall comfortably within the scope of § 502(a)(1)(B), which
>> allows a plan participant 'to recover benefits due to him,'". . . .  [P]laintiffs cannot
>> avoid their agreements to arbitrate their individual claims by slapping a
>> "representative" label on them. . . .
>>
>> [T]he plan need not agree to arbitrate claims that plaintiffs bring on their own
>> behalf. . . . The complaint here . . . alleges injuries that are personal to <u>these</u>
>> [P]laintiffs; the complaint individually describes each plaintiff's tenure at Morgan
>> Stanley and the deferred compensation each purportedly "earned" in that time and
>> now seeks.  Seeking "plan-wide relief" is not the same as seeking relief on behalf
>> of the plan, and plaintiffs' claims seeking benefits <u>from</u> the plan cannot "belong

---

[13]  Plaintiffs do not argue that § 502(a)(1) claims for benefits are, as a general matter, non-arbitrable.  Plaintiffs' claims for benefits are brought as part of the "two-step" Second Cause of Action, however, in which Plaintiffs first seek (1) reformation under § 502(a)(3), and then (2) recovery of benefits from the reformed plans pursuant to § 502(a)(1).  (Am. Cmplt. (Dkt. No. 58) ¶¶ 102-07)  <u>See Laurent v. PricewaterhouseCoopers LLP</u>, 945 F.3d 739, 747 (2d Cir. 2019) ("[W]e have previously affirmed the entry of a two-step reformation and enforcement remedy under ERISA.") (citing <u>Amara v. CIGNA Corp.</u>, 775 F.3d 510, 532 (2d Cir. 2014)).

40

<u>to</u>" the plan.  Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them. . . .

> Plaintiffs can obtain complete relief, if any, through their individual claims for benefits.  It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class – plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims. . . . Arbitration of plaintiffs' claims accordingly does not frustrate <u>anyone</u>'s ability to obtain any ERISA remedy that they may be due.

(Def. Reply Br. (Dkt. No. 69) at 9-11 (quoting <u>Frommert v. Conkright</u>, 433 F.3d 254, 270 (2d Cir. 2006) (in turn quoting 29 U.S.C. § 1132(a)(1)(B); further citations and quotations omitted; alterations omitted) (emphasis in original))

Accordingly, this Court must determine (1) whether Plaintiffs' § 502(a)(2) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; (2) whether Plaintiff's § 502(a)(3) claims are subject to arbitration, notwithstanding that Plaintiffs purport to bring these claims in a representative capacity; and (3) whether arbitration would impermissibly curtail Plaintiffs' statutory rights.

### a.    ERISA § 502(a)(2) Claim for Breach of Fiduciary Duty

The Amended Complaint's Third Cause of Action alleges that

> [t]he Compensation Committee is a fiduciary under the [Financial Advisor] Deferred Compensation Program because it is the administrator of the [Compensation Incentive Plan] and [Equity Incentive Plan] and is responsible for, among other things, reviewing and establishing the rules and procedures of the [Financial Advisor] Deferred Compensation Program, including the ability to determine that it is governed by ERISA.

> ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries.  ERISA § 1104, 29 U.S.C. § 1104(a).  Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA.  <u>Id.</u>

ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but **only if** the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA.

. . . .

Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 108-13, 117 (emphasis in original))

### i.  Applicable Law

ERISA § 502(a)(2), codified at 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section [409] of this title."

ERISA § 409, codified at 29 U.S.C. § 1109, in turn provides that

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . .

The "responsibilities, obligations, or duties imposed upon fiduciaries" are set out in ERISA § 404, codified at 29 U.S.C. § 1104, which provides in relevant part that fiduciaries must adhere to the "prudent man standard of care":

(a) Prudent man standard of care

(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

42

> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> >
> > (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> >
> > (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

29 U.S.C. § 1104(a).

Thus, "ERISA imposes 'four distinct, but interrelated duties' on fiduciaries, including the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to comply with the provisions of the plan." Anderson v. Advance Publications, Inc., No. 22 CIV. 6826 (AT), 2023 WL 3976411, at *2 (S.D.N.Y. June 13, 2023) (quoting Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715-16 (2d Cir. 2013)). "[T]these fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996).

