**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 25-1385**

———————————

KELLY MILLIGAN, on behalf of himself and all others similarly situated,

> Plaintiff - Appellant,

> v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; BANK OF
AMERICA CORPORATION,

> Defendants - Appellees,

and

JOHN/JANE DOE 1, the Senior Vice President-Human Resources Global Banking
and Global Wealth and Investment Management Administration at Bank of America
Corp.,

> Defendant.

------------------------------

SOCIETY FOR HUMAN RESOURCE MANAGEMENT; THE CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA; THE CENTER ON
EXECUTIVE COMPENSATION; THE AMERICAN BENEFITS COUNCIL; THE
ERISA INDUSTRY COMMITTEE; SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION,

> Amici Supporting Appellee.

———————————

Appeal from the United States District Court for the Western District of North Carolina, at
Charlotte.  Kenneth D. Bell, District Judge.  (3:24-cv-00440-KDB-DCK)

———————————

Argued:  January 29, 2026

Decided:  April 17, 2026

---

Before WILKINSON, WYNN, and BERNER, Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Berner joined. Judge Wilkinson wrote a concurring opinion.

---

**ARGUED:**  Mathew Paul Jasinski, MOTLEY RICE LLC, Hartford, Connecticut, for Appellant.  Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS, LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  John S. Edwards, Jr., AJAMIE LLP, Houston, Texas; Robert A. Izard, Jr., IZARD, KINDALL & RAABE, LLP, West Hartford, Connecticut; Riley Breakell, MOTLEY RICE LLC, Hartford, Connecticut, for Appellant.  Samuel S. Shaulson, Miami, Florida, Matthew A. Russell, Chicago, Illinois, Andrew R. Hellman, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellees.  Ian H. Morrison, Sam Schwartz-Fenwick, Jules A. Stevenson, SEYFARTH SHAW LLP, Chicago, Illinois, for Amicus Society for Human Resource Management.  Andrew J. Pincus, Archis A. Parasharami, Charles A. Rothfeld, Daniel E. Jones, MAYER BROWN LLP, Washington, D.C., for Amici the Chamber of Commerce of the United States of America, the Center on Executive Compensation, the American Benefits Council, and the ERISA Industry Committee.  Janet Galeria, Mariel A. Brookins, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus the Chamber of Commerce of the United States of America.  Ani Huang, CENTER ON EXECUTIVE COMPENSATION, Arlington, Virginia, for Amicus the Center on Executive Compensation.  Michael Delikat, Alyssa Barnard-Yanni, New York, New York, Robert M. Loeb, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., for Amicus the Securities Industry and Financial Markets Association.

---

2

WYNN, Circuit Judge:

This dispute asks whether an employer's incentive compensation program qualifies as an "employee pension benefit plan" under the Employee Retirement Income Security Act of 1974 ("ERISA").

ERISA defines an employee pension benefit plan as any compensation program that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). By contrast, bonuses paid for work performed do not qualify as payments under an employee pension benefit plan "unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c).

Regarding the program before us, the employer offered a lump-sum cash award to select high-performing employees conditioned on their remaining employed at the company for eight years. Although payment was delayed, the award remained a retention-based bonus tied to continued service. It did not provide retirement income, nor did it systematically defer compensation until employment termination.

Because the program did not qualify as an ERISA-defined employee pension benefit plan, it fell outside ERISA's coverage. Accordingly, we affirm the district court's order granting summary judgment to the employer.

3

I.

A.

Employers in every industry design employee compensation plans that incentivize productivity, discourage misconduct, and promote retention. Large financial services institutions implement particularly complex plans. These plans commonly feature performance-based compensation schemes that encourage employees to take risks to generate revenue along with extended compensation vesting schedules that discourage employees from engaging in short-termism and defecting to competitors.

Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), a wholly owned subsidiary of Bank of America, offers this type of multi-faceted compensation package to its Financial Advisors ("Advisors").[1] It annually distributes a Financial Advisor Incentive Plan ("Plan"), which contains its compensation policies and plans. Every Plan describes several compensation and incentive awards available to Advisors, including (1) a guaranteed monthly salary, (2) monthly incentive compensation, and (3) long-term contingent awards. The Plans indicate that "[an Advisor] has no vested or contractual rights to any non-base salary compensation described in [the Plans], the award and payment of which is always subject to management's sole discretion and local laws and regulations." S.J.A. 779.[2]

---

[1] We recite the facts in the light most favorable to Milligan, the non-moving party. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015) (en banc).

[2] Citations to the "J.A." and "S.J.A." refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

4

The monthly incentive compensation is calculated as a percentage of the Advisor's "production credits" using "cash grid rates" provided in the Plan. S.J.A. 779–80. An Advisor receives production credits for revenue generated from their clients. The cash grid establishes the percentage of the Advisor's production credits that they receive as monthly incentive compensation based on predetermined production-credit ranges. At year end, if the Advisor's actual production credits are less than the anticipated production-credit amount that was used to calculate their monthly incentive compensation throughout the year, then their final annual compensation is adjusted downward.

In addition to the monthly incentives, the Plan includes annual contingent awards. These are calculated "based on [production-credit] levels for the full performance year." S.J.A. 780. The annual contingent awards at issue here are called WealthChoice Awards, which are calculated as a percentage of the Advisor's production credits using a "long term productivity grid," as opposed to the "cash grid" used to calculate monthly incentive compensation. S.J.A. 779. Unlike monthly incentive compensation, Advisors must cross a minimum production threshold to qualify for WealthChoice Awards.

The WealthChoice Award program "provid[es] long-term contingent incentive compensation, subject to certain conditions, to a select group of Financial Advisors." J.A. 67. It is designed to "encourage the Financial Advisor to remain employed by the Company and its Subsidiaries and to further align the interests of the Financial Advisor with the Company's business objectives." *Id.* It accomplishes this goal "[b]y awarding a portion of a Financial Advisor's incentive compensation in the form of a cash award which becomes earned and payable over time." *Id.*

WealthChoice Awards are granted annually to Advisors who satisfy specific conditions. Subject to certain exceptions, an Advisor must "remain employed with Bank of America and its Subsidiaries through" the date that the WealthChoice Award "becomes earned and payable." S.J.A. 565. A WealthChoice Award generally does not become "earned and payable" until eight years after the Advisor was granted the Award. In addition, the Advisor must satisfy all "performance criteria" as "established periodically by the Administrator," who has "sole and exclusive discretion" to determine Advisor eligibility. J.A. 68.

When a WealthChoice Award is granted, a notional account is created. The notional account does not contain any funds. Instead, the Advisor selects a mutual fund or other investment that serves as a benchmark, and the notional account mirrors this benchmark's value.

The Advisor also signs an Award Agreement. The Award Agreement "represents an unsecured, unfunded, contingent promise" to pay the value of the notional account "after the Vesting Date." S.J.A. 561. The Plans notify Advisors that "no awards are earned or paid until fully vested in accordance with the terms and conditions of each award." S.J.A. 785. After vesting, the Advisor is paid "as soon a[s] practicable . . . but in no event later than 2 ½ months following such Vesting Date." J.A. 72. Advisors cannot defer the payment of their WealthChoice Award once it vests.

Typically, when an Advisor's employment ends, any notional account associated with an unvested WealthChoice Award is canceled. But the cancellation is not always automatic. The nature of an Advisor's departure determines if and when a WealthChoice

6

Award vests. If the Advisor dies while still employed, the Awards are "immediately earned and payable." S.J.A. 565. If the Advisor departs due to workforce reduction, divestiture, or disability, the Awards "shall continue to become earned and payable" according to the original vesting schedule if the Advisor complies with certain terms (e.g., non-solicitation obligations). *Id.* If the Advisor is terminated within two years of a change in control of Merrill Lynch, the Awards are "immediately earned as of the date of such" termination. S.J.A. 566. Finally, if the Advisor retires and complies with non-competition and other obligations, the Awards are earned and payable in two installments: first, after the end of the retirement year and second, at the end of the following year.