The Supreme Court has explained that it was "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole. Indeed, the common interest shared by all four classes [of plaintiffs authorized to bring breach of fiduciary duty actions] is in the financial integrity of the plan." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 n.9 (1985); see also Browe v. CTC Corp., 15 F.4th 175, 205-06 (2d

Cir. 2021) ("[T]he remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary).").

Plaintiffs allege – and this Court agrees – that the deferred compensation programs at issue are "individual account plans." (Am. Cmplt. (Dkt. No. 58) § 68)  Under ERISA, "[t]he term 'individual account plan' or 'defined contribution plan' means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  ERISA § 3(34), codified at 29 U.S.C. § 1002(34); see Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008) ("A 401(k) plan is a common defined contribution plan.").[14]  In the context of a defined contribution plan, § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account," notwithstanding the tension between the individualized nature of each employee's pension and the representative nature of claims brought under § 502(a)(2). LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008).

In Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit held that "the representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." Coan, 457 F.3d at 259.  "[A]lthough plan participants need not always comply with Rule 23 to act as a representative of other plan participants or beneficiaries, those who do will likely be proceeding

---

[14]  By contrast, a "defined benefit plan" under ERISA "'conventional[ly] . . . credit[s] the employee with a specific percentage of salary for each year of employment.'"  Hirt, 533 F.3d at 104-05 (quoting Esden v. Bank of Bos., 229 F.3d 154, 158 n.4 (2d Cir. 2000)).

44

in a 'representative capacity' properly for purposes of section 502(a)(2)." Id. at 261 (footnote omitted).

ii.   **Application**

In arguing that the procedural safeguards applicable to representative claims under § 502(a)(2) preclude compelled arbitration of their claims, Plaintiffs must – of course – establish that they have actually asserted representative claims under § 502(a)(2).

As both Plaintiffs and Defendants recognize (Pltf. Opp. (Dkt. No. 72) at 21; Def. Reply Br. (Dkt. No. 69) at 9-10), "section 409 of ERISA, 29 U.S.C. § 1109, on which the section 502(a)(2) right of action is based, requires plan fiduciaries '"to make good to such plan any losses to the plan"' resulting from a breach of fiduciary duty." Coan, 457 F.3d at 259 (quoting Russell, 473 U.S. at 140) (in turn quoting ERISA § 409(a), 29 U.S.C. § 1109(a)) (emphasis added in Russell).

Here, the Amended Complaint seeks – pursuant to § 502(a)(2) – "the restoration of all deferred compensation that was illegally deemed forfeited by Defendants." (Am. Cmplt. (Dkt. No. 58) ¶ 117) This type of claim is not properly brought under § 502(a)(2), however, because it is not a claim for "losses to the plan."

While "ERISA does not define 'loss' as that term is used in section 409," Donovan v. Bierwirth, 754 F.2d 1049, 1052 (2d Cir. 1985), "its draftsmen were primarily concerned with the possible misuse of plan assets." Russell, 473 U.S. at 142. "[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." Id. at 140 n.8. Accordingly, the case law indicates that "loss" is defined with reference to investment losses or other financial diminutions of plan assets that are attributable to a fiduciary's mismanagement. See Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir.

2016) ("'If, but for the breach, the plan would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.'  Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the same period in proper transactions.'") (quoting Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989), and Donovan, 754 F.2d at 1056) (alteration omitted).  And while the Supreme Court in LaRue held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches" with respect to individual accounts, its holding is limited to "fiduciary breaches that impair the value of plan assets in . . . [such] account[s]."  LaRue, 552 U.S. at 256 (emphasis added).

Here, Plaintiffs have not alleged that the Compensation Committee – the alleged fiduciary – mismanaged plan assets or otherwise "impair[ed] [their] value" (LaRue, 552 U.S. at 256), such as by making imprudent or conflicted investment decisions, or by incurring unnecessary administrative costs.

Plaintiffs instead "seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants."  (Am. Cmplt. (Dkt. No. 58) ¶ 117)  Any such forfeited compensation, however, would be equivalent to "the balance of [each] individual's account" – which ERISA defines as an "accrued benefit" in an "individual account plan." ERISA § 3(23), codified at 29 U.S.C. § 1002(23).  The relief Plaintiffs seek in their § 502(a)(2) breach of fiduciary cause of action is thus redundant of their claim for benefits under § 502(a)(1), in which they seek to "recover their vested benefits [and] enforce their rights to the payment of their past vested benefits . . . after reformation [of the plan to comply with ERISA's anti-forfeiture rules]."  (Am. Cmplt. (Dkt. No. 58) ¶ 107; see Russell, 473 U.S. at 147 (explaining that ERISA provides for "an action pursuant to § 502(a)(1)(B) to recover accrued benefits").