B.

Kelly Milligan worked as an Advisor for Merrill Lynch from 2000 to 2021. During his tenure, Milligan was granted and earned several WealthChoice Awards. In 2021, he voluntarily resigned to cofound a competitor investment firm. In accordance with WealthChoice Award program policies, his voluntary resignation canceled the unvested Awards that he'd been granted but had not yet earned.

Disappointed by the cancellation of his WealthChoice Awards, Milligan filed a putative class-action complaint alleging that the WealthChoice Award plan qualifies as an "employee pension benefit plan" under ERISA. J.A. 14–34. Milligan alleged that the WealthChoice Award program violated ERISA's vesting and anti-forfeiture requirements. He further alleged that the plan administrator breached her fiduciary duty in implementing the plan and sought declaratory relief and reformation of the plan.

7

Merrill Lynch moved for summary judgment, arguing that the WealthChoice Award program is not an ERISA-covered plan. The district court granted Merrill Lynch's motion for summary judgment, and Milligan timely appealed.

## II.

We review an order granting summary judgment de novo. *Boyer-Liberto*, 786 F.3d at 276.

## A.

To state a claim under ERISA, a plaintiff must show that the challenged compensation scheme is an employee pension benefit plan governed by ERISA. *Fraver v. N.C. Farm Bureau Mut. Ins. Co.*, 801 F.2d 675, 677 (4th Cir. 1986). ERISA defines an employee pension benefit plan as

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

Congress has authorized the Department of Labor to "define accounting, technical, and trade terms used in [the statute]." 29 U.S.C. § 1135. Pursuant to that delegated

8

authority, the Department of Labor promulgated 29 C.F.R. § 2510.3-2(c), which provides that

> the terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

Additionally, *Black's Law Dictionary* defines a "bonus" as a "premium paid in addition to what is due or expected; esp., a payment by way of division of a business's profits, given over and above normal compensation." *Bonus*, Black's Law Dictionary (12th ed. 2024).

The district court granted Merrill Lynch's motion for summary judgment in part because it concluded that the Plan qualifies as a "bonus plan exempt from ERISA." *Milligan v. Bank of Am. Corp.*, No. 3:24-cv-440, 2025 WL 892972, at *6 (W.D.N.C. Mar. 11, 2025). We affirm on that basis.

### B.

Milligan argues that this Court should disregard the Department of Labor's bonus-program regulation because "it is inconsistent with the clear statutory language of ERISA," Opening Br. at 50, and "the Secretary of Labor has no authority to exempt plans from ERISA if those plans fall within the statute's definition of a pension plan," Reply Br. at 27. He rests this argument on a faulty application of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

In *Loper Bright*, the Supreme Court delineated the process courts must follow when interpreting statutes that "delegate[] discretionary authority to an agency." 603 U.S. at 395.

9

First, courts are required to "recognize[] constitutional delegations." *Id.* Next, courts must "fix[] the boundaries of [the] delegated authority." *Id.* Finally, courts must "ensure[] the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

Here, Congress clearly delegated discretionary authority to the Secretary of Labor. Under 29 U.S.C. § 1135, "the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter," including the provision of ERISA at issue here, § 1002.

Congress also properly fixed the boundaries of that delegation. As *Loper Bright* recognized, Congress does not offend the Constitution when it "leaves agencies with flexibility" to promulgate regulations as "appropriate," or delegates to agencies the authority to define "a particular statutory term" or to "fill up the details of a statutory scheme." 603 U.S. at 394–95 (cleaned up). Here, the delegating statute authorizes the Secretary to "prescribe such regulations as he finds necessary or appropriate." 29 U.S.C. § 1135. And the statute specifically authorizes the Secretary to "define accounting, technical and trade terms" that are used in ERISA. *Id.*