46

In <u>L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.</u>, 710 F.3d 57 (2d Cir. 2013), the Second Circuit observed that "a 'claim for benefits' under ERISA § 502(a)(1)(B)" is by definition distinct from "a claim for recovery of 'losses to the plan' caused by the fiduciaries' breach of duties under ERISA §§ 502(a)(2) and 409(a)." <u>Id.</u> at 66. <u>L.I. Head Start</u> cites with approval Chief Justice Roberts' concurring opinion in <u>LaRue</u>, in which he states that "[i]f LaRue may bring his claim under § 502(a)(1)(B), it is not clear that he may do so under § 502(a)(2) as well. . . . The significance of the distinction between a § 502(a)(1)(B) claim and one under § 502(a)(2) is not merely a matter of picking the right provision to cite in the complaint. Allowing a § 502(a)(1)(B) action to be recast as one under § 502(a)(2) might permit plaintiffs to circumvent safeguards for plan administrators that have developed under § 502(a)(1)(B)." <u>LaRue</u>, 552 U.S. at 258 (Roberts, C.J., concurring).

Moreover, other circuits have cautioned that plaintiffs may not use artful pleading to bring what are, in reality, § 502(a)(1) claims, under § 502(a)(2). See <u>Stephens v. Pension Ben. Guar. Corp.</u>, 755 F.3d 959, 966 n.7 (D.C. Cir. 2014) ("[The] exception to the exhaustion requirement [for § 502(a)(2) claims] does not embrace plan-based claims artfully dressed in statutory clothing, such as where a plaintiff seeks to avoid the exhaustion requirement [of § 502(a)(1)] by recharacterizing a claim for benefits as a claim for breach of fiduciary duty.") (quotation omitted); <u>Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc.</u>, 102 F.3d 712, 714 (4th Cir. 1996) ("Although [plaintiff employer] directs our attention to sections 502(a)(2) and (a)(3), the analysis of who may recover benefits under ERISA must begin with section 502(a)(1)(B), the section which specifically provides a cause of action for benefits. [Plaintiff employer's] description of its claim as one for breach of [defendant] Blue Cross' fiduciary duty does not alter the fact that it is seeking medical benefits which it claims are owed

to [plaintiff's employee].  To permit the suit to proceed as a breach of fiduciary duty action

would encourage parties to avoid the implications of section 502(a)(1)(B) by artful pleading;

indeed <u>every</u> wrongful denial of benefits could be characterized as a breach of fiduciary duty

under [plaintiff's] theory.") (emphasis in original).

   The same reasoning applies here.  The Amended Complaint's Third Cause of

Action for breach of fiduciary duty is a disguised claim for benefits; while actually bringing a

claim under § 502(a)(1)(B), Plaintiffs invoke the procedural safeguards associated with a claim

under § 502(a)(2).  But because Plaintiffs have not alleged "losses to the plan," they are not, in

fact, proceeding in a representative capacity, and are therefore not entitled to the procedural

safeguards available under § 502(a)(2).

   In arguing that they have brought a § 502(a)(2) claim on behalf of the plans, and

therefore cannot be compelled to arbitrate, Plaintiffs cite <u>Cooper v. Ruane Cunniff & Goldfarb

Inc.</u>, 990 F.3d 173 (2d Cir. 2021), <u>Ferguson v. Ruane Cuniff & Goldfarb Inc.</u>, No. 17-CV-6685

(ALC), 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), <u>Hawkins v. Cintas Corp.</u>, 32 F.4th 625

(6th Cir. 2022), and <u>Munro v. U.S.C.</u>, 896 F.3d 1088 (9th Cir. 2018).  (Pltf. Opp. (Dkt. No. 72) at

16, 18)

   In <u>Cooper</u>, the Second Circuit reversed a district court order granting defendant's

motion to compel arbitration of an employee's breach of fiduciary duty claim.  That claim had

been brought on behalf of a class of plan participants regarding the "catastrophic over-allocation

of Plan assets" to a single company's stock.  The motion to compel arbitration was premised on

an arbitration provision in an employee handbook that (1) applied to "all legal claims arising out

of or relating to employment," and (2) "prohibit[ed] joinder of multiple parties and class or

collective actions."  <u>Cooper</u>, 990 F.3d at 177-78, 184.  While the Second Circuit disagreed with

the district court's interpretation of the phrase "relating to employment" and reversed on that basis (id. at 180-84), the Circuit went on to state in dicta that the defendant's "[broad] reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the Coan representative adequacy requirement." Id. at 184 (citing Coan, 457 F.3d at 261).