Pursuant to this general discretionary authority, and the specific authority to define "trade terms," the Secretary promulgated 29 C.F.R. § 2510.3-2(a), which "clarifies the limits of the defined term[] 'employee pension benefit plan,'" and § 2510.3-2(c), which excludes bonus programs from that definition. Although Congress did not define "trade terms," the term "employee pension benefit plan" is a "phrase belonging to the specialist vocabulary of a particular trade or industry." *Trade term (n.)*, Oxford English Dictionary,

https://www.oed.com/dictionary/trade-term_n [https://perma.cc/4DV9-HLBM]. Thus, the Secretary did not trespass beyond the boundaries of its broad and lawfully delegated authority by clarifying the definition of "employee pension benefit plan."

We are also satisfied that the Secretary "engaged in reasoned decisionmaking" when it excluded certain bonus-payment plans from the definition of an employee pension benefit plan because it promulgated the regulation in response to inquiries contemporaneous with the statute, and the regulation accords with the purpose of ERISA. *Loper Bright*, 603 U.S. at 395 (cleaned up); *see United States v. Kokinda*, 146 F.4th 405, 417–18 (4th Cir. 2025) (considering Congress's purpose in enacting the Sex Offender Registration and Notification Act when determining whether the Attorney General's interpretation of a term in the statute evinced reasoned decisionmaking under *Loper Bright*).

First, we find "especially useful" the "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time." *Loper Bright*, 603 U.S. at 394. The Department of Labor promulgated the relevant regulation less than one year after Congress passed ERISA, and the relevant portion of the regulation has remained unchanged ever since.

Five years after the Department of Labor implemented the bonus-program regulation, Congress amended the section of ERISA at issue here but did not subvert the regulation, Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, § 409, 94 Stat. 1208, 1307 (codified as amended at 29 U.S.C. § 1002(2)(B)), giving us some evidence that the regulation comported with Congress's intended definition of an

11

employee pension benefit plan, *see CFTC v. Schor*, 478 U.S. 833, 846 (1986) ("It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75 (1974))). And in the ensuing five decades, Congress still has not disturbed the bonus-program regulation.

Second, the bonus-program regulation came in response to concerns raised immediately after ERISA was passed and reflected careful consideration by the Department of Labor. In promulgating the regulation in 1975—the year after ERISA was enacted—the Department explained that it had "received numerous inquiries relating to the coverage under Title I of [ERISA] of various types of practices of employers with respect to employees and arrangements between employers and employees." Employee Retirement Income Security Act of 1974, 40 Fed. Reg. 24642, 24642 (Jun. 9, 1975). After analyzing numerous practices and programs, the Department clarified that bonus programs do not qualify as welfare plans but do constitute pension plans when "payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees, or both." *Id.*

Finally, the regulation's bonus-program exclusion comports with ERISA's purpose because bonus programs do not create the risk that retirees will be left in financial precarity if the employer defaults on payment—the threat that troubled Congress. As the Supreme Court has explained, Congress enacted ERISA "to ensure that employees [would] not be

12

left emptyhanded once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996); *see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (explaining one of Congress's "principal purposes" in enacting ERISA "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans"). To that end, Congress passed ERISA to ensure that "if a worker has been promised a defined pension benefit upon retirement— and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Pension Benefit Guar. Corp.*, 467 U.S. at 720 (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980)). But a bonus is a "premium paid in addition to what is due or expected," not a guaranteed benefit that employees reasonably forecast to be retirement income. *Bonus*, Black's Law Dictionary (12th ed. 2024).

For these reasons, the Department of Labor acted within its authority when it promulgated the regulations at issue here. We therefore proceed to analyze how they apply to the WealthChoice Award program.