In Ferguson, the court applied the dicta in Cooper and, on that basis, rejected arbitration claimants' objections to certification of a settlement class regarding the same claims, made against the same third-party benefits administrator as in Cooper, even though the plan documents in Ferguson themselves – rather than an employee handbook – contained the arbitration provision. Ferguson, 2021 WL 3667979, at *3-4.

In Hawkins, plaintiff employees brought a putative class action, alleging that plan fiduciaries had breached the duty of loyalty and the duty of prudence by "offer[ing] participants the ability to invest only in actively managed funds, rather than more cost-effective passively managed funds[,] . . . [and by] charg[ing] the Plan imprudently expensive recordkeeping fees." Hawkins, 32 F.4th at 628. And in Munro, plaintiff employees, "as representatives of a class of participants and beneficiaries of the Plans," alleged that defendant plan administrators had "squandered [their negotiating] leverage by allowing the Plans' conflicted third party service providers – TIAA-CREF, Vanguard, Fidelity, and Prudential – to dictate the Plans' investment lineup, to link their recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products." Munro v. U.S.C., 16 Civ. 6191, Am. Cmplt. (Dkt. No. 40) ¶¶ 4-5 (C.D. Cal. Nov. 17, 2016). In these cases the Sixth and Ninth Circuits, respectively, held that plaintiffs could not be compelled to arbitrate based on arbitration provisions in their individual employment agreements, because

their breach of fiduciary claims "should be thought of as Plan claims, not [p]laintiffs' claims. And because the arbitration provisions only establish the [p]laintiffs' consent to arbitration, the employment agreements do not subject these claims to arbitration." Hawkins, 32 F.4th at 635; accord Munro, 896 F.3d at 1094.

These cases do not support Plaintiffs' arguments, because they involve significantly different factual circumstances. As described above, Cooper, Ferguson, Hawkins, and Munro all involve mismanagement of plan assets – i.e., straightforward "losses to the plan." Given these circumstances, plaintiffs properly raised claims under § 502(a)(2), and benefitted from the procedural safeguards available under that statutory provision. As discussed above, however, those procedural safeguards are not available to Plaintiffs, who have brought a disguised claim for recovery of benefits, rather than a true § 502(a)(2) claim. Cf. Stevenson v. Bank of New York Co., Inc., No. 06 CV 4268 (GBD), 2007 WL 9815654, at *5 (S.D.N.Y. Mar. 30, 2007) ("[a] court's . . . inquiry ultimately must focus on the factual nature of the claims rather than the . . . label that has been applied by the plaintiff") (quotation omitted).[15]

---

[15] Plaintiffs have also not alleged a "breach[] [of] any of the responsibilities, obligations, or duties imposed upon fiduciaries." ERISA § 409(a), codified at 29 U.S.C. § 1109(a). Although the Amended Complaint alleges that "[t]he Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the [Financial Advisor] Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the [financial advisors] who left Morgan Stanley their deferred compensation that should have been vested under ERISA" (Am. Cmplt. (Dkt. No. 58) ¶ 113), "'[t]rustees do not breach their fiduciary duties under ERISA simply by presiding over a plan which fails in some respect to conform to one of ERISA's myriad provisions, but rather, where the trustee fails to discharge one or more of the duties described in 29 U.S.C. § 1104.' 'The proposition that a trustee who administers a pension plan knowing it to be in violation of ERISA acts in violation of his fiduciary duties under ERISA, while perhaps facially attractive, is based on an overly broad reading of ERISA § 404(a), and comes to this court conspicuously unsupported by caselaw.'" Roe v. Empire Blue Cross Blue Shield, No. 12-CV-04788 NSR, 2014 WL 1760343, at *8 (S.D.N.Y. May 1, 2014) (quoting Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2005)) (alterations omitted), aff'd, 589 F.