## C.

Our peer circuits have consistently held that plans similar to the WealthChoice Award program are bonus payment plans under 29 C.F.R. § 2510.3-2(c). For example, in *Emmenegger v. Bull Moose Tube Co.*, the Eighth Circuit considered whether a phantom stock plan that granted seven key members of the company the right to redeem phantom stock at various times in the future was an employee pension benefit plan. 197 F.3d 929

13

(8th Cir. 1999). In holding that the plan was an excepted bonus program, the court noted that the plan's purpose was to incentivize performance and improve retention, that it reflected a "classic 'bonus' situation" because the plan was given to managers whose superior performance would increase the value of the stock they were granted, and that after the five-year vesting period the managers were able to redeem the stock "at any time." *Id.* at 933 (emphasis omitted); *see id.* at 932.

Similarly, in *McKinsey v. Sentry Insurance*, the Tenth Circuit considered whether the employer's "Golden Career Bonus Plan" was an employee pension benefit plan. 986 F.2d 401, 403 (10th Cir. 1993). The plan granted sales representatives "bonus allocations based on their sales of insurance." *Id.* at 405. The company described the plan "as a deferred compensation plan" designed to incentivize performance and reward longevity. *Id.* at 406. Rights to the bonus allocations vested over the course of seven years, and employees could withdraw the allocations at any time after they vested. *Id.* Employees could elect to have their vested bonus allocations paid when their employment with the company ended or even incrementally post-retirement. *Id.* Non-vested allocations were canceled in the event of termination. *Id.* The Tenth Circuit held that the program was not an employee pension benefit program because employees could withdraw the funds at any time after they vested and thus payments under the program were not systematically deferred as contemplated by the bonus payment plan regulation. *Id.*

Conversely, the Fifth Circuit ruled in *Tolbert v. RBC Capital Markets Corp.* that the employer's "wealth accumulation plan" was an employee pension benefit plan. 758 F.3d 619, 621 (5th Cir. 2014). The plan documents described it as "a nonqualified, deferred

compensation plan." *Id.* at 622. Under the plan, employees were required to defer some of their compensation and were given the option to voluntarily defer more. *Id.* Specifically, employees could "defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." *Id.* Compensation deferred voluntarily vested immediately, whereas compensation deferred by company mandate vested "later, on dates determined by [a] Committee." *Id.* Participating employees could elect to have their vested compensation distributed either during their employment, upon separation from employment, or—if they satisfied the retirement requirements—in "substantially equal annual installments for up to ten years." *Id.* The court reasoned that the plan was an employee pension benefit plan because it required employees to "forego[] income . . . in exchange for receiving income" at a later date—including upon separation and after retirement. *Id.* at 625–26 (citing *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011)).

Having surveyed the case law of our peer circuits, we find the following non-exhaustive list of factors useful to consider when determining whether a plan is a bonus payment plan: (1) whether the plan contemplates universal employee participation or imposes heightened eligibility requirements, (2) whether the plan is funded with money that would otherwise be immediately payable to the employee, (3) whether the plan is actually funded or involves phantom investments, (4) whether employees can unilaterally postpone payments until termination or beyond, (5) whether the plan is presented as a vehicle for obtaining retirement income, and (6) whether firm performance impacts plan payments. Of course, not every listed factor must be present in every case, and some factors not listed here may prove important in future cases. Our holding here is simply that courts

15

may find these factors useful when considering whether a particular program is a bonus payment plan.

We now proceed to considering how these factors apply in this case.

D.

We are convinced that the WealthChoice Award program ("Program") comfortably qualifies as a bonus payment plan.

First, the Program has heightened eligibility requirements. Unlike monthly incentive compensation, only high-performing Advisors who generate more than a predetermined minimum amount of revenue for the company qualify.

Second, the revenue threshold is only a necessary, not a sufficient, condition to earn WealthChoice Awards. Employees only earn the award if they remain continuously employed through the vesting date. Therefore, the Program is not funded with money that employees would otherwise be immediately entitled to receive.

Third, the Program does not set aside any employee income. Instead, when an Advisor is granted a WealthChoice Award, an "unfunded" notional account is created whose value is indexed to a reference investment. S.J.A. 561. The notional account is "unsecured" and represents a "contingent promise" to pay its hypothetical value once the Advisor satisfies the other Program requirements. *Id.* Thus, the Plan does not defer an Advisor's income. Instead, it is carefully devised to further two management objectives: increasing employee retention and maximizing employee productivity. The Plan includes a temporal condition to incentivize retention and a minimum revenue requirement to incentivize productivity. And the Plan further incentivizes productivity by calculating the

16

initial value of the notional account as a percentage of the revenue the Advisor brought into the firm in the prior year. The Plan's use of the Advisor's productivity for the prior year to calculate the initial value of the notional account does not prove that the account is funded with the Advisor's deferred income—rather, it is simply Merrill Lynch's strategy to incentivize higher productivity by connecting the value of the WealthChoice Award to the Advisor's performance.[3]

Fourth, Advisors cannot choose to have their WealthChoice Award payments disbursed at termination or during retirement—vesting triggers automatic and mandatory payment. Generally, the awards are paid out during employment. In fact, the parties agree that approximately 92% of the Advisors who were paid WealthChoice Awards between 2018 and 2024 were current employees. Where, as here, only 8% of payments occur at or after termination, they cannot be said to be "systematically deferred to the termination of covered employment or beyond."[4] 29 C.F.R. § 2510.3-2(c).

---

[3] Milligan's arguments notwithstanding, we perceive no principled reason why a bonus payment can't be calculated based on the revenue an employee brings into the firm. *See* DOL Advisory Op. 2025-03A, 2025 WL 2642870, at *5–6 (Sept. 9, 2025) (stating that "[t]he Department [of Labor] has applied the 'bonus program' regulation to programs that calculate bonuses in diverse ways, including an incentive plan that calculates bonus as a percentage of revenue generated by the participants").

[4] The Department of Labor has offered guidance that is useful in understanding what might constitute the systematic deferral of income until the termination of employment or retirement age. *See, e.g.*, DOL Advisory Op. 98-02A, 1998 WL 103654 (Mar. 6, 1998). The Department of Labor offered as examples a plan that allocates the "economic benefits earned in a year disproportionately to retirees and participants reaching retirement age as defined under the Plan," a situation where "an inordinate percentage of the bonus recipients [are] at one time at or nearly at retirement age," and a plan where "payments [are not] made under the plan often enough or within a reasonable time to avoid their actually serving as retirement income." *Id.* at *2. It further cautioned that "if the plan is communicated to

17

Fifth, employees are explicitly told that the purpose of the Program is "to encourage" Advisors "to remain employed by the Company and its Subsidiaries," and there is no evidence that it is otherwise promoted as a pension plan. J.A. 67.

Finally, the amount of an Advisor's WealthChoice Award is determined by that Advisor's contribution to firm revenue, which is at least somewhat correlated with the firm's overall performance, another feature common to bonus plans.

Accordingly, we agree with the district court that the WealthChoice Awards program qualifies as an excepted bonus payment program and is not an employee pension benefit plan.

### III.

For the foregoing reasons, we affirm the district court's order granting summary judgment to Merrill Lynch because the WealthChoice Awards program does not fall within the protections of ERISA.

*AFFIRMED*

---

participants in a manner that causes them to act under the Plan so as to result in their deferring receipt of income until retirement, it may be deemed a pension plan." *Id.* This persuasive guidance bolsters the conclusion that the WealthChoice Award program is a bonus payment plan that does not systematically defer income.

18

WILKINSON, Circuit Judge, concurring:

I concur in my good colleague Judge Wynn's opinion holding that Merrill Lynch's WealthChoice Contingent Award Plan ("WealthChoice") constitutes a bonus plan exempt from ERISA under 29 C.F.R. § 2510.3-2(c). Such a path carefully balances the need to protect against efforts to circumvent ERISA's protections on retirement-like income while preserving businesses' flexibility in rewarding employee loyalty and performance. I write separately to emphasize that any other conclusion would generate an avalanche of deleterious consequences. The statute as written does not justify any such result.