---

Having failed to allege a true § 502(a)(2) claim, Plaintiffs will not be heard to complain that claims under § 502(a)(2) are non-arbitrable.

### b.   ERISA § 502(a)(3) Claims for Equitable Relief

ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3), provides that "[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Amended Complaint asserts § 502(a)(3) claims in the first and second causes of action.  In the First Cause of Action,

> Plaintiffs seek a declaration that the [Financial Advisor] Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).
>
> Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:
>
> a.   A declaration that the [Financial Advisor] Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;
>
> b.   An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;
>
> c.   Surcharge;
>
> d.   An "accounting" of all deferred compensation wrongfully withheld from [financial advisors] because of the Cancellation Rule;
>
> e.   Disgorgement of all amounts wrongfully withheld;

---

App'x 8 (2d Cir. 2014).  Plaintiffs' failure to identify any fiduciary duty that the Compensation Committee breached supports this Court's conclusion that they have not brought a true § 502(a)(2) claim.

f.  Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

g.  A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

h.  An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

i.  All other relief the Court determines is just and proper under its equitable powers.

(Am. Cmplt. (Dkt. No. 58) ¶¶ 98-101)

In the Second Cause of Action, Plaintiffs assert that they and the putative class "are entitled to reformation of the [Financial Advisor] Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a)." (Id. ¶ 105)  As discussed above, the requested reformation is a prelude to recovery of benefits from the reformed plan under § 502(a)(1).  (Id. ¶¶ 106-07)

Plaintiffs argue that they "assert claims in a representative capacity under ERISA § 502(a)(3)," and "[t]hese representative claims should not be litigated in individual arbitrations." (Pltf. Opp. (Dkt. No. 72) at 16-18)

The case law does not support Plaintiffs' assertion that (1) § 502(a)(3) claims must be brought on behalf of a plan, or (2) it is unlawful to compel individual arbitration of such claims.  To the contrary, the Supreme Court has held that – in contrast to § 502(a)(2) breach of fiduciary duty claims – "§ 502(a)(3) authorizes . . . lawsuit[s] for individual relief." Varity, 516 U.S. at 507.  And the case law indicates that plaintiffs who bring putative class actions alleging § 502(a)(3) claims may nevertheless be required to arbitrate their claims individually.  See Duke v. Luxottica U.S. Holdings Corp., No. 21-CV-06072 (JMA) (AYS), 2023 WL 6385389, at *10 (E.D.N.Y. Sept. 30, 2023) (granting motion to compel arbitration of § 502(a)(3) claims brought

by plaintiffs on behalf of a putative class; stating that "the concerns [regarding procedural safeguards for § 502(a)(2) claims] do not apply").

Plaintiffs cite no case demonstrating that § 502(a)(3) claims are non-arbitrable. At best, Plaintiffs have cited case law stating that § 502(a)(3) claims are not inherently limited to individual relief.  See Banyai v. Mazur, No. 00 CIV. 9806 (SHS), 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) ("[N]othing suggests that section 502(a)(3) authorizes only individual relief, thereby precluding suits seeking 'other appropriate equitable relief' – on behalf of the plan – against non-fiduciaries.") (emphasis in original).[16]

In sum, Plaintiffs have not demonstrated that their § 502(a)(3) claims are non-arbitrable.

### c.   Whether Arbitration Would Void Statutory Rights

The Supreme Court has held that courts cannot compel arbitration when enforcing an arbitration clause would entail a "prospective waiver of a party's right to pursue statutory remedies."  Italian Colors, 570 U.S. at 229 (quotation omitted).