## I.

Milligan would have us ignore the bonus-plan regulation and hold that the WealthChoice plan constitutes a "pension plan." In relevant part, ERISA defines a covered "pension plan" as

> any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances . . .
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

Milligan claims that the WealthChoice plan falls under Subsection (ii) because the terms of the plan necessarily "result[] in a deferral of income" "beyond" "the termination

19

of covered employment." *Id.* Specifically, while WealthChoice awards typically vest on an eight-year schedule, and unvested awards are generally canceled upon the termination of employment, Merrill Lynch makes exceptions, including for retired, disabled, and deceased employees. These individuals may continue to receive award payments after covered employment ceases, subject to accelerated vesting schedules and some additional conditions. J.A. 565–68. In Milligan's mind, these post-termination payments to excepted groups are sufficient to trigger Subsection (ii).

Milligan presents the statutory definition of a "pension plan" as an easy question resolved simply by pointing to the most common definition of "results in." But divining § 1002(2)(A)'s meaning is far from a rote task. Indeed, for whatever reason, our sister circuits have largely agreed upon an approach contrary to Milligan's interpretation. *See Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575–76 (5th Cir. 1980); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933–34 (8th Cir. 1999); *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 188–89 (3d Cir. 2003); *Rich v. Shrader*, 823 F.3d 1205, 1210–11 (9th Cir. 2016). *But see Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 434–45 (6th Cir. 2019). My point today is not to advance a definitive construction of the statute, but to emphasize that Milligan's interpretation is anything but a slam dunk. Rather, it invites chaos which the courts in the absence of congressional clarity may not sanction.

Indeed, by oversimplifying the statutory question, Milligan reaches a reductive and destabilizing interpretation of § 1002(2)(A)(ii). He asks only one question and it is the wrong one: does the plan at issue generate even a single post-termination payment? Such an interpretation would treat every compensation scheme as a pension plan subject to

20

ERISA so long as it results in *any* deferral of income to a period extending beyond a person's employment. Milligan ignores the number of post-termination payments made, the value of those payments, the purpose of those payments, the ratio of pre-termination to post-termination payments, and the length of the deferment. In effect, a single incidental, or perhaps even accidental, deferral of income would create an ERISA pension plan. And thus, we would suddenly find ERISA plans where every previous mind sensibly agreed there were none.

Consider, for instance, that many Americans do not receive income immediately when they finish their workday. Employers usually defer issuing paychecks until the end of a weekly, biweekly, or monthly pay period or beyond. When an employee dies, retires, or is otherwise terminated, he will often receive his final paycheck after his employment has ceased. Should this final, anomalous post-termination payment trigger ERISA coverage? Must employers pay all employees a final paycheck *before* employment ceases to avoid converting normal payroll practices into ERISA pension plans (assuming this is even practically achievable)? Can even the stray deferred penny now suffice to trigger Subsection (ii)?

According to Milligan's logic, the only answer must be an unequivocal "yes." But that ignores the profound repercussions that would follow from this vast expansion of ERISA's scope. There would be an explosion in the number of compensation schemes subject to ERISA given their newfound status as "pension plans." Designating a payment practice a "pension plan" under ERISA is no trifling affair. ERISA imposes strict disclosure and reporting regimes, vesting schedules, fiduciary duties—the list goes on.

21

*E.g.*, 29 U.S.C. §§ 1021, 1023, 1053, 1104. Failure to comply with these responsibilities can lead to both civil liability and criminal penalties for plan administrators, including personal liability for some fiduciaries. *Id.* §§ 1109, 1131, 1132.

Thus, if we adopted Milligan's view, organizations employing payment systems they reasonably believed rewarded employee productivity and loyalty would suddenly need to devote significant resources to amending those plans. They might also become suddenly liable for countless ERISA violations. Notably, some civil penalties under ERISA can accrue every day the violation continues and for every employee, amounting to an unthinkable sum for those businesses that inadvertently violated ERISA for years on end. *See, e.g.*, *id.* § 1132(c). And all of this ignores possible downstream consequences if employers categorically eliminate post-termination award payments to avoid ERISA coverage: removal of humanitarian exceptions for retirees, disabled employees, and the families of deceased employees. *See* J.A. 845. The irony is thus that Milligan's view may harm some of the exact individuals ERISA and the bonus regulation intended to protect.

A number of amicus briefs extensively expound upon the consequences that would flow from reversing the district court. U.S. Chamber of Com. et al. Amicus Br. at 12–21 ("[T]he harmful consequences of this increase in costs would not be limited to employers. Businesses would pass these costs on to customers in the form of higher prices or less attractive service offerings, and to employees in the form of reduced compensation."); Sec. Indus. & Fin. Mkts. Ass'n Amicus Br. at 3–15 ("[C]hanges [to conform with Milligan's interpretation] will harm not just the systemic health of the financial sector, but executives and employees themselves." (citation omitted)); Soc'y for Hum. Res. Mgmt. Amicus Br.

at 19–25 ("SHRM anticipates that its members could be facing significant costs in further liability associated with transforming how they run incentive programs and in potential exposure for past plan administration outside the scope of ERISA."). While I would not embrace all the specific arguments and statistics advanced by the amici, their general point of massive dislocation is uncontestable.

## II.

To be sure, Congress may object to the view that ERISA does not cover compensation programs like the WealthChoice plan. Such disagreement is the legislative branch's prerogative. *See, e.g.*, *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313 (1994); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818 n.5 (1985). My unease with the implications of Milligan's view reflects a concern with legislative clarity, not legislative authority. That Congress could adopt Milligan's position and thereby sanction the significant consequences discussed herein remains incontrovertibly true. Indeed, what a court may declare in one breath extreme, Congress may clarify is perfectly acceptable in the next, provided the legislature's enumerated powers allow it.

But we do not simply presume that Congress intended to invite widespread tumult in the absence of clear signals to that effect. The Supreme Court has repeatedly instructed that non-legislative actors should not initiate great social and economic change while Congress remains silent—a principle now encapsulated most prominently in the Major Questions Doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2613–14 (2022). I am cognizant that the Major Questions Doctrine applies most readily to executive agencies;

23

however, the doctrine merely represents one manifestation of historical precepts with a much broader reach. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378–81 (2023) (Barrett, J., concurring) (discussing how the Major Questions Doctrine is a reformulation of longstanding and common-sense contextual considerations). The Court's jurisprudence has, in a variety of contexts, long embraced the necessity of congressional clarity. One need only look to the number of clear-statement rules in effect. *See generally, e.g.*, Note, *Clear Statement Rules, Federalism, and Congressional Regulation of States*, 107 HARV. L. REV. 1959 (1994). Such focus on clarity serves to preserve the Constitution's careful balance of powers by restraining the executive and judicial branches from intruding upon legislative authority.

Where the law does not require it, courts may not take upon themselves the hubristic task of reorganizing socioeconomic affairs. Judges are not arbiters of wise policymaking; we serve merely to discern and ensure fidelity to Congress' legitimate policy choices. Stability is a virtue not foreign to a judicial hand. Reform is a force best bearing a democratic imprimatur, which we lack. Congress has not acted here with sufficient clarity for us to green-light a sea change in basic financial practice. ERISA and the bonus regulation were adopted more than fifty years ago. Since then, the legislative branch has not found it necessary to adopt Milligan's position or to change the bonus regulation. *See* 40 Fed. Reg. 34526, 34532 (Aug. 15, 1975); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024) (indicating that agency regulations "issued roughly contemporaneously with enactment of the statute and [which] remain[] consistent over time" may have some persuasive effect).

25

Perhaps existing practice will continue, but perhaps not. Until such time as Congress makes its will known, we are left to exercise restraint and find a path that respects the legislative process and prevents unwarranted disruption. That path is affirmance of the district court.