Under the prospective waiver doctrine, courts have denied motions to compel arbitration where the arbitration provision at issue contains limitations on remedies that are inconsistent with ERISA.  See, e.g., Lloyd v. Argent Tr. Co., No. 22CV4129 (DLC), 2022 WL 17542071, at *3 (S.D.N.Y. Dec. 6, 2022) ("The Plan states that . . . arbitration cannot provide

---

[16]  Browe v. CTC Corp., 15 F.4th 175 (2d Cir. 2021) – also cited by Plaintiffs (Pltf. Opp. (Dkt. No. 72) at 17) – is not on point.  In Browe, the Second Circuit considered a district court post-bench trial opinion addressing, inter alia, § 502(a)(3) claims.  Browe, 15 F.4th at 188-89.  The court ordered the disbursement of an award on remand, and directed the district court to "include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled."  Id. at 206.  Plaintiffs contend that this direction is an example of a plan-wide application of § 502(a)(3) relief.  (Pltf. Opp. (Dkt. No. 72) at 17)  The portion of Browe cited by Plaintiffs does not address § 502(a)(3), however, and it is thus not clear that § 502(a)(3) was the statutory basis for the disbursement.  See Browe, 15 F.4th at 206.

'any remedy which has the purpose or effect of providing additional benefits or monetary relief to any other Employee, Participant, or Beneficiary other than the Claimant.' . . . This provision imposes a limitation on relief that ERISA does not contain, and precludes remedies that ERISA expressly authorizes, such as the removal of a fiduciary."); <u>Cedeno v. Argent Tr. Co.</u>, No. 20-CV-9987 (JGK), 2021 WL 5087898, at *2 (S.D.N.Y. Nov. 2, 2021) (same).

Prohibiting class treatment does not inherently limit statutory remedies, however, because class treatment is a procedural matter, and not a substantive right.  <u>See</u> <u>Smith v. Bd. of Directors of Triad Mfg.</u>, 13 F.4th 613, 622 (7th Cir. 2021) ("[T]he problem with the plan's arbitration provision is its prohibition on certain plan-wide remedies, not plan-wide representation.  It is not that the plan funnels its participants away from class actions."); <u>Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 408 (2010) (plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.  And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.").[17]

Here, Plaintiffs argue that, "if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA."  (Pltf. Opp. (Dkt. No. 72) at 21)  Plaintiffs have not

---

[17] To the extent that "the Second Circuit's opinion in <u>Cooper</u> indicates that the ability to bring a representative action is a 'statutory right' that an arbitration agreement cannot override," <u>Lloyd</u>, 2022 WL 17542071, at *4 (citing <u>Cooper</u>, 990 F.3d at 184), that is the result of <u>Coan</u>'s requirement – reiterated in <u>Cooper</u> – that in § 502(a)(2) cases "'plan participants must employ procedures to protect effectively the interests they purport to represent.'"  <u>Cooper</u>, 990 F.3d at 184 (quoting <u>Coan</u>, 457 F.3d at 259).  As explained above, <u>Coan</u>'s procedural requirements are not at issue here, because Plaintiffs have not brought a claim for "losses to the plan," as required by § 502(a)(2).  <u>See</u> <u>Duke</u>, 2023 WL 6385389, at *10 (holding that concerns regarding compelling arbitration of § 502(a)(2) claims do not apply in the § 502(a)(3) context).

identified any limitation on remedies that would apply in an arbitration, however, other than the

class waiver.  Moreover, the arbitration provisions in the Bonus Agreement and CARE Program

Arbitration Agreement provide that "[a]rbitrators are authorized to award any party the full

remedies that would be available to such party if the Covered Claim had been filed in a court of

competent jurisdiction."  (2015 Shafer Bonus Agmt. (Dkt. No. 67-2) § 7(g); see CARE Program

Arbitration Agmt. (Dkt. No. 68-5) § 5(d) (same))  Accordingly, Plaintiffs have not demonstrated

that the prospective waiver doctrine applies.

*       *       *       *

For the reasons stated above, Plaintiffs have not demonstrated that the instant

claims are outside the scope of the arbitration provisions to which they agreed.[18]

---

[18] Plaintiffs argue that "[i]ndividual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants."  (Pltf. Opp. (Dkt. No. 72) at 24)  But this argument is foreclosed by the Second Circuit's decision in Bird. See Bird, 926 F.2d at 122 ("We are not persuaded that the fact that federal common law is to be created and applied to ERISA disputes alleging breaches of fiduciary duties creates an inherent conflict with arbitration.").

55

## **CONCLUSION**

Defendants' motion to compel arbitration (Dkt. No. 65) is granted.  Because "the text, structure, and underlying policy of [Section 3 of] the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested," Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015), the case will be stayed pending arbitration.

The Clerk of Court is directed to terminate the motion (Dkt. No. 65).

Dated:  New York, New York
       November 21, 2023

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